IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION RECEIVED

2006 DEC 20  P 1: 12

DEBRA P. HACKETT, CLK.
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA.

GARY HORNE, AIS #180206,       )
                               )
        Petitioner,            )
                               )
VS.                            )  CIVIL ACTION NO.
                               )  1:06-CV-968-WKW
                               )
GWENDLYN MOSLEY, et al.,       )
                               )
        Respondents.           )

**RESPONDENTS' ANSWER TO COURT'S
ORDER TO SHOW CAUSE**

Come now Respondents, by and through the Attorney General of the State of

Alabama, and file their response to this Court's Order to Show Cause dated

October 30, 2006, giving the Respondents until November 20, 2006 in which to

file a response to the Petition for Writ of Habeas Corpus filed by the Petitioner,

Gary Horne.  In response, Respondents file the following answer, memorandum

brief, and exhibits.

**PROCEDURAL HISTORY**

1.      On March 3, 2004, the petitioner, Gary Horne, was indicted by the

Dale County Grand Jury for attempted murder by shooting John Williams with a

handgun.  State's Exhibit A (C. 34-35)  On September 3, 2004, Horne moved to

dismiss the charges against him, arguing that the State had lost evidence that was

"crucial to the defense."  State's Exhibit A (C. 95-97; RS2. 2)[1]  Specifically, Horne

argued that the State had lost a bullet which was "strongly believed" to have been

shot from a gun allegedly sold by the victim, John Williams, shortly after the

actions serving as the basis for the prosecution against Horne were committed.

State's Exhibit A (C. 95; RS2. 2-12, 16)  Horne also argued that photographs taken

of the scene were unavailable.  State's Exhibit A (C. 96; RS2. 13-15)  Judge

McLauchlin denied Horne's motion to dismiss on December 16, 2004.  State's

Exhibit A (C. 2)

Horne was tried before a jury, beginning on May 16, 2005.  State's Exhibit

A (R. 1-111)  On May 18, 2005, the jury found Horne guilty of the lesser included

offense of assault in the second degree.  State's Exhibit A (C. 2)  On July 14, 2005,

Judge McLauchlin sentenced Horne according to the Habitual Felony Offender Act

("HFOA") based upon two prior felonies to twenty-two years' imprisonment.

State's Exhibit A (C. 2; R. 123-124)  At the sentencing hearing, Horne, through his

attorney, objected to the State's alleged failure to give sufficient notice of the two

prior felonies used to enhance his sentence.  State's Exhibit A (R. 112-114)  Judge

---

[1] References to the hearing on Horne's motion to dismiss, contained in the "Second
Supplemental" record on appeal, are designated by "RS2".

McLauchlin ruled that the State had given sufficient notice of the two felonies.

State's Exhibit A (R. 114)  Horne filed a motion for new trial on July 28, 2005,

which Judge McLauchlin denied after a hearing on August 19, 2005.  State's

Exhibit A (C. 8-9; R. 125-142)

       2.    Horne directly appealed his conviction, arguing:

> (a) the State failed to produce potentially exculpatory evidence
> in violation of Brady v. Maryland, 373 U.S. 83 (1963);

> (b) his sentence was illegally enhanced under the Habitual
> Felony Offender Act ("HFOA") because the State allegedly
> failed to provide proper notice of the prior felonies it intended
> to use for enhancement purposes.

State's Exhibit B.

       3.    The Alabama Court of Criminal Appeals affirmed Horne's conviction

in an unpublished memorandum issued on August 11, 2006.  State's Exhibit E.

The court found:

> (a) Under Arizona v. Youngblood, 488 U.S. 51 (1988), Horne
> was not entitled to any relief due to the State's inadvertent loss
> of evidence when the State did not seek to introduce such
> evidence in its case-in-chief;

> (b) Horne's argument that he did not receive proper notice
> under the HFOA was without merit because the record
> supported the trial court's conclusion that Horne received
> timely oral notice of the prior felonies used to enhance his
> sentence.

State's Exhibit E. The Court of Criminal Appeals overruled Horne's application

for rehearing on September 1, 2006. State's Exhibits F and G. The Alabama

Supreme Court denied Horne's petition for writ of certiorari and issued its

certificate of judgment on December 9, 2005. State's Exhibit H and I. Horne has

not filed any petitions for post-conviction relief in State court or any previous

federal habeas petitions attacking the conviction at issue in this petition.


## HORNE'S FEDERAL HABEAS CLAIMS

4. On October 25, 2006, Horne filed a writ of habeas corpus petition raising

the following claims:

> (A)   The State violated Brady v. Maryland, 373 U.S. 83
> (1963), by withholding potentially exculpatory evidence;
> and
>
> (B)   The Court of Criminal Appeals improperly found that he
> received oral notice of the prior felonies used to enhance
> his sentence under the HFOA because plea discussions
> may not be used as evidence in other criminal
> proceedings.

Petition, p. 5.

5. On October 30, 2006, this Court entered an order requiring Respondents

to show cause why Horne's habeas corpus petition should not be granted, giving

the Respondents until November 20, 2006 in which to respond.

4

6. On November 20, 2006, this Court granted the Respondents 21 days in which to file its response. After Horne filed a motion to amend his petition on November 29, 2006, this Court granted the Respondents until December 21, 2006 in which to respond to his petition as amended.

## ANSWER TO THE PETITION

7. Horne's federal habeas corpus petition is timely under the one-year statute of limitation provision of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).

8. Horne's federal habeas corpus petition is due to be denied because his claims are without merit.

9. Respondents deny Horne is in custody in violation of the laws or constitution of the United States. Horne's conviction and sentence were validly and constitutionally obtained.

## MEMORANDUM BRIEF IN SUPPORT OF ANSWER

10. Horne's claim that the State violated <u>Brady</u> by withholding potentially exculpatory evidence is due to be denied because he has failed to show that the state courts resolved this claim in a manner contrary to or involving an unreasonable application of federal law as established by United States Supreme

5

Court precedent.  Petition, p. 5, Ground A.  Title 28 U.S.C. Section 2254(d)

provides for the standard under which a federal habeas court should review a state

court's application of federal law:

> (d)  An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted
> with respect to any claim that was adjudicated on the merits in State
> court proceedings unless the adjudication of the claim--
>
>> (1) resulted in a decision that was contrary to, or involved an
>> unreasonable application of, clearly established Federal law, as
>> determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable
>> determination of the facts in light of the evidence presented in
>> the State court proceeding.

The United States Supreme Court stated in Wiggins v. Smith, 539 U.S. 510, 520-

21 (2003):

> In order for a federal court to find a state court's application of our
> precedent "unreasonable," the state court's decision must have been
> more than incorrect or erroneous.  See *Lockyer, supra,* at ----, 123
> S.Ct. 1166 (slip op., at 11).  The state court's application must have
> been "objectively unreasonable."  See *Williams v. Taylor, supra,* at
> 409, 120 S.Ct. 1495.

11.    Horne's argument that the State committed a Brady violation did not

involve any application of United States Supreme Court precedent.  The Court of

Criminal Appeals held that Horne's "Brady" claim was governed by Arizona v.

Youngblood,  488 U.S. 51 (1988), rather than by Brady.  State's Exhibit E, p. 4.

In Youngblood, 488 U.S. at 55-58 (1988), the United States Supreme Court

distinguished the <u>Brady</u> situation from cases in which evidence had been lost or destroyed before the exculpatory value of such evidence could be determined. While the <u>Youngblood</u> majority acknowledged that the good or bad faith of the State was irrelevant when the State failed to disclose evidence that had been determined to have been material and exculpatory, it emphasized that a different standard should apply when the State failed "to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." <u>Id.</u> at 57. As the Court, quoting <u>California v. Trombetta</u>, 467 U.S. 479, 486 (1984), explained, "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." For this reason, the Court held that the State was not required to preserve all material that had any "conceivable evidentiary significance" and that a defendant alleging that his due process rights had been violated because of lost evidence that was potentially exculpatory had to show that the police acted in bad faith. <u>Youngblood</u>, 488 U.S. at 58.

Because the State did not try to introduce at trial any of the evidence Horne claims to be potentially exculpatory, the Court of Criminal Appeals properly determined that <u>Youngblood</u> governed in this case. Its determination that Horne failed to meet the <u>Youngblood</u> standard was proper because, as Horne himself

7

conceded on direct appeal, the State's loss of the potential evidence did not involve

any bad faith. See State's Exhibit B, pp. 16-17 (Horne admitted in his brief on

direct appeal, "While the loss of the potentially exculpatory evidence seems in this

instance to be truly inadvertent, it was inarguably negligent."). Horne has failed to

cite any United States Supreme Court authority showing that he is entitled to a

reversal of his conviction due to the allegedly negligent loss of evidence that the

State did not seek to introduce at trial. Accordingly, he has failed to show that

Alabama courts have applied any United States Supreme Court precedent in an

objectively unreasonable manner and that he is entitled to habeas corpus relief on

this issue.

     12.    Horne's argument that he is due to be resentenced without the

application of the HFOA because he did not receive adequate notice of the prior

felonies to be used to enhance his sentence is due to be denied because he has

failed to show that the state courts resolved this claim in a manner contrary to or

involving an unreasonable application of federal law as established by United

States Supreme Court precedent. The Court of Criminal Appeals has stated that a

trial court has discretion to determine the sufficiency of notice of prior felonies

under the HFOA, as governed by "rules of reasonableness, fair play, and due

process." Capps v. State, 630 So.2d 486, 489 (Ala. Crim. App. 1993). In finding

that the trial court did not abuse its discretion in this case, the Court of Criminal

8

Appeals found that, although the State's written notice was untimely, the trial

court's finding that Horne received timely oral notice during plea negotiations was

supported by the record.  State's Exhibit A (C. 85); State's Exhibit E, p. *8.

Indeed, Horne did not dispute at his sentencing hearing that such prior felonies

were discussed during plea negotiations.  State's Exhibit A (R. 113-114)  Because

Horne has not presented clear and convincing evidence showing otherwise, this

Court must defer to the state court's finding that he received timely oral notice of

his prior convictions. See U.S.C. § 2254(e)(1)("In a proceeding instituted by

application for a writ of habeas corpus by a person in custody pursuant to the

judgment of a State court, a determination of a factual issue made by a State court

shall be presumed to be correct.  The applicant shall have the burden of rebutting

the presumption of correctness by clear and convincing evidence.").  Although

Horne cites Rule 410(4) of the Alabama Rules of Evidence to argue that plea

negotiations cannot be used to show his knowledge of his prior felonies, this

provision is merely a rule of evidence making such plea negotiations inadmissible

as substantive evidence of guilt at trial.  Motion to Amend, p. 3.

　　　With regard to whether there was sufficient written notice of his prior

felonies to be used to enhance his sentence, Horne claims that the prosecutor lied

in open court about the time he mailed the written notice.  Motion to Amend, p. 4.

The record, however, shows that the written notice was filed on July 12, 2005, a

9

day before he was sentenced on July 13, 2005. State's Exhibit A (C. 2, 81)

Furthermore, although not relied upon by the Court of Criminal Appeals, the prior

felonies were listed in Horne's presentence report. State's Exhibit A (C. 57) Even

assuming that the written notice in this case was inadequate, the Court of Criminal

Appeals held that, according to Alabama law, written notice is not required and

that the oral notice was adequate in this case. State's Exhibit E, pp. 8-9.

   The Court of Criminal Appeals' finding that Horne received adequate notice

of his prior felonies used to enhance his sentence is consistent with the treatment

federal courts have given this issue. In United States v. O'Neal, 180 F.3d 115,

125-26, fn 11 (4th Cir. 1999), the Fourth Circuit held that O'Neal's awareness of

his prior conviction and inclusion of such conviction in a pre-sentence report were

sufficient to establish that he received adequate notice.  Horne has not cited, nor is

the State aware of, any United States Supreme Court precedent requiring any more

notice of prior felonies used to enhance a sentence. Accordingly, this claim should

be denied.

10

## CONCLUSION

Based upon the foregoing authorities and facts, Horne's federal habeas corpus petition should be denied.

Respectfully submitted,

Troy King (KIN047)
Attorney General

By-

John M. Porter (ASB5818-P77J)
Assistant Attorney General

11

# EXHIBITS

Exhibit A    - Record and transcript on direct appeal in <u>Horne v. State</u>, CR-04-2461. (Dale County Circuit Court, CC-04-122).

Exhibit B    - Initial Brief of the Appellant in <u>Horne v. State</u>, CR-04-2461.

Exhibit C    - Brief of the Appellee in <u>Horton v. State</u>, CR-04-2461.

Exhibit D    - Reply Brief of the Appellant in <u>Horton v. State</u>, CR-04-2461.

Exhibit E    - Court of Criminal Appeals decision in <u>Horne v. State</u>, CR-04-2461 (Ala. Crim. App. Aug. 23, 2005)(unpublished memorandum)

Exhibit F    - Application for Rehearing and supporting brief in CR-04-2461.

Exhibit G    - Court of Criminal Appeals's Order overruling Horne's application for rehearing in CR-04-2461).

Exhibit H    - Petition for writ of certiorari in Supreme Court of Alabama Case No. 1051770.

Exhibit I    - Supreme Court of Alabama order in Case No. 1051770 denying petition for writ of certiorari and issuing certificate of judgment.

12

**CERTIFICATE OF SERVICE**

I hereby certify that on this <u>20th</u> day of December, 2006, I served a copy of the foregoing (including all exhibits) on Horne, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

>      Gary Horne
>      AIS #180206
>      Easterling Correctional Facility
>      P. O. Box 10
>      Clio, Alabama  36017-0010

>                    John M. Porter(ASB5818-P77J)
>                    Assistant Attorney General

Office of the Attorney General
Alabama State House
11 South Union
Montgomery, AL  36130-0152
Telephone: (334) 242-7300
Fax: (334) 242-2848

204077

13

# Exhibit A

ATTORNEY GENERAL'S COPY
VOLUME 1

COURT OF CRIMINAL APPEALS NO. _CR04-2461_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

FROM

## CIRCUIT COURT OF _DALE_ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC -2004-122_

CIRCUIT JUDGE _P.B. McLAUCHLIN, JR._

Type of Conviction / Order Appealed From: _ASSAULT II_

Sentence Imposed: _22 YEARS_

Defendant Indigent: ☒ YES ☐ NO

GARY HORNE

HON JOSEPH GALLO          334-598-6200          **NAME OF APPELLANT**
(Appellant's Attorney)                    (Telephone No.)
451 N. DALEVEILLE AVE STE 105
(Address)
DALEVILLE          AL          36322
(City)          (State)          (Zip Code)

**V.**

STATE OF ALABAMA          **NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)

EXHIBIT

A

INDEX:

CASE ACTION SUMMARY-------------------      01 - 09

AL ARREST REPORT --------------------         10

AFFIDAVIT OF SUBSTANTIAL HARDSHIP &
        ORDER -------------------------      11 - 12

FIRST APPEARANCE HEARING -------------         13

NOTICE OF APPOINTMENT ----------------         14

ENTRY OF APPEARANCE ------------------         15

DISCOVERY MOTION ---------------------      16 - 18

MOTION FOR PRELIMINARY HEARING -----         19

NOTICE OF APPEARANCE ----------------         20

REQUEST FOR DISCOVERY ---------------      21 - 25

MOTION TO SET BOND ------------------         26

MOTION TO SET BAIL ------------------         27

MOTION TO WITHDRAW ------------------         28

ORDER TO WITHDRAW -------------------         29

ORDER TO SET BOND -------------------         30

DISCOVERY ORDER ---------------------      31 - 32

CONSOLIDATE APPEARANCE BOND --------         33

INDICTMENT --------------------------      34 - 35

PLEA OF NOT GUILTY & WAIVER --------         36

REQUEST FOR DISCOVERY ---------------      37 - 41

DISCOVERY ORDER ---------------------      42 - 43

MOTION FOR CONTINUANCE --------------      44 - 45

INDEX CONTINUATION:

MOTION TO COMPEL ----------------------    46 - 47

NOTICE OF POTENTIAL CONFLICT ---------    48 - 49

ORDER --------------------------------          50

MOTION FOR NEW TRIAL ON IN THE ALTERNATIVE
   FOR JUDGMENT NOTWITHSTANDING THE
      VERDICT ------------------------------    51 - 54

REPORT OF INVESTIGATION ------------------    55 - 60

MOTION TO CONTINUE ----------------------    61 - 62

LETTER FROM DEF ---------------------------          63

MOTION TO CONTINUE ----------------------    64 - 71

NOTIFICATION OF HABITUAL OFFENDER STATUS          72

TRANSCRIPT OF RECORD --------------------          73

MOTION FOR NEW TRIAL --------------------    74 - 76

MOTION TO VACATE SENTENCE ---------------    77 - 80

NOTIFICATION OF HABITUAL OFFENDER STATUS          81

LETTER FROM DEF -------------------------    82 - 83

TRIAL COURT'S RULING ON MOTION FOR NEW
      TRIAL ----------------------------    84 - 86

NOTICE OF APPEAL MOTION TO APPOINT
   APPELLATE COUNSEL & MOTION FOR
      APPEAL BOND ----------------------    87 - 88

MOTION TO WITHDRAW ---------------------    89 - 90

POST TRIAL MOTION TO CLARIFY POST TRIAL
      RULING ----------------------------    91 - 93

MOTION TO RECUSE -----------------------          94

MOTION TO DISMISS ----------------------    95 - 97

NOTICE OF APPEAL -----------------------          98

REPORTER'S TRANSCRIPT ------------------          99

INDEX CONTINUATION:

DOCKETING STATEMENT ------------------        100 -101

CLERK'S NOTICE OF APPEAL ---------------             102

CERTIFICATE OF COMPLETION & TRANSMITTAL
    OF RECORD ON APPEAL BY TRIAL CLERK      103 -104

COURT REPORTER'S COVER SHEET ----------             01

COURT REPORTER'S PROCEEDINGS ----------       02 -142

COURT REPORTER'S TRANSCRIPT -----------            143

```
ACRO372              ALABAMA JUDICIAL INFORMATION SYSTEM        CASE: CC 2004 000122.00
OPER: SHS                     CASE ACTION SUMMARY
PAGE:   1                      CIRCUIT  CRIMINAL                 RUN DATE: 03/05/2004
===========================================================================================
    HE CIRCUIT COURT OF    DALE                                             JUDGE: PBM

STATE  OF  ALABAMA                   VS        HORNE GARY
                                               LOT 46
CASE: CC 2004 000122.00                        HIDDEN GROVE TRAILER PARK
                                               OZARK, AL   36360 0000

DOB: 10/16/1972            SEX: M   RACE: B   HT: 6 00   WT: 180    HR: BLK EYES: BRO
SSN: 416983121   ALIAS NAMES:
-------------------------------------------------------------------------------------------
CHARGE01: ATTEMPT - MURDER       CODE01: MURDA LIT: ATTEMPT - MURD TYP: F #: 001
OFFENSE DATE:                         AGENCY/OFFICER: 0260100 TEX TIP

DATE WAR/CAP ISS:                       DATE ARRESTED: 01/16/2004
DATE     INDICTED: 03/02/2004           DATE    FILED: 03/03/2004
DATE    RELEASED: 01/30/2004            DATE   HEARING:
BOND      AMOUNT:      $30,000.00           SURETIES:

DATE 1: 04/06/2004   DESC: ARRG                 TIME: 0900 A
DATE 2:              DESC:                       TIME: 0000

TRACKING NOS: GJ 2004 000028 00 / DC 2004 000089 00  /  WR 2004 000044 00
   DEF/ATY: NICKSON N TRAC              TYPE: R                           TYPE:
            2181 A A COBBS FORD RD
            PRATTVILLE     AL 36066                              00000

PROSECUTOR: EMERY DAVID C

-------------------------------------------------------------------------------------------
OTH CSE: GJ200400002800 CHK/TICKET NO:                          GRAND JURY: 28
C RT REPORTER:                   SID NO:          000000000
C  STATUS: BOND               DEMAND:                              OPER: SHS
-------------------------------------------------------------------------------------------
DATE            ACTIONS, JUDGEMENTS,  AND  NOTES
-------------------------------------------------------------------------------------------
```

| DATE | ACTIONS, JUDGEMENTS, AND NOTES |
|---|---|
| 3/26/04 | Plea of N/G & waiver of Arrg. filed by Hon. Nickson. |
| 3/29/04 | Request for Discovery. |
| 3/29/04 | Discovery Order. cy: DA/NICKSON |
| 4/27/04 | Motion for continuance. |
| 4/27/04 | *Continued in D. PBM cy. DA/Nickson* |
| 5-14-04 | Motion to Compel file. |
| 5/14/04 | *Stat to address B or his counsel to inspect evidence in covered at the scene of the Crime. PBM cy. DA/Nickson* |
| MAY 14 2004 | |
| 9/3/04 | Motion to dismiss. |
| 9-3-04 | *Motion will be heard prior to trial. S/Feng.* |
| SEP - 3 2004 | *cy: DA/Nickson* |
| 9/17/04 | *Continued in D. PBM* |
| 11/15/04 | *Motion Set Dec 16 at 9:30 PM cy: DA/Nickson* |
|  | *—over—* |

0   001

ACRO369   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2004 000122.00
JUDGE ID:  PBM

STATE OF ALABAMA                    VS     HORNE GARY

DATE          ACTION; JUDGMENTS; CASE NOTES

12/16/04 *[handwritten] Motion to dismiss filed by the △ denied. PBM  cy: Dy/Nickson*

3/22/05 - PBM

5/1/05 *[handwritten] Cont'd for def K's*

5/18/05 *[handwritten] Case tried to jury & jury returned its following Verdict: We the jury find the △ guilty of Assault in the 2nd degree & pay costs incident to order. Sentence delayed for Sentencing Hearing - San Bd. PBM  cy: DA/Nickson/PSP*

6-21-05 *[handwritten] Sentencing Hearing set for July 13, 2005, at 9:30 A.M. G/PBM  cy: DA/Nickson/PSP*

7/11/05 *[handwritten] DA Sentencing Hearing continued to July 13 at 1:30 & Motion for New Trial set July 4 at 9:30 — PBM  cy: DA/Nickson*

7/13/05 *[handwritten] Gary Carlee at Sentencing Hearing. On the Verdict of the jury of guilty of Assault in the 2nd degree the Court finds that the △ guilty & adjudges the △ guilty. The court finds that the △ is an habitual offender with 2 prior felonies & that the △ fired a firearm in the commission of the Assault & Based on the △'s prior record & the nature of this assault the court sentences the △ to 22 yrs to the State Pen.*

*[handwritten] It having been ordered & adjudged that the △ is hereby sentenced to 22 yrs to the State Pen. △ is to pay C.C., restitution to Victim & the V.C.C., & 100% to the VCC. △ to remain in the custody of the Sheriff for the Execution of the Sentence. △ advised of post trial & appeal rights. PBM  cy: DA/Nickson/BCSD/DOC*

ACRO369   A L A B A M A   J U D I C I A L   I N F O R M A T I O N   C E N T E R

CASE ACTION SUMMARY
CONTINUATION

CASE: CC 2004 000122.00
JUDGE ID:   PBM

STATE OF ALABAMA                        VS        HORNE GARY

| DATE | ACTION, JUDGMENTS, CASE NOTES |
|------|-------------------------------|
| 8/29/05 | Motion to Clarify Post Trial Ruling Denied. |
| 8/29/05 | Motion to wait for granted. |
| 8/29/05 | Hon. Bob Roberts appt'd to rep'd D on Appeal - Notify Bob - Need to file Notice of Appeal. (Prev. DA Nickson / Robison) |
| 9/1/05 | Motion to Release on house arrest @ grand. PM |
| 9/1/05 | Hon. Joe Gaines appt'd to rep't D on Appeal. Notify Joe - Needs to file (Motion) Appeal. (cy DA Gallis) Appeal. |

0  003

```
ACRO370              ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2004 000122.00
OPER: SHS                       CASE ACTION SUMMARY
PAGE:   1                        CIRCUIT  CRIMINAL            RUN DATE: 09/07/2005
=
I. THE CIRCUIT COURT OF     DALE                                    JUDGE: PBM

STATE OF ALABAMA                        VS       HORNE GARY
                                                 LOT 46
CASE: CC 2004 000122.00                          HIDDEN GROVE TRAILER PARK
                                                 OZARK, AL  36360 0000

DOB: 10/16/1972          SEX: M  RACE: B  HT: 6 00  WT: 180     HR: BLK EYES: BRO
SSN: 416983121  ALIAS NAMES:
===============================================================================
CHARGE01: ATTEMPT - MURDER      CODE01: MURDA LIT: ATTEMPT - MURD TYP: F #: 001
OFFENSE DATE:                           AGENCY/OFFICER: 0260100 TEX TIP

DATE WAR/CAP ISS:                    DATE ARRESTED: 01/16/2004
DATE      INDICTED: 03/02/2004       DATE    FILED: 03/03/2004
DATE      RELEASED: 01/30/2004       DATE   HEARING:
     BOND AMOUNT:    $30,000.00         SURETIES:

DATE 1: 08/04/2005  DESC: MOTD        TIME: 0930 A
DATE 2:             DESC:             TIME: 0000

TRACKING NOS: GJ 2004 000028 00  /  DC 2004 000089 00  /  WR 2004 000044 00

   DEF/ATY: GALLO JOSEPH JAMES          TYPE: A                    TYPE:
            451 N DALEVILLE AVE
            SUITE 105
            DALEVILLE      AL 36322                        00000

PROSECUTOR: ADAMS THOMAS KIRKE


===============================================================================
OTH CSE: GJ200400002800 CHK/TICKET NO:              GRAND JURY: 28
COURT REPORTER:              SID NO:
I   STATUS: BOND             DEMAND:       000000000
                                                              OPER: SHS
===============================================================================
   TRANS DATE     ACTIONS, JUDGEMENTS, AND NOTES                        OPE
```

| TRANS DATE | ACTIONS, JUDGEMENTS, AND NOTES | | OPE |
|---|---|---|---|
| 03/05/2004 | ASSIGNED TO: (PBM) P. B. MCLAUCHLIN | (AR01) | SHS |
| 03/05/2004 | INITIAL STATUS SET TO: "B" - BOND | (AR01) | SHS |
| 03/05/2004 | FILED ON: 03/03/2004 | (AR01) | SHS |
| 03/05/2004 | DEFENDANT ARRESTED ON: 01/16/2004 | (AR01) | SHS |
| 03/05/2004 | DEFENDANT INDICTED ON: 03/02/2004 | (AR01) | SHS |
| 03/05/2004 | ATTORNEY FOR DEFENDANT: NICKSON N TRACY | (AR01) | SHS |
| 03/05/2004 | BOND SET AT: $30000.00 | (AR01) | SHS |
| 03/05/2004 | DEFENDANT RELEASED FROM JAIL: 01/30/2004 | (AR01) | SHS |
| 03/05/2004 | SET FOR:  ARRAIGNMENT ON 04/06/2004 AT 0900A | (AR01) | SHS |
| 03/05/2004 | CHARGE 01: ATTEMPT - MURDER/#CNTS: 001 | (AR01) | SHS |
| 03/05/2004 | CASE ACTION SUMMARY PRINTED | (AR10) | SHS |
| 03/22/2004 | NOTICE SENT: 03/22/2004 DIAZ BONDING CO | | SHS |
| 03/22/2004 | NOTICE SENT: 03/22/2004 NICKSON N TRACY | | SHS |
| 03/22/2004 | NOTICE SENT: 03/22/2004 HORNE GARY | | SHS |
| 03/26/2004 | SET FOR: JURY TRIAL ON 05/17/2004 AT 0900A | (AR01) | SHS |
| 03/26/2004 | PLEA OF N/G & WAIVER OF ARRG FILED BY HON | | SHS |
| 03/26/2004 | NICKSON | | SHS |

0  004

```
ACRO370          ALABAMA JUDICIAL INFORMATION SYSTEM          CASE: CC 2004 000122.00
OPER: SHS               CASE ACTION SUMMARY
PAGE:   2               CIRCUIT  CRIMINAL                      RUN DATE: 09/07/2005
```

```
IN THE CIRCUIT COURT OF     DALE                                 JUDGE: PBM

STATE OF ALABAMA              VS      HORNE GARY
                                      LOT 46
C/ : CC 2004 000122.00                HIDDEN GROVE TRAILER PARK
                                      OZARK, AL  36360 0000

DOB: 10/16/1972       SEX: M  RACE: B  HT: 6 00   WT: 180    HR: BLK EYES: BRO
SSN: 416983121  ALIAS NAMES:
```

| TRANS DATE | ACTIONS, JUDGEMENTS, AND NOTES | OPE |
|---|---|---|
| 03/29/2004 | REQUEST FOR DISC | SHS |
| 04/19/2004 | NOTICE SENT: 04/19/2004 NICKSON N TRACY | SHS |
| 04/19/2004 | NOTICE SENT: 04/19/2004 HORNE GARY | SHS |
| 04/19/2004 | SET FOR: JURY TRIAL ON 05/18/2004 AT 0900A  (AR10) | SHS |
| 04/21/2004 | WITNESS SUBPOENA ISSUED                    AWP24 | MAH |
| 04/23/2004 | SERVICE OF SERVED PERSON   ON 04222004 FOR W001 (A | LYK |
| 04/23/2004 | SERVICE OF SERVED PERSON   ON 04222004 FOR W003 (A | LYK |
| 04/23/2004 | SERVICE OF SERVED PERSON   ON 04222004 FOR W004 (A | LYK |
| 04/27/2004 | MOTION FOR CONTINUANCE | SHS |
| 04/27/2004 | CONT'D FOR THE DEF | SHS |
| 04/28/2004 | SET FOR: JURY TRIAL ON 09/13/2004 AT 0900A  (AR01) | SHS |
| 04/28/2004 | SERVICE OF OTHER            ON 04282004 FOR W005 (A | LYK |
| 04/28/2004 | SERVICE OF OTHER            ON 04272004 FOR W006 (A | LYK |
| 05/14/2004 | STATE TO ADDRESS DEF OR HIS COUNSEL TO INSPECT | SHS |
| 5/14/2004 | EVIDENCE RECOVERED AT THE SEEN OF THE CRIME | SHS |
| 05/14/2004 | MOTION TO COMPEL FILED. | DEW |
| 08/11/2004 | NOTICE SENT: 08/11/2004 NICKSON N TRACY | SHS |
| 08/11/2004 | NOTICE SENT: 08/11/2004 HORNE GARY | SHS |
| 08/11/2004 | SET FOR: JURY TRIAL ON 09/14/2004 AT 0900A  (AR10) | SHS |
| 08/12/2004 | WITNESS SUBPOENA ISSUED                    AWP24 | MAH |
| 08/17/2004 | ENF STATUS SET TO: "K"                     (EC01) | SHS |
| 09/03/2004 | MOTION TO DISMISS | SHS |
| 09/03/2004 | MOTION WILL BE HEARD PRIOR TO TRIAL. | DEW |
| 09/15/2004 | SET FOR: JURY TRIAL ON 11/15/2004 AT 0900A  (AR10) | DEW |
| 10/20/2004 | NOTICE SENT: 10/20/2004 NICKSON N TRACY | SHS |
| 10/20/2004 | NOTICE SENT: 10/20/2004 HORNE GARY | SHS |
| 10/20/2004 | CAS ATTACHMENT PRINTED                     (AR08) | SHS |
| 10/22/2004 | WITNESS SUBPOENA ISSUED                    AWP24 | MAH |
| 11/04/2004 | PARTY ADDED  W007  REX TIPTON              (AW21) | SHS |
| 11/04/2004 | PARTY W007 ISSUED DATE: 11042004   TYPE:   (AW21) | SHS |
| 11/04/2004 | PARTY ADDED  W008  MARTIN SPEARS           (AW21) | SHS |

G05

```
ACRO370          ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2004 000122.00
OPER: SHS                    CASE ACTION SUMMARY
PAGE:   3                    CIRCUIT  CRIMINAL              RUN DATE: 09/07/2005
=========================================================================
IN THE CIRCUIT COURT OF     DALE                              JUDGE: PBM
```

STATE OF ALABAMA                    VS      HORNE GARY
                                            LOT 46
C   : CC 2004 000122.00                     HIDDEN GROVE TRAILER PARK
                                            OZARK, AL  36360 0000

DOB: 10/16/1972        SEX: M  RACE: B  HT: 6 00  WT: 180    HR: BLK EYES: BRO
SSN: 416983121  ALIAS NAMES:

| Date | Action | | |
|---|---|---|---|
| 11/04/2004 | PARTY W008 ISSUED DATE: 11042004  TYPE:    (AW21) | | SHS |
| 11/04/2004 | PARTY ADDED  W009   TERRANCE BARR    (AW21) | | SHS |
| 11/04/2004 | PARTY W009 ISSUED DATE: 11042004  TYPE:    (AW21) | | SHS |
| 11/04/2004 | PARTY ADDED  W010   IMOGENE PAUL    (AW21) | | SHS |
| 11/04/2004 | PARTY W010 ISSUED DATE: 11042004  TYPE:    (AW21) | | SHS |
| 11/04/2004 | PARTY ADDED  W011   JOHN BELL    (AW21) | | SHS |
| 11/04/2004 | PARTY W011 ISSUED DATE: 11042004  TYPE:    (AW21) | | SHS |
| 11/04/2004 | PARTY ADDED  W012   LT KEITH CAUTHEN    (AW21) | | SHS |
| 11/04/2004 | PARTY W012 ISSUED DATE: 11042004  TYPE:    (AW21) | | SHS |
| 11/04/2004 | PARTY ADDED  W013   LT BOBBY BLANKENSHIP    (AW21) | | SHS |
| 11/04/2004 | PARTY W013 ISSUED DATE: 11042004  TYPE:    (AW21) | | SHS |
| 11/04/2004 | PARTY ADDED  W014   CHRIS FORD    (AW21) | | SHS |
| 11/04/2004 | PARTY W014 ISSUED DATE: 11042004  TYPE:    (AW21) | | SHS |
| 11/24/2004 | SET FOR: MOTION DOCKET/HEAR ON 12/16/2004 AT 0930A | | SHS |
| 11/24/2004 | SET FOR: JURY TRIAL ON 02/28/2005 AT 0900A  (AR10) | | SHS |
| 2/16/2004 | MOTION TO DISMISS FILED BY THE DEF DENIED | | SHS |
| 01/28/2005 | COPY OF PETITION OF WRIT OF MANDAMUS FILED ALONG | | SHS |
| 01/28/2005 | WITH ORDER FROM CT OF CRIM APPLS | | SHS |
| 02/08/2005 | NOTICE SENT: 02/08/2005 NICKSON N TRACY | | SHS |
| 02/08/2005 | NOTICE SENT: 02/08/2005 HORNE GARY | | SHS |
| 02/11/2005 | WITNESS SUBPOENA ISSUED    AWP24 | | AMB |
| 03/01/2005 | CONT'D FOR DEF | | SHS |
| 03/03/2005 | SET FOR: JURY TRIAL ON 05/16/2005 AT 0900A  (AR01) | | SHS |
| 04/26/2005 | WITNESS SUBPOENA ISSUED    AWP24 | | AMB |
| 05/02/2005 | NOTICE OF POTENTIAL CONFLICT FILED BY HON NICKSON | | SHS |
| 05/02/2005 | READ NO ACTION TAKEN | | SHS |
| 05/16/2005 | PARTY ADDED  W015   SHANIECE HORNE    (AW21) | | SHS |
| 05/16/2005 | WITNESS SUBPOENA ISSUED TO W015 SHANIECE HORNE | | SHS |
| 05/17/2005 | PARTY ADDED  W016   CHRISTINA WILLIAMS    (AW21) | | AMB |
| 05/17/2005 | PARTY W016 ISSUED DATE: 05162005  TYPE:    (AW21) | | AMB |
| 05/17/2005 | WITNESS SUBPOENA ISSUED TO W016 CHRISTINA WILLIAMS | | AMB |
| 05/18/2005 | JUROR FELONY FLAG SET ON FOR INDIVIDUAL    (AR10) | | SHS |

0  C006

```
ACRO370      ALABAMA JUDICIAL INFORMATION SYSTEM           CC 2004 000122.00
OPER: SHS                      CASE ACTION SUMMARY
PAGE:    4                    CIRCUIT   CRIMINAL              RUN DATE: 09/07/2005
=============================================================================
IN THE CIRCUIT COURT OF    DALE                              JUDGE: PBM
```

STATE OF ALABAMA                   VS      HORNE GARY
                                           LOT 46
C   : CC 2004 000122.00                    HIDDEN GROVE TRAILER PARK
                                           OZARK, AL   36360 0000

DOB: 10/16/1972        SEX: M   RACE: B  HT: 6 00   WT: 180   HR: BLK EYES: BRO
SSN: 416983121   ALIAS NAMES:

| | | |
|---|---|---|
| 05/18/2005 | CHARGE 01 DISPOSED BY: CONVICTED ON: 05/18/2005 | SHS |
| 05/18/2005 | DISPOSITION JUDGE ID CHANGED FROM:        TO: PBM | SHS |
| 05/18/2005 | CHARGE 01: ASSAULT 2ND DEGREE /#CNTS: 001    (AR10) | SHS |
| 05/18/2005 | CASE TRIED TO JURY JURY RETURNED THE FOLLOWING | SHS |
| 05/18/2005 | VERDICT GUILTY OF ASSAULT 2ND PRE-SENT INV | SHS |
| 05/18/2005 | SENTENCING DELAYED SENTENCING HEARING SAME BOND | SHS |
| 05/20/2005 | SET FOR:   SENTENCING DKT/HE ON 07/14/2005 AT 0930A | SHS |
| 06/01/2005 | CONVICTION REPORT TO BOARD OF REGISTRARS | SHS |
| 06/21/2005 | WITNESS SUBPOENAS ISSUED | SHS |
| 06/21/2005 | MOTION FOR NEW TRIAL OR IN THE ALTERNATIVE FOR | SHS |
| 06/21/2005 | JUDGMENT NOTWITHSTANDING THE VERDICT | SHS |
| 06/22/2005 | SET FOR:   SENTENCING DKT/HE ON 07/13/2005 AT 0930A | SHS |
| 07/01/2005 | WITNESS SUBPOENA ISSUED TO W009 TERRANCE BARR | AMB |
| 07/01/2005 | WITNESS SUBPOENA ISSUED TO W009 TERRANCE BARR | AMB |
| 07/08/2005 | REPORT OF INVESTIGATION | SHS |
| 7/08/2005 | REPORT OF INVESTIGATION | SHS |
| 07/11/2005 | SENTENCING HEARING CONT TO JULY 13 @ 1:30 | SHS |
| 07/11/2005 | MOTION FOR NEW TRIAL SET 8/4/05@ 9:30 AM | SHS |
| 07/11/2005 | MOTION TO CONTINUE FILED BY HON NICKSON | SHS |
| 07/12/2005 | SET FOR: MOTION DOCKET/HEAR ON 08/04/2005 AT 0930A | SHS |
| 07/12/2005 | NOTIFICATION OF HABITUAL OFFENDER STATUS | SHS |
| 07/13/2005 | CASE CALLED AT SENT HEARING ON THE VERDICT OF | SHS |
| 07/13/2005 | THE JURY OF GUILTY OF ASSAULT ON 2ND DEGREE | SHS |
| 07/13/2005 | THE JURY | SHS |
| 07/13/2005 | THE COURT FINDS THE DEF GUILTY & ADJS THE DEF | SHS |
| 07/13/2005 | GUILTY THE COURT FINDS THE DEF IS AN HABITUAL | SHS |
| 07/13/2005 | OFFENDER WITH 2 PRIOR FELONIES & THAT THE DEF | SHS |
| 07/13/2005 | FIRED A FIREARM IN THE COMMISSION OF THE ASSAULT | SHS |
| 07/13/2005 | & BASED ON THE DEF'S PRIORRECORD & THE NATURE OF | SHS |
| 07/13/2005 | THIS ASSAULT THE COURT SENT THE DEF TO 22 YRS TO | SHS |
| 07/13/2005 | STATE PEN THEREFORE IT IS ORDERED & ADJ THAT THE | SHS |
| 07/13/2005 | DEF IS SENTENCED TO 22 YRS TO THE STATE PEN DEF | SHS |

```
ACRO370          ALABAMA  JUDICIAL  INFORMATION  SYSTEM     CASE: CC 2004 000122.00
OPER: SHS                   CASE  ACTION  SUMMARY
PAGE:    5                  CIRCUIT    CRIMINAL                 RUN DATE: 09/07/2005
===========================================================================================
IN THE CIRCUIT COURT OF      DALE                                        JUDGE: PBM

STATE  OF  ALABAMA                   VS        HORNE GARY
C    : CC 2004 000122.00                       LOT 46
                                               HIDDEN GROVE TRAILER PARK
                                               OZARK, AL  36360 0000

DOB: 10/16/1972         SEX: M  RACE: B  HT: 6 00  WT: 180   HR: BLK EYES: BRO
SSN: 416983121   ALIAS NAMES:
===========================================================================================
```

| Date | Description | |
|---|---|---|
| 07/13/2005 | IS TO PAY CC REST & VICTIM AT THE VCC & 100.00 | SHS |
| 07/13/2005 | TO THE VCC DEF REMANDED TO CUSTODY OF THE SHERI | SHS |
| 07/13/2005 | FOR THE EXECUTION OF THE SENTENCE DEF ADVISED OF | SHS |
| 07/13/2005 | POST TRIAL & APPEAL RIGHTS | SHS |
| 07/14/2005 | DEFENDANT SENTENCED ON: 07/13/2005       (AR05) | SHS |
| 07/14/2005 | IMPOSED CONFINEMENT: 22 YEARS           (AR05) | SHS |
| 07/14/2005 | TOTAL CONFINEMENT: 22 YEARS             (AR05) | SHS |
| 07/14/2005 | SENTENCE TO BEGIN ON: 07/13/2005        (AR05) | SHS |
| 07/14/2005 | COST PROVISION ORDERED BY THE COURT      (AR05) | SHS |
| 07/14/2005 | SUBPOENA FEE PROVISION ORDERED BY THE COURT (AR05) | SHS |
| 07/14/2005 | RESTITUTION FOR R001 ORDERED BY THE COURT   (AR05) | SHS |
| 07/14/2005 | CVCC PROVISION ORDERED BY THE COURT      (AR05) | SHS |
| 07/14/2005 | HISTORY FEE PROVISION ORDERED BY THE COURT (AR05) | SHS |
| 07/14/2005 | PENITENTIARY PROVISION ORDERED BY THE COURT (AR05) | SHS |
| 07/14/2005 | HABITUAL OFFENDER - #OFFENSES: 002       (AR05) | SHS |
| 7/14/2005 | HABITUAL OFFENDER PROVISION ORDERED BY THE COURT | SHS |
| 07/14/2005 | PAYMENT FREQUENCY SET TO: "L"            (FE52) | SHS |
| 07/14/2005 | DEF SENT TO 22 YRS TO DOC               (FE52) | SHS |
| 07/14/2005 | JAIL CREDIT: 014 DAYS                   (AR05) | SHS |
| 07/14/2005 | TRANSCRIPT OF RECORD ISSUED: 07/14/2005  (AR08) | SHS |
| 07/14/2005 | CAS ATTACHMENT PRINTED                  (AR08) | SHS |
| 07/19/2005 | WITNESS SUBPOENA ISSUED TO W009 TERRANCE BARR | AMB |
| 07/26/2005 | SERVICE OF SERVED PERSON   ON 07222005 FOR W009 (A | SHS |
| 07/26/2005 | SET FOR: MOTION DOCKET/HEAR ON 08/04/2005 AT 0930A | SHS |
| 07/28/2005 | MOTION TO VACATE SENTENCE & MOTION FOR NEW TRIAL | SHS |
| 07/28/2005 | FILED BY HON NICKSON | SHS |
| 08/19/2005 | TRIAL COURT RULING ON MOTION FOR NEW TRIAL | SHS |
| 08/19/2005 | THIS CAUSE COMING ON TO BE HEARD IS SUBMITTED | SHS |
| 08/19/2005 | FOR A JUDGMENT ON THE MOTION FOR NEW TRIAL OR IN | SHS |
| 08/19/2005 | ALTERNATIVE MOTION FOR JUDGMENT NOTWITHSTANDING | SHS |
| 08/19/2005 | THE VERDICT & THE MOTION TO VACATE THE SENTENCE & | SHS |
| 08/19/2005 | THE COURT HAVING CONSIDERED THE SAME THE COURT | SHS |

```
ACRO370      ALABAMA JUDICIAL INFORMATION SYSTEM      CASE: CC 2004 000122.00
OPER: SHS                 CASE ACTION SUMMARY
PAGE:    6                CIRCUIT   CRIMINAL                RUN DATE: 09/07/2005
=================================================================================
IN THE CIRCUIT COURT OF    DALE                                   JUDGE: PBM
```

STATE OF ALABAMA            VS      HORNE GARY
                                    LOT 46
CI  : CC 2004 000122.00             HIDDEN GROVE TRAILER PARK
                                    OZARK, AL  36360 0000

DOB: 10/16/1972        SEX: M  RACE: B  HT: 6 00  WT: 180  HR: BLK EYES: BRO
SSN: 416983121  ALIAS NAMES:

| Date | Action | |
|---|---|---|
| 08/19/2005 | FINDS AS FOLLOWS | SHS |
| 08/19/2005 | ON MAY 18 2005 THE DEF WAS FOUND GUILTY OF ASSAUL | SHS |
| 08/19/2005 | IN THE 2ND  BY VERDICT OF THE JURY ON JULY 13 | SHS |
| 08/19/2005 | 2005 THE DEF WAS ADJ GUILTY & SENT TO 22 YRS TO | SHS |
| 08/19/2005 | THE STATE PEN | SHS |
| 08/19/2005 | DEF HAVING 2 PRIOR FELONIES | SHS |
| 08/19/2005 | 5/24/95 DALE CO ROBBERY II 5 YRS | SHS |
| 08/19/2005 | 3/24/95 PIKE CO HINDERING PROS I  1 YR & 1 DAY | SHS |
| 08/19/2005 | AT SENT HEARING THE STATE PROVED THE TWO PRIOR | SHS |
| 08/19/2005 | CONVICTIONS & FILED CERT COPIES OF THE CONVICTION | SHS |
| 08/19/2005 | THE VERDICT OF THE JURY WAS SUSTAINED BY THE LAW | SHS |
| 08/19/2005 | AND THE EVIDENCE IN THE CASE THE JURY WAS POLLED | SHS |
| 08/19/2005 | & EACH JUROR AGREED AS TO THE VERDICT OF THE JURY | SHS |
| 08/19/2005 | THE COURT HAS REVIEWED ALL OF THE OTHER GROUNDS | SHS |
| 08/19/2005 | OF THE MOTIONS AND FINDS THE GROUNDS NOT WELL | SHS |
| 3/19/2005 | TAKEN THEREFORE THE MOTIONS FILED BY THE DEF | SHS |
| 08/19/2005 | ARE DENIED | SHS |
| 08/29/2005 | POST TRIAL MOTION TO CLARIFY POST-TRIAL RULING | SHS |
| 08/29/2005 | MOTION TO WITHDRAW GRANTED | SHS |
| 08/29/2005 | HON BOB ROBISON APPT TO REP THE DEF ON APPEAL | SHS |
| 08/29/2005 | NOTIFY HON ROBISON NEED TO FILE NOTICE OF APPEAL | SHS |
| 08/30/2005 | ATTORNEY FOR DEFENDANT: ROBISON ROBERT G    (AR10) | SHS |
| 08/31/2005 | MOTION TO RECUSE FILED BY HON ROBISON | SHS |
| 09/01/2005 | ATTORNEY FOR DEFENDANT: GALLO JOSEPH JAMES  (AR01) | SHS |
| 09/01/2005 | MOTION TO RECUSE GRANTED | SHS |
| 09/01/2005 | HON JOE GALLO APPT TO REP THE DEF ON APPEAL | SHS |
| 09/01/2005 | NOTIFY HON GALLO TO FILE NOTICE OF APPEAL | SHS |
| 09/07/2005 | CASE ACTION SUMMARY PRINTED             (AR08) | SHS |

# ALABAMA UNIFORM ARREST REPORT

| Fingerprinted | R84 Completed |
|---|---|
| ■ Yes | ■ Yes |
| ☒ No | ☒ No |

03TF01202

OFFICER'S WORK PRODUCT MAY NOT BE PUBLIC INFORMATION

## IDENTIFICATION

| 1 ORI # | 2 AGENCY NAME | 3 CASE # | 4 SFX |
|---|---|---|---|
| 0 2 6 0 1 0 0 | OZARK POLICE DEPARTM | 0 4 0 1 - 0 3 5 7 | |

| 5 LAST, FIRST, MIDDLE NAME | 6 ALIAS AKA |
|---|---|
| HORNE, GARY | |

| 7 SEX | 8 RACE | 9 HGT. | 10 WGT. | 11 EYE | 12 HAIR | 13 | 14 | |
|---|---|---|---|---|---|---|---|---|
| ☑ M ☐ F | ☑ W ☐ B ☐ A ☐ I | 6' 00" | 175 | BRO | BLK | MED | | ☐ SCARS ☒ MARKS ■ TATOOS ☐ AMPUTATIONS BOTH ARMS |

| 15 PLACE OF BIRTH (CITY, COUNTY, STATE) | 16 SSN | 17 DATE OF BIRTH | 18 AGE | 19 MISCELLANEOUS ID # |
|---|---|---|---|---|
| TUSKEE   MACON    AL | 4 1 6 - 9 8 - 3 1 2 1 | 1 0 1 6 7 2 | 031 | S416983121 |

| 20 SID # | 21 FINGERPRINT CLASS | KEY | MAJOR | PRIMARY | SCDV | SUB-SECONDARY | FINAL | 22 DL # | 23 ST |
|---|---|---|---|---|---|---|---|---|---|
| | HENRY CLASS | | | | | | | 6301217 | AL |
| 24 FBI # | NCIC CLASS | | | | | | | 25 IDENTIFICATION COMMENTS | |

| 26 ■ RESIDENT ☑ NON-RESIDENT | 27 HOME ADDRESS (STREET, CITY, STATE, ZIP) | 28 RESIDENCE PHONE | 29 OCCUPATION (BE SPECIFIC) |
|---|---|---|---|
| | #46 HIDDEN GROVE TR. PARK  OZARK, AL 36360 | (334) 445-4402 | HORNE ROOFING |

| 30 EMPLOYER (NAME OF COMPANY/SCHOOL) | 31 BUSINESS ADDRESS (STREET, CITY, STATE, ZIP) | 32 BUSINESS PHONE |
|---|---|---|
| | | (334) 477-3314 |

## ARREST

| 33 LOCATION OF ARREST (STREET, CITY, STATE, ZIP) | 34 SECTOR # | 35 ARRESTED FOR YOUR JURISDICTION? ■ YES ☐ NO |
|---|---|---|
| DRUG TASK FORCE  OZARK, AL 36360 | | ■ IN STATE ☐ OUT STATE ☐ NATIONAL |

| 36 CONDITION OF ARRESTEE: | ☐ DRUNK ☐ DRINKING | ■ SOBER ☐ DRUGS | 37 RESIST ARREST? ☐ YES ☒ NO | 38 INJURIES? ■ NONE ☐ OFFICER ☐ ARRESTEE | 39 ARMED? ☐ Y ■ N | 40 DESCRIPTION OF WEAPON ☐ HANDGUN ☐ RIFLE ☐ SHOTGUN ☐ OTHER FIREARM ☐ OTHER WEAPON |
|---|---|---|---|---|---|---|

| 41 DATE OF ARREST | 42 TIME OF ARREST | 43 DAY OF ARREST | 44 TYPE ARREST | 45 ARRESTED BEFORE? |
|---|---|---|---|---|
| 0 1 1 6 0 4 | 01:15 ☑ 1. AM ☐ 2. PM ☐ MIL. | S M ☐ T ☐ W ☐ T ☒ F ☐ S | ☐ ON VIEW ☐ CALL ☑ WARRANT | ☐ YES ☑ NO ☐ UNKNOWN |

| 46 CHARGE - 1 ☐ FEL ☒ MISD | 47 UCR CODE | 48 CHARGE - 2 ☐ FEL ☒ MISD | 49 UCR CODE |
|---|---|---|---|
| ASSAULT NON-FAMILY GUN | 1305 | | |

| 50 STATE CODE/LOCAL ORDINANCE | 51 WARRANT # | 52 DATE ISSUED | 53 STATE CODE/LOCAL ORDINANCE | 54 WARRANT # | 55 DATE ISSUED |
|---|---|---|---|---|---|
| 013A-06-0020 | | M  D  Y | | | M  D  Y |

| 56 CHARGE - 3 ☐ FEL ☒ MISD | 57 UCR CODE | 58 CHARGE - 4 ☐ FEL ☐ MISD | 59 UCR CODE |
|---|---|---|---|
| | | | |

| 60 STATE CODE/LOCAL ORDINANCE | 61 WARRANT # | 62 DATE ISSUED | 63 STATE CODE/LOCAL ORDINANCE | 64 WARRANT # | 65 DATE ISSUED |
|---|---|---|---|---|---|
| | | M  D  Y | | | M  D  Y |

| 66 ARREST DISPOSITION ■ HELD ☐ BAIL ☐ RELEASED ☐ TOT - LE ☐ OTHER | 67 IF OUT ON RELEASE WHAT TYPE? | 68 ARRESTED WITH (1) ACCOMPLICE (FULL NAME) |
|---|---|---|
| | | 69 ARRESTED WITH (2) ACCOMPLICE (FULL NAME) |

## VEHICLE

| 70 VYR | 71 VMA | 72 VMO | 73 VST | 74 VCO | TOP BOTTOM | 75 TAG # | 76 LIS | 77 LIY |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| 78 VIN | 79 IMPOUNDED? ☐ YES ☑ NO | 80 STORAGE LOCATION/IMPOUND # |
|---|---|---|
| | | |

| 81 OTHER EVIDENCE SEIZED/PROPERTY SEIZED |
|---|
| |

☐ CONTINUED IN NARRATIVE

## JUVENILE

| 82 JUVENILE DISPOSITION: | ☐ HANDLED AND RELEASED ☑ REF. TO JUVENILE COURT | ☐ REF. TO WELFARE AGENCY ☐ REF. TO OTHER POLICE AGENCY | ☒ REF. TO ADULT COURT | 83 RELEASED TO |
|---|---|---|---|---|

| 84 PARENT OR GUARDIAN (LAST, FIRST, MIDDLE NAME) | 85 ADDRESS (STREET, CITY, STATE, ZIP) | 86 PHONE |
|---|---|---|
| | | |

| 87 PARENTS EMPLOYER | 88 OCCUPATION | 89 ADDRESS (STREET, CITY, STATE, ZIP) | 90 PHONE |
|---|---|---|---|
| | | | |

## RELEASE

| 91 DATE AND TIME OF RELEASE | 92 RELEASING OFFICER NAME | 93 AGENCY/DIVISION | 94 ID # |
|---|---|---|---|
| M  D  Y  ☐ 1. AM ☐ 3. MIL. ☐ 2. PM | | | |

| 95 RELEASED TO: | 96 AGENCY/DIVISION | 97 AGENCY ADDRESS |
|---|---|---|
| | | |

| 98 PERSONAL PROPERTY RELEASED TO ARRESTEE ☐ YES ☒ NO ☐ PARTIAL | 99 PROPERTY NOT RELEASED / HELD AT: | 100 PROPERTY |
|---|---|---|

FILED DALE COUNTY, AL.
JAN 2 3 2004
MARY BLUDSWORTH CIRCUIT CLERK

| 101 REMARKS (NOTE ANY INJURIES AT TIME OF RELEASE) |
|---|
| |

| 102 SIGNATURE OF RECEIVING OFFICER | 103 SIGNATURE OF RELEASING OFFICER |
|---|---|
| | |

LOCAL USE
STATE USE

| MULTIPLE CASES CLOSED | 104 CASE # | 105 SFX | 106 CASE # | 107 SFX | 108 CASE # | 109 SFX | 110 ADDITIONAL CASES CLOSED NARRATIVE ☐ Y ☐ N |
|---|---|---|---|---|---|---|---|

| 111 ARRESTING OFFICER (LAST, FIRST, M.) | 112 ID # | 113 ARRESTING OFFICER (LAST, FIRST, M.) | 114 ID # | 115 SUPERVISOR | 116 WATCH CMDR. |
|---|---|---|---|---|---|
| TIPTON, REX | 00105 | RUSSELL, WALTON    010 | 00132 | ID # | TIPTON ID # 00105 |

TYPE OR PRINT IN BLACK INK ONLY

| State of Alabama<br>DALE COUNTY | **AFFIDAVIT OF SUBSTANTIAL<br>HARDSHIP AND ORDER** | Case Number |
| --- | --- | --- |
| Form C-10 *Page 1 of 2*  Rev. 2/95 | | 0401-0357 |

IN THE _____**DISTRICT**_____ COURT OF _____**DALE**_____ COUNTY

☒ STATE OF ALABAMA v. _Gary Horne_____, Defendant

CHARGE(S): _Attempted Murder_____

_____ TYPE OF PROCEEDING: _FIRST APPEARANCE_

☐ CIVIL CASE-- I, because of substantial hardship, am unable to pay the docket fee and service fees in this case. I request that payment of these fees be waived initially and taxed as costs at the conclusion of the case.

☐ CIVIL CASE-- (such as paternity, support, termination of parental rights, dependency)-- I request an attorney be appointed for me.

☒ CRIMINAL CASE-- I am financially unable to hire an attorney and request that the Court appoint one for me.

☐ DELINQUENCY/NEED OF SUPERVISION- I am financially unable to hire an attorney and request that the Court appoint one for my child.

## AFFIDAVIT

**I N C O M E / E M P L O Y M E N T**

A. Do you have a job or work for yourself?  ☒ Yes ___ No
Employer's name and address _Horne's Roofing_
_Dothan Al._
How much money do you take home each week?  + $ _360⁰⁰ - 400⁰⁰_

B. If unemployed, give month and year of last
employment and amount earned per month _____  $ _____

C. Does your husband or wife have a job?  ___ Yes ☒ No
Employer's name and address _____

How much money does he/she take home each week?  + $ _____

D. Do you receive money or benefits from any other source?  ___ Yes ☒ No
(Example: retirement pay, social security, workmen's compensation, unemployment compensation, food stamps, support payments, interest, dividends, etc.)
How much do you receive each month?  + $ _____

**A S S E T S**

A. Do you have any money in any bank, savings and loan, credit union, or any other place, including cash on hand?  ___ Yes ☒ No
Where? _____  How much? + $ _____

B. Do you own anything else of value? (Land, house, boat, television, stereo, jewelry, car, truck, van, stocks, bonds, etc.)  ___ Yes ☒ No
What? _____
_____  Total Value + $ _____

**D E P E N D E N T S**

A. Are you: ☒ Single ___ Married ___ Widowed ___ Divorced ___ Separated?

B. Do you have any dependents?  ☒ Yes ___ No
Who and what relationship? _3 children 2 sons 1 daughter_
_____
_____

0   011

Form C-10 *Page 2 of 2* Rev. 2/95

AFFIDAVIT OF SUBSTANTIAL HARDSHIP AND ORDER

What does it cost you to live each month?                                    – $ _400. ͦͦ_

| | Creditor | Total Debt | Monthly Payment |
|---|---|---|---|
| **D** | Loans | $ | $ |
| **E** | Charge Accounts | | |
| **B** | House or rent payments | | |
| **T** | Alimony | | 250. ͦͦ |
| **S** | Support | | |
| | Car payment | | 150. ͦͦ |
| | Groceries | | |
| | Utilities | | |
| | | | |
| | | | |

In support of this request, I have answered the above questions relating to my ability to pay. I swear that these answers are true and reflect my present financial status. I understand that a false statement or answer to any questions in this affidavit will subject me to penalties for perjury.

I further understand and acknowledge that if the Court appoints an attorney to represent me, the Court may require me to pay the fees and expenses of my court-appointed counsel.

Sworn to and subscribed before me this

X _____

_____ day of _____, 20 _____

Affiant Signature
Home Address _Lot 46 Hidden Grove Trailor Pk_
_Ozark AL 36360_

_____
Judge/Notary

Social Security Number _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_
Date of Birth _10-16-72_

## ORDER

### IT IS ORDERED THAT THE FOREGOING REQUEST BE:

☑ **GRANTED**          ☐ **DENIED**

FILED
DALE COUNTY, AL
JAN 2 0 2004
MARY BLUDSWORTH
CIRCUIT CLERK

**APPOINTMENT OF ATTORNEY:**

IT IS THEREFORE, ORDERED AND ADJUDGED BY THE COURT THAT _Will Matthews_

_____Attorney at Law, be and is hereby appointed as counsel to represent, assist and defend in this (these) case(s).

It is further ordered that the Court reserves the right and may order reimbursement of attorney's fees and expenses, approved by the Court and paid to the appointed counsel.

DONE this _16th_ day of _Jan_, 20_04_.

_____
Judge

0   012

STATE OF ALABAMA,
PLAINTIFF.

\*  IN THE DISTRICT COURT OF

\*  DALE COUNTY, ALABAMA

VS.

\*  CRIMINAL                    DIVISION

_Gary Horne_,

\*  CASE NUMBER  _0401-0357_

DEFENDANT.

## FIRST APPEARANCE HEARING

This is a first appearance hearing.  You are charged with a violation of

_Attempted Murder_

and a primary purpose of this hearing is to insure that you know and understand the charge or charges that are against you.  At this hearing, there will be no determination made about your guilt or innocence of the alleged offense(s), but only that you know and understand the charge or charges against you.

You are entitled to be represented by an attorney in these proceedings.  You have a right to hire your own attorney.  One purpose of this hearing is to determine if you can or cannot afford to hire an attorney; if the Court concludes that you are indigent, one will be appointed for you, if you otherwise qualify for such representation.

You have a right to talk with your attorney, family or friends, and if necessary, reasonable means will be provided in order to enable you to do so.

If you are charged with a felony, you are entitled to a Preliminary Hearing before a judge to determine whether the prosecution has sufficient evidence to establish that you probably committed the crime or crimes with which you are charged; however, you may waive, that is, give up your right to such Preliminary Hearing.  Your attorney will assist you with the decision as to whether to request a Preliminary Hearing.  If, at the conclusion of a Preliminary Hearing, the judge finds that sufficient evidence has been shown to establish that you probably committed the crime or crimes with which you are charged, he will than bind you over for further action of the Court, including the Grand Jury.  If, on the other hand, the judge finds that the evidence is insufficient to establish that you probably committed the crime or crimes charged, then he will dismiss the charge and discharge you from further custody or pre-trial release obligations.

Another purpose of this hearing is to determine whether bail should be set in your case, or, if it has been already set, if it should remain the same, be raised, be lowered, or whether you should be released upon your own recognizance, that is, your personal promise to appear for future court proceedings, or released in the custody of some responsible person.  In order for me to make this determination, it will be necessary for me to ask you some questions concerning your ties with the community.  Your attorney can request a separate hearing in regard to your bail.

This, the _16_ day of _Jan_ , _2004_

FILED
DALE COUNTY, AL

JAN 2 0 2004

MARY BLUDSWORTH
CIRCUIT CLERK

_____
Judge

I have read, or have had the above read to me, and I am fully aware of all of my rights presented in this initial appearance.

cc: Defendant

_____
Defendant
_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_

)                                                    )

STATE OF ALABAMA,                    )        IN THE DISTRICT COURT OF
                                     )        DALE COUNTY, ALABAMA
        Plaintiff,                   )
                                     )
vs.                                  )        CRIMINAL DIVISION
                                     )
GARY HORNE,                          )
                                     )
        Defendant.                   )        DC-2004_____

## TO: HONORABLE WILLIAM B. MATTHEWS, JR.

### NOTICE OF APPOINTMENT
### AS ATTORNEY TO REPRESENT DEFENDANT

The above named Defendant has requested that the Court appoint an attorney for him in connection with these proceedings, and has executed an Affidavit of Substantial Hardship in this regard.

You have been appointed to represent the Defendant in connection with these charges, as provided by law. Please contact the Defendant as soon as possible so that your preparation of defensive matters can be started without delay.

You may, of course, feel free to contact the District Attorney or one of the Assistant District Attorneys, as appropriate, in regard to development of the defense.

If for any reason you are not in a position to represent this Defendant, please notify this Court immediately by telephone, and confirm such notice in writing. If there are any questions in this regard, please call this Court.

This the 16th day of January, 2004.

_____
William H. Filmore, District Judge

CHARGE(S): Attempted Murder

ADDRESS: Lot 46, Hidden Grove Trailer Court, Ozark, AL 36360;
*Currently in the Dale County Jail*

cc: **Attorney**



FILED
DALE COUNTY, AL
JAN 2 0 2004
MARY BLUDSWORTH
CIRCUIT CLERK

0   014

| | | |
|---|---|---|
| STATE OF ALABAMA,<br>**PLAINTIFF** | )<br>)<br>) | **IN THE DISTRICT COURT OF**<br>**DALE COUNTY, ALABAMA** |
| **vs.** | )<br>) | **CRIMINAL DIVISON** |
| GARY HORNE,<br>**DEFENDANT** | )<br>)<br>) | **CASE NO.  DC-2004-** |

## ENTRY OF APPEARANCE

**COMES NOW** William B. Matthews, Jr. who hereby enters his appearance as counsel for the Defendant, Gary Horne, in the above styled case.

**DONE** this the _16ᵗʰ_ day of _Jan._ , 2004.

_(signature)_

William B. Matthews, Jr.  (MAT016)
Attorney for Defendant
P. O. Box 1145
Ozark, AL      36361
(334) 774-8804

_[FILED DALE COUNTY, AL / JAN 1 6 2004 / MARY BLUDSWORTH CIRCUIT CLERK stamp]_

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have served a copy of the foregoing instrument on the Honorable David Emery, District Attorney, by placing a copy of same in the U.S. Mail, postage prepaid and addressed to him at P. O. Box 1688, Ozark, AL, 36361, this _16ᵗʰ_ day of _Jan_ , 2004.

_(signature)_

William B. Matthews, Jr.

0   015

STATE OF ALABAMA,          *      IN THE DISTRICT COURT OF
        PLAINTIFF,          *      DALE COUNTY, ALABAMA
                        *

VS.                     *      CRIMINAL DIVISION
                        *

GARY HORNE,            *
        DEFENDANT,       *      CASE NO. DC-2004-

## DISCOVERY MOTION

**COMES NOW** the Defendant in the above-styled case and moves the Honorable

Court to require the State, through the District Attorney of the 33rd Judicial Circuit, to produce at

any of the non-jury hearings and prior to trial the following:

    1. Copies of all police reports in connection with this case.

    2. Copies of any scientific reports, if applicable.

    3. Names and addresses of all witnesses.

    4. Any statements made by Defendant whether oral or written to any police officer or
other witness to be called by State.

    5. The criminal records of all persons whom the State intends to call as a witness.

    6. The criminal record of the Defendant, if any.

    7. Copies of the affidavits used to procure search warrants and a copy of the actual search
warrant, if applicable.

    8. Any other evidence which the Prosecutor plans to use at the trial of the Defendant, if
any previously asked for.

    This motion is made under the authority of Brady v. Maryland, 373 U.S. 83, 83 S. Ct.

1194, (1963); Giles v. Maryland, 386 U.S. 66, 87 S. Ct. 793 (1967); and Williams v. Dutton, 400

Fed. 2d 797 (5th Cir. 1968).

    That all of said documents, pictures and articles are relevant, significant and constitute

substantial material evidence and will be useful to the named Defendant as evidence upon

Defendant's trial under said case.

The aforesaid documents are in possession of the State and are favorable or arguably favorable to the Defendant as to the issue of Defendant's innocence.

That without the production of the documents referred to above and the list of witnesses which State intends to use, the Defendant's counsel will not be able to effectively represent Defendant in the above-styled case and thus Defendant will be denied the right of counsel which is guaranteed to Defendant under the provisions of Article I Section VI, of the Alabama Constitution, and the Sixth Amendment of the United States Constitution made applicable to the State through the due process clauses of the Fourteenth Amendment of the United States Constitution.

**WHEREFORE**, the Defendant prays:

a. That the state be required to produce all documents and other evidence referred to above as well as a list of all witnesses and people that the District Attorney, his staff, or the law enforcement agencies have interviewed in regard to this case.

b. Without waiving Defendant's right to have Defendant's counsel examine said documents, pictures and articles, if the Court does not permit this to be done, that the Court conduct an in camera examination of said documents, pictures and articles, and Defendant's counsel be permitted to see and copy or reproduce any of said documents, pictures and articles which the Court determines to be favorable to the named Defendant as to the question of guilt or punishment or for the purpose of impeaching any of the witness to be called by the State and in the trial of the named Defendant.

c. That if any part of said documentary evidence is not made available to the named Defendant prior to the commencement of Defendant's trial, then without waiving Defendant's right to the production of said evidence prior to Defendant's trial, Defendant respectfully moves the Court for an order directing the District Attorney to produce all such documents and evidence and to submit the same to Defendant's counsel at the close of the State's evidence.

d. Without waiving the foregoing, the Defendant requests that an exact copy be made of each item which is not presented to defense counsel and that the same be sealed and included in the record of this case for the purpose of insuring effective review of the Court's denial of the Defendant's previous request for disclosure.

e.  That the duty of the District Attorney to disclose pursuant to this motion be considered as continuing up until and through the trial and post judgment proceedings.

**DONE** this *16th* day _____*Jan.*_____, 2004.

_William B. Matthews, Jr._ (MAT016)
Attorney for Defendant
Post Office Box 1145
Ozark, Alabama 36361
(334) 774-8804

FILED
DALE COUNTY, AL

JAN 1 6 2004

MARY BLUDSWORTH
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have mailed a copy of the foregoing motion to the District Attorney, Mr. David Emery, Attorney for Plaintiff, by placing a copy of same in the U.S. Mail, postage prepaid and addressing it to him at P.O. Box 1688, Ozark, Alabama 36361 this *16th* day of _____*Jan.*_____, 2004.

_William B. Matthews, Jr._

0   C18

)                                    )

| STATE OF ALABAMA, | | * | IN THE DISTRICT COURT OF |
| PLAINTIFF, | | * | DALE COUNTY, ALABAMA |
| | | * | |
| VS. | | * | CRIMINAL DIVISION |
| | | * | |
| GARY HORNE, | | * | |
| DEFENDANT, | | * | CASE NO. DC-2004- |

## MOTION FOR PRELIMINARY HEARING

COMES NOW the Defendant, Gary Horne, by and through his undersigned Attorney, William B. Matthews, Jr., who files this motion for preliminary hearing.

DONE this _16th_ day of _Jan._, 2004.

William B. Matthews, Jr.  (MAT016)
Attorney for Defendant
Post Office Box 1145
Ozark, Alabama 36361
(334) 774-8804

FILED
DALE COUNTY, AL

JAN 1 6 2004

MARY BLUDSWORTH
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have mailed a copy of the foregoing motion to the District Attorney, Mr. David Emery, counsel for Plaintiff, by placing a copy of same in the U.S. Mail, postage prepaid and addressing it to him at P.O. Box 1688, Ozark, Alabama 36361 this _16th_ day of _Jan._, 2004.

William B. Matthews, Jr.

0    019

# IN THE DISTRICTCOURT OF DALE COUNTY, ALABAMA

## CRIMINAL DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.:  DC– 03 – |
| | ) | |
| GARY HORNE, | ) | |
|     Defendant. | ) | |

### NOTICE OF APPEARANCE

COMES NOW, N. Tracy Nickson and makes this his Notice of Appearance on behalf the Defendant, _GARY HORNE_ .

RESPECTFULLY submitted on this the 21 day of ~~August~~ Jan 2004.

FILED
DALE COUNTY, AL
JAN 2 1 2004
MARY BLUDSWORTH
CIRCUIT CLERK

**N. TRACY NICKSON (NIC026)**
**ATTORNEY FOR DEFENDANT**
**2181 AA COBBS FORD ROAD**
**PRATTVILLE, ALABAMA 36066**
**(334) 285-1776**

### CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the offices of the Dale County District Attorney by placing same in his/her box and or by first class U.S. Mail, postage pre-paid on this the 21st of January 2004.

OF COUNSEL

)                    )

# IN THE DISTRICTCOURT OF DALE COUNTY, ALABAMA
## CRIMINAL DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
|    Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.:   DC– 03 – |
| | ) | |
| GARY HORNE, | ) | |
|    Defendant. | ) | |

## REQUEST FOR DISCOVERY

**COMES NOW**, the Defendant, by and thorough his attorney N. Tracy Nickson, and moves this Court, pursuant to the Due Process clause of the Fifth and Fourteenth Amendment to the United States Constitution and the Alabama State Constitution and the Alabama Rules of Criminal Procedure, for an order to the District Attorney to produce and make available to the Defendant and his attorney for the purpose of inspection, copying and / or testing the following:

1. All information from whatever source or in whatever forms which may be exculpatory in nature or which may lead to evidence, which tends to be exculpatory in nature.  See ***Brady v. Maryland***, 373 U.S. 83.

2. All Statements made by Defendant to anyone, including law enforcement officials, whether statements are recorded (tape video), written or in memoranda form of any oral statement of Defendant.

3. A transcript of the arrest and conviction record, if any, of the Defendant.

4. Any and all information which, in any way, tends to adversely affect the creditability of all witness (es) the prosecution intends to call on its behalf at trial or any hearing in this case.

5. All items of physical evidence, which the prosecution expects to use as evidence in this case, such items to be produced for examination and testing.

6. Any and all materials required to be produced by the prosecution pursuant to the precedent set forth in ***Giglio v. United States***, 405 U.S. 150,; Naque v. Illinois, 360 U.S. 264; ***United States v. Tashman***, 478 FR.2d 129 (5 Cir. 1973.)

7. Any and all tape recordings, videotapes, wire tap information, pen register information, or any other electronic evidence, which may exist concerning this case or any related case.

8. All information, which is discoverable pursuant to the provisions of Rule 16. ***Alabama Rules of Criminal Procedure***.

9. Defendant requests this Court to Order the prosecution to provide early access to any information, which constitutes "Jenkins Act" (18 U.S.C. Sec. 3500) material.

10. Any and all tape recordings and stenographic transcription of admissions, confessions and statements of Defendant at any time or place to any federal, state, city or county law enforcement officer or agent, or to anyone acting in an official capacity.

11. Any and all tangible objects, currency, weapons, books, papers and documents obtained from any other person's relating to the charges against the Defendant.

12. The results and reports of any scientific or other tests, analysis, experiments or studies made in connection with the instant case, including but not limited to any and all results of fingerprints compared, blood tests taken, hair samples compared, and medical reports of whatever nature.

13. The results and reports of any and all sobriety tests conducted by any law enforcement officer.

14. Copies of any witness statements or summaries of any oral statement, whether or not reduced to writing, made by any person(s) in connection with the instant case.

15. A list of all persons interviewed, whether or not reduced to writing by any person in connection with the investigation of the instant case.

16. A list of all persons, their names, addresses and telephone numbers (both residential and employment) that the prosecution expects to call or may call to testify in connection with this case.

17. Copies of all incident reports, arrest reports, supplemental reports or any report whether official or unofficial, made by any law enforcement agent in connection with the instant case.

18. A list of all documents currently in the possession of the District Attorney's office or any other State agency used in the investigation of this case or expected to be used as evidence in this case.

19. A list of all items collected as possible evidence in this case and a list of items to be tested, scientifically or otherwise in connection with the instant case.

20. Permission to inspect any and all physical items, photographs or physical places contemplated of ruse in connection with the instant case, including but not limited to inspection of the scene at any location connected with the arrest of the Defendant for then commission of the alleged crime.

21. Copies of all photographs, diagrams or charts taken in connection with this case.

22. The pretrial discovery requested in the foregoing Motion is essential to insure the accused his or her right to a fair hearing, his right to confrontation, his right to prepare a defense in

his own behalf, and his right to effective counsel and due process of law and all other rights not herein enumerated.

23. Defendant requests that the Government be required to produce all the foregoing items to this Honorable Court for an in-camera inspection in order to allow the Court to make a determination concerning the validity of any objection the Government may have to the production of the foregoing items.

24. Any and all intelligence reports that are created from any and all law enforcement agencies within this State or any other State or federal government.

25. Original or copies of any and all notices of appearance served upon each and every witness, including return of service of each said notice in the instant case.

26. Any and all probable cause reports, statement, search warrants and any and all statements to which an impartial magistrate or Judicial Officer issued any search warrant in the instant case, including but not limited to, arrest report and or indictment, date indicted and date notice was served upon the Defendant.

27. Copies of all ballistics test results.

**WHEREFORE THE PREMISES CONSIDERED,** the Defendant prays that this Court shall set forth an order that is consistent with the above-stated request for discovery.



RESPECTFULLY submitted on this the 21 day of _January_ 2003.

FILED
DALE COUNTY, AL.

JAN 2 1 2004

MARY BLUDSWORTH
CIRCUIT CLERK

N. TRACY NICKSON (NIC026)
**ATTORNEY FOR DEFENDANT**
**2181 AA COBBS FORD ROAD**
**PRATTVILLE, ALABAMA 36066**
**(334) 285-1776**

**CERTIFICATE OF SERVICE**

I do hereby certify that a copy of the foregoing document has been served upon the

offices of the Dale County District Attorney by placing same in his/her box and or by first class

U.S. Mail, postage pre-paid on this the 21st of ___January___ 2003.

_____
OF COUNSEL

)                                    )

# IN THE DISTRICTCOURT OF DALE COUNTY, ALABAMA

## CRIMINAL DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.:   DC– 03 – |
| | ) | |
| GARY HORNE, | ) | |
| Defendant. | ) | |

## MOTION TO SET BOND

**COMES NOW,** the Defendant in the above styled action, and respectfully

requests that this Honorable Court will schedule a hearing after which bond may be set in

said action.

**RESPECTFULLY** submitted on this the 21st day of January 2004.

> FILED
> DALE COUNTY, AL
>
> JAN 2 1 2004
>
> MARY BLUDSWORTH
> CIRCUIT CLERK

N. TRACY NICKSON (NIC026)
**ATTORNEY FOR DEFENDANT**
**2181 AA COBBS FORD ROAD**
**PRATTVILLE, ALABAMA 36066**
**(334) 285-1776**

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon

the offices of the Dale County District Attorney by placing same in his/her box and or by

first class U.S. Mail, postage pre-paid on this the 21st of January 2004.

OF COUNSEL

0   C26

STATE OF ALABAMA,           )     IN THE DISTRICT COURT OF
       PLAINTIFF         )     DALE COUNTY, ALABAMA
                      )
vs.                    )     CRIMINAL DIVISION
                      )
GARY HORNE,            )
       DEFENDANT      )     CASE NO.  DC-2004-

## MOTION TO SET BAIL

      COMES NOW the Defendant, Gary Horne, by and through his undersigned Attorney, William B. Matthews, Jr., who moves the Honorable Court to set bail in the above styled case and shows the Court the following:

      1. The Defendant is being held without bail.

      2. That the Defendant is presently charged with a Class B felony and the recommended bond range is from $2,000 to $20,000.

      WHEREFORE, the premises considered, the Defendant prays for the following relief:

      1. An order setting bail within the recommended range according to Rule 7.2 of the Alabama Rules of Criminal Procedure.

      DONE this the ____ 23rd ____ day of _____ 2004.

FILED
DALE COUNTY, AL

JAN 2 3 2004

MARY BLUDSWORTH
CIRCUIT CLERK

William B. Matthews, Jr.   (MAT016)
Attorney at Law
P. O. Box 1145
Ozark, AL   36361
(334) 774-8804

## CERTIFICATE OF SERVICE

      I, the undersigned, do hereby certify that I have served a copy of the foregoing instrument on the Honorable David Emery, District Attorney, by placing a copy of same in the U.S. Mail, postage prepaid and addressed to him at P. O. Box 1688, Ozark, AL, 36361, this 23rd day of _____, 2004.

William B. Matthews, Jr.

0    027

| | | |
|---|---|---|
| STATE OF ALABAMA,<br>　　　PLAINTIFF | )<br>)<br>) | IN THE DISTRICT COURT OF<br>DALE COUNTY, ALABAMA |
| vs. | )<br>) | CRIMINAL DIVISION |
| GARY HORNE,<br>　　　DEFENDANT | )<br>)<br>) | CASE NO. DC-2004- |

## MOTION TO WITHDRAW

**COMES NOW** William B. Matthews, Jr., who moves the Honorable Court to allow him to withdraw as counsel for the Defendant, Gary Horne, the above styled case and shows the Court the following:

　　1. The Defendant has retained other counsel.

　　**DONE** this the 26 day of _____, 2004.

　　　　　　　　　　　　_____
　　　　　　　　　　　　William B. Matthews, Jr.　(MAT016)
　　　　　　　　　　　　Attorney at Law
　　　　　　　　　　　　P. O. Box 1145
　　　　　　　　　　　　Ozark, AL　36361
　　　　　　　　　　　　(334) 774-8804



FILED
DALE COUNTY, AL

JAN 2 6 2004

MARY BLUDSWORTH
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

　　I, the undersigned, do hereby certify that I have served a copy of the foregoing instrument on the Honorable David Emery, District Attorney, by placing a copy of same in the U.S. Mail, postage prepaid and addressed to him at P. O. Box 1688, Ozark, AL, 36361, this 26 day of _____, 2004.

　　　　　　　　　　　　_____
　　　　　　　　　　　　William B. Matthews, Jr.

0　028

STATE OF ALABAMA,        )     IN THE DISTRICT COURT OF
                      )     DALE COUNTY, ALABAMA
     Plaintiff,        )
                      )
vs.                   )     CRIMINAL DIVISION
                      )
GARY HORNE,         )
                      )
     Defendant.       )     CASE NO.  DC-2004-89

# ORDER

      The Attorney for the Defendant, William B. Matthews, Jr., having made a motion to

withdraw in open Court as the Defendant has hired N. Tracy Nickson, to represent him in this matter,

the Court having considered same, it is hereby,

      **ORDERED, ADJUDGED** and **DECREED** that the Attorney for the Defendant is permitted

to withdraw from the case.

      **DONE** this the 26th day of January, 2004.

1/26/04

_____
William H. Filmore, District Judge

cc:   Honorable William B. Matthews, Jr.
      Honorable David C. Emery
      Honorable N. Tracy Nickson



FILED
DALE COUNTY, AL
JAN 2 6 2004
MARY BLUDSWORTH
CIRCUIT CLERK

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE DISTRICT COURT OF |
| | ) | DALE COUNTY, ALABAMA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL DIVISION |
| | ) | |
| GARY HORNE, | ) | |
| | ) | |
| Defendant. | ) | CASE NO.  DC-2004-89 |

## ORDER

Defendant's Motion to Set Bond having been presented to the Court this date and the Court considering and understanding the same, it is therefore,

**ORDERED, ADJUDGED** and **DECREED** that said Motion to Set Bond  Hearing is set for January 28, 2004 at 10:00 a.m. in Courtroom No. 2, Dale County Courthouse, 2nd Floor, Ozark, Alabama.

This the 26th day of January, 2004.



William H. Filmore
District Court Judge

1/27/04

cc:   Honorable David C. Emery
       Honorable N. Tracy Nickson

FILED
DALE COUNTY, AL

JAN 2 6 2004

MARY BLUDSWORTH
CIRCUIT CLERK

)                                    )

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE DISTRICT COURT OF |
| | ) | DALE COUNTY, ALABAMA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CRIMINAL DIVISION |
| | ) | |
| GARY HORNE, | ) | |
| | ) | |
| Defendant. | ) | CASE NO. DC-2004-89 |

## DISCOVERY ORDER

**IT IS HEREBY ORDERED:**

1. The District Attorney shall produce or make available to the defendant's attorney the following:

a. A copy of the Indictment against the Defendant;

b. All statements of the Defendant, which are reduced in writing;

c. All statements of the Defendant which are electronically recorded or taped, and any transcript thereof;

d. The substance of any oral statements made by the Defendant which are not included within (b) and (c) hereof, or if the District Attorney knows of any statements or spontaneous remarks made by the Defendant while in the custody of the police or during the investigation.

e. Any and all evidence tending to exculpate the guilt of the Defendant;

f. The results of any scientific or expert tests, experiments, or examinations to be used by the prosecution at the trial;

g. All physical evidence or documentary evidence which the prosecution will offer into evidence in its case in chief, including any search warrant and search affidavits upon which the prosecution will rely on its case in chief;

h. All physical evidence or documentary evidence seized from the Defendant by law enforcement officers, whether or not the same will be offered into evidence at trial;

i. In prosecutions under the Alabama Uniform Control Substance Act, the defendant may procure the examination and testing of controlled substance or other prosecution evidence by his own expert, upon request to the District Attorney or his assistants. Such examination and testing shall only take place in the presence of the District

Attorney or his authorized representative, and the same shall be done at the defendant's expense;

j. The name and last known address of all confidential government informants who are eyewitnesses to the commission of the crime charged in the indictment, if the defendant doesn't already have such information.

2. In all instances where physical or documentary evidence, tape recordings and the like are to be inspected, examined or copied by the defense counsel, the parties shall insure that such procedures are used as will safeguard and maintain the integrity of said evidence

3. The District Attorney is under an obligation to disclose to defense counsel any evidence subject to this Order, which he subsequently discovers to exist, and do so within a reasonable time after its existence is discovered.

4. Any disagreements with the parties concerning the scope, identity or existence of discoverable matter are to be submitted to the Court for resolution upon written motion of either party within a reasonable time before trial. Any party who does not so submit any unresolved discovery issue to the court will be precluded from raising the same at trial. If the court finds that either party has failed to use good faith in complying with this Order, the court may, in the case of the State, bar the State from using at trial any non-disclosed matter; and the Court may, in the case of the defendant, hold the objections to the State's use of said matter at trial, based upon non-disclosure, to be waived.

This the 29th day of January, 2004.

_____
District Judge

cc:    Honorable David C. Emery
       Honorable N. Tracy Nickson

FILED
DALE COUNTY, AL
JAN 2 9 2004
MARY BLUDSWORTH
CIRCUIT CLERK

0    C32

| State of Alabama<br>Unified Judicial System | **CONSOLIDATED APPEARANCE BOND**<br>(District Court, Grand Jury, Circuit Court) | Case Number |
|---|---|---|
| Form CR-10    Rev. 8/98 | | |

IN THE _____*Circuit*_____ COURT OF _____*Dale*_____, ALABAMA
<div align="center">(Circuit or District)                    (Name of County)</div>

STATE OF ALABAMA  v.  _____*Gary Horne*_____
<div align="right">**Defendant**</div>

I, _____*Gary Horne*_____ (Defendant), as principal,
and I (we), _____*Diaz Bond Co.*_____
<div align="center">(Please print)</div>
_____, as surety(ies), agree
to pay the State of Alabama the sum of $ *30,000.00* and such costs as authorized by law unless the above-named defendant
appears before the district court of the county on _____*Next Term*_____ (date) at _____*9:00*__.M. (time) (if date and time
are unknown, the words "the scheduled" may be placed in the date blank and a line may be placed in the space for time) and from time
to time thereafter until discharged by law or at the next session of circuit court of the county; there to await the action by the grand jury
and from session to session thereafter until discharged by law to answer to the charge of *ATTEMPTED MURDER*
_____, or any other charge as authorized by law.
    We hereby severally certify that we have property valued over and above all debts and liabilities that has a fair market value equal
to or greater than the amount of the above bond, and we, and each of us, waive the benefit of all laws exempting property from levy and
sale under execution or other process for the collection of debt by the constitution and laws of the State of Alabama, and we especially
waive our rights to claim as exempt our wages or salary that we have under the laws of Alabama, and our rights to homestead exemption
that we have under the Constitution of Alabama and the laws of the State of Alabama, as set out in a separate writing.
    It is agreed and understood that this is a consolidated bond, eliminating the necessity for multiple bonds and that it shall continue
in full force and effect, until the defendant appears before the district court or circuit court, whichever has jurisdiction, to answer the above
charge, and from time to time thereafter until the defendant is discharged by law, or, until such time as the undersigned sureties are
otherwise duly exonerated as provided by law.
    Signed and sealed this date with notice that false statements are punishable as perjury.

| Signature of Defendant *Gary Horne* (L.S.) | | | |
|---|---|---|---|
| Address (print) *Lot 46 Hidden Grove Tr Pk* | City *Ozark* | State *Al* | Zip *36360* |

| Signature of Surety/Agent of Professional Surety or Bail Company (L.S.) | Signature of Surety/Agent of Professional Surety or Bail Company (L.S.) |
|---|---|
| Social Security Number *Diaz Bo.* Telephone Number *790-0899* | Social Security Number    Telephone Number |
| Address (print)    City    State    Zip | Address (print)    City    State    Zip |

| Signature of Surety/Agent of Professional Surety or Bail Company (L.S.) | Signature of Surety/Agent of Professional Surety or Bail Company (L.S.) |
|---|---|
| Social Security Number    Telephone Number | Social Security Number    Telephone Number |
| Address (print)    City    State    Zip | Address (print)    City    State    Zip |

FILED
DALE COUNTY, AL

FEB - 2 2004

MARY BLUDSWORTH
CIRCUIT CLERK

Date *1-30-2004*

Approved by: Judge/Magistrate/Sheriff

By *Diaz Bo. Co.* Deputy Sheriff

**Defendant's Information**

| Date of Birth *10-16-72* | Sex *M* | Height *6'* | Weight *180* | Employer |
|---|---|---|---|---|
| Social Security Number *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* | Race *Blk* | Hair *Blk* | Eyes *Bro* | Employer's Address |
| Driver's License Number *6301217*    State *(AL)* | | Telephone Number *445-4402* | | Employer's Telephone Number |

**INDICTMENT # 28**

| | |
|---|---|
| **THE STATE OF ALABAMA** | **CIRCUIT COURT** |
| **DALE COUNTY** | **MARCH 2, TERM 2004** |

THE GRAND JURY OF SAID COUNTY CHARGE THAT BEFORE THE FINDING OF THIS INDICTMENT,

ON OR ABOUT JANUARY 15, 2004, ONE GARY HORNE DID, WITH THE INTENT TO COMMIT THE CRIME OF MURDER OF TO-WIT: JOHN WILLIAMS, IN VIOLATION OF SECTION 13A-6-2 OF THE CODE OF ALABAMA,    ATTEMPT TO COMMIT SAID OFFENSE BY SHOOTING HIM WITH A HANDGUN, IN VIOLATION OF SECTION 13A-4-2 OF THE CODE OF ALABAMA,

AGAINST THE PEACE AND DIGNITY OF THE STATE OF ALABAMA.

DISTRICT ATTORNEY OF THE 33RD JUDICIAL CIRCUIT

A TRUE BILL

FOREMAN OF THE GRAND JURY

PRESENTED TO THE COURT BY THE GRAND
JURY IN THE PRESENCE OF

FILED _____ IS _____ OTHER JURORS.

CLERK

WRIT OF ARREST ORDERED ISSUED AND
AMOUNT OF BAIL TO BE REQUIRED OF THE
DEFENDANT

BOND: $30,000.00

_____
JUDGE

CHARGES

ATTEMPTED MURDER

---

FILED
DALE COUNTY, AL

MAR - 3 2004

MARY BLUDSWORTH
CIRCUIT CLERK

---

INDICTMENT # 28

THE STATE OF ALABAMA

DALE COUNTY

CIRCUIT COURT

THE STATE

Vs

GARY HORNE

INDICTMENT

PROSECUTOR

STATE WITNESSES

REX TIPTON
KEITH CAUTHEN
MARTIN SPEARS

---

I,

CLERK OF THE CIRCUIT COURT OF
DALE COUNTY ALABAMA, HEREBY
CERTIFY THAT THIS IS A TRUE AND
CORRECT COPY OF THE ORIGINAL
INDICTMENT WITH ALL THE
ENDORSEMENTS THEREON, IN CASE OF
THE CASE OF ALABAMA AGAINST

GARY HORNE

THIS _____ DAY OF
MARCH 2004.

CLERK OF THE CIRCUIT COURT OF
DALE COUNTY ALABAMA

| State of Alabama<br>Unified Judicial System | PLEA OF NOT GUILTY AND WAIVER OF ARRAIGNMENT | Case Number |
|---|---|---|
| Form CR-9         Rev. 3/95 | | CC-04-1220 |

IN THE _____CIRCUIT_____ COURT OF ___*Dale*__ COUNTY_____, ALABAMA
       *(Circuit, District or Municipal)*         *(Name of County or Municipality)*

⊠ STATE OF ALABAMA v. _____GARY HORNE_____, Defendant

Comes now, the defendant in the above-styled matter, and to the offense charged enters a plea of

⊠ Not Guilty
☐ Not Guilty by Reason of Mental Disease or Defect
☐ Not Guilty and Not Guilty by Reason of Mental Disease or Defect

Defendant acknowledges receipt of the copy of the charge against him/her and further waives the right to have an arraignment at which the defendant is present in person, or at which the defendant is represented by an attorney.

But, the defendant specifically and expressly reserves the right upon the filing hereof to hereafter, but before trial or before such date as may be set by the court, to interpose any defenses, objections, or motions which the defendant had the right as a matter of law or rule to interpose in this cause, prior to the filing hereof.

Defendant's date of birth is __16 October 1972__ Defendant's age is __31 years__
The defendant is not eligible for consideration by the court for youthful offender status as provided by law.

Date _3/26/2004_

Date _3/26/2004_

Defendant _____

Attorney for Defendant _____

This is to certify that I am the attorney for the defendant in this matter, and that I have fully explained this form and all matters set forth herein, and pertaining hereto, to the defendant. I further state to the court that I have explained to the defendant his right to be arraigned in person and his right to have me represent him at arraignment. I further certify to the court that my client hereby knowingly, voluntarily, and intelligently waives these rights after a full and complete explanation of each and every one of them to him/her by me. BOTH MYSELF AND THE DEFENDANT UNDERSTAND THAT I AM RESPONSIBLE FOR ASCERTAINING WHAT DATE, IF ANY, HAS BEEN SET BY THE COURT FOR THE MAKING OR FILING OF ANY DEFENSES, OBJECTIONS, OR MOTIONS. I FURTHER UNDERSTAND THAT I AM RESPONSIBLE FOR NOTIFYING MY CLIENT OF THE DATE HIS/HER CASE IS SET FOR TRIAL, AND THAT I HAVE ADVISED AND INFORMED HIM/HER THAT IN THE EVENT HE/SHE FAILS TO APPEAR ON THE DATE HIS/HER CASE IS SET FOR TRIAL, ALL APPROPRIATE LEGAL ACTION WILL BE TAKEN BY THE COURT AGAINST THE DEFENDANT AND HIS/HER BOND. I further certify to the court that I have advised my client that he/she is responsible for obtaining the date his/her case is set for trial in this matter and that in the event he/she fails to appear on the date his/her case is set for trial all appropriate legal action will be taken by the court against the defendant and his/her bond, and I hereby certify that the defendant knows that he/she is personally responsible for obtaining the date his/her case is set for trial and for being present in court on that date.

Date _3/26/2004_

Attorney for Defendant Signature _____

I certify that I served a copy of the foregoing plea and waiver of arraignment on the Prosecutor by mailing/delivering a copy of the same to him/her on:

Date _3/26/2004_

N. TRACY NICKSON  (NIC-026)
Printed or Typed Attorney's Name

2181 AA COBBS FORD ROAD, PRATTVILLE AL 36066
Address

This is to certify that my attorney has explained each and every matter and right set forth in this form and I have completely and fully read and do so understand each and every matter set forth in this form. I further state to the court that I do not wish to be personally present at an arraignment in this case and that I do not want to have an attorney represent me at an arraignment and WITH FULL KNOWLEDGE OF EACH OF THESE RIGHTS, I HEREBY EXPRESSLY WAIVE SUCH RIGHTS. I further state to the court that I have been informed of the charge against me and have received a copy of the charge.

Date _3/26/2004_

MAR 2 6 2004

Filed in office this date

MARY BUDSWORTH
CIRCUIT CLERK

Defendant Signature _____

Clerk _Mary Budsworth_ By _DS_

M

)                                    )

## IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA
## CRIMINAL DIVISION

STATE OF ALABAMA,              )
      Plaintiff,               )
                       )
                       )
vs.                            )        CASE NO.:  CC– 04–1220
                       )
GARY HORNE,                    )
      Defendant.               )

### REQUEST FOR DISCOVERY

**COMES NOW**, the Defendant, by and thorough his attorney N. Tracy Nickson, and moves this Court, pursuant to the Due Process clause of the Fifth and Fourteenth Amendment to the United States Constitution and the Alabama State Constitution and the Alabama Rules of Criminal Procedure, for an order to the District Attorney to produce and make available to the Defendant and his attorney for the purpose of inspection, copying and / or testing the following:

1.   All information from whatever source or in whatever forms which may be exculpatory in nature or which may lead to evidence, which tends to be exculpatory in nature.  See ***Brady v. Maryland***, 373 U.S. 83.

2.   All Statements made by Defendant to anyone, including law enforcement officials, whether statements are recorded (tape video), written or in memoranda form of any oral statement of Defendant.

3.   A transcript of the arrest and conviction record, if any, of the Defendant.

4.   Any and all information which, in any way, tends to adversely affect the creditability of all witness (es) the prosecution intends to call on its behalf at trial or any hearing in this case.

5.  All items of physical evidence, which the prosecution expects to use as evidence in this case, such items to be produced for examination and testing.

6.  Any and all materials required to be produced by the prosecution pursuant to the precedent set forth in *Giglio v. United States*, 405 U.S. 150,; Naque v. Illinois, 360 U.S. 264; *United States v. Tashman*, 478 FR.2d 129 (5 Cir. 1973.)

7.  Any and all tape recordings, videotapes, wire tap information, pen register information, or any other electronic evidence, which may exist concerning this case or any related case.

8.  All information, which is discoverable pursuant to the provisions of Rule 16. *Alabama Rules of Criminal Procedure*.

9.  Defendant requests this Court to Order the prosecution to provide early access to any information, which constitutes "Jenkins Act" (18 U.S.C. Sec. 3500) material.

10. Any and all tape recordings and stenographic transcription of admissions, confessions and statements of Defendant at any time or place to any federal, state, city or county law enforcement officer or agent, or to anyone acting in an official capacity.

11. Any and all tangible objects, currency, weapons, books, papers and documents obtained from any other person's relating to the charges against the Defendant.

12. The results and reports of any scientific or other tests, analysis, experiments or studies made in connection with the instant case, including but not limited to any and all results of fingerprints compared, blood tests taken, hair samples compared, and medical reports of whatever nature.

13. The results and reports of any and all sobriety tests conducted by any law enforcement officer.

)                                                    )

14. Copies of any witness statements or summaries of any oral statement, whether or not reduced to writing, made by any person(s) in connection with the instant case.

15. A list of all persons interviewed, whether or not reduced to writing by any person in connection with the investigation of the instant case.

16. A list of all persons, their names, addresses and telephone numbers (both residential and employment) that the prosecution expects to call or may call to testify in connection with this case.

17. Copies of all incident reports, arrest reports, supplemental reports or any report whether official or unofficial, made by any law enforcement agent in connection with the instant case.

18. A list of all documents currently in the possession of the District Attorney's office or any other State agency used in the investigation of this case or expected to be used as evidence in this case.

19. A list of all items collected as possible evidence in this case and a list of items to be tested, scientifically or otherwise in connection with the instant case.

20. Permission to inspect any and all physical items, photographs or physical places contemplated of ruse in connection with the instant case, including but not limited to inspection of the scene at any location connected with the arrest of the Defendant for then commission of the alleged crime.

21. Copies of all photographs, diagrams or charts taken in connection with this case.

22. The pretrial discovery requested in the foregoing Motion is essential to insure the accused his or her right to a fair hearing, his right to confrontation, his right to prepare a defense in

his own behalf, and his right to effective counsel and due process of law and all other rights not herein enumerated.

23. Defendant requests that the Government be required to produce all the foregoing items to this Honorable Court for an in-camera inspection in order to allow the Court to make a determination concerning the validity of any objection the Government may have to the production of the foregoing items.

24. Any and all intelligence reports that are created from any and all law enforcement agencies within this State or any other State or federal government.

25. Original or copies of any and all notices of appearance served upon each and every witness, including return of service of each said notice in the instant case.

26. Any and all probable cause reports, statement, search warrants and any and all statements to which an impartial magistrate or Judicial Officer issued any search warrant in the instant case, including but not limited to, arrest report and or indictment, date indicted and date notice was served upon the Defendant.

27. *Copies of all ballistics test results, to include the results which determined the caliber of the bullet used and it location at the scene.*

**WHEREFORE THE PREMISES CONSIDERED**, the Defendant prays that this Court shall set forth an order that is consistent with the above-stated request for discovery.

**RESPECTFULLY** submitted on this the 26th day of March 2004.

N. TRACY NICKSON (NIC026)
**ATTORNEY FOR DEFENDANT**
**2181 AA COBBS FORD ROAD**
**PRATTVILLE, ALABAMA 36066**
**(334) 285-1776**

FILED
DALE COUNTY, AL
MAR 2 9 2004
MARY BLUDSWORTH
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the

offices of the Dale County District Attorney by placing same in his/her box and or by first class

U.S. Mail, postage pre-paid on this the 26th of March 2004.

OF COUNSEL

0   C41

)                                    )

# IN THE 33RD JUDICIAL CIRCUIT
# DALE COUNTY, ALABAMA

STATE OF ALABAMA,            ]    CRIMINAL DIVISION

      PLAINTIFF,            ]

GARY HORNE,                  ]    CASE No. CC-2004-1220

      DEFENDANT.            ]

## DISCOVERY ORDER

IT IS HEREBY ORDERED:

1. The District Attorney shall produce or make available to the defendant's attorney the following:

    a. a copy of the Indictment against the defendant;

    b. all statements of the defendant which are reduced in writing.

    c. all statements of the defendant which are electronically recorded or taped, and any transcript thereof;

    d. the substance of any oral statements made by the defendant which are not included within (b) and (c) hereof, or if the District Attorney knows of any statements or spontaneous remarks made while the defendant is in the custody of the police or during the investigation.

    e. any and all evidence tending to exculpate the guilt of the defendant;

    f. the results of any scientific or expert tests, experiments, or examinations to be used by the prosecution at the trial;

    g. all physical evidence or documentary evidence which the prosecution will offer into evidence in its case in chief, including any search warrant and search affidavits upon which the prosecution will rely on its case in chief;

    h. all physical evidence or documentary seized from the defendant by law enforcement officers, whether or not the same will be offered into evidence at trial;

Page 2 - Discovery Order

    i. in prosecutions under the Alabama Uniform Control Substance Act, the defendant may procure the examination and testing of controlled substance or other prosecution evidence by his own expert, upon request to the District Attorney or his assistants. Such examination and testing shall only take place in the presence of the District Attorney or his authorized representative, and the same shall be done at the defendant's expense;

    j. the name and last known address of all confidential government informants who are eyewitnesses to the commission of the crime charged in the indictment, if the defendant doesn't already have such information.

    2. In all instances where physical or documentary evidence, tape recordings and the like are to be inspected, examined or copied by the defense counsel, the parties shall insure that such procedures are used as will safeguard and maintain the integrity of said evidence.

    3. The District Attorney is under an obligation to disclose to defense counsel any evidence subject to this Order which he subsequently discovers to exist, and do so within a reasonable time after its existence is discovered.

    4. Any disagreements with the parties concerning the scope, identify or existence of discoverable matter are to be submitted to the Court for resolution upon written motion of either party within a reasonable time before trial. Any party who does not so submit any unresolved discovery issue to the Court will be precluded from raising the same at trial. If the Court finds that either party has failed to use good faith in complying with this Order, the Court may, in the case of the State, bar the State from using at trial any non-disclosed matter; and the Court may, in the case of the defendant, hold the objections to the State's use of said matter at trial, based upon non-disclosure, to be waived.

ORDERED, this the 29th day of March, 2004.

P. B. McLAUCHLIN, JUDGE
33RD JUDICIAL CIRCUIT
DALE COUNTY, ALABAMA

MAR 2 9 2004
MARY BLUDSWORTH
CIRCUIT CLERK

0  043

## IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA

## CRIMINAL DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA,<br>    **Plaintiff,** | ) ) ) | |
| **vs.** | ) ) | CASE NO.:   CC– 2004 – 122¢ |
| GARY HORNE,<br>    **Defendant.** | ) ) ) | |

## MOTION FOR CONTINUANCE

**COMES NOW,** the Defendant in the above styled action, by and through the undersigned counsel, and respectfully requests that this Honorable Court will grant unto him a Continuance in trial of the above-styled action; as grounds he states as follows:

1.    Trial is currently scheduled in the action for 18 May 2004 at 8:30 a.m.

2.    Counsel for Defendant has learned of potentially exculpatory evidence existing and being held as evidence in another action in Dale County District Court; this evidence is described more fully in a Motion to Preserved Evidence filed by the undersigned in District Court, a copy of which is attached to this Motion.

3.    Further, the undersigned still awaits the production of evidence gathered at the scene of the alleged crime in the above styled action, evidence which is referred to within the Incident Report filed by law enforcement authorities but which, for whatever reason, now seems unable to be located or produced, despite specific requests by the undersigned counsel.

4.    Trial of this action while crucially important evidentiary issues remain unresolved would greatly prejudice the Defendant.

0    C44

**WHEREFORE,** these premises considered, the undersigned respectfully requests a continuance in the above styled action until such time as the evidentiary issues may be resolved.

**RESPECTFULLY** submitted on this the 26th day of April, 2004.

N. TRACY NICKSON (NIC026)
ATTORNEY FOR DEFENDANT
2181 AA COBBS FORD ROAD
PRATTVILLE, ALABAMA 36066
(334) 285-1776

<u>**CERTIFICATE OF SERVICE**</u>

I do hereby certify that a copy of the foregoing document has been served upon the offices of the Dale County District Attorney by placing same in his/her box and or by first class U.S. Mail, postage pre-paid on this the 26 of Apl 2004.

FILED
DALE COUNTY, AL
APR 27 2004
MARY BLUDSWORTH
CIRCUIT CLERK

OF COUNSEL

0   045

)                                    )

# IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA
## CRIMINAL DIVISION

| | | |
|---|---|---|
| **STATE OF ALABAMA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.:   CC– 04–1220** |
| | ) | |
| **GARY HORNE,** | ) | |
| **Defendant.** | ) | |

## MOTION TO COMPEL

**Comes now,** the Defendant in the above-styled action, and, pursuant to Rule 16, Alabama Rules of Criminal Procedure, respectfully requests that this Honorable Court will enter an Order compelling the State to provide evidence gathered to the Defendant; as grounds he avers as follows:

1. The State has in its custody evidence gathered at the scene of the alleged crime.

2. There is a strong probability that this evidence is exculpatory as to the Defendant.

3. The Defendant is entitled to inspect this evidence pursuant to the holdings in *Brady v. Maryland*, 373 U.S. 83, *Giglio v. United States*, 405 U.S. 150; Naque v. Illinois, 360 U.S. 264; and *United States v. Tashman*, 478 FR.2d 129 (5 Cir. 1973.)

4. The Defendant has specifically requested that this evidence me made available in his earlier "Request for Discovery," which request was Granted by this Honorable Court on 29 March 2004.

**Wherefore,** these premises considered, the Defendant respectfully requests that this Honorable Court will enter an Order compelling the State to provide evidence gathered to the Defendant

N. TRACY NICKSON (NIC026)
**ATTORNEY FOR DEFENDANT**
**2181 AA COBBS FORD ROAD**
**PRATTVILLE, ALABAMA 36066**
**(334) 285-1776**

### CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the

offices of the Dale County District Attorney by placing same in his/her box and or by first class

U.S. Mail, postage pre-paid on this the ___ of May ___ 2004.

OF COUNSEL

FILED
DALE COUNTY, AL

MAY 1 4 2004

MARY BLUDSWORTH
CIRCUIT CLERK

0   C47

## IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA
## CRIMINAL DIVISION

| | |
|---|---|
| **STATE OF ALABAMA,** )<br>      **Plaintiff,** )<br> )<br>**vs.** )      **CASE NO.:  CC– 04–1220**<br> )<br>**GARY HORNE,** )<br>      **Defendant.** ) | |

### NOTICE OF POTENTIAL CONFLICT

**Comes now,** the undersigned counsel for Defendant in the above-styled action, and respectfully offers notice to this Honorable Court of a potential prior conflict;  he further states as follows:

1.    Trial of this action is set for 16 May 2005.

2.    The undersigned is currently scheduled to appear at trial in Montgomery County Circuit Court in Case No. CC-05-405; a copy of this trial notice is attached hereto.

3.    Absent the resolution of either of these matters prior to 16 May 2005, the undersigned may be forced to request a continuance in the above styled matter, which is the most recently set hearing.

**Respectfully submitted this the 30th day April, 2005.**

**N. TRACY NICKSON (NIC026)**
**ATTORNEY FOR DEFENDANT**
**2181 AA COBBS FORD ROAD**
**PRATTVILLE, ALABAMA 36066**
**(334) 285-1776**

MAY - 2 2005
CIRCUIT CLERK

)                                    )

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the

offices of the Dale County District Attorney by placing same in his box and/or by first class U.S.

Mail, postage pre-paid on this the 30th day April, 2005

OF COUNSEL

)                                              )

# THE CIRCUIT COURT FOR
## MONTGOMERY COUNTY, ALABAMA

STATE OF ALABAMA                    )

V.                                  )          CASE NO. CC-05-405-S

ALTON D. ARRINGTON                  )

## O R D E R

### TRIAL DATE

The above case is set for trial on May 16, 2005, at 9:00 a.m. in Courtroom 3-C, Montgomery County Courthouse.

### STATUS CONFERENCE

Status conference is set for May 12, 2005, at 9:30 a.m. Defendant is ordered to be present at this conference.

### DISCOVERY

State and the Defendant shall at a convenient time and place disclose, produce for inspection and copying and exchange all items and things set out in Rule 16, A.R. Crim.P.,and the State shall also disclose all Rule 404(b), Ala.R.Evid., matters it intends to use at trial. At the same time, the State shall disclose all evidence generally required by Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972); United States v. Agurs, 427 U.S. 97 (1976); and United States v. Bagley, 473 U.S. ___, 105 S. Ct. 3375 (1975). The State shall make inquiry of the appropriate law enforcement or other agency to determine if it is aware or has possession of any items or information required to be disclosed, etc,

### MOTION CUT-OFF

Motion cut-off is SEVEN DAYS prior to trial. All motions shall cite supporting authority.

Done this the _31st_ day of March, 2005.

_William A. Shashy_
**WILLIAM A. SHASHY**
Circuit Judge

FILED
DALE COUNTY, AL

MAY - 2 2005

Tracy Nickson
Azzie Melton - DDA

0   C50

IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA
CRIMINAL DIVISION

STATE OF ALABAMA,          )
    Plaintiff,          )
                   )
vs.          )          CASE NO.:   CC–04–1220
                   )
GARY HORNE,          )
    Defendant.          )

## MOTION FOR NEW TRIAL, OR, IN THE ALTERNATIVE, FOR JUDGMENT NOTWITHSTANDING THE VERDICT

**Comes now,** the undersigned counsel for Defendant in the above-styled action, and respectfully requests that this Honorable Court will grant a new trial in this matter, or, in the alternative, enter a judgment of acquittal notwithstanding he verdict rendered in the case by struck jury; as grounds he states as follows:

1.    Trial of this action was concluded on 18 May 2005, and the verdict of guilt as to the lesser included charge of Assault 2d Degree was rendered by the jury on the same day.

2.    At the conclusion of the evidence, this Honorable Court charged the jury on the offenses of Assault, both 1rst and 2d Degree, without a pre-submission instruction conference and without the knowledge of counsel as to its intent to so charge.

3.    Despite repeated requests, the State has to this day failed to provide numerous items of discovery, among them, a copy of the indictment in this case, which was procured by the undersigned on the date of this motion.

4.    Prior to rendering the verdict, the jury made several requests as to the evidence and as to the proper verdicts available to them.

5. The jury was apparently confused by the unrequested charges of the lesser included offenses, as is evidenced by their inquiry as to the propriety of finding the Defendant not guilty of the sole charged offense, Attempted Murder, by reason of self-defense.

6. Although this Honorable Court attempted to clarify this issue, it is probable that had the jury been instructed solely as to the offense for which the Defendant was charged, Attempted Murder, it would have acquitted him of that charge based on its belief that the Defendant indeed acted in self-defense, a finding that necessarily would have precluded a finding of guilt on any lesser included offense involving a crime against a person.

7. This Honorable Court certainly within its discretion could have overruled Defendant's objection to the inclusion of charges on the lesser included offenses of Assault (1rst, 2nd or 3rd Degree); however, the Defendant was never afforded an opportunity to so object prior to the jury being so charged; moreover, such an objection would have been warranted in light of the variance between the specific nature of the crime for which Defendant was charged in the indictment, and the offense of Assault 2nd Degree, which contains within its definition the alternative of recklessness as opposed to specific intent.

8. "An attempt to commit murder requires the perpetrator to act with the specific intent to commit murder.... A general felonious intent is not sufficient." Free v. State, 455 So.2d 137, 147 (Ala.Cr.App.1984).

9. "The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073, 25 L.Ed.2d 368 (1970).

)                                    )

10.    The finding by the jury of the commission by the Defendant of a lesser, non-specific intent crime other than the Attempted Murder for which he was charged indicates that the State failed to prove a prima facie case of that charge, permitting this Honorable Court to enter a judgment notwithstanding the verdict rendered.

11.    The Defendant submits that had the jury been instructed only as to the sole specific-intent offense charged in the indictment, he would have been fully exonerated.

12.    Defendant again renews his prior objections to the State's failure to provide evidence collected in this case, and hereby supplements these objections with another for State's failure to provide a copy of a written statement of witness Terrence Barr, which it had in its possession prior to trial, and requests as sanction for this ongoing abuse of the discovery process, which abuse has characterized this prosecution from its inception, the entry of a judgment notwithstanding the verdict.

    **WHEREFORE,** these premises considered, Defendant respectfully requests that this Honorable Court will

a.    Grant unto the Defendant a new trial; or, in the alternative, will

b.    Enter a judgment of acquittal notwithstanding the verdict rendered; and/or will

c.    As sanction for the State's multiple and prejudicial discovery violations, enter a judgment of acquittal notwithstanding the verdict rendered, or

d.    Will schedule a hearing on this motion at which the issues raised herein may be heard and recorded.

                        /s/

**Respectfully submitted this the 20th day June, 2005.**



N. TRACY NICKSON (NIC026)
ATTORNEY FOR DEFENDANT
2181 AA COBBS FORD ROAD
PRATTVILLE, ALABAMA 36066
(334) 285-1776

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the

offices of the Dale County District Attorney by placing same in his box and/or by first class U.S.

Mail, postage pre-paid on this the 20th day of June, 2005.



OF COUNSEL



FILED
JUN 2 1 2005
CIRCUIT CLERK

0   054

## ALABAMA BOARD OF PARDONS AND PAROLES

| REPORT OF INVESTIGATION |
|---|

| | | | | |
|---|---|---|---|---|
| **Type of Investigation:** | PSI | | **Date Dictated:** | 06/01/2005 |
| **Name:** | HORNE GARY | | **PR#:** | PR199507341400 |
| **Alias:** | | | | |
| **RS** | BM  **DOB:** 10/16/1972 **Est. Age:** 32 | | **Height and Weight:** | 6'00" | 190 |
| **Complexion:** | | **Color of Hair:** BLK | **Color of Eyes:** | BRO |
| **Bodily Marks:** | | | | |
| **Driver's License:** | | **SSN:** 416983121, | | |
| **AIS#:** | 180206  **FBI#:** 688599PA2  **SID:** | | | |
| **Phone #:** | 0000000000 | | | |
| **Address:** | 189 LINDA ST | | | |
| | OZARK, AL 36360 | | | |

| OFFENSE(S) OF INVESTIGATION |
|---|

**County:**  Dale                              **Case #:**   CC 2004 000122.00

**Offense(s):**

ATTEMPT - MURDER

| Sentence(s) | Date | Begin Date | Conf Imp | Conf Susp | Probation | Restitution |
|---|---|---|---|---|---|---|
| ASSAULT 2ND DEGREE : C | | | | | | $ 0.00 |

**Date of Arrest:** 01/16/2004            **Date of Bond:** 01/30/2004  **Bond Amt.:**  $ 30000.00

**Judge:**  P. B. MCLAUCHLIN            **D.A.:**  ADAMS THOMAS KIRKE

**Attorney:**  NICKSON N TRACY            **Retained:**  X          **Appointed:**

**Court Ordered Restitution:** $0

**NOTES:**

FILED
DALE COUNTY, AL

JUL - 8 2005

MARY BLUDSWORTH
CIRCUIT CLERK

---

## PRESENT OFFENSE(S)

**County Court and Case Number:**    Dale, CC 2004 000122.00

**Offense(s)**

ATTEMPT - MURDER

| Sentence(s) | | Date | Begin Date | Conf Imp | Conf Susp | Prob. | Rest. |
|---|---|---|---|---|---|---|---|
| ASSAULT 2ND DEGREE : C | | | | | | | |
| | | | | | | | $ 0.00 |

**Date of Sentence:**

**Details of Offense:**    (1) On January 15, 2004 Gary Horne and John Williams got into an argument and a fight ensued. John Williams was shot duing the fight with a .40 cal handgun. This occured at 1298 South Union Ave., Arrowhead Apartments, Ozark Al. at 10:15 pm. Investigative report incicate that the victim and Gary Horne had been arguing over the defendants sister, Shenica Horne on Mark Ave. in Ozark. The victim left and went to his mom's residence at Arrowhead Apartments and Gary Horne and his sister followed. Again, Gary Horne and John Williams became engaged in a verbal exchange which led to a fight. During the fight Horne pulled a handgun and shot John Williams in the upper torso. Gary Horne than fled, however he turned himself in to police a couple of hours later. He was formally charged with Attempted Murder. Police responded to the scene where they found the victim lying in the front yard with a gunshot wound. He was transported to Dale Medical Center where he was treated. Gary Horne had a jury trial and was found guilty of Assault 2nd and a sentencing investigation was ordered.

**On Probation At Arrest:**    No

**On Parole At Arrest:**    No

**Serious Physical Injury Barring Parole:**    No

**Subject's Statement:**    (1) I did not commit this crime.

**Case Status of Co-defendants:**    (1) NONE

**Victim Notification Information:**    (1) The victim in this case is John Williams who resides at 514 E. Eufaula St. Ozark Al.

**Victim Impact:**    (1) A victim Impact Form has been sent to John Williams.

**Location of Offense:**    Dale Co.

**Court Ordered Restitution:**    $0

---

## RECORD OF ARREST(S)

| Date | Agency ORI | Type | Charge | | Disposition |
|---|---|---|---|---|---|

| | | Prior Adult | | Other: |
| | | Prior Adult | | Other: |
| 03/01/1993 | Dale Co | Prior Adult | RSP 2nd (YO) | Other: 1 year suspended, 18 months prob., 01/04/1995 prob. revoked |
| 03/06/1993 | Dale Co | Prior Adult | B&E Veh. 2 cts. | Other: Reduced to Theft 3rd rec. a 60 day SS |
| 08/17/1993 | OPD | Prior Adult | Speeding | Other: Guilty |
| 02/08/1994 | OPD | Prior Adult | Obstruct. Police - Crim. Impersonation | Other: Guilty |
| 03/24/1995 | Pike Co | Prior Adult | Hindering Prosecution 1st | Other: 1 year and 1 day |
| 05/24/1995 | Dale Co | Prior Adult | Robbery 2nd | Other: 5 years |
| 11/25/1997 | Dale Co | Prior Adult | Burglary 3rd | Other: Dismissed |
| 01/29/1998 | Dale Co | Prior Adult | RSP 2nd | Other: Dismissed |
| 09/10/2001 | Dale Co | Prior Adult | POM 2nd | Other: Guilty 6 mo. SS and 500.00 fine. Subject still owes over 700.00 on his fine and cost. |

## PERSONAL/SOCIAL HISTORY

### Marital Status/History Separated

| Name | Address | DOB | DOD | Marriage Begin/End |
|---|---|---|---|---|

### Children

| Name | Address | DOB | DOD | Other Parent |
|---|---|---|---|---|
| Gemontae Horne | | 07/10/2002 | | |
| Geona Horne | | 03/30/2000 | | |
| Gary Horne Jr. | | 01/21/1999 | | |

### Housing History

| | | | |
|---|---|---|---|
| Orphanage: | No | Homeless: | No |
| Foster Home: | No | Other Institution: | No |
| Boarding School: | No | | |

### Health

| | |
|---|---|
| Physical Disability: | No |
| Mental Disability: | No |
| Psychological Report: | No |
| Prescribed Medications: | No |
| Defendants Opinion Of Drug Problem: | Denies |
| Past Drugs: | Yes   MARIJUANA |

**Treatment History:**

| | |
|---|---|
| P____ ant Drugs: | No |
| Defendants Opinion Of Alcohol Problem: | Denies |

## Education
### High School

| Last Grade Completed | Name/Year | If DropOut, Reason why: |
|---|---|---|
| HSGraduate | Carroll High , | |

### College

| Last Level Completed | Name/Year | If DropOut, Reason why: |
|---|---|---|
| AttendedCollege | Troy University, | Was sent to Prison |

### Further Education/Training

| Type | Place | Length | Completed |
|---|---|---|---|
| | | | |

## Financial Status

**Owns:** Car

| Money Owed | To | Amount |
|---|---|---|
| | Fines | $ |

## Employment History

| Type/Employer | Begin Date | # Months | Pay | Reason For Leaving |
|---|---|---|---|---|
| Cook \ Larry's BBQ | / | 9 | 7.50 | |
| Laborer \ City of Newton | / | 24 | 5.15 Hr. | |

## Military Record

| Registered W/Selective Service | Served | Length Of Service | Discharge Type |
|---|---|---|---|
| Yes | NationalGuard | 1 year | Honorable |

| Discharge Reason | Highest\Discharge Rank | Military Job Title | Medals/Awards |
|---|---|---|---|
| | \ | | |

**Notes:** Subject states he got out of the military because he did not like serving. This information has not been verified.

## Offender's Family
### Parents

| Father | Address | DOB | Felony Conv. | Deceased |
|---|---|---|---|---|
| Je___ ny Horne | Dothan Al. | | No | |

| Mother | Address | DOB | Felony Conv. | Deceased |
|---|---|---|---|---|

| Mary Horne | Dothan Al | | No |

### Siblings

| Name | Address | DOB | Felony Conv. |
|------|---------|-----|--------------|
| Shanell Horne | Ozark | | |
| Toby Horne | Ozark | | |
| Priscilla Horne | Ozark | | |
| Shanicce Horne | Ozark | | |
| Renee Horne | Ozark | | |
| Johnny Horne | California | | |

**Notes:**

### Personal Relationship

**Relationship w/father:**  Good

**Relationship w/mother:**  Good

**Relationship w/siblings:** Good

---

### PROBATION PLAN

#### Home

| Living With | Address | Relation |
|-------------|---------|----------|
| None | 189 Linda St Ozark Al | |

#### Employment

| Employer | Address | Phone | Pay Rate |
|----------|---------|-------|----------|
| Horne's Roofing- Cousin | Ozark | | 400.00 week |

#### Treatments

| Treatment Type | Treatment Description |
|----------------|----------------------|
| | |

**Officer Remarks:**  The defendant has been on probation in Dale Co before and this probation was revoked. His criminal record dates back over 10 years.

**Recommendations To Court:**  NONE

Signed and dated at ___Ozark___,
Alabama the _7th_ day of ___June___ 05

_____
EARLY MITCH
Alabama Probation and Parole Officer

port of Investigation

PBF 203

_____

**Reviewed By**

)                                             )

## IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA
### CRIMINAL DIVISION

STATE OF ALABAMA,                          )
      Plaintiff,                       )
                         )
vs.                                        )        CASE NO.:   CC– 04–1220
                         )
GARY HORNE,                                )
      Defendant.                       )

### MOTION TO CONTINUE

**Comes now,** the undersigned counsel for Defendant in the above-styled action, and respectfully requests that this Honorable Court will continue sentencing in said action; as grounds he further states as follows:

1.  A sentencing hearing is currently scheduled to be held on 13 July 2005 at 9:30 a.m.

2.  The undersigned is currently scheduled to appear in Pike County Circuit Court in Case No. CV-04-48; a copy of notice thereof is attached hereto. This setting precedes the setting in the instant action.

3.  The undersigned has, in a separate document, requested a hearing in the instant action which, if permitted, will probably precede, and potentially delay, sentencing in the instant action.

4.  No prejudice will inure to any party as a consequence of the requested continuance.

**Respectfully submitted this the 8th day of July, 2005.**



```
FILED
DALE COUNTY, AL

JUL 1 1 2005
```

**N. TRACY NICKSON (NIC026)**
**ATTORNEY FOR DEFENDANT**
**2181 AA COBBS FORD ROAD**
**PRATTVILLE, ALABAMA 36066**
**(334) 285-1776**

0   061

)                                    )

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the

offices of the Dale County District Attorney by placing same in his box and/or by first class U.S.

Mail, postage pre-paid on this the 8th day of July, 2005.

OF COUNSEL

OF

0  C62

Dear, MR. Nixion my name is
Andrew McCray. I was chosen
to be one of the Jurey on the
Gary Horne case. I was very burden
and upset on the day I gave my
Verdects. I was distrated In the
Court Room durning the Trail. Their
was number of thing that was going
on phone Ringing, People walking In
and out of Cortroom. When Back
In the Jurey Room I made
decidion to give a second Degree
Verdect on what I thought was
best on the evidence I was
persented. After going home I heavily
Burden on my decidsion. No dout In
my mine that Gray Horne had acted
In self defense. I feel like I let
Gray down, as well as our Justic
Styeum. I like to take this time to
Apolize Apolizee tell Gray and His
flamily Sorry FOR letting the
Sysuem down as well as him.

m FILED
DALE COUNTY, AL
JUL 1 1 2005
MARY BLUDSWORTH
CIRCUIT CLERK

)                                          )

## IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA
### CRIMINAL DIVISION

STATE OF ALABAMA,                )
    Plaintiff,                         )
                      )
                      )
vs.                                                   )         CASE NO.:  CC– 04–1228
                      )
GARY HORNE,                          )
    Defendant.                        )

### MOTION TO CONTINUE

      **Comes now**, the undersigned counsel for Defendant in the above-styled action, and respectfully requests that this Honorable Court will continue sentencing in said action; as grounds he further states as follows:

1.      A sentencing hearing is currently scheduled to be held on 13 July 2005 at 9:30 a.m.

2.      The undersigned is currently scheduled to appear in Pike County Circuit Court in Case No. CV-04-48; a copy of notice thereof is attached hereto. This setting precedes the setting in the instant action.

3.      The undersigned has, in a separate document, requested a hearing in the instant action which, if permitted, will probably precede, and potentially delay, sentencing in the instant action.

4.      No prejudice will inure to any party as a consequence of the requested continuance.

      **Respectfully submitted this the 8th day of July, 2005.**

FILED
DALE COUNTY, AL

JUL 1 1 2005

MARY BLUDSWORTH
CIRCUIT CLERK

M TRACY NICKSON (NIC026)
ATTORNEY FOR DEFENDANT
2181 AA COBBS FORD ROAD
PRATTVILLE, ALABAMA 36066
(334) 285-1776

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the offices of the Dale County District Attorney by placing same in his box and/or by first class U.S. Mail, postage pre-paid on this the 8th day of July, 2005.

OF COUNSEL

0  065

)                                    )

# PIKE COUNTY CIVIL JURY DOCKET

Judge Thomas E. Head, III, Presiding

DOCKET/STATUS CALL SET FOR WEDNESDAY, JULY 13, 2005, AT 9:00 A.M.

CIVIL JURY TERM BEGINS AUGUST 22, 2005, AT 9:00 A.M.

| CASE NO. | STYLE | ATTORNEY |
|---|---|---|
| CV 1999-H-227 | COMMUNITY HEALTH VS. ROBERT GREENLAW | ALLEN JONES RICHARD SMITH NICK CERVERA |
| CV 2001-K-64 | PIKE FARMERS CO-OP VS. JOE SENN | JOEL WILLIAMS KEITH WATKINS |
| CV 2001-B-112 | ISABELLA MAXINE WARREN, ET AL VS. TROY HOSPITAL CORP., ET AL | GREG CUSIMANO MARK DAVIS |
| CV 2001-K-197 | MIKE KILCREASE, ET AL VS. TYSON HOMEBUILDERS, ET AL | MIKE ROUNTREE ROBERT HALL JAMES WALDING |
| CV 2001-H-234 | ANNIE MOSLEY PAUL VS. JASON BRADLEY SPEAR | FRANK RALPH PAUL JAMES, JR. MERRILL SHIRLEY |
| CV 2001-H-246 | LARRY MCDANIEL, ET AL VS. FIRST NATIONAL BANK OF BRUNDIDGE | JOE SAWYER JOE FAULK |
| CV 2001-K-252 | ELAINE PHELPS VS. ELIZABETH PATTERSON | FRANK RALPH JOHN PEEK |

1

0   066

| | | |
|---|---|---|
| CV 2004-K-11 | FAYE AND ROBERT MCGOVERN<br>VS.<br>CHARLES NONNENMAN | JOEL WILLIAMS<br><br>DOROTHY POWELL |
| CV 2004-H-23 | BARBARA AND MARY GREEN<br>VS.<br>FIRST QUALITY<br>MANUFACTURING, ET AL | GORDAN MAYFIELD |
| CV 2004-B-41 | JACK AND DIANE JORDAN<br>VS.<br>COUCH READY MIX, USA, ET AL | M. MCSWEAN<br><br>RANDALL MORGAN |
| CV 2004-H-42 | RICHARD W. GILCHRIST, JOE W.<br>GILCHRIST & AMY GILCHRIST<br>VS.<br>AIMEE SIMONTON | MIKE JONES<br><br>HAYES BROWN |
| CV 2004-K-48 | DARNELL WHITE<br>VS.<br>CHARLES DRIVAS, EARL ELLIS,<br>AND TROY LANDMARK | N.T. NICKSON<br>ALLEN JONES<br>RICHARD CALHOUN<br>JEFFERY SMITH |
| CV 2004-H-70 | KATRINA THORPE<br>VS.<br>CLEAR CHANNEL<br>BROADCASTING, INC., ET AL. | DAVID THOMAS<br><br>JOSEPH STOTT |
| CV 2004-B-80 | ANTHONY AND JANET GRANT<br>VS.<br>JAMES (COLBY) MCLENDON | FRANK RALPH<br><br>MIKE ROUNTREE |
| CV 2004-K-82 | LESHUN CALHOUN, ET AL<br>VS.<br>MAURENA FINNEY, ET AL | STEVEN HENRY |
| CV 2004-H-97 | PALOMAR INSURANCE CORPORATION<br>VS.<br>MARK KNOTTS | GRAY TRAWICK<br><br>ALLEN JONES |

)                                              )

**LAW OFFICE OF**
**N. TRACY NICKSON**
**2181 AA COBBS FORD ROAD**
**PRATTVILLE, ALABAMA 36066**
**(334) 285-1776**

**8 July 2005**

Hon. Philip B. McLauchlin, Jr.
**Dale County Circuit Judge, Presiding**
P.O. Box 1305
Ozark, AL 36361

     **RE:** *State of Alabama v. Gary Horne, CC-04-1220*

Dear Judge McLauchlin,

  I hope this letter finds Your Honor well. It is written to apprise you of the existence of the enclosed letter, which was prepared by a juror who sat on the above referenced trial, conducted last month, over which Your Honor presided.

  Shortly after the conclusion of the trial, I was informed by my client and his family that the juror, Mr. Andrew McCray, had approached my client's mother and expressed his dissatisfaction with the verdict rendered by him and his fellow jurors. I advised Mrs. Horne to refrain from initiating contact with the juror, and if contacted again, to advise the juror to reduce his concerns to writing and deliver them to either me or Your Honorable Court.

  On 5 July 2005, I was informed that Mr. McCray had written a letter addressed to me and delivered it to an acquaintance of his to be forwarded to me. Upon my receipt of the letter, I have immediately forwarded copies to both Your Honor and Mr. Kirk Adams.

  I am aware of the very limited circumstances in which a jury verdict may be revisited or analyzed for purposes of a new trial, and in all likelihood this letter is of no practical consequence whatsoever. However, I would be remiss in my duty to my client were I to neglect to seek to gain whatever beneficial result to my client may accrue thereunto from the letter, specifically as concerns the potential confusion it may indicate to have existed among the jury regarding appropriate verdicts.

  It is and has been my belief that the jury was indeed confused as to its verdict options, as evidenced by its question regarding the applicability of the defense of self-defense as grounds of acquitting Mr. Horne of Attempted Murder as charged by the indictment. As Your Honor may recall, Mr. Horne was charged with Attempted Murder but convicted of Assault 2d Degree. It remains my contention that the jury found Mr. Horne not guilty of the attempted murder charge by reason of self-defense, which would preclude a conviction for assault on the same grounds. If any testimony or affidavit supporting this contention were available, I respectfully seek Your Honor's guidance as to its admissibility for the purpose of demonstrating a level of confusion among the jury which would conceivably allow a new trial. Specifically, I am requesting a

hearing, *in camera* or otherwise, at which the issues raised by Mr. McCray's letter may be addressed. Frankly, this set of circumstances is one of first impression in my personal practice.

Also enclosed is a copy of the body of my Motion to Continue the sentencing hearing in this matter currently scheduled for 13 July 2005, based in part on a prior conflict which I am unable to abate.

Thank you very much for the time and assistance Your Honor affords this matter.

Sincerely,



N. Tracy Nickson



NTN/pab
Cc:  file, Hon. Kirk Adams
Enclosures

)                                              )

# PIKE COUNTY CIVIL JURY DOCKET

Judge Thomas E. Head, III, Presiding

DOCKET/STATUS CALL SET FOR WEDNESDAY, JULY 13, 2005, AT 9:00 A.M.

CIVIL JURY TERM BEGINS AUGUST 22, 2005, AT 9:00 A.M.

| CASE NO. | STYLE | ATTORNEY |
|---|---|---|
| CV 1999-H-227 | COMMUNITY HEALTH<br>VS.<br>ROBERT GREENLAW | ALLEN JONES<br>RICHARD SMITH<br>NICK CERVERA |
| CV 2001-K-64 | PIKE FARMERS CO-OP<br>VS.<br>JOE SENN | JOEL WILLIAMS<br><br>KEITH WATKINS |
| CV 2001-B-112 | ISABELLA MAXINE WARREN,<br>ET AL<br>VS.<br>TROY HOSPITAL CORP.,<br>ET AL | GREG CUSIMANO<br><br><br>MARK DAVIS |
| CV 2001-K-197 | MIKE KILCREASE, ET AL<br>VS.<br>TYSON HOMEBUILDERS,<br>ET AL | MIKE ROUNTREE<br><br>ROBERT HALL<br>JAMES WALDING |
| CV 2001-H-234 | ANNIE MOSLEY PAUL<br>VS.<br>JASON BRADLEY SPEAR | FRANK RALPH<br>PAUL JAMES, JR.<br>MERRILL SHIRLEY |
| CV 2001-H-246 | LARRY MCDANIEL, ET AL<br>VS.<br>FIRST NATIONAL BANK OF<br>BRUNDIDGE | JOE SAWYER<br><br>JOE FAULK |
| CV 2001-K-252 | ELAINE PHELPS<br>VS.<br>ELIZABETH PATTERSON | FRANK RALPH<br><br>JOHN PEEK |

1          0    070

)                                    )

| | | |
|---|---|---|
| CV 2004-K-11 | FAYE AND ROBERT MCGOVERN<br>VS.<br>CHARLES NONNENMAN | JOEL WILLIAMS<br><br>DOROTHY POWELL |
| CV 2004-H-23 | BARBARA AND MARY GREEN<br>VS.<br>FIRST QUALITY<br>MANUFACTURING, ET AL | GORDAN MAYFIELD |
| CV 2004-B-41 | JACK AND DIANE JORDAN<br>VS.<br>COUCH READY MIX, USA, ET AL | M. MCSWEAN<br><br>RANDALL MORGAN |
| CV 2004-H-42 | RICHARD W. GILCHRIST, JOE W.<br>GILCHRIST & AMY GILCHRIST<br>VS.<br>AIMEE SIMONTON | MIKE JONES<br><br>HAYES BROWN |
| CV 2004-K-48 | DARNELL WHITE<br>VS.<br>CHARLES DRIVAS, EARL ELLIS,<br>AND TROY LANDMARK | N.T. NICKSON<br>ALLEN JONES<br>RICHARD CALHOUN<br>JEFFERY SMITH |
| CV 2004-H-70 | KATRINA THORPE<br>VS.<br>CLEAR CHANNEL<br>BROADCASTING, INC., ET AL. | DAVID THOMAS<br><br>JOSEPH STOTT |
| CV 2004-B-80 | ANTHONY AND JANET GRANT<br>VS.<br>JAMES (COLBY) MCLENDON | FRANK RALPH<br><br>MIKE ROUNTREE |
| CV 2004-K-82 | LESHUN CALHOUN, ET AL<br>VS.<br>MAURENA FINNEY, ET AL | STEVEN HENRY |
| CV 2004-H-97 | PALOMAR INSURANCE CORPORATION<br>VS.<br>MARK KNOTTS | GRAY TRAWICK<br><br>ALLEN JONES |

STATE OF ALABAMA,                    )        IN THE CIRCUIT COURT OF
                                     )        DALE COUNTY, ALABAMA
        Plaintiff,                   )
                                     )
vs.                                  )        CRIMINAL DIVISION
                                     )
GARY HORNE,                          )
                                     )
        Defendant.                   )        CASE NO. CC-2004-122

## NOTIFICATION OF HABITUAL OFFENDER STATUS

The State of Alabama hereby gives notice to the Court and the Attorney for the Defendant that the Office of the District Attorney intends to prove that the Defendant is a habitual offender. The State intends to introduce a certified copy of a Robbery 2nd conviction from the Thirty-Third Judicial Circuit of Alabama dated May 24, 1995 and a certified copy of a Hindering Prosecution 1st conviction from the Twelfth Judicial Circuit (Pike County) of Alabama dated March 24, 1995.

As a habitual offender with two prior felony convictions, the Defendant must be punished for a Class A Felony for the Class C Felony upon which he was convicted in this cause. §13A-5-9(b)(1), *Code of Alabama, 1975, as amended.* As a Class A Felony the Defendant is looking at a minimum sentence of 10 years to life, however, pursuant to §13A-5-6(a)(4) the State contends that an enhancement should apply and the minimum mandatory sentence would be 20 years.

**DATED** this the 11th day of July, 2005.



FILED
DALE COUNTY, AL
JUL 1 2 2005
MARY BLODSWORTH
CIRCUIT CLERK

_____
William H. Filmore
Chief Assistant District Attorney
P.O. Box 1688
Ozark, AL 36361
(334) 774-9500

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has forwarded a copy of this notice to the Defendant's Attorney of Record, Honorable N. Tracy Nickson, to his address of 2181AA Cobbs Ford Road, Prattville, AL 36066, via U.S. Mail, postage prepaid this the 11th day of July, 2005.

_____
Chief Assistant District Attorney

0   072

ACR359

ALABAMA JUDICIAL DATA CENTER
DALE COUNTY
TRANSCRIPT OF RECORD
CONVICTION REPORT

CC 2004 000122.00 01
P. B. MCLAUCHLIN

CIRCUIT COURT OF DALE COUNTY

COURT ORI: 026015 J

STATE OF ALABAMA          VS.
HORNE GARY                     ALIAS:
LOT 46                         ALIAS:
HIDDEN GROVE TRAILER PARK
OZARK   AL   36360

DC NO: GJ 2004 000028.00
G J:    28
SSN:    416983121
SID:    000000000
AIS:    180206

DOB: 10/16/1972   SEX: M   HT: 6 00                    WT: 180   HAIR: BLK   EYE: BRO
RACE: ( )W (X)B ( )O   COMPLEXION: _____   AGE: _____   FEATURES: _____

DATE OFFENSE: 00/00/0000   ARREST DATE: 01/16/2004   ARREST ORI: 0260100

CHARGES @ CONV          CITES
ASSAULT 2ND DEGREE 13A-006-021

| | CT | CL | COURT ACTION | | CA DATE |
|---|---|---|---|---|---|
| | 01 | C | CONVICTED | | 05/18/2005 |
| | 00 | | | | 00/00/0000 |
| | 00 | | | | 00/00/0000 |

JUDGE: P. B. MCLAUCHLIN

PROSECUTOR: ADAMS THOMAS KIRKE

PROBATION APPLIED      GRANTED      DATE              REARRESTED DATE      REVOKED   DATE
( )Y ( )N              ( )Y ( )N _____              ( )Y ( )N _____    ( )Y ( )N _____

15-18-8, CODE OF ALA 1975
( )Y (X)N
DATE SENTENCED: 07/13/2005

|  | CONFINEMENT: | IMPOSED | SUSPENDED | TOTAL | JAIL CREDIT |
|---|---|---|---|---|---|
| | CONFINEMENT: | 22 00 000 | 00 00 000 | 22 00 000 | 00 00 014 |
| | PROBATION : | 00 00 000 | | 00 00 000 | |

SENTENCE BEGINS: 07/13/2005

PROVISIONS

PENITENTIARY
HABITUAL OFDR

| COSTS/RESTITUTION | DUE | ORDERED |
|---|---|---|
| RESTITUTION | | |
| ATTORNEY FEE | $0.00 | $0.00 |
| CRIME VICTIMS | $0.00 | $0.00 |
| COST | $100.00 | $100.00 |
| FINE | $836.00 | $836.00 |
| MUNICIPAL FEES | $0.00 | $0.00 |
| DRUG FEES | $0.00 | $0.00 |
| ADDTL DEFENDANT | $0.00 | $0.00 |
| DA FEES | $0.00 | $0.00 |
| COLLECTION ACCT | $0.00 | $0.00 |
| JAIL FEES | $0.00 | $0.00 |
| TOTAL | $936.00 | $936.00 |

APPEAL DATE          SUSPENDED              AFFIRMED              REARREST
( )Y ( )N _____    ( )Y( )N _____       ( )Y ( )N _____     ( )Y ( )N _____

REMARKS:

DEF SENT TO 22 YRS TO DOC.

THIS IS TO CERTIFY THAT THE
ABOVE INFORMATION WAS EXTRACTED
FROM OFFICIAL COURT RECORDS
AND IS TRUE AND CORRECT.

Mary Bludsworth
MARY BLUDSWORTH

07/14/2005

OPERATOR: SHS
PREPARED: 07/14/2005

0   073

)                                    )

IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA

CRIMINAL DIVISION

STATE OF ALABAMA,                )
      Plaintiff,                     )
                          )
                          )
vs.                                            )          CASE NO.:   CC–04–1220
                          )
GARY HORNE,                          )
      Defendant.                  )

## MOTION FOR NEW TRIAL

**COMES NOW**, the Defendant in the above-styled action, by and through the undersigned counsel, and respectfully requests that this Honorable Court will, pursuant to Ala. Code 1975 § 15-17-5, grant unto the Defendant a new trial; as grounds he states as follows:

1.    On 13 July 2005, this Honorable Court imposed a sentence of twenty-two years following a jury verdict finding the Defendant guilty of Assault 2d Degree.

2.    The Defendant respectfully submits that he is entitled to a new trial for the following reasons:

    a.    Irregularity in the proceedings of the court, jury or state or any order of court or abuse of discretion by which the defendant was prevented from having a fair trial, specifically including, but not limited to:

      1.  The State's failure to provide exculpatory evidence (an issue raised in separate documents which, along with other filed documents referenced within this Motion, is incorporated as if fully set out within this Motion);

      2.  The Order of this Honorable Court in denying Defendant's motion to dismiss on *Brady* grounds, also raised in his previously filed Writ of Mandamus and related documents);

0   074

3. The Orders of this Honorable denying Defendant's motion for mistrial which was made on 16 May 2005 and renewed on 17 May 2005.

4. The Order of this Honorable denying Defendant's motion for directed judgment of acquittal which was made on 17 May 2005.

5. The State's failure to provide prior notice of intent to seek sentence enhancement pursuant to the Habitual Felony Offender Act;

6. The State's failure to provide documents purporting to prove prior felony convictions, which to this day the Defendant has not received;

7. The 13 July 2005 Order of this Honorable Court overruling Defendant's notice objections;

8. Confusion of the jury following instructions by the Court (also raised in a separate "Motion for New Trial" filed by Defendant);

b. The verdict or decision is not sustained beyond a reasonable doubt and is contrary to law.

**WHEREFORE**, these premises considered, Defendant respectfully requests that \this Honorable Court will

a.  For some or all of the grounds delineated above, grant unto the Defendant a new trial in this action; or, in the alternative, will

b.  Schedule a hearing at which the issues raised in this Motion may be heard and recorded.

Respectfully submitted this the 27th day July, 2005.

N. TRACY NICKSON (NIC026)
ATTORNEY FOR DEFENDANT
2181 AA COBBS FORD ROAD
PRATTVILLE, ALABAMA 36066
(334) 285-1776

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the offices of the Dale County District Attorney by placing same in his box and/or by first class U.S. Mail, postage pre-paid on this the 27th day July, 2005.

OF COUNSEL

Hon. Kirke Adams
Dale County District Attorney
Hon. Stephen G. Smith
Dale County Assistant District Attorney
P.O. Box 1688
Ozark, AL 36361-1688



FILED
DALE COUNTY, AL
JUL 2 8 2005
MARY BLUDSWORTH
CIRCUIT CLERK

O   076

)                                              )

IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA

CRIMINAL DIVISION

STATE OF ALABAMA,                )
    Plaintiff,                  )
                                 )
vs.                              )
                                 )        CASE NO.:  CC– 04–1220
GARY HORNE,                      )
    Defendant.                  )
                                 )

## MOTION TO VACATE SENTENCE

**COMES NOW,** the Defendant in the above-styled action, by and through the undersigned counsel, and respectfully requests that this Honorable Court will vacate the sentence imposed in said action on 13 July 2005; as grounds he states as follows:

1.  On 13 July 2005, this Honorable Court imposed a sentence of twenty-two years following a jury verdict finding the Defendant guilty of Assault 2d Degree.

2.  At the 13 July sentencing hearing this Court, upon what was presumably a motion by the State, invoked the Habitual Felony Offender Act (HFOA) after finding the Defendant had been previously convicted of two prior felonies.

3.  No notice, whatsoever was provided to Defendant or his counsel of the State's intent to seek invocation of the HFOA.

4.  Describing the type of notice required before the HFOA can be invoked, the Supreme Court of Alabama stated in <u>Connolly v. State,</u> 602 So.2d 452, 454 (Ala.1992):

"For the HFOA to apply to a particular sentencing, the State must give reasonable notice, prior to the sentencing hearing, of the State's intention to proceed under the HFOA. Rule 26.6(b)(3), Ala.R.Crim.P. (Formerly Temp. Rule 6(b)(3)(ii), Ala.R.Crim.P.)...Determination of the 'reasonableness' of the notice period is left to the trial judge's discretion, because the trial judge is present and is familiar with the circumstances of the case. <u>Humber v. State,</u> 481 So.2d 452 (Ala.Crim.App.1985). The

9/29/05
yickson
IDA

7/27/05
* Motion set Aug 4 at 9:30

notice requirement is eliminated when during the trial the defendant admits the previous felony conviction. <u>Petite v. State,</u> 520 So.2d 207 (Ala.Crim.App.1987)."

5.  To the best of the undersigned's recollection, this Honorable Court did not specifically state the kind of notice it found to have been provided to Defendant by the State; however, to the extent that representations made at the hearing by the State's Attorney contributed to invocation of the HFOA, Defendant avers that such representations are substantially inaccurate.

6.  The State's representative, Mr. Stephen G. Smith, stated at the sentencing hearing that notice was provided to the undersigned of its intent to seek enhancement under the HFOA at a prior plea negotiation. There were no plea negotiations at which Mr. Smith was present, but rather the "negotiations" consisted of very few words exchanged between the undersigned and Mr. Kirk Adams or Mr. David Atwell.

7.  At the time of these "negotiations," there was no specific mention of the crimes which the State intended to use to enhance, much less either notice that the state would seek to use them, nor were certified copies of the conviction(s) provided either then or now.

8.  The State's representative, Mr. Smith, further averred at sentencing that a Notice of Intent to Enhance, or some kind of other notice, was filed on 11 July 2005; the case action summary in this action fails to reflect any such filing.

9.  No copy of this notice document was provided to the undersigned before, or at, the sentencing hearing.

10. On or after 15 July 2005, the undersigned received via U.S. Mail a copy of the State's "Notification of Habitual Offender Status," a copy of which is attached to this Motion.

11. As can be seen, the Certificate of Service on the notification certifies that it was mailed on 11 July 2005; the clerk's date stamp reads 12 July; and the envelope in which the

undersigned received the notice (a copy of which is also attached hereto) is postmarked 13 July 2005.

12.     Clearly it was and is temporally impossible for the undersigned to have received the notification prior to the sentencing hearing.

13.     In Burgin v. State, 824 So.2d 77 (Ala. Crim. App. 2001), the Court of Criminal Appeals found that the State failed to give proper notice prior to second sentencing hearing of intent to seek enhancement under Habitual Felony Offender Act (HFOA), warranting remand for new sentencing hearing, where the record failed to reflect that state gave defendant notice before hearing that state intended to proceed under HFOA and record did not indicate that state notified defendant regarding what convictions state would attempt to prove at hearing. (See also Ala. Code 1975, § 13A-5-9).

14.     To this day, Defendant has been provided with no documents whatsoever purporting to certify that Defendant has any prior conviction(s).

15.     At no point in the course of this action has the Defendant either admitted any prior conviction(s), nor has he stipulated to any prior conviction(s), nor has he waived his right to notice of the State's intent to enhance his sentence.

16.     The Defendant avers that because he was initially provided with notice, such as it was, of the State's intent to proceed under the HFOA a full days *after* sentencing, and further because to this day he has not been provided with certified copies of the alleged prior convictions, that such *ad hoc* notice was insufficient to invoke the Act, and concomitantly requests that this Honorable Court will

a.     Re-sentence the Defendant under the range statutorily provided upon conviction of a Class C felony; or, in the alternative, will

)                                          )

b.    Schedule a hearing at which the issues raised in this Motion may be heard and recorded.

**Respectfully submitted this the 27th day July, 2005.**



N. TRACY NICKSON (NIC026)
ATTORNEY FOR DEFENDANT
2181 AA COBBS FORD ROAD
PRATTVILLE, ALABAMA 36066
(334) 285-1776

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that a copy of the foregoing document has been served upon the offices of the Dale County District Attorney at P.O. Box 1688, Ozark, AL 36361-1688 by placing same in his box and/or by first class U.S. Mail, postage pre-paid on this the 27th day July, 2005.

Hon. Kirke Adams
Dale County District Attorney
Hon. Stephen G. Smith
Dale County Assistant District Attorney
P.O. Box 1688
Ozark, AL 36361-1688

OF COUNSEL

FILED
DALE COUNTY, AL

JUL 2 8 2005

MARY BLUDSWORTH
CIRCUIT CLERK

0    C80

)                                               )

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | IN THE CIRCUIT COURT OF |
| Plaintiff, | ) | DALE COUNTY, ALABAMA |
| | ) | |
| vs. | ) | CRIMINAL DIVISION |
| | ) | |
| GARY HORNE, | ) | |
| Defendant. | ) | CASE NO. CC-2004-122 |

## NOTIFICATION OF HABITUAL OFFENDER STATUS

The State of Alabama hereby gives notice to the Court and the Attorney for the Defendant that the Office of the District Attorney intends to prove that the Defendant is a habitual offender. The State intends to introduce a certified copy of a Robbery 2nd conviction from the Thirty-Third Judicial Circuit of Alabama dated May 24, 1995 and a certified copy of a Hindering Prosecution 1st conviction from the Twelfth Judicial Circuit (Pike County) of Alabama dated March 24, 1995.

As a habitual offender with two prior felony convictions, the Defendant must be punished for a Class A Felony for the Class C Felony upon which he was convicted in this cause. §13A-5-9(b)(1), *Code of Alabama*, 1975, *as amended*. As a Class A Felony the Defendant is looking at a minimum sentence of 10 years to life, however, pursuant to §13A-5-6(a)(4) the State contends that an enhancement should apply and the minimum mandatory sentence would be 20 years.

**DATED** this the 11th day of July, 2005.



FILED
DALE COUNTY, AL

JUL 1 2 2005

MARY BLUDSWORTH
CIRCUIT CLERK

William H. Filmore
Chief Assistant District Attorney
P.O. Box 1688
Ozark, AL 36361
(334) 774-9500

FILED
DALE COUNTY, AL

JUL 2 8 2005

MARY BLUDSWORTH
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he has forwarded a copy of the notice to the Defendant's Attorney of Record, Honorable N. Tracy Nickson, to his address of 2181AA Cobbs Ford Road, Prattville, AL 36066, via U.S. Mail, postage prepaid this the 11th day of July, 2005.

Chief Assistant District Attorney

O   C81



FILED
DALE COUNTY, AL

AUG 1 9 2005

MARY BLUDSWORTH
CIRCUIT CLERK

Honorable P.B. McLaughlin:

My name is Gary Horne, your Honor I haven't been heard throughout this whole action. I just wanted to say I am innocent, but I would of pleaded guilty if the D.A. told me they was gonna persue the Habitual Felony Offender Act when they offered me the Asslt. 2nd, 10 years. I would of taken it just so I wouldn't be facing 20 + years if I lost at trial, my point is that they NEVER gave us no notice, oral or written. Me nor my lawyer new anything until the Sentencing Hearing started. I was completely shocked because he told me I was looking at 1-10 years. He didn't get there notice until July 15, 2005. Please Your Honor if you give me a re-sentence since they botched the notice requirement, and give me the max which is 10 years, I would be blessed that you did your fas as a Judge and I could come home to my children e. 3

082

The prosecution team has been over zealous from day one. The trial matter will be heard on appeal, it doesn't matter if you deny I, you did your job with good descretion and ethnic, the prosecution set it up so I would not have a fair trial by getting rid of all exculpatory and impeachment evidence ... willful or inadvertent. Just please correct this illegal sentencing and sentenced me to 1-10 years by law for what I was convicted of so I don't have to wait for the Appellate courts to do right. I have 3 children to take care of and I can't go to work-release with all this 22 years. Everything the D.A. said at the hearing to Vacate was hearsay, record don't reflect that they gave me nor my lawyer notice prior to Sentencing hearing. Please rule in our favor just once, I was found guilty on May 18 they had ample time to send out that Notification of Habitual Offender Status before July 13, they could of send it when we got the Sentencing date. Instead of sending it 2 days after hearing, thats not reasonable.

)                                              )

1

STATE OF ALABAMA          )     CIRCUIT COURT OF

PLAINTIFF          )     DALE COUNTY, ALABAMA

)

VS.          )

)

GARY HORNE          )     CASE NO. <u>CC-04-122</u>

DEFENDANT          )


## <u>TRIAL COURT'S RULING ON</u>

## <u>MOTION FOR NEW TRIAL</u>


This cause coming on to be heard is submitted for a judgment on the Motion For New Trial or in the alternative Motion For Judgment Notwithstanding the Verdict and the Motion To Vacate The Sentence and the Court having considered the same, the Court finds as follows:

On May 18, 2005, the Defendant was found guilty of Assault in the 2nd Degree by verdict of the Jury. On July 13, 2005, the Defendant was adjudged guilty and sentenced to 22 years to the state penitentiary at the sentencing hearing.

A probation report was prepared by the Probation Officer and filed in the Court file on July 8, 2005. The Record Of Arrest portion of the report listed two prior adult felonies:

1) 5/24/95 – Dale County – Robbery II – 5 years

2) 3/24/95 – Pike County – Hindering Pros. I – 1 year and 1 day

)                                    )

                                                                    2

This report was available to the Court, the District Attorney and the Defense Counsel.

On July 12, 2005, a Notice of Habitual Offender Status was filed by the District Attorney listing the State's intent to prove the two prior felonies and to invoke the Habitual Offender Law.

The Court finds that the Defendant was aware that he had two prior felony convictions. This has never been disputed. At the Sentencing Hearing, the State proved the two prior convictions and filed certified copies of the convictions.

The provisions of the Habitual Offender Law are mandatory. The Trial Court has no discretion as to whether a repeat offender should be punished as an Habitual Offender. The State Prosecution has no discretion as to whether or not to produce evidence of prior convictions and he must do so if he is aware of the accused record.

In this case, at the time of the Sentencing Hearing the State, the Defendant, and the Defendant's attorney, and the Court were aware that the Defendant had two prior felony convictions and this has never been disputed. Therefore, the Defendant was properly sentenced as an Habitual Offender.

After both sides had rested, the Court asked for written requested charges. No written requested charged were presented to the Court. The Defense attorney did orally request for the Court to charge on self defense.

The Court finds that there was no prosecutorial misconduct and the Defendant's attorney had ample opportunity to interview Mr. Barr and Mr. Henderson and did interview them prior to trial. The Court further finds that the

)                                    )

3

Jury heard the evidence and returned a verdict of guilty of assault in the 2nd

degree. The verdict of the Jury was sustained by the law and the evidence in the

case. The Jury was polled and each Juror agreed as to the verdict of the Jury.

The Court has reviewed all of the other grounds of the motions and finds

the grounds not well-taken.

Therefore, the motions filed by the Defendant are denied.


DATED THIS THE _19th_ day of _August_, 2005.


P.B. McLauchlin, Jr., Circuit Judge



FILED
DALE COUNTY, AL

AUG 1 9 2005

MARY BLUDSWORTH
CIRCUIT CLERK

0   086

IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA

CRIMINAL DIVISION

STATE OF ALABAMA,  )
    Plaintiff,  )
        )
vs.  )    CASE NO.:  CC– 04–1220
        )
GARY HORNE,  )
    Defendant.  )

## NOTICE OF APPEAL; MOTION TO APPOINT APPELLATE COUNSEL; and MOTION FOR APPEAL BOND

**COMES NOW**, the Defendant in the above-styled action, by and through the undersigned counsel, and respectfully offers this his Notice of Appeal and Motion to Appoint Counsel; further he states as follows:

1. The Defendant hereby files his Notice of Appeal of both the conviction entered on 18 May 2005 and the sentence imposed on 13 July 2005 in the above styled action.

2. In a separately and simultaneously filed document, the undersigned has moved to withdraw from further representation.

3. The Defendant has been rendered indigent as a result of his conviction, and respectfully requests that this Honorable Court will appoint counsel to prosecute his appeal.

4. The Defendant further requests that he be released on reasonable bond during the prosecution of his appeal; he represents risks neither of flight or danger to the community, and indeed was free on bond for virtually the entire duration of the proceedings up to conviction.

**WHEREFORE**, these premises considered, the Defendant respectfully requests that this Honorable Court will

    a. Appoint counsel to prosecute the Defendant's appeal; and will

0    087

b.  Release the Defendant during the pendency of his appeal after his payment of reasonable

bond.

**Respectfully submitted this the 26th day August, 2005.**



N. TRACY NICKSON (NIC026)
**ATTORNEY FOR DEFENDANT**
2181 A COBBS FORD ROAD
**PRATTVILLE, ALABAMA 36066**
(334) 285-1776



FILED
DALE COUNTY, AL

AUG 2 9 2005

MARY BLUDSWORTH
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the

offices of the Dale County District Attorney by placing same in his box and/or by first class U.S.

Mail, postage pre-paid on this the 26th day August, 2005.



OF COUNSEL

0  088

IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA

CRIMINAL DIVISION

STATE OF ALABAMA,         )
     Plaintiff,            )
                      )
                      )
vs.                    )     CASE NO.:  CC– 04–1220
                      )
GARY HORNE,          )
     Defendant.         )

## MOTION TO WITHDRAW

**COMES NOW**, the undersigned counsel for the Defendant in the above-styled action, and respectfully requests that this Honorable Court will, following it ruling or response to pending motions, permit the undersigned to withdraw from further representation of the Defendant; further he states as follows:

1.    The Defendant in a separate and simultaneously filed document has filed his Notice of Appeal of both the conviction entered on 18 May 2005 and the sentence imposed on 13 July 2005 in the above styled action, and has further requested the appointment of appellate counsel. **TO**

2.    The Defendant has also simultaneously filed a post-trial motion to clarify parts of this Honorable Court's prior Ruling on one of Defendant's post-trial motion.

3.    The undersigned's contractual obligations to the Defendant have been met, and the indigency of the Defendant resulting from his conviction prevent him from retaining private appellate counsel.

**WHEREFORE,** these premises considered, the Defendant respectfully requests that this Honorable Court will

a. Immediately appoint counsel to prosecute the Defendant's appeal; and following such appointment, will

b. Relieve the undersigned counsel from further representation of the Defendant in the above-styled action; and will further

**Respectfully submitted this the 26th day August, 2005.**



**N. TRACY NICKSON (NIC026)**
**ATTORNEY FOR DEFENDANT**
**2181 AA COBBS FORD ROAD**
**PRATTVILLE, ALABAMA 36066**
**(334) 285-1776**

FILED
DALE COUNTY, AL

AUG 2 9 2005

MARY BLUDSWORTH
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the offices of the Dale County District Attorney by placing same in his box and/or by first class U.S. Mail, postage pre-paid on this the 26th day August, 2005.



**OF COUNSEL**

IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA

CRIMINAL DIVISION

| | |
|---|---|
| STATE OF ALABAMA,<br>　　　Plaintiff, | ) <br> ) <br> ) |
| vs. | ) <br> )　　　CASE NO.:　CC– 04–1220 |
| GARY HORNE,<br>　　　Defendant. | ) <br> ) <br> ) |

## POST-TRIAL MOTION TO CLARIFY POST-TRIAL RULING

COMES NOW, the Defendant in the above-styled action, by and through the undersigned counsel, and respectfully offers this his post-trial Motion to Clarify the Ruling entered following Defendant's Motion for New Trial and to vacate sentence. The Defendant with all due respect and sincerity requests that this Honorable Court will, for the purposes of efficacious and economical appeal, clarify those aspects of the Ruling which concern the issue of notice regarding the Defendant's alleged prior felonies; further he states as follows:

1.　This Honorable Court on 19 August 2005 entered a Ruling in which it was held that the Defendant was properly sentenced as an habitual offender based on his awareness of two alleged prior felony convictions.

2.　At the sentencing hearing conducted on 13 July 2005, and also within his prior Motion to Vacate Sentence, the undersigned respectfully requested that if this Honorable Court indeed found prior notice to have been given to the Defendant by the State of its intent to invoke prior felony convictions, that it would, for purposes of appeal, specifically state the form and time of the prior notice it found which conformed to the requirements of the Habitual Felony Offender Act (HFOA).

3.    The Ruling refers to a probation report filed on 8 July 2005 in this case which purports the existence of two prior felony convictions.

4.    The Ruling also refers to Notice of Habitual Offender Status filed by the District Attorney's office on 12 July 2005.

5.    The Defendant respectfully requests, for the purposes of appeal, whether this Honorable Court found the probation report filed on 8 July to satisfy the prior notice requirements of he HFOA.

6.    Likewise, The Defendant respectfully requests, for the purposes of appeal, whether this Honorable Court found the Notice of Habitual Offender Status filed on 12 July to satisfy the prior notice requirements of he HFOA; or whether perhaps these two filings combined in a totality of the circumstances to become prior notice as required by the HFOA.

7.    The Defendant has contemporaneously filed a Motion to Appoint Counsel, and respectfully requests that this Honorable will toll the time for Defendant to file appeal pending response to this post-trial motion.

**WHEREFORE,** these premises considered, the Defendant respectfully requests that this Honorable Court will clarify its ruling as concerns the issue of prior notice of the State's intent to invoke the HFOA as that issue is posed herein; and further will toll the time for Defendant to file notice of appeal pending its response to this instant post-trial Motion.

**Respectfully submitted this the 26th day August, 2005.**

0    092



N. TRACY NICKSON (NIC026)
ATTORNEY FOR DEFENDANT
2181 AA COBBS FORD ROAD
PRATTVILLE, ALABAMA 36066
(334) 285-1776

FILED
DALE COUNTY, AL
AUG 2 9 2005
MARY BLUDSWORTH
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the

offices of the Dale County District Attorney by placing same in his box and/or by first class U.S.

Mail, postage pre-paid on this the 26th day August, 2005.

OF COUNSEL

0   093

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | IN THE CIRCUIT COURT OF |
| | ) | DALE COUNTY, ALABAMA |
| Vs. | ) | |
| | ) | |
| GARY HORNE | ) | CASE NO: __CC-04-122__ |
| DEFENDANT. | ) | |

## MOTION TO RECUSE

**COMES NOW**, the undersigned, and moves the Court to recuse him from the appointment to represent the above named Defendant for that he represents the victim, John Williams, and has give him advice and counsel that is contrary to the interests of this Defendant.

**SUBMITTED**, this the ____31st____ day of ____August____, 2005.



FILED
DALE COUNTY, AL.
AUG 3 1 2005
MARY BLUDSWORTH
CIRCUIT CLERK

ROBERT G. ROBISON(rob037)
Attorney for Defendant
PO Drawer 70
Newton, AL 36352
(334) 299-3521

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have this date mailed a copy of the foregoing notice to the HONORABLE KIRKE ADAMS by placing a copy of same in the U.S. Mail, postage prepaid and addressing it to his proper mailing address this the ____31ST____ day of ____August____, 2005.

_____
ROBERT G. ROBISON

0   C94

IN THE CIRCUIT COURT OF DALE COUNTY, ALABAMA
CRIMINAL DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.:  CC– 04–122● |
| | ) | |
| GARY HORNE, | ) | |
| Defendant. | ) | |

## MOTION TO DISMISS

**Comes now,** the Defendant in the above-styled action, and respectfully requests that this Honorable Court will enter an Order Dismissing said action; as grounds he avers as follows:

1. The Defendant is charged with Attempted Murder, and is scheduled for trial on 14 September 2004.

2. There is evidence in the case once held by the State but which now is unable to be located, to wit: one bullet of unknown caliber found at the scene of the alleged crime and retrieved by Lt. Rex Tipton, the previous case agent, and photographs of the scene taken by evidence technicians.

3. This bullet is crucial to the defense of this action; reference is hereby made to Defendant's "Motion to Preserve Evidence," filed with both the District Court and this Honorable Court on or about 27 April 2004; this Motion details the necessity for the bullet. Briefly, the bullet is strongly believed to have been fired from the same .40 caliber weapon which the alleged victim in the instant case sold to another person, now incarcerated, approximately two weeks after the alleged Attempted Murder.

9/3/04 –
Motion will be heard prior

4.      This weapon is being held as evidence in another case arising in Dale County, *State v. Dassinger, DC-2004-213*, making matching of the bullet to the weapon readily possible were the bullet available.

5.      Were the bullet to match the weapon sold to Dassinger by John Williams, the alleged victim in the instant case, it would prove the Defendant's theory of self-defense, which contends that Williams always had the weapon, assaulted the Defendant with it, and in the ensuing struggle was himself shot with his own gun.

6.      Following the Defendant's Motion to Compel Discovery, filed with this Honorable Court on 14 May 2004, which was granted, the Defendant was allowed to inspect the evidence collected at the scene, which included, *inter alia*, a .40 caliber shell casing.

7.      Lt. Rex Tipton was certain that a bullet was collected at the scene, a fact which he stated clearly to the undersigned counsel, counsel's legal assistant, and to Officer Chris Ford, the present case agent, on numerous occasions.

8.      Moreover, the Narrative Summary prepared by Lt. Tipton clearly refer to photographs of the crime scene; these are also now unavailable.

9.      The case against the Defendant is due to be dismissed. Failure by the State to provide exculpatory evidence, whether willful or, as in this case, inadvertent forecloses a verdict against the Defendant in any case. *Wilson v. State,* WL 1020014, ___ So. 2d ____ (Ala. 2003): *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).

10.      The law enforcement agents involved in the case concede that the bullet is in all likelihood irretrievably lost, and indeed all have expressed no interest whatsoever in pursuing the case.

10.    Because it would be legally and constitutionally impossible to maintain a potential finding of guilt, the action should be Dismissed.

**Wherefore**, these premises considered, the Defendant respectfully requests that this Honorable Court will enter an Order Dismissing the action, or, in the alternative, will schedule a hearing prior to the scheduled trial at which the issues raised herein may be heard and recorded.

**Respectfully submitted this the 2nd day of September, 2004.**



N. TRACY NICKSON (NIC026)
**ATTORNEY FOR DEFENDANT**
**2181 AA COBBS FORD ROAD**
**PRATTVILLE, ALABAMA 36066**
**(334) 285-1776**

FILED
DALE COUNTY, AL

SEP - 3 2004

MARY BLUDSWORTH
CIRCUIT CLERK

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing document has been served upon the offices of the Dale County District Attorney by placing same in his/her box and or by first class U.S. Mail, postage pre-paid on this the 2nd of September, 2004.



OF COUNSEL

0    097

REV. 4/1/97

## NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
## BY THE TRIAL COURT CLERK

Gary Horne
_____    V.    [XX] STATE OF ALABAMA
**APPELLANT'S NAME**                              [  ] CITY OF _____
(as it appears on the indictment)                                      **APPELLEE**

[XX] CIRCUIT    [ ] DISTRICT    [ ] JUVENILE COURT OF    Dale _____ COUNTY
**CIRCUIT/DISTRICT/JUVENILE JUDGE:**    P.B. McLauchlin, Jr.

**DATE OF NOTICE OF APPEAL:**    9/8/05
(NOTE: If the appellant is incarcerated and files notice of appeal, this date should be the date on the certificate of service, or if there was no certificate of service, use the postmark date on the envelope.)

**INDIGENCY STATUS:**
Granted Indigency Status at Trial Court:                            [ ] Yes [XX] No
Appointed Trial Counsel Permitted to Withdraw on Appeal:    [XX] Yes [ ] No
Indigent Status Revoked on Appeal:                                [ ] Yes [X] No

**DEATH PENALTY:**
Does this appeal involve a case where the death penalty has been imposed?    [ ] Yes [X] No

**TYPE OF APPEAL: (Please check the appropriate block.)**
[XX] State Conviction        [ ] Pretrial Appeal by State        [ ] Juvenile Transfer Order
[ ] Rule 32 Petition         [ ] Contempt Adjudication           [ ] Juvenile Delinquency
[ ] Probation Revocation     [ ] Municipal Conviction            [ ] Habeas Corpus Petition
[ ] Mandamus Petition        [ ] Writ of Certiorari              [ ] Other(specify)

**IF THIS APPEAL IS FROM AN ORDER DENYING A PETITION (I.E., RULE 32 PETITION, WRIT OF HABEAS CORPUS, ETC.) OR FROM ANY OTHER ORDER ISSUED BY THE TRIAL JUDGE, COMPLETE THE FOLLOWING:**

**TRIAL COURT CASE NO.:** _____

**DATE ORDER WAS ENTERED:** _____
                                            **PETITION:** [ ] Dismissed    [ ] Denied    [ ] Granted

**IF THIS IS AN APPEAL FROM A CONVICTION, COMPLETE THE FOLLOWING:**
**DATE OF CONVICTION:**    5/18/05 _____    **DATE OF SENTENCE:**    7/13/05
**YOUTHFUL OFFENDER STATUS:**
Requested:    [ ] Yes [ ] No        Granted:    [ ] Yes [ ] No
**LIST EACH CONVICTION BELOW:** *(attach additional page if necessary)*
1.    Trial Court Case No. CC 04 122 _____    CONVICTION: Assault II _____
      Sentence: 22 years _____
2.    Trial Court Case No. _____    CONVICTION: _____
      Sentence: _____
3.    Trial Court Case No. _____    CONVICTION: _____
      Sentence: _____

**POST-JUDGMENT MOTIONS FILED: (complete as appropriate)**

| | Date Filed | Date Denied | Continued by Agreement To *(Date)* |
|---|---|---|---|
| [XX] Motion for New Trial | 7/28/05 | 8/19/05 | |
| [ ] Motion for Judgment of Acquittal | | | |
| [ ] Motion to Withdraw Guilty Plea | | | |
| [ ] Motion in Arrest of Judgment | | | |
| [ ] Other | | | |

**COURT REPORTER(S):**    David Glen
**ADDRESS:**    Dale County Courthouse
               Ozark, AL  36360
**APPELLATE COUNSEL:** _____
**ADDRESS:** _____

**APPELLANT: (IF PRO SE)**    AIS#_____
**ADDRESS:** _____

**APPELLEE (IF CITY APPEAL):** _____
**ADDRESS:** _____

FILED
DALE COUNTY, AL
SEP - 8 2005
MARY BLUDSWORTH
CIRCUIT CLERK

I certify that the information provided above is accurate
to the best of my knowledge and I have served a copy of this

0  C98

| State of Alabama<br>Unified Judicial System<br>Form ARAP-1C      8/91 | **REPORTER'S TRANSCRIPT ORDER -- CRIMINAL**<br>See Rules 10(c) and 11(b) of the<br>Alabama Rules of Appellate Procedure (A.R. App.P.) | Criminal Appeal Number<br><br>____ - ____ |

**TO BE COMPLETED BY COUNSEL FOR THE APPELLANT OR BY THE APPELLANT IF NOT REPRESENTED AND FILED WITH THE WRITTEN NOTICE OF APPEAL OR FILED WITHIN 7 DAYS AFTER ORAL NOTICE OF APPEAL IS GIVEN.**

[X] CIRCUIT COURT   [ ] DISTRICT COURT   [ ] JUVENILE COURT OF   Dale _____ COUNTY

_Gary Horne_ _____

V. [X] STATE OF ALABAMA   [ ] MUNICIPALITY OF _____, Appellant

| Case Number<br>CC 04 122 | Date of Judgment/Sentence/Order<br>7/13/05 |
| Date of Notice of Appeal<br>Oral: 8/29/05          Written: 9/8/05 | Indigent Status Granted:<br>[X] Yes        [ ] No |

**PART 1. TO BE SIGNED IF THE APPEAL WILL NOT HAVE A COURT REPORTER'S TRANSCRIPT:**
I CERTIFY THAT NO REPORTER'S TRANSCRIPT IS EXPECTED AND THAT THE RECORD ON APPEAL SHALL CONSIST OF THE CLERK'S RECORD ONLY. IF THE APPEAL IS FROM DISTRICT COURT OR JUVENILE COURT, I ALSO CERTIFY **(1)** THAT A STIPULATION OF FACTS WILL BE INCLUDED IN THE CLERK'S RECORD AND THAT THE APPELLANT WAIVES HIS RIGHT TO A JURY TRIAL IF SO ENTITLED; OR **(2)** THAT THE PARTIES HAVE STIPULATED THAT ONLY QUESTIONS OF LAW ARE INVOLVED AND THAT THE QUESTIONS WILL BE CERTIFIED BY THE JUVENILE/DISTRICT COURT FOR INCLUSION IN THE CLERK'S RECORD (SEE RULE 28(A)(1), ALABAMA RULES OF JUVENILE PROCEDURE, AND §12-12-72, *CODE OF ALABAMA 1975*).

Signature _____   Date _____   Print or Type Name _____

**PART 2. DESIGNATION OF PROCEEDINGS TO BE TRANSCRIBED.** Request is hereby made to the court reporter(s) indicated below for a transcript of the following proceedings in the above referenced case (see Rule 10(c)(2), Alabama Rules of Appellate Procedure (A.R.App.P.)):

**MARK PROCEEDINGS REQUESTED:**

**COURT REPORTER(S)**

A.[X] TRIAL PROCEEDINGS - Although this designation will include the judgment and sentence proceedings, a transcript of the organization of the jury and arguments of counsel must be designated separately.                                     _David Glen_
_____
_____

B.[X] ORGANIZATION OF THE JURY - This designation will include voir dire examination and challenges for cause. Note that in noncapital cases the voir dire of the jury will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)     _David Glen_
_____

C.[ ] ARGUMENTS OF COUNSEL - Note that in noncapital cases the arguments of counsel will not be recorded unless the trial judge so directs. (See Rule 19.4, ARCrP.)     _____
_____

**IN ADDITION TO ANY PROCEEDINGS DESIGNATED ABOVE, SPECIAL REQUEST IS HEREBY MADE TO INCLUDE THE FOLLOWING PROCEEDINGS IN THE REPORTER'S TRANSCRIPT PORTION OF THE RECORD ON APPEAL. (ATTACH ADDITIONAL PAGES IF NECESSARY):**

**ADDITIONAL PROCEEDINGS REQUESTED**                   **DATE**                **COURT REPORTER(S)**

D. _____          _____          _____

E. _____          _____          _____

F. _____          _____          _____

G. _____          _____          _____

FILED
DALE COUNTY, AL
SEP -8 2005
MARY BLUDSWORTH
CIRCUIT CLERK

**IMPORTANT NOTICE:** The court reporter who reported the proceedings for which a transcript is requested must be identified on this form to be effective. Additionally, it is important to note that the appellant may not be permitted to raise any issue on appeal relating to any proceedings in the case that are not specifically designated on this form for inclusion in the reporter's transcript. A general designation such as "all proceedings" is not sufficient. (See Rule 10(c)(2), A.R.App.P.)

**PART 3. MUST BE SIGNED IF THE APPEAL WILL HAVE A COURT REPORTER"S TRANSCRIPT:**
I CERTIFY THAT I HAVE DISTRIBUTED THIS FORM AS SET OUT BELOW. I ALSO CERTIFY **(1)** THAT I HAVE MADE SATISFACTORY FINANCIAL ARRANGEMENTS WITH EACH COURT REPORTER LISTED ABOVE FOR PREPARING HIS OR HER PORTION OF THE REPORTER'S TRANSCRIPT HEREIN REQUESTED; OR **(2)** THAT THE APPELLANT PROCEEDED AT TRIAL AS AN INDIGENT AND THAT THAT STATUS HAS NOT BEEN REVOKED; OR, **(3)** THAT THE APPELLANT HAS BEEN GIVEN PERMISSION TO PROCEED ON APPEAL IN FORMA PAUPERIS.

Signature _____

Date   9/7/05                                          _Joseph J. Gallo_

| State of Alabama<br>Unified Judicial System<br>Form ARAP- 26 (front)    8/91 | **COURT OF CRIMINAL APPEALS<br>DOCKETING STATEMENT** | Criminal Appeal Number<br><br>_____ - _____ |
|---|---|---|

**A. GENERAL INFORMATION:**

☒ CIRCUIT COURT  ☐ DISTRICT COURT  ☐ JUVENILE COURT OF    Dale                                         COUNTY

___ Gary Horne _____ , Appellan

**v.** ☒ STATE OF ALABAMA    ☐ MUNICIPALITY OF _____

| Case Number<br>CC 04 122 | Date of Complaint or Indictment<br>3/2/04 | Date of Judgment/Sentence/Order<br>7/13/05 |
|---|---|---|
| Number of Days of Trial/Hearing<br>1                    Days | Date of Notice of Appeal<br>Oral:  8/29/05 |  Written:   9/08/05 |
| Indigent Status Requested: ☒ Yes ☐ No | Indigent Status Granted: ☒ Yes ☐ No | |

**B. REPRESENTATION:**

Is Attorney Appointed or Retained?  ☒ Appointed  ☐ Retained.        If no attorney, will appellant represent self?  ☐ Yes  ☐ No

| Appellant's Attorney (Appellant if pro se) *(Attach additional pages if necessary)*<br><br>  Joseph J. Gallo | Telephone Number<br><br>  334/598-6200 | | |
|---|---|---|---|
| Address  451 N. Daleville Ave<br>Suite 105 | City<br>Daleville | State<br>AL | Zip Code<br>363 |

**C. CODEFENDANTS:** List each CODEFENDANT and the codefendant's case number.

| Codefendant | Case Number |
|---|---|
| Codefendant | Case Number |
| Codefendant | Case Number |

**D. TYPE OF APPEAL:**  Please check the applicable block.

1 ☒ State Conviction         4 ☐ Pretrial Order            7 ☐ Juvenile Transfer Order      10 ☐ Other (Specify)
2 ☐ Post-Conviction Remedy   5 ☐ Contempt Adjudication     8 ☐ Juvenile Delinquency         _____
3 ☐ Probation Revocation     6 ☐ Municipal Conviction      9 ☐ Habeas Corpus Petition       _____

**E. UNDERLYING CONVICTION/CHARGE:** Regardless of the type of appeal checked in Section D, please check the box beside each offense category for which the appellant has been convicted or charged as it relates to this appeal. Also include the applicable section of the Code of Alabama for State convictions.

1 ☐ Capital Offense - § _____      6 ☐ Trafficking in Drugs - § _____    11 ☐ Fraudulent Practices - § _____
2 ☐ Homicide - § _____               7 ☐ Theft - § _____                12 ☐ Offense Against Family - § _____
3 ☒ Assault - § 13A-6-21                8 ☐ Damage or Intrusion                 13 ☐ Traffic - DUI - § _____
4 ☐ Kidnapping/Unlawful                    to Property - § _____          14 ☐ Traffic - Other - § _____
    Imprisonment - § _____            9 ☐ Escape - § _____               15 ☐ Miscellaneous (Specify):
5 ☐ Drug Possession - § _____        10 ☐ Weapons/Firearms - § _____         _____ - § _____

**F. DEATH PENALTY:**

Does this appeal involve a case where the death penalty has been imposed?  ☐ Yes  ☒ No

**G. TRANSCRIPT:**

1. Will the record on appeal have a reporter's transcript?  ☒ Yes  ☐ No
2. If the answer to question "1" is "Yes," state the date the Reporter's Transcript Order was filed. _____ / _____ / 05
    *(Date)*
3. If the answer to question "1" is "No":
    (a)  Will a stipulation of facts be filed with the circuit clerk?  ☐ Yes  ☐ No
    (b)  Will the parties stipulate that only questions of law are involved and will the trial court certify the questions?  ☐ Yes  ☐ No

**NOTE:**  If the appeal is from the district or juvenile court and the answer to question "1" is "No," then a positive response is required for question 3(a) or 3(b).

FILED
DALE COUNTY, AL
SEP - 8 2005
MARY BLUDSWORTH
CIRCUIT CLERK

| Form ARAP- 26 (back)    8/91 | COURT OF CRIMINAL APPEALS DOCKETING STATEMENT |

**H. POST-JUDGMENT MOTIONS:** List all post-judgment motions by date of filing, type, and date of disposition (whether by trial court order or by the provisions of Rules 20.3 and 24.4 (ARCrP)):

| DATE OF FILING | | | TYPE OF POST-JUDGMENT MOTION | DATE OF DISPOSITION | | |
|---|---|---|---|---|---|---|
| Month | Day | Year | | Month | Day | Year |
| 7 | 13 | 05 | Motion for New Trial | 8 | 19 | 05 |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**I. NATURE OF THE CASE:** Without argument, briefly summarize the facts of the case.

Defendant charged with attempted murder.  Defendnat convicted of Assault II; sentenced to twenty (22) years as habitual felony offender

**J. ISSUE(S) ON APPEAL:** Briefly state the anticipated issues that will be presented on appeal. *(Attach additional pages if necessary.)*

Not known until record received

**K. SIGNATURE:**

0    101    *[signature]*

ACR371
ALABAMA JUDICIAL DATA CENTER
NOTICE OF APPEAL TO THE ALABAMA COURT OF CRIMINAL APPEALS
BY THE TRIAL COURT CLERK
IN THE CIRCUIT COURT OF     DALE COUNTY
STATE OF ALABAMA VS HORNE GARY                JUDGE: P. B. MCLAUCHLIN

---

APPEAL DATE: 09/08/2005

---

INDIGENCY STATUS:
GRANTED INDIGENCY STATUS AT TRIAL COURT:                    ___ YES   _X_ NO
APP. TRIAL COUNSEL PERMITTED TO W/D ON APPEAL:   _X_ YES   ___ NO
INDIGENT STATUS REVOKED ON APPEAL:                        ___ YES   _X_ NO
INDIGENT STATUS GRANTED ON APPEAL:                        _X_ YES   ___ NO

DEATH PENALTY: NO

APPEAL TYPE: STATE CONVICTION

---

THIS IS AN APPEAL FROM A CONVICTION.

DATE OF CONVICTION: 05/18/2005          DATE OF SENTENCE: 07/13/2005

YOUTHFUL OFFENDER STATUS: DENIED

CO/CASE NUMBER: 26/CC 2004 000122.00
CODE: ASS2    CONVICTION: ASSAULT 2ND DEGR     ACTION: CONVICTED
                                                STATUTE: 13A-006-021
SENTENCE:   CONF: 22 YRS 00 MOS 000 DAYS
SENTENCE:   PROB: 00 YRS 00 MOS 000 DAYS        LIFE: NO   LIFEWO: NO

---

POST-JUDGMENT MOTIONS FILED:   DT FILED    DT DENIED    CON BY AGREE
___ MOTION FOR NEW TRIAL
___ MOTION FOR JUDG. OF ACQUIT
___ MOTION TO W/D GUILTY PLEA
___ MOTION FOR ATTY TO W/DRAW
___ OTHER

---

COURT REPORTER(S):
ADDRESS:                        GLENN, DAVD M.
                                C/O HON. P. B. MCLAUCHLIN
                                OZARK            ,   AL 36361
APPELLATE COUNSEL #1:
ADDRESS:                        GALLO JOSEPH JAMES
                                451 N DALEVILLE AVE
                                SUITE 105
PHONE NUMBER:                   DALEVILLE    ,   AL   36322
                                334-598-6200
APPELLATE COUNSEL #2:
ADDRESS:


PHONE NUMBER:

APPELLANT (PRO SE):
ADDRESS:                        HORNE GARY
                                LOT 46
AIS #:                          OZARK        ,   AL   363600000
                                180206
APPELLEE (IF CITY APPEAL):
ADDRESS:

---

I CERTIFY THAT THE INFORMATION PROVIDED
ABOVE IS ACCURATE TO THE BEST OF MY            OPERATOR: SHS
KNOWLEDGE AND I HAVE SERVED A COPY OF          PREPARED: 09/08/2005
THIS NOTICE OF APPEAL ON ALL PARTIES TO
THIS ACTION ON THIS 8th DAY OF September 2005

                                Mary Dudsworth
                                CIRCUIT COURT CLERK

0  102

103

AP 14-3 Certificate of Completion and Transmittal of Record on Appeal by Trial Clerk

## CERTIFICATE OF COMPLETION AND TRANSMITTAL
## OF RECORD ON APPEAL BY TRIAL CLERK

GARY HORNE
_____
**Appellant**

TO: The Clerk of the Court of Criminal
Appeals of Alabama

**V.**

Case No. CC-2004-122

State of Alabama Appellee

Date of Notice of Appeal 9-8-2005

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of_____ pages) (_____1_____ volumes of 200 pages each and one volume of ____47_____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of ths certificate has this date been served on counsel for each party to the appeal,

DATED this_____12th_____ day of____September_____, 20_05_.

_____
Mary Bledsworth
Circuit Clerk

Date

_____
County

104

Civil Action No._____

## STATE OF ALABAMA

Dale                    **County**

### CIRCUIT COURT

## CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD ON APPEAL BY TRIAL CLERK

Gary Horne

### APPELLANT
### V.
### STATE OF ALABAMA
### APPELLEE

**FILED**____12th

September_____, **20** 05 .

*Mary Bludsworth*

**Clerk**

1

| | | |
|---|---|---|
| STATE OF ALABAMA | ) | IN THE CIRCUIT COURT OF |
| PLAINTIFF | ) | DALE CO., ALABAMA |
| | ) | |
| VS. | ) | CASE NO. <u>CC-04-122</u> |
| | ) | |
| GARY HORNE | ) | |
| DEFENDANT | ) | |

---oOo---

The following Jury Trial began on the 16th day of May, 2005, in the Dale County Courthouse, Ozark, Alabama, before the Honorable Judge P.B. McLauchlin, Jr.

<u>APPEARANCES:</u>

<u>FOR THE STATE</u>                          <u>FOR THE DEFENDANT</u>

Bill Filmore                                    Tracy Nickson

Asst. District Attorney                  Attorney At Law

Ozark, Alabama                             Dothan, Alabama

2

PROCEEDINGS:

(Whereupon, the Jury Panel was both generally and

(specially qualified by the Court, Voir Dire was

(conducted by counsel for the State and Defendant,

(and a Jury was struck, following which the following

(occurred out of the hearing of the Jury:


MR. NICKSON: I would object to Mr. Filmore trying this case because he was the District Court Judge that bound Mr. Horne over. I just witnessed Mr. Smith say something to one of my key witnesses, one of my eye witnesses, and he left here in tears saying he could not testify. I do not know what he said, but I have now lost another witness and I've lost evidence in this case. The Prosecution has –

THE COURT: Was he subpoenaed by the State?

MR. SMITH: Your Honor, he was subpoenaed by the Defendant and he is on the witness list from the Task Force. He gave a statement originally in this case and then he has subsequently given another statement to Officer Henderson last week that I became aware of. I discussed that with him and that was really all I talked to him about was the statement he had given.

MR. NICKSON: And is the Prosecution not under a continuing duty to disclose these statements?

MR. SMITH: Well, it was just revealed to me today what he had talked to Mr. Henderson about. It was the end of last week. I would be happy to –

THE COURT: Mr. Henderson will need to tell you, or, you give him a copy of the statement.

MR. SMITH: Right, he went in and talked – I will be happy to tell him that information and, I think that once he hears that, he will understand.

THE COURT: Just give him whatever information you've gotten from Mr. Henderson.

MR. SMITH: Okay. Kirke was the one that actually talked to Eddie.

MR. NICKSON: When I don't know, and the Prosecution speaks to one of my witnesses and he leaves here saying he can't testify and he's leaving here crying, then I –

THE COURT: he has the right to talk to the witnesses.

MR. NICKSON: But not intimidate them.

THE COURT: I don't think Mr. Smith intimidated him by asking him questions.

MR. NICKSON: Like I said, I don't know what was said to this witness, but –

THE COURT: I don't think Mr. Smith intimidated him by –

MR. NICKSON: He said he couldn't appear here in this courtroom to –

4

THE COURT:  You can subpoena him and put him up here and see what he says.

MR. NICKSON:  Thank you, Your Honor.  I object to Mr. Filmore trying the case.

THE COURT:  Just let Steve (Smith) try the case and you'll get another one.

MR. FILMORE:  Okay.

(Whereupon, Court was recessed until the following (morning, following which the following occurred out (of the hearing of the Jury:

MR. NICKSON:  As to what occurred yesterday, I would like to renew my objection to the State's failure to provide discovery, which would be the most recent statement of Mr. Bar (PHON) and I have not had the opportunity to see this discovery, I have not had an opportunity to review it or to examine it, especially those new pieces of evidence.  I did not get the statement yesterday, I just got the crux of what the statement was.

THE COURT:  Where is the statement?

MR. SMITH:  The statement was made to Eddie Henderson. Eddie Henderson came over to the office and it was there.  Mr. Nickson was there in our office and I gave him what Mr. Henderson told me on the phone, then Mr. Henderson came over to the office and he was available and Mr. Nickson was

there and I believe that they actually were involved in a short discussion. I don't know if it was about the statement, but –

MR. NICKSON: It was not, Your Honor. I did not know who Mr. Henderson was, but he came in and he and Mr. Adams left immediately to discuss another matter. Then Mr. Smith came in with a tablet and said, "This is what was said." Yet I have never seen a statement of this witness.

THE COURT: Is it a written statement?

MR. SMITH: No. He just came into the office and talked to Mr. Henderson at the police station. He didn't take a written statement from him, he just came in and talked to him and told him what I told Mr. Nickson. Mr. Henderson can be here and he can testify or he can – if he wants to take his testimony, I can get him here.

THE COURT: We might have to just get him here.

MR. SMITH: Okay.

MR. NICKSON: Your Honor, the State indicated to me that the statement has taken a 180-degree turn and, for this reason, I believe there's been some form of witness tampering. I mean this gentleman made a statement shortly after the incident occurred and I was told a couple of weeks ago that he came in and made a contrary statement, not in writing and not under penalties or perjury, not sworn to.

THE COURT: Where is the witness? Is he here?

MR. NICKSON: Your Honor, he left out of here yesterday after Mr. Smith talked to him and he was in tears and I haven't seen him since. I can't find him.

MR. SMITH: All I did was ask him about what he had asked Mr. Henderson and he asked if that was going to come up and I said, "Well, if you testify, I will ask you about what you told Mr. Henderson."

THE COURT: Where is he now?

MR. SMITH: I don't know.

THE COURT: You need to find him and get him here.

MR. NICKSON: Your Honor, this statement given to the State, in an attempted murder prosecution, it's very unusual for a witness who has stuck to the statement he had made only hours after the incident occurred, to all of a sudden change his statement.

MR. SMITH: Well, I'll have Mr. Henderson here to testify about the statement, Your Honor, just so we can clear all this up, and he can ask him whatever questions he wants to, if the Court will allow that.

THE COURT: The first statement was for the State or against the State?

MR. SMITH: The first statement was to the benefit –

MR. NICKSON: To the benefit of the Defendant.

MR. SMITH: -- of the Defendant. I never said it was a 180-degree turn, but I said it was contradictory to what he had said before, and it was

contradictory to what he had said before. What he came in and told Mr. Henderson implicated the Defendant.

MR. NICKSON: Which was 180-degrees from what he had several hours shortly after the incident occurred. This statement, from my understanding, was given last week or the week before, which indicates to me that the – well, this trial was set once again two or three weeks ago and this totally looks like somebody has tampered with this witness, somebody has encouraged to go and say something that is contrary 180-degrees from what his statement has been for over a year and three months. Your know, I just –

THE COURT: Get an attachment for the witness and get him up here because I'm going to start this thing at 1:15, and have Eddie over here at 1:00.

MR. SMITH: Yes, sir.

MR. NICKSON: Your Honor, I'm asking for a hearing prior to trial to ascertain to what degree our witness has been tampered with.

THE COURT: I'm going to have Mr. Henderson here at 1:00.

MR. NICKSON: And all I want to know is to what degree our witness was tampered with and by whom.

THE COURT: Well, he's going to be here and you can ask him to see what happened.

(Short recess)

MR. NICKSON: I want to renew my objection once again to the State's failure to provide discovery. I have had no opportunity to see this

8

discovery or review and examine this particular piece of new evidence.  I believe

there has been some form of witness tampering and I am asking for a mistrial.

THE COURT:  Motion denied.

MR. NICKSON:  Thank you.

(Whereupon, after opening statements were presented, the

(following occurred:


JOHN WILLIAMS

Having been first duly sworn, was examined and testified as follows, to-wit:

EXAMINATION

BY MR. SMITH:

Q      Would you introduce yourself, please?

A      John Williams.

Q      Where do you live?

A      I stay with my uncle right now at 156 Enterprise Road.

Q      Here in Ozark?

A      Yeah.

Q      Where do you work?

A      I own a restaurant.

Q      What kind of restaurant?

A      Chicken business off of East Andrews.

Q      What's it called?

A      The Red Zone.

Q      What?

A      The Red Zone.

Q      Does that mean your wings are hot, you make hot wings?

A      You can get any type of sauce you want on them.

Q      Are you married now?

A      No.

Q      You were once married to Christina Williams, is that right?

A      Yes.

Q      And you have a child with Shanice Horne, is that right?

A      Yes, sir.

Q      How old is that child?

A      He will be eight on his birthday, Friday.

Q      His birthday is Friday?

A      Uh-huh.

Q      What's his name?

A      Jaquan.

Q      Jaquan?

A      Yes.

Q      And Shanice – let's go back to January the 15th of 2004.

A      Okay.

Q      Were you at Mr. Horne's apartment on that night?  You were with him

that night, is that correct?

A      Yes, sir.

Q      Where were you?

A      He's got a house off Logan Road and we was at his house playing the X-Box.

Q      Playing an X-Box?

A      Yeah.

Q      Video games?

A      Uh-huh.

Q      And who was there?

A      It was me and him, a guy named Terrance Bar, Shanice came up with my son, and his girlfriend Kesha was there.

Q      His girlfriend?

A      Yes, she was there.

Q      And what time of the night were you over there playing video games?

A      It was 7:00 or 8:00, something like that.

Q      Was it dark?

A      I came out there during the daytime, you know, we always play the games for a long time, and it was dark when I left.

Q      And were you and Gary playing video games together?

A      Yes, sir.

Q      Tell the Jurors what led to your wife coming over there?  Do you know why she came – you were married to Christina at that time?

A      Yes, sir.

Q     And you are divorced now?

A     Yes, sir.

Q     Why did she come over there?

A     Well, I didn't know what was taking place at first.  We was in the garage playing the video games and his girlfriend Kesha came and asked me could she use my cell phone because he wouldn't let her use hers.  So, I told her she had to go out there in the car and get it because my phone has a good signal.  So, I told her she could go out there and use my phone.  So, apparently she used it and they must have gone through my call log and called Christina and that's how she ended up coming out there.

Q     Okay, so Christina shows up at Gary's house?

A     Uh-huh.

Q     What happened after Christina shows up?

A     Well, we were still in the garage.  He went and answered the door and he came back to me and said, "Hey man, your wife is at the door and you need to go check because you know how she is."  So, I go to the door and I was – I call her Tina, and I go to the door and I said, "What's up?", and she was like, "What are you doing out here?", and I said, "Playing a game."  And she was like, "It's time to go", and I said, "Let me get my keys and my pager", and stuff like that.  So, I started to go get my keys and my pager and Shanice hit me in my face, you know.

Q     Let me ask you this.  Was she irritated that you were there?

A     Yes, sir.

Q      Christina was mad?

A      Yes, sir.

Q      And then you said you were going to get your keys?

A      Yes, sir.

Q      Where did Shanice hit you?  How did she hit you?

A      Well, she was standing in the door of the kitchen.  Their kitchen and the front door is like in a little hallway, and I had to go by the kitchen walkway to get out the door.  As I was walking by, she punched me in the face.

Q      Why was she angry at you?

A      Because she had this ongoing thing saying that I left her for Christina and went and married her.

Q      Okay.

A      That's why she was so upset.

Q      Do you have children with Christina?

A      Yes, sir.

Q      How old are they?

A      Eighteen or nineteen months old, something like that.

Q      Okay.  Very young?

A      Uh-huh.

Q      So, What happened after she hit you?

A      Well, we ended up tussling into the kitchen.  I never hit her, you know, but I basically grabbed her to keep her from hitting me.  She just kept swinging. During the process, we fell over the kitchen table and fell all back in the corner

and everything like that. So, he started directing his attention basically toward me, pushing on me and stuff like that. Then I was –

Q      Are you taking about Gary?

A      Yes, sir.

Q      Okay, so he got involved in your situation with her?

A      Yes, sir.

Q      Alright.

A      From that point, I rushed him back to the refrigerator and he asked me what the hell I think I'm doing.

Q      Okay.

A      And I told him I was violating for me to have been out there anyway, you know. So, I started to leave and Shanice kept trying to fight on me as I was getting in the car and I am trying to pull off and she was steady trying to open the car door and punch on me and stuff like that. I got in my car and left and –

Q      Did you leave by yourself?

A      I was in the car by myself.

Q      Had Christina left at that point?

A      No.

Q      She left after you did?

A      She left after I did.

Q      Did she follow you?

A      Yes, sir.

14

Q      What happened next?

A      As I'm leaving Logan Road, Christina was following me and I looked in my mirror and Shanice was following her. So, we're all in a line following each other. I'm going to my mom's house because my mom don't allow no foolishness at her house, you know what I'm saying, she don't allow them to come over there and be acting up like that. So, I was going there to keep them from coming over there acting kind of crazy.

So, once I got – well, on my way there, you know, I called him on the phone, you know, because I thought we was cool and I basically said to him, "I think it's messed up the way you handled the situation", and he just started going all off talking about what he would do to me and stuff like that. I told him if he came to Arrowhead –

Q      What was he saying he would do to you?

A      He was just like, "I'll fuck you up, nigger, you don't know me", and stuff like that.

Q      Okay.

A      So, I told him – my comment to him was, "You know I'll beat your ass", and he was like, "Where you at, my nigger?", and I said, "Come to Arrowhead", you know, because that's where my mom stays and that's where I was at. So, I didn't think he was coming and I was sitting in my car and I noticed Shanice crunk her car up and she pulled right in behind me and –

Q      Let's explain that. You said she cranked her car up?

A      Yeah.

Q      You had parked your car?

A      Yes, sir.

Q      And she – had Christina parked her car?

A      I pulled in the first parking spot, Christina pulled in the once beside me, and there was a couple of cars between us, between her car and the next available slot.  So, Shanice got in that spot.

Q      So, you are at Arrowhead Apartments?

A      Yes, sir.

Q      And you are parked in the parking lot at Arrowhead?

A      Yes, sir.

Q      Where was your car parked in relation to your mother's apartment?

A      If you're facing her apartment, I was to the left of her apartment on the side of the dumpster.

Q      Okay.  How far away were you from her?

A      Ten or fifteen feet.

Q      So, you say Shanice cranked her car up and parked somewhere else?

A      Well, she pulled in behind my car and she just sat there, I guess so I couldn't get out, or something like that.

Q      Okay.  Did Gary Horne show up there?

A      He showed up about five or ten minutes after that.

Q      Were you still sitting in your car?

A      Yes, sir.

Q      Why were you – where was Christina and Shanice?

A      Christina was sitting in her car with the baby and Shanice was sitting in her car with my son.

Q      And none of ya'll had gotten out of your cars?

A      No, sir.

Q      Why didn't you get out of your car?  Were you still on the phone or what were you doing?

A      No, I was just sitting there because I know how my mom is about people coming to her house acting up, so, I didn't really want to bring that there, but I went there just so they wouldn't come there with – I was thinking maybe they were going about their business, that's why I went there.

Q      Okay.  And you were sitting in your car when Gary Horne showed up?

A      Yes, sir.

Q      Tell the Jury about that?

A      When I noticed – see, South Union runs parallel to Arrowhead Apartments and, when I noticed I seen this car shooting up the highway, you know, I kind of got on my defense then.  I seen it shoot up in the apartment complex and he got in the slot where Shanice was initially parked at.  So, by this time when he pulled up, I got out of the car and I stood up on the curb and I stood right there in front of Christina's car.  When he stepped up on the curb, I noticed he had a gun because the gun almost fell and he picked it up with his pants.

Q      What do you mean by "almost fell"?

A    Because his pants was baggy.

Q    He was wearing baggy pants?

A    Yeah.

Q    And the gun was in his pants?

A    Yeah.

Q    Did you notice it fall in his pants, is that what you're telling us?

A    I noticed the – I know he had the gun because I made the comment to him, "You got a gun, you're tough now", because he was talking and he just kept talking smack to me as he was walking toward me.

Q    Some of the Jurors may not understand when you say he was "talking smack" to you.  What do you mean?

A    He was arguing at me.

Q    Arguing what?

A    Just saying little gestures like, "What in the fuck did you have your wife come to my house for in front of my sister?", and stuff like that.

Q    That's some of the things you mean by "smack"?

A    Yeah, that's what I mean.

Q    So, you say something to him about having a gun?

A    Yeah, I said, "You got your gun, you're tough now" because of the way he kept talking to me.  You know, he was talking basically like I was beneath him.  I basically told him, "I ain't no punk", you know.  So, he just kept mouthing off and he got – it seemed like he got louder and louder as we stood there.

Q    Ya'll were standing how far apart?

A    Less then four feet.  It was like right there in front of Christina's car, it was directly in front of her car.

Q    I'm going to walk to you and you tell me about how far away from him you were.

A    About right there, maybe like that.

Q    This far?

A    Uh-huh.

Q    And you were mouthing back to him, is that correct?

A    Excuse me?

Q    You were saying some smack back to him?

A    Yeah, I basically was telling him like, "Because you've got a gun don't mean I'm going to back down from you", that's basically what I told him.

Q    And what happened after that?

A    Well –

Q    How long – I mean was this very long?

A    It was short, it was kind of short because I got tired of him talking.

Q    Would it have been – I mean we're not talking about like a 5-minute conversation, are we?

A    No.

Q    Are we talking about maybe less than a minute?

A    Somewhere in that vicinity, a minute, no more than two minutes once he got out of the car.

19

Q     Okay.

A     Everything happened within three minutes from the point he got out of the car, less than three minutes everything had took place.

Q     Okay.  Did he try to get you or how did this altercation start?

A     Well, he was like standing in front of me and he just kept mouthing off and I just asked him, "What you want to do?", you know, and he pushed me. When he pushed me, I went to strike him back and he shot me.

Q     Okay.  When he pushed you, did you fall backwards a little bit?

A     Yes, sir.

Q     And then he – did you try to swing at him?

A     I tried to swing, yes.

Q     At what point were you shot?

A     I know that as I was swinging to hit him, as he was shooting me, I grazed his chin.

Q     So, as you swung at him is when he pulled the trigger on you?

A     Yes, sir.

Q     Is that fair to say?

A     Yes, sir.

Q     Where did he – where did you get shot?

A     In my side right here.  (Indicating)

Q     Are you right-handed?

A     Yes, sir.

Q    So, you swung at him like this?

A    Yes, sir.

Q    And then you were shot under here?

A    Yes, sir.

Q    Do you remember what happened after that?

A    Well, I remember hitting the ground and, as I hit the ground, I heard my mom screaming. Then he stood over me like – like the same distance we were at the first time, and then made the comment, "I should kill this fuck nigger."

Q    Okay, did you see him holding a gun at that time?

A    Yes, sir.

Q    It was like a pistol, I guess?

A    Yes, sir.

Q    Did you have a gun?

A    No, sir.

Q    Do you own a pistol?

A    I have a hunting rifle, an SK hunting rifle, that's what I have.

Q    But you don't have a pistol?

A    No, sir.

Q    And you didn't have a pistol at that time?

A    I don't have one at all.

Q    Did you have one two weeks later?

A    No, sir.

Q    Did you ever sell a pistol to somebody?

A    No, sir.

Q    You went to the hospital, is that correct?

A    Yes, sir.

Q    Did you go to Dale Medical Center?

A    Yes, sir.

Q    How long were you there?

A    I think I got out on the 21st of January.

Q    And you were there a week?

A    Yes.

Q    Is that correct?

A    Yes, sir.

Q    What kind of treatment did you have while you were in the hospital?

A    I'm not quite sure, I don't remember.  They was telling me a bunch of stuff like stuff with my kidneys and they some intestines out of me and some more things.

Q    Did you have surgery?

A    Yes, sir, two of them.

Q    Two surgeries?

A    Yes, sir.

Q    As far as when you got out of the hospital, did you have any – were you the same as you were before you went in?

A    No, sir.

Q      How has getting shot affected you physically?

A      Well, I know the way I was before I got shot and I have a lot of back pain, when I urinate I have pain, when I use the bathroom I have pain.

Q      Okay.

A      Some mornings I can't even get out of the bed, you know, I just deal with it basically.

Q      Would you stand up and point to the spot where the bullet hit you?

A      Right here.

Q      What did he say while he was standing above you?

A      He made the comment, "I should kill this fuck nigger."

Q      You heard him say that with your own ears, right?

A      Yes, sir.

Q      And you could see him with your own eyes?

A      Yes, sir.

Q      Was he standing over you looking at you when he said that?

A      Yes, sir.

Q      Did he stay there until help arrived?

A      No, he ran.  When my mom said that the police was on their way, the guy that was with him named Terrance Bar said, "Come on, my nigger, let's go", and they ran from that point.

            MR. SMITH:  Thank you.

<u>EXAMINATION</u>

BY MR. NICKSON:

Q      Good afternoon, Mr. Williams.

A      How are you doing?

Q      You stated that you are divorced presently?

A      Yes, sir.

Q      And you say on the day in question ya'll were playing X-Box?

A      Yes, sir.

Q      And that's a video game?

A      Uh-huh.

Q      And how long had you been there at Mr. Horne's home?

A      We had a chance to play maybe like three or four games.

Q      How long does it take?

A      It all depends on penalties in the game or something like that, or what the score is like, maybe going into overtime, or whatever, maybe twenty or thirty minutes at the most.

Q      Per game?

A      Per game.

Q      And you were visiting there?

A      Yes, sir.

Q      And visiting with your son?

A      Yes, sir.

Q    And your girlfriend Shanice?

A    No, she wasn't my girlfriend, it was my son's mother.

Q    Had you been drinking?

A    No, sir.

Q    Nothing at all?

A    Well, we smoked a blunt, if that's what you're trying to get at.

Q    So, you were using prescription or non-prescription drugs?

A    Yes, sir.

Q    Are you under the influence of any drugs or alcohol at this time?

A    No, sir.

Q    And your relationship to Mr. Horne's sister is that she is your son's mother?

A    Yes, sir.

Q    During the time that you've known Ms. Horne, have you ever threatened her?

A    No, sir.

Q    Have you ever struck her?

A    We've got into altercations before.

Q    Have the police ever been called out?

A    Yes, I've called them on her and she's called them on me.

Q    How many times?

A    We never had nothing like nothing serious, we never had nothing serious where she had bodily harm and stuff like that.

Q       Okay.

A       It wasn't never like that.  When the police comes out for a domestic argument, or anything like that, someone goes to jail.  I never went to jail on too many occasions.

Q       Too many occasions?

A       I probably went to jail like once or twice.

Q       Was Mr. Horne's sister and your wife arguing?

A       Shanice started arguing when Christina showed up.

Q       And Christina was your wife at the time?

A       Yes, sir.

Q       Was your wife at the time inside the home?

A       No, she was at the front door.

Q       Was the front door open?

A       He opened the door.

Q       Did it stay open?

A       Yeah.

Q       And at the time you tried to leave, you say Ms. Horne hit you?

A       I went to go retrieve my pager and my keys and, when I was coming out the door, that's when she struck me.

Q       Were you and Shanice in an argument, or, did she just not want you to go, or, did you have some discussion about the child?

A       I had called to talk to my son that day and, like always, I'm always asking her if I can see my son without all the drama that I have to go through to see him,

and she said, "We'll discuss it when I get there." You know, I asked him what did he want from KFC and he said he wanted some hot wings, so, that's what I brought him when I came. We was in the garage playing the video game when they came and I gave him his hot wings and told him we would be up there in a minute because we were outside smoking a blunt.

Q    Okay. Do you and Shanice co-parent this child?

A    Well, he stays with her, you know, and I had to go through the court system to try to get my visitation because when she gets mad with me she won't let me see him.

Q    Do you pay child support?

A    She didn't want child support.

Q    So, you don't pay child support?

A    No, I don't pay child support.

Q    But the child is yours?

A    Yes, sir.

Q    So, it's your testimony that she attacked you?

A    Yes, sir.

Q    And isn't it true that night that you attacked Shanice?

A    No, it's not true.

Q    Didn't you grab her by the neck and didn't Mr. Horne have to pull you off of her?

A    Well, I mean –

Q     Did you grab her by the neck?

A     No.

Q     Not at all?

A     No.

Q     And you never gave Mr. Horne any cause to remove or separate you and his sister?

A     Well, I just told you that he was separating both of us because, when she hit me, we got into an altercation and we fell over the kitchen table.

Q     So, she hit you and then you went after her?

A     Basically.

Q     Do you recall the preliminary hearing in this matter back on February 18th?

A     Yes, sir.

Q     Do you recall we had a Court Reporter here in the courtroom?

A     Yes, sir.

Q     And do you remember that I asked you if you owned a gun?

A     Yes, sir.

Q     But you didn't have one that night?

A     Right.

Q     According to the statements taken that night, the majority of the witnesses indicate that they saw you strike Mr. Horne and –

     MR. SMITH:  I'm going to object to what other witnesses who have not testified yet had said.

THE COURT:  Repeat your question.

MR. NICKSON:  Mr. Williams, at the preliminary hearing we had back in February, it was --

A      Uh-huh.

Q      -- indicated that you had struck Mr. Horne twice?

A      Did you hear me say that?  Look at your notes again because you didn't hear me say that.

Q      Did Mr. Horne make you leave the house?

A      No, I left on my own.

Q      You left on your own?

A      Uh-huh.

Q      And was it because of the altercation, or, because your wife wanted you to go?

A      A little bit of both.

Q      A little bit of both?

A      Yes, sir.

Q      Why were you and the Defendant arguing?

A      I don't even know because everybody knows how his sister is, you know.

Q      So, it was over Shanice?

A      Basically.

Q      Do you know a Mr. William Dassinger?

A      Who is that?

Q    William Dassinger?

A    No.

Q    Shortly after the shooting, did you sell a 40-caliber Glock?

A    No, sir.

Q    Have you ever owned one?

A    No, sir.

Q    Never?

A    No, sir.

Q    How many times have you been arrested for assaulting people?

A    I'm not sure –

          MR. SMITH:  I object.  He's not –

          THE COURT:  I overrule.

          MR. SMITH:  You can answer.

A    I mean what – state your question again?

Q    How many times have you been arrested for assaulting people?

A    I don't know.

Q    Is it so many times that you just don't remember?

A    No, I'm just saying I don't know, I wasn't keeping a record when I would

get into it with someone.  People get in altercations every day.

Q    Have you ever been arrested for attempted murder?

A    No, sir.

Q    Never?

A    No, sir.

Q    You are sure about that?

A    Yes, sir.

Q    Okay.  Have you ever been arrested for domestic violence?

A    Yes, sir.

Q    When was the last time you were arrested for domestic violence?

A    I'm not sure.

Q    Isn't it true that right now you have a case pending against you for domestic violence 3rd?

A    The case is not domestic violence, it's harassment.  A cell phone was broken.

Q    What were you charged with?

A    Harassment.

Q    When was the last time you were arrested for domestic violence?

A    I'm not sure, I'm not too good at dates.

Q    Mr. Williams, might you have been arrested for Assault 3rd back in '97?

A    I'm listening to you.

Q    I'm asking a question.

A    You asked what now?

Q    Were you arrested for Assault in the 3rd back in 1997?

A    You are talking about '97, this is 2005.

Q    I understand that, but the question was might you have been arrested back in '97 for –

A    I'm not sure, that's eight years ago.

Q       Were you arrested for possession and receiving controlled substance in 2003?

        MR. SMITH:  Your Honor, I object.

        THE COURT:  I sustain as to that.

        MR. NICKSON:  Sir?

        THE COURT:  I sustain.

        MR. NICKSON:  Mr. Williams, you have no idea what you have been arrested for throughout your life?

A       Yeah, I have an idea what I've been arrested for, but what has that got to do with me getting shot, what I've been arrested for?  I wasn't arrested the night he shot me.

Q       Mr. Williams, I'm asking the questions.

A       I understand that, but I'm just saying –

Q       I simply asked you before have you been arrested for crimes and you said you didn't remember.  I'm just trying to go through here and see if you were arrested for discharging a firearm in '93, possession of marijuana in '95, attempted murder in '95?

A       I never – I never was – I never had to come to Court.

        MR. SMITH:  I object to him reading out his entire –

        THE COURT:  I sustain.

A       I mean those charges and allegations that you are accusing me of, I never had to come to Court on any of those, they was all dismissed.  So, I was the wrong person at the wrong time during those times.

MR. SMITH: Okay, and I didn't accuse you of them.

A    I'm not saying you did, you know, you're just doing your job.

Q    Back in September of 2004 were you arrested for domestic violence?

A    I could have been.

Q    And you filed a divorce back in 2004, right?

A    When?

Q    Back in 2004 you filed for divorce, or, did your wife file for divorce?

A    I did.

Q    You indicated that you were conscious after you were shot?

A    Yes, sir.

Q    And you never answered the question whether you struck Mr. Horne twice?

A    I didn't strike him twice, I answered that question.

Q    Pardon?

A    I didn't strike him twice.

Q    You didn't?

A    No.

Q    Did you strike him at all?

A    I tried to.

Q    And you didn't grab Shanice Horne by the neck?

A    No, sir.

Q      Never been arrested for attempted murder, domestic violence and you've never owned a handgun?

A      I didn't say I never owned one, I said I don't have one.

Q      Have you ever owned a handgun?

A      Back in the day.

Q      What's the "day"?

A      I was a teenager, I'm 29 now.

Q      So, about ten years ago?

A      Basically.

Q      And you don't know a William Dassinger at all?

A      Not by that name.  I mean you are saying "William Dassinger", and I know people by nicknames and stuff like that, I don't know everybody by their full name.

Q      On that night you indicated to the Prosecution that you had made a phone call to Mr. Horne?

A      Yes, sir.

Q      Did you make just one phone call or several phone calls?

A      Well, I was on the back road and you barely can get a signal back there with the particular cell phone I had.  That's why I wasn't sure the first phone call went through and that's when I called back.

Q      You just called twice?

A      Yes, sir.

Q     What was the purpose of you calling?

A     Because I felt like we were friends and I basically wanted to let him know I didn't feel like it was right, you know what I'm saying, what he did and how he intervened in what was going on, like he was directing everything toward me.

Q     So, you didn't believe he was right in intervening in what was going on in the home that he lived in with his children?

A     Correct.

Q     And he should have allowed you to continue with the ongoing thing with Shanice in his home?

A     No, you're not understanding what I'm saying. You wasn't there, so, you don't know. I'm saying when he intervened, he shouldn't have been trying to stop me, he should have been trying to stop her because she was the one doing all the swinging and all the stuff like that.

Q     So, if you are married to a woman that's at the door and she's jealous because of the girlfriend or the mother of your child inside, I don't understand why ya'll are fighting. You should have been just getting out, shouldn't you?

A     Well, she never would have came if they never would have called her. They called her from my cell phone – they went through his girlfriend Kesha and Shanice Horne and they called her from my cell phone. They went to my call log and was calling and playing games on the phone with her and that's why she came out there.

Q     How did they get your phone?

A     She asked me could she use my cell phone.

Q    And where was your phone?

A    It was inside the car.

Q    In your car?

A    Yeah.

Q    So, Ms. Horne's girlfriend and Shanice went out to your car to use your cell phone, correct?

A    Kesha went to go get my cell phone. I'm not sure where they used it at because I was in the garage playing a video game. She asked him could she use his and he called her a bitch and told her no. They were arguing and that's why she had to use my cell phone.

Q    So, she went to your car and used your cell phone?

A    Correct.

Q    Who came to your aid after Mr. Horne left?

A    My mom was there, Christina was there.

Q    Who?

A    Christina. Shanice was there.

Q    By your side?

A    Well, she was standing up over me.

Q    And that was pretty much immediate?

A    Yes.

Q    Did anyone remove anything from your pockets before the ambulance arrived?

A    No, sir.

Q      Nobody took anything out of your pockets?

A      No, sir.  What was supposed to have been taken out of my pocket?

Q      Now, you said that you were violating for being out there to begin with?

A      Yes.

Q      What did you mean by that?

A      Because of the way everything was going down, you know.  I was in his house, me and his sister is into an altercation, and the wife is at the door, you know.  So, the best thing for me to do is to leave.  That's why I say I was violating from being there, that's why I left.

Q      So, you weren't violating a probation term or anything like that?

A      Oh, no, I'm not on probation.

Q      How long have you known the Defendant?

A      Well, we grew up on Logan Road together.

Q      Okay.  So, you've known him about 30 years?

A      Maybe like twenty years, something like that.

Q      About twenty years?

A      Yeah.

Q      Ya'll have been good friends?

A      We was always alright, you know.

Q      Always good friends?

A      Okay, you know.  It was not like we was best friends, but we was always on speaking terms.

Q    You ran with him and he ran with you?

A    I mean we stayed up the street from each other. I would go see him sometimes, he would come see me, stuff like that.

Q    When did you cease this relationship?

A    The night he shot me.

Q    Mr. Williams, isn't it true that you're the one that had the gun?

A    No, sir.

Q    Isn't true that you're the one that made the first strike at Mr. Horne?

A    No, sir.

Q    Matter of fact, two of them and hit him?

A    No, sir.

Q    Isn't it a fact that you pulled that gun from your waist band?

A    No, sir.

Q    And in the tussle, you were shot by that gun?

A    No, sir.

Q    Do you know Mr. Mark Jolly?

A    Who now?

Q    Mark Jolly?

A    Yes, sir.

Q    And a female friend named Shawn?

A    Who now?

Q    A female?

A    A female friend named Shawn?

Q     Yes?

A     I don't know any Shawn.

MR. NICKSON:  Your witness.

### EXAMINATION

BY MR. SMITH:

Q     Just a couple of follow-up questions.  Shanice followed you to Arrowhead Apartments?

A     Yes, sir.

Q     Gary Horne wasn't at Arrowhead Apartments when you arrived there and when Shanice arrived there?

A     No, sir.

Q     Shanice left Gary Horne's apartment or house?

A     Yes, sir.

Q     To follow you?

A     Yes, sir.

Q     Is that right?

A     Yes, sir.

Q     Gary Horne shows up and shoots you?

A     Yes, sir.

Q     Is that pretty much the way it happened?

A     That sums it all up.

Q     Now, was Shanice in any danger when Gary Horne arrived?

A     No, sir.

Q    Was she sitting in her car when Gary Horne arrived?

A    Her and my son was sitting in her car and sitting behind me.

Q    And you were in your car?

A    Yes.

Q    So, when he got out of his car, Shanice was still in her car?

A    She was still in her car.  Then once we got –

Q    You weren't in the car with Shanice, were you?

A    No, sir.

Q    And you were in the car by yourself?

A    Yes, sir.

MR. SMITH:  That's all.

<u>EXAMINATION</u>

BY MR. NICKSON:

Q    What kind of car do you have?

A    I had a Corsica at the time.

Q    Corsica?

A    A Corsica.

Q    Is that a compact car?

A    It was a four-door.

Q    Did it have bucket seats or bench seats?

A    Bucket seats.

Q    And you called Mr. Horne twice?

A    Yes, sir.

Q    And just to find out what was going on?

A    Basically to let him know I didn't agree with what had just happened.

Q    Did you ever call Mr. Horne and ask him to come get his sister?

A    No, sir.

Q    Was she causing you any trouble there at the apartments?  Any reason for you to be concerned?

A    I mean she was just there and then she pulled behind me.  I don't see how that's causing trouble because she's not bothering me sitting in the car.

Q    When she pulled behind you, what did you do then?

A    I was still sitting in the car.  She pulled behind me so I wouldn't leave.

Q    So, you were talking to her?

A    No, you could hear her hollering.

Q    So, you could hear her hollering in the car with –

A    She had the window down, you know, and she made the comment, "I bet you won't go no where now", when she pulled behind me.

Q    Did you make any threats to her?

A    No, sir.

Q    Did you make any threats to Mr. Horne?

A    No, sir.

MR. NICKSON:  Nothing further.

CHRISTINA PATTERSON WILLIAMS

Having been first duly sworn, was examined and testified as follows, to-wit:

EXAMINATION

BY MR. SMITH:

Q      Would you introduce yourself to the Jury, please?

A      My name is Christina Patterson Williams.

Q      Speak up a little bit.

A      My name is Christina Patterson Williams.

Q      And you are the ex-wife of John Williams?

A      Correct.

Q      And you were divorced in the last few years?

A      Right.

Q      I'm going to ask you a few questions about what happened on January the 15th of 2004, okay?

A      Okay.

Q      At that time you were married to John, is that correct?

A      Yes.

Q      You went over to Gary Horne's house at some point that evening?

A      Yes.

Q      Is that correct?

A      Yes.

Q      Tell the Jurors why you ended up going over there?

A      That night somebody kept calling my cell phone from my husband's

phone and they wasn't saying anything. So, I thought it was him and I had went over to Gary Horne's house to check on my husband. When I arrived, I told my husband, "Let's go." He was leaving and Shanice Horne started hitting him and saying he wasn't going anywhere. At that point Gary started holding my husband and Shanice was still hitting him. So, John got in his car and I followed him and we went over to my mother-in-law's house.

Q    Okay. So, you went over there and Shanice was mad because John was going to leave?

A    Right.

Q    Did Shanice hit John?

A    Right, yes.

Q    Did Shanice follow you two when you went back over to your mother-in-law's house?

A    Yes.

Q    Was your child with you when this happened?

A    No, sir.

Q    Were you in the car by yourself?

A    I was in the car by myself and John parked and he was going to leave his car, but Shanice Horne blocked him in and that's when Gary Horne came over.

Q    Shanice was blocking John in?

A    Right.

Q    Was she parked like in a –

A    He parked and then she parked behind him so he couldn't leave.

Q      Did you see when John arrived there?

A      Yes, he was going to leave with me, but within seconds Gary Horne came and started arguing with my husband and he pushed my husband and it was like John was going to defend himself and Gary shot him.

Q      Did John try to hit him back?

A      I mean he -- like I said, it happened so fast, but he pushed my husband and then that's when he shot him.

Q      Okay.  Did you see Gary Horne shoot John?

A      Yes, sir, I did.

Q      And did Gary Horne have a gun?

A      He had it within his waist and he grabbed it and shot my husband, yes.

Q      And you saw the gun?

A      I seen him right there, yes.

Q      This is him?

A      Yes.

Q      What happened after that?

A      My husband fell to the ground and he ran and there was another gentleman with him but I don't know his name.  He jumped in his car and he took off and Shanice Horne was yelling, "Gary, why did you shoot John?", and --

          MR. NICKSON:  Object to hearsay.

          THE COURT:  I overrule.

          MR. SMITH:  And then did you stay until the ambulance came?

A      Yes, I did.

MR. SMITH:  Thank you very much.

EXAMINATION

BY MR. NICKSON:

Q      Is it Ms. Williams?

A      Patterson Williams, yes.

Q      Ms. Patterson Williams, on that day where had your husband been all day?

A      He was at Gary's house playing the Play Station.

Q      All day long?

A      I don't know about all day long, but I know when he had last called me,
that's where he was at.

Q      Did you know where he was going earlier in the day?

A      Yes, he told me everywhere he goes, yes.

Q      Where was he going earlier in the day?

A      To his house, when he last called, to play the Play Station with him.

Q      So, he was pretty much there all day?

A      When he last called, yes, a couple of hours, yes.

Q      And when you went to Mr. Horne's house, you went there because
somebody was calling you from Mr. Horne's house?

A      No, sir, somebody was calling from my husband's phone.  It's a special
ring when they call my phone so I know when it's my husband.  And it was a
female and they were playing games.

MR. NICKSON:  Your Honor, may I treat the witness as hostile?

45

THE COURT:  Go ahead and just ask questions and we'll see what happens.

MR. NICKSON:  So, you came to Mr. Horne's house trying to find your husband?

A      To get my husband.

Q      To get your husband?

A      Yes.

Q      And when you got there, did you get upset because you saw Gary's sister there in his home?

A      No, sir.

Q      Not at all?

A      No, sir.

Q      Were you aware that Ms. Horne was Mr. Williams's girlfriend?

A      How can he have a girlfriend when he is married?

Q      It happens all the time.

A      Well, they have a child together.

Q      So, you knew he was there to visit the child?

A      Right.

Q      And when you arrived there did you go to the door?

A      Yes, I went by the door, like the steps.

Q      And did they shut you out?

A      No, sir.

Q    They didn't?

A    No, sir.

Q    They left the door open and invited you in?

A    They were peeking out the window – somebody was peeking out the window.  Then that's when my husband came up to the door to leave and that's when Ms. Horne started hitting him.

Q    And when you saw Ms. Horne hitting him, then what happened?  Did they shut the door on you then?

A    No, the door was still open.

Q    The door stayed wide open and you watched all this go on?

A    Yes, I watched everything.

Q    That being your husband, you didn't go in and help him?

A    No, because that wasn't my house to go in.

Q    After your husband got shot, did you and another lady start going through your husband's pockets?

A    No, sir.

Q    Were you upset when Ms. Horne followed you over to your mother-in-law's house?

A    No, I wasn't upset because I'm used to that.  She's always following us, stalking my husband, ex-husband.

Q    And how do you know that?

A    Because we used to live at an address and she used to jump out of the bushes, just arrive at all times of the night, you know, and I was just used to it.

Q       How old are you?

A       I'm twenty-two years old.

Q       How long were you married to Mr. Williams?

A       Three and-a-half years.

Q       Have you ever filed domestic charges against Mr. Williams?

A       No.

Q       Have you ever called the police on a domestic violence call?

A       Neighbors maybe, but not me, no.

Q       Were you ever in the service?

A       Yes, sir, I was in the Air Force.

Q       Ever been to McGuire Air Force Base?

A       Right.

Q       Did an incident occur up there between you and Mr. Williams where he hit you in the mouth and broke several teeth?

A       No, sir, that didn't happen.  I fell down the stairs, but he didn't hit me.

Q       Did he push you?

A       No, he didn't push me.

Q       Was he even present?

A       Yes, he was there.

            MR. NICKSON:  Nothing further.

            MR. SMITH:  Nothing further.

<u>KEITH CAUTHEN</u>

Having been first duly sworn, was examined and testified as follows, to-wit:

<u>EXAMINATION</u>

BY MR. SMITH:

Q    State your name?

A    Lt. Keith Cauthen.

Q    And you are an Ozark Police Officer?

A    Yes, sir.

Q    How long have you been an officer with the Ozark Police Department?

A    Twenty-four years.

Q    What's your title?

A    Watch Commander.

Q    Watch Commander?

A    Yes, sir.

Q    Did you go to the scene at the Arrowhead Apartments where a shooting took place on January the 15th of 2004?

A    Yes, sir, I did.

Q    Tell the Jurors what you observed when you arrived at that scene?

A    I approached the scene from the South Union side of the roadway across the grass onto where the sidewalk was. Upon arrival, I observed a black male lying on the grass in front of the O-Building of Arrowhead Apartments.

Q    Was that individual identified as John Williams?

A    Yes, sir.

Q     And did you see that he was shot?

A     After approaching, yes, sir.

Q     He was laying on the ground when you approached?

A     Yes, sir.

Q     Who else do you recall seeing when you arrived at the scene?

A     His mother was there, two other subjects were Ricky Ivey and a Bell subject, and I believe his wife was also there.

Q     Okay.  Did you see the gun in the area where Mr. Williams was shot?

A     No, sir.

Q     Did you look in the area around where he was shot?

A     Yes.

Q     In his immediate area?

A     I had it secured immediately by the officers that arrived on the scene behind me and we processed the scene – I didn't process the scene, but we secured the scene and had it processed.

Q     Did Mr. Williams have a gun?

A     Not on him, no, sir, not on his person.

Q     And you found no gun in the immediate area?

A     No, sir.

Q     Do you recall where Mr. Williams was shot?

A     Upper torso.

Q     Okay.

          MR. SMITH:  Thank you very much.

<u>EXAMINATION</u>

BY MR. NICKSON:

Q      Lt. Cauthen, is that correct?

A      Yes, sir.

Q      My name is Tracy Nickson, how are you doing?

A      Alright, sir.

Q      You were the first officer on the scene?

A      Yes, sir.

Q      And did dispatch call anybody else to the scene?

A      Yes, sir.

Q      Do you recall who they were?

A      There were several other officers dispatched.

Q      Could one of the officers have been Rex Tipton?

A      He was the investigator who I contacted.

Q      Did he respond?

A      Yes, sir, he did.

Q      Was Agent Martin Spears there?

A      Yes, sir.

Q      What was his role?

A      Agent Spears was our Evidence Custodian and he processes our scenes.

Q      Did you assist him?

A      No, sir.

Q       You were just there to secure the scene?

A       Yes, sir, I secure the scene and I insure that everything is done properly.  I
don't handle any evidence or secure or process any evidence.

Q       And what were you told at the scene?

A       By who?

Q       By anyone there?

A       Mr. Bell, one of the witnesses, made a statement to me that he observed
Mr. Horne shoot Mr. Williams.  Mr. Williams's wife made that statement to me at
the scene.

Q       Are you aware that Mr. Bell recanted that statement?

        MR. SMITH:  I object, Your Honor.  He's not going to testify.

        THE COURT:  I sustain.

        MR. NICKSON:  Did you do a report with respect to what was
said to you?

A       As far as the statements?

Q       Yes?

A       No, sir, the investigator handles all the statements, I did the initial incident
offense report and turned it over to him.

Q       Who is Officer Ed Farren?  (PHON)

A       That's one of my patrol officers assigned to my shift.

Q       What was his role?

A       He was the second officer on the scene.

Q    When did Lt. Rex Tipton show up?

A    After the scene was secured and the victim was transported.

Q    Had Agent Spears collected evidence and processed the scene at that time?

A    I'm not sure, sir.

Q    Did you go with Mr. Williams when he was transported?

A    No, sir, I did not.

Q    You remained at the scene?

A    At the scene, yes, sir.

   MR. NICKSON:  Nothing further.

   THE COURT:  Thank you, sir.  We appreciate you coming in.

<u>SHANICE HORNE</u>

Having been first duly sworn, was examined and testified as follows, to-wit:

<u>EXAMINATION</u>

BY MR. SMITH:

Q    Would you introduce yourself to the Jury, please?

A    Shanice Horne.

Q    Shanice Horne?

A    Uh-huh.

Q    And Gary Horne is your brother, is that correct?

A    Uh-huh.

Q    And you have a child with John Williams?

A    Yes.

Q      I'm going to ask you a few questions about what happened on the night of January the 15th of 2004, okay?

A      Okay.

Q      You were at your brother's house?

A      Yes.

Q      Do you remember what time of the evening that was?  Were you there most of the day?

A      No.

Q      When did you arrive at your brother's house?

A      I guess at 8:30.

Q      That night?

A      Yeah.

Q      Dark?

A      Yeah.

Q      And John was there?

A      Yes.

Q      He was there when you arrived?

A      Well, we met up because he had called my mom and told me to come over to my brother's.

Q      So, you met him over at your brother's house?

A      Uh-huh.

Q      Was your son with you?

A      Yes.

Q    Your and John's son?

A    Uh-huh.

Q    Did Gary and John play video games together at Gary's house?

A    Yeah.

Q    At some point in time, John's wife came over, is that correct?

A    Uh-huh.

Q    Tell the Court what happened after she showed up?  Did John try to leave?

A    Yeah, he was trying to leave and then me and him got into it.

Q    What happened when he tried to leave?

A    I think we went to tussling each other and then I punched him.

Q    You punched him?

A    Uh-huh.

Q    Was he trying to leave when you hit him?

A    I think he was pushing me when I hit him.

Q    So, you are now saying that he was pushing you?

A    Yeah, we was tussling, you know.

Q    Earlier when I asked you out in the hall, didn't you tell me that you punched him first?

A    Yeah, I did hit him first.

Q    You did hit him first?

A    Yeah.

Q    Then did ya'll get into an altercation where ya'll fell on the table?

A    I think we kind of like fell on the table.

Q      Is that when your brother got involved?

A      Yes.

Q      Now, after he got involved, John left Gary's house, is that right?

A      Uh-huh.

Q      Did you follow John and his wife back over to the Arrowhead Apartments?

A      Yeah.

Q      Did you block John's car into the parking space there at the Arrowhead Apartments?

A      Uh-huh.

Q      Why did you do that?

A      Because it goes on all the time and I thought he was going to try to leave without getting through with the argument.

Q      You wanted to finish the argument?

A      Yeah.

Q      What was this argument about?

A      I was mad because his ex-wife came to my brother's house.

Q      Okay. It was his wife that –

A      At the time, yes.

Q      You were mad because she came over?

A      Uh-huh.

Q      Did that make you mad while you were at Gary's house?

A      Yeah.

Q       Very mad?

A       I was upset.

Q       And then you followed them because you were still mad?

A       No, he left and she followed him and then I followed.

Q       You followed him?

A       Yes.

Q       Because you wanted to finish the argument?

A       Yes.

Q       Did you call Gary at any point in time?

A       No, I don't have a cell phone.

Q       So, you followed John on your own?

A       Yeah.

Q       Did you tell Gary why you were following him?

A       No.

Q       Did you feel like you needed him there to finish this argument?

A       Who?

Q       Your brother?

A       No.

Q       So, you came over and you blocked John's car?

A       Yes.

Q       Is that right?

A       Yes.

Q    At some point did you get out of your car before Gary arrived?

A    (No response)

Q    Was it before or after Gary arrived?

A    I think it was a little afterwards.

Q    After Gary arrived, that's when you got out of your car?

A    Yes.

Q    What did Gary do when he got out of his car?

A    I think they was like fussing as they was walking to each other, so, I was getting out of my car to go across the street to call my mother.

Q    You walked across the street?

A    Yeah.

Q    Were you ever between John and Gary at the Arrowhead Apartments?

A    No.

Q    You had walked across the street?

A    Yes.

Q    Got out of your car and walked across the street?

A    Yes.

Q    And you weren't in any danger at this point in time, were you?

A    No.

Q    Not at all?

A    No.

Q    And when you walked across the street and went to the apartments, what happened?

A    I heard a gunshot and I turned around.

Q    Okay. What did you see when you turned around?

A    John on the floor.

Q    John was on the ground?

A    Uh-huh.

Q    And what was your brother doing?

A    He was gone, getting in his car.

Q    Getting in his car?

A    Yes.

Q    Did you see him run to his car?

A    I don't remember.

Q    You don't remember –

A    I don't remember if he was running or walking.

Q    Did you see him going towards his car?

A    Yeah.

Q    You did?

A    Yeah.

Q    Have you and John ever had these kinds of fights before?

A    Yes.

Q    And you went there to finish this one, is that fair to say?

A    Yeah.

Q     You were pretty mad, weren't you?

A     Yeah, I was mad.

Q     Was your son in the car?

A     Uh-huh.

Q     So, John's son and your son was sitting in the car when his father was shot, is that right?

A     Yes.

Q     By himself?

A     Yeah.

Q     Did you go back over to where John was after he was shot?

A     Uh-huh.

Q     Did you see where he was shot?

A     Uh-huh.

Q     Where was he shot?

A     Like on the side in his stomach.

Q     On the side?

A     Yes.

Q     Okay.

MR. SMITH:  That's all.

<u>EXAMINATION</u>

BY MR. NICKSON:

Q     On the 15th you were at your brother's house?

A     Yes.

60

Q    And you were there with your son?

A    Uh-huh.

Q    Was Mr. Williams there as well?

A    Yeah, I think we pulled up at the same time.

Q    And you went in and do you know how long you stayed?

A    Probably twenty minutes.

Q    You stayed twenty minutes?

A    About thirty minutes before it happened.

Q    Before you left?

A    Yeah.

Q    Before all of ya'll left?

A    Yeah, like probably thirty to forty-five minutes.

Q    And you followed Mrs. Williams and Mr. Williams over to the Arrowhead Apartments?

A    Yes.

Q    And you were upset?

A    Yes.

Q    With him?

A    Yes.

Q    Were you upset because you were Mr. Williams's girlfriend?

A    Uh-huh, because he always go back and forth.

Q    Even though he was married?

A    Yeah.

Q       Did you have any discussions that day about your son?

A       Well, we went to eat lunch with him together at school and we went to his aunt's and me and him got into a little argument there.

Q       And was that the same day?

A       Yes.

Q       So, you were with Mr. Williams earlier that day?

A       Uh-huh.

Q       When Mrs. Williams came, did you call her to come over?

A       Huh-uh.

Q       Did you have an opportunity to go use Mr. Williams's phone?

A       Huh-uh, I didn't use the phone.

Q       Pardon?

A       I didn't use the phone.

Q       Were you with anybody that did?

A       Uh-huh.

Q       Who was that?

A       Kesha.

Q       Kesha?

A       Yes.

Q       Where did ya'll use the phone?

A       In his car.

Q       Mr. Williams's car?

A       Yes.

Q     I'm trying to understand why did you not want him to leave?

A     Why did I want him to leave?

Q     Why did you not want him to leave?

A     John to leave?

Q     Yes?

A     Because he had called and told me to come over, so, I was mad and –

Q     You said that you and Mr. Williams were tussling?

A     Uh-huh.

Q     As he was trying to leave?

A     Yes.

Q     But you hit him first?

A     Yes.

Q     After ya'll were tussling, did he hit you?

A     No.

Q     So, he just grabbed you and slammed you to the floor?

A     I never hit the floor, he just pushed me.

Q     He just pushed you?

A     Yes.

Q     Are you and Mr. Williams in a habit of getting into these little arguments?

A     Yes.

Q     Have you ever filed charges of domestic violence?

A     Yeah, he's been arrested for it.

Q      Do you know how many times?

A      With me?

Q      Yeah?

A      I guess probably three or four.

Q      Do you have any personal knowledge of him being arrested at any other times?

A      For her.

Q      For her?

A      His ex-wife.

Q      His ex-wife?

A      Yeah.

Q      Do you know how many?

A      I don't know how many, a couple.

Q      A couple?

A      Yes.

Q      So, you were sitting in the car?

A      Yes.

Q      Blocking Mr. Williams?

A      Yes.

Q      And when your brother pulled up, you got out?

A      Yes.

Q      And you went across the street to call your mother?

A      Yes.

Q        And at that point you couldn't see anything?

A        Huh-uh, no.

Q        Your back was to the situation?

A        Yeah.

Q        Then you heard a gunshot?

A        Yes.

Q        Then when you looked back, you saw that your brother was gone?

A        Yes.

Q        Did you see that he was gone, or, that he was leaving?

A        Well, he was in the car ready to crank it up, I guess, and then he was gone.

It happened so quick.

Q        So, he was already gone?

A        Yeah.

Q        And John was on the ground?

A        Yeah.

Q        And he had been shot?

A        Uh-huh.

Q        Did you see anybody going through Mr. Williams's pockets?

A        Huh-uh.

Q        Nobody went through his pockets?

A        Not that I saw.

Q        Before the ambulance arrived?

A        Not that I saw.

Q    And you didn't see who shot John?

A    Huh-uh.

Q    And you know Mr. Williams quite well?

A    Yes.

Q    Have you ever known Mr. Williams to be in possession of a handgun?

A    I think he used to have one.

Q    Have you ever known him to own any other guns?

A    I don't remember, I don't think so.

Q    Rifles or shotguns or sawed-off shotguns, or anything like that?

A    Oh, he had a rifle.

Q    A rifle?

A    Yes, but I don't know what kind.

Q    But you did know him to have a handgun?

A    Uh-huh.

Q    Do you know what kind of handgun?

A    No.

Q    Are you familiar with handguns?

A    No.

Q    So, you heard a gunshot?

A    Yeah.

Q    Do you know who had the gun?

A    Huh-uh.

Q    How long did your relationship with Mr. Williams go back?

A      (No response)

Q      Your child is –

A      My child is fixing to be eight on Friday.

Q      Eight years old?

A      Yes.

Q      So, you go back further than eight years?

A      Well, yeah, ten, about ten years, since '96.

Q      Do you have any personal knowledge with respect to Mr. Williams being arrested for anything else other than domestic violence?

          MR. SMITH:  I object.

          THE COURT:  I sustain.

          MR. NICKSON:  As you've said, you've had Mr. Williams arrested three or four times for domestic violence?

A      Uh-huh.

Q      Do you understand that your brother is accused of attempted murder?

A      Yes.

Q      Have you ever known your brother to own a gun?

A      Not that I know of.

          MR. NICKSON:  Nothing further.


<u>EXAMINATION</u>

BY MR. SMITH:

Q     You said this happened really fast?

A     Yes.

Q     In just seconds?

A     Yes.

Q     Less than a minute or two?

A     Yeah.

Q     Is that from the time you got out of the car and the time that you heard the

gunshot?

A     Yeah.

Q     Okay.  So, you didn't ask your brother to come over there?

A     Huh-uh.

Q     But he arrived?

A     Yes.

Q     And then seconds after he arrived, John was shot?

A     Uh-huh.

          MR. SMITH:  That's all.

          THE COURT:  Thank you, ma'am, you can step down.

          MR. SMITH:  The State rests.

                    (The following occurred out of the presence of

                    (the Jury:

          MR. SMITH:  Your Honor, I was going to recall him just to have

him state that these events occurred in Dale County.

MR. NICKSON:  We'll stipulate to that.  At this time I would like to ask the Court for a directed verdict with respect to the charges against Gary Horne.  The State has failed to make a prima facie showing that he committed these crimes.

THE COURT:  Motion denied.

MR. SMITH:  I would renew my objection as to the State's failure to provide discovery with respect to Mr. Barr and I have not received it.

THE COURT:  Motion denied.

MR. SMITH:  I would respectfully move for a mistrial.

THE COURT:  Motion for a mistrial denied.


(Whereupon, the Jury was returned for the

(following:


<u>IMMOGENE PAUL</u>

Having been first duly sworn, was examined and testified as follows, to-wit:

<u>EXAMINATION</u>

BY MR. NICKSON:

Q       State your name?

A       Imogene Kesha Paul.

Q       Are you employed?

A       Yes.

Q      Where?

A      Westside Health & Rehab.

Q      What do you do there?

A      Nursing.

Q      Do you recall the event that led to an argument in your home on the 15th of January of 2004?

A      Yes, sir.

Q      What happened?

A      Well, we planned to have a nice night and Gary was like –

        REPORTER:  You need to speak up because they can't hear you over there at that end of the Jury.

A      Okay.  Gary said John was coming over to play a game and, when John got over there, he asked Gary if he had called and told Shanice to come over because he had to talk to her about something.  Then they were playing the game and all and I asked John if I could use his phone.  When I went out to his car to use his phone, I was just looking around and I got his cell phone out and me and Shanice sat down in my car and I used the phone.  When I mashed the "send" button, I thought I had dialed my number in, but when I mashed the "send" button a lady answered the phone, so, I hung up.  Then after that, I made the call I had to make and went back inside.

Q      You went to Mr. Williams's vehicle to use his cell phone?

A      To get his phone out of the car.

Q    To get his phone out of the car?

A    Yes.

Q    Did you use the phone in the car or –

A    I got it out of his car and went back to my car.  We sat in my car to use his phone because Shanice wanted to copy some numbers out of his phone.

Q    Do you know why she wanted to do that?

A    I guess being nosey.

Q    Because that's his girlfriend?

A    Uh-huh.

Q    While you were in Mr. Williams's vehicle getting the phone, did you happen to see anything else in his car?

A    Yeah, he already knew he couldn't bring any guns into my house, but between the two seats there was the black end of a gun sticking down between the seats.

Q    Was it a rifle or handgun?

A    A handgun.

Q    Do you recall what color it was?

A    Black.

Q    Black?

A    Yes.

Q    And you know for sure it was a gun?

A    Uh-huh.

Q    So, you used the phone?

A    Yes.

Q    And you let Shanice have it and she wrote down some numbers?

A    Uh-huh.

Q    Did you put it back and go back in the house?

A    No, we just went in the house.

Q    With the phone?

A    With the phone.

Q    What happened after that?

A    We were just sitting down and then Gary had left to go pick up his friend Terrance and, when he came back, he like whispered something to John and John was like, "What?", and he was like, "Your folks is outside."  So, John got up and he went outside and he came back in and he was like, "Which one of ya'll bitches called my wife?", and then I looked at Shanice and she looked at me because I didn't intend to call his wife, but when I mashed "send", a lady picked up the phone and I just hung up.

Q    And you did that one time?

A    Yes.

Q    And that was by accident?

A    Yes.

Q    And you didn't say anything?

A    No, I didn't say anything, I just hung up the phone.

Q    And this phone doesn't indicate that whoever answered the phone was at your house?

A    Do what?

Q    The phone doesn't indicate, when the phone is answered, that the phone is at your house?

A    No.

Q    Continue.

A    Well, after that –

Q    Did you take the phone in the house?

A    Yes.

Q    Okay.

A    And after all that happened with his wife coming over –

Q    Where was she at this time?

A    She was standing in my doorway.

Q    Was the door open or closed?

A    It was open because when John came in he left the door open and she stepped into my house.

Q    She stepped in your house?

A    Right, and then I told her she couldn't come out there and start fussing because I had my grandmother out there that I was taking care of and my kids and they don't witness stuff like that.

Q    Did the door stay open?

A    It did because she was standing there fussing with Shanice and Shanice

was fussing with John and telling him that he wasn't leaving and going no where

with her.  So, John walked by and he was – they were fussing.  I think when he

walked by that Shanice punched him and then he grabbed her and they started

fighting in the kitchen.  Me and Gary broke them up and we was like, "Ya'll got

to leave, ya'll can't be doing this in here."

Q      At any time did you see Mr. Williams hold Ms. Horne by  the throat?

A      Yes.

Q      Where was that?

A      In the kitchen.

Q      Was that before or after Ms. Horne hit him?

A      It was after.  I think she hit him first.

Q      Was Mr. Williams and Ms. Horne there with their son?

A      Right.

Q      Were they busy with the son or visiting together?

A      They were visiting with the son and I think John wanted Shanice to come

over there so he could see his son and just tell her that he didn't want nothing else

to do with her.

Q      Do you know if they got into any other arguments about the child or any

other thing?

A      Yeah, he asked her, "Don't my son have school tomorrow?", and she said,

"Yeah, I'm just going to keep him home", and he was just looking at her like,

"You're so stupid, that boy needs to be in school."

Q     How long have you known Mr. John Williams?

A     Years.

Q     Years?

A     Yes.

Q     Is he a good law abiding citizen, in your opinion?

          MR. SMITH:  Objection.

          THE COURT:  I sustain.

          MR. NICKSON:  How long have you known Gary's sister?

A     Years.  I grew up here in Ozark.

Q     Have you ever been present to observe behavior that you felt was abusive between Mr. Williams and Ms. Horne?

A     Other than that night, no, only things I would hear.

Q     Do you know if Mr. Williams and Ms. Horne have an ongoing relationship as boyfriend/girlfriend?

A     Yes.

Q     Even when Mr. Williams was married?

A     Yes.

Q     And you were present when this broke out?

A     Yes, sir.

Q     And this is when –

          MR. SMITH:  I object to leading the witness.

          THE COURT:  I overrule, go ahead.

MR. NICKSON:  Ms. Williams came to your house?

A     Yes.

Q     And did she start anything, or, just –

A     No, when she came in the house she started fussing and I looked at Gary and I said, "She can't come out here like this", and I told him he needed to say something to her and he was like –

Q     So, this is very much a family affair at this point?

A     Yes, sir.

Q     And one that certainly got out of hand?

A     Yes, sir.

Q     Do you know how these people left your home?

A     Yes, sir, after we told them they had to leave, John got in his car and when he got in he must have dropped something because he pulled off and then his wife pulled off behind him.  Then Shanice pulled off.  I was trying to tell Shanice she needed to go because she had her little boy and she was like, "No, I'm going anyway."  So, they all left together and then John came back and picked something up off the ground and then they all left again and they were just following each other in a line.

Q     Do you know what happened after that?

A     After that, they went over to John's mama's house.

Q     How do you know that?

A     Because that's what they told me.

Q      Did you have an opportunity to hear Mr. Horne's phone go off?

A      Yes, sir.

Q      How many times did it go off?

A      A lot of times.  The whole time it was going off, he was telling me that he didn't do anything and –

Q      Every time that Mr. Horne's phone rang, did he answer it?

A      Not every time.

Q      Did he know who was calling?

A      He did.  After the first couple of times he answered and John was fussing and he asked me, "Did you have anything to do with this?", and I was like, "No", and then I told him I did dial a number on accident but I didn't know it was his wife.  Then he told Gary, "I'm shooting you and if you don't hurry up and get over here by the time my mom gets home, I'm going to shoot this bitch in her head."

Q      So, this was Mr. Williams saying that?

A      Uh-huh.

Q      Were you on the telephone?

A      I wasn't on the phone, but he was screaming and I was standing right by Gary and he was screaming loud enough you could hear it through the phone.

Q      So, you could hear all this?

A      Uh-huh.

Q      And you heard the threat to Mr. Horne's wife?

A      Yes, sir.

Q    And you heard Mr. Williams threaten to shoot his sister?

A    Uh-huh.

Q    And did you think that he might have the ability to do so?

A    Yes, sir.

Q    Is that because you saw the gun in the car that day?

A    Not just because I saw a gun, but because I know that he would fight a woman.

Q    So, you actually heard Mr. Williams say all this?

A    Yes, sir.

Q    Are you certain that the voice you heard was that of Mr. John Williams?

A    Yes, sir.

Q    It was that individual sitting over there?

A    Yes, sir.

Q    Did you actually hear Mr. Williams state to Gary that he needed to come get his sister before Mr. Williams shot her?

A    Yes, sir.

Q    To the best of your knowledge, does Gary own a gun?

A    · No.

Q    Does he own a rifle?

A    No, sir.

Q    Do you believe that Mr. Williams would have ever caused Mr. Horne's sister any harm?

A    Yes, sir.

Q    Did you go with Mr. Horne that night?

A    No, sir, I didn't.

Q    Did anybody go with Mr. Horne that night?

A    Terrance Barr did.

Q    Did you stay there at your home?

A    Yes, sir.

Q    Why?

A    Because my children were there and my grandmother.

Q    How did you find out about what happened after Gary and Mr. Barr left to

go to –

A    I kept calling his phone.  At first, he wouldn't answer, but when he finally

called me back, I could just tell something was wrong and I was like, "What

happened?", and he told me at first that him and John got into a fight.  I kept

saying, "What's wrong?", and finally he told me to just meet him somewhere and

he was crying.  So, I told him okay and then I called my mom and she came over

and sat at the house with my kids.

Q    How long did it take you to get to Mr. Horne?

A    Like five minutes.

Q    What happened after that?

A    I sat down in the car where he was at and I asked him what was wrong and

he told me that –

        MR. SMITH:  I object to the hearsay.

        THE COURT:  I sustain.

MR. NICKSON:  You said you didn't go with Mr. Horne?

A    No, sir.

Q    Were you afraid for Mr. Horne's safety?

A    Yes, sir.

Q    And at no time did you see any other gun, other than the gun you believed you saw in Mr. Williams's car?

A    Right.

Q    Just the gun in Mr. Williams's car?

A    Yes, sir.

Q    And is it your belief that this gun would have been the gun involved in this accident?

MR. SMITH:  I object to what she believes.

THE COURT:  I sustain.

MR. NICKSON:  That's all.

## EXAMINATION

BY MR. SMITH:

Q    Gary Horne is the father of your children, is that right?

A    Yes, sir.

Q    You are not his wife?

A    No.

Q    Doe she have a wife?

A    I understand he's engaged to be married.

Q    Engaged now?

A    Uh-huh.

Q    Was he engaged when you were dating him or living with him?

A    No, sir.

Q    Did you make a comment about Mr. Williams would fight a woman?

A    Yes, sir.

Q    Wouldn't Mr. Horne fight with a woman?

A    He never hit me.

Q    Never hit you?

A    No.

Q    Wasn't he charged with domestic violence against you?

A    No, he was not charged with domestic violence.  A neighbor did call the police because of an incident that happened at my house.

Q    And he was charged with domestic violence against you, isn't that correct?

A    No, he wasn't.  I never pressed any charges against him and I never said he hit me.

Q    Did he have to go to Court because he was charged with domestic violence against you?

A    No – did you?  I don't know.

Q    Back in June of 2003 wasn't he charged with harassment against you?

A    I don't know if he was or not.  I didn't call the police and I didn't press no charges against him.

Q    Okay.

A     He didn't hit me and –

     MR. NICKSON:  Your Honor, I object to this.

     THE COURT:  I sustain.

     MR. SMITH:  Let me ask you about that night.  You said that you were afraid for Gary Horne's safety?

A     Right.

Q     Did you tell him not to go?

A     I told him not to get in the middle of it.

Q     You told him not to go?

A     I gave him my opinion.

Q     When did you call the police about the altercation that happened at your house?

A     When did I call them?

Q     Did you call them?

A     No, I didn't.

Q     All this stuff happened at your house and you didn't call the police?

A     No, I didn't.  I would hate for my kids to see the police come over because of something that someone was doing.

Q     What do you not want them to see?

A     The fighting and the police coming over.

Q     Did Gary call the police?

A     No, he didn't.

Q       When he was getting these threats on the telephone, did you call the police?

A       No, sir.

Q       Did Gary Horne call the police and tell them his sister was being threatened by John Williams?

A       No, he didn't.

Q       Gary was mad at you that night about the phone calls, wasn't he?

A       Uh-huh, he asked me why would I get in the middle of their mess.

Q       Who told Shanice she had to leave?

A       We both did.

Q       You told them to get out of the house?

A       That's right.

Q       And you used Mr. William's phone in your car?

A       Yes, I went to his car to get the phone, then I got in my car.

        MR. SMITH:  That's all.


<u>JOHN DASSINGER</u>

Having been first duly sworn, was examined and testified as follows, to-wit:

<u>EXAMINATION</u>

BY MR. NICKSON:

Q       State your name?

A       John Dassinger.

Q        Speak up.  Where do you reside?

A        In Ariton right now.

Q        Where are you employed?

A        Right now I'm currently not employed.  I was working with Terminex, but

I'm not any more.

Q        Do you know the Defendant Gary Horne?

A        I do now.

Q        Are you familiar with what Mr. Horne is charged with here today?

A        Yes, sir.

Q        Do you personally know the victim Mr. Williams?

A        Yes, sir.

Q        How long have you known him?

A        Quite a while.

Q        Quite a while?

A        Yes, sir.

Q        Could you define "quite a while"?

A        A few years.

Q        Did you have an occasion to speak to Mr. Williams or procure anything

from Mr. Williams after January the 15th of 2004?

A        I bought a pistol from him in late January.

Q        Do you remember what kind of pistol it was?

A        A Glock-40.

Q    Do you know where the gun is now?

A    The police have it.

Q    Okay.

A    I got pulled over and they took it from me.

Q    Where did you get this gun?

A    From John-John Williams.

Q    Pardon?

A    From John-John Williams.

Q    And did you but it or did he give it to you?

A    Yes, sir, I bought it.

Q    And how much did you pay for the gun?

A    A hundred bucks.

Q    And this was after the 15th or 16th of January?

A    It was late January.

Q    Sir?

A    Late January.

Q    Did Mr. Williams tell you anything about the firearm?

A    No.

Q    Had you ever tried to buy this firearm from him before?

A    I tried to buy it a couple of times before and he wouldn't sell it to me.

Q    Do you know why?

A    He said he didn't want to get rid of it.

Q     And you say that the police took the gun from you?

A     Yes, sir.

Q     Were you charged with having a firearm?

A     Yes, sir.

Q     So, the police should still have this gun?

A     They should.

Q     When you bought this handgun, was anybody with you?

A     Huh-uh.

Q     Was it the Dale County law enforcement that got the gun?

A     Yes, sir, it was Ozark.

Q     Ozark?

A     Yes, sir.

Q     Was there anything unusual about this gun?

A     No.

Q     Were you charged with having this gun?

A     I was charged with having a pistol without a permit, and then they tried to change the charges and say I had a pistol with altered serial numbers.

Q     Okay.

A     I don't know what they're trying to charge me with now.

Q     But you no longer have the gun?

A     No.

Q     And you did purchase this gun from Mr. Williams?

A     Yes, sir.

Q    And it was a .40 caliber Glock?

A    Yes, sir.

Q    Have you ever known Mr. Williams to have any other guns?

A    Yes, sir.

Q    Do you know what kind?

A    I've just seen flashes of them here and there.

Q    When you say "flashes", do you –

A    I mean like I would see one laying in the seat, you know, or laying in the floorboard or I would see it through his shirt on the side right here.

Q    He held it in his waistband?

A    Yes, sir.

Q    And you have known him for several years?

A    Yes, sir.

Q    And he would always carry a firearm?

A    As far as I know.

MR. SMITH:  He keeps leading this witness, Your Honor, and I object.

MR. NICKSON:  Nothing further.

<u>EXAMINATION</u>

BY MR. SMITH:

Q    Mr. Dassinger, you say you are not sure about what you are charged with?

A    I know that I was charged at first with receiving a pistol without a permit, and then they tried to change it to pistol with altered serial numbers.  The serial

numbers weren't altered because I checked them myself and they matched on the clip and on the pistol itself.

Q        Weren't you indicted for possessing a pistol with – possession of an altered pistol?

A        That's the second charge they tried to get me on.

Q        Aren't you indicted also for possession of a controlled substance?

A        Yes, sir.

Q        And possession of marijuana?

A        Yes, sir.

Q        Did you plead guilty to those charges?

A        Yes, sir.

Q        Didn't you at one point in time tell someone in law enforcement that you found this firearm?

A        No, sir, I told them that I found the drugs.

Q        You didn't say you found the firearm?

A        No.

Q        So, you told them you found the drugs?

A        Yes, sir.

Q        When did you purchase this gun?

A        Late January.

Q        Like how late in January?

A        Like towards the end of January.

Q    Was it the last day of January?

A    I'm not exactly sure of the date, but I know it was towards the end of January.

Q    Towards the end of January?

A    Yes, sir.

Q    Conveniently shortly after he was shot, correct?

A    Yeah, I guess so.

Q    Now, let me ask you this. Where did you purchase this gun?

A    At his mother's house?

Q    At his mother's house?

A    Well, I used to stay like four or five doors down from his mother and we had got kicked out of the apartments, then I stayed at a friend's house that lived in those same apartments and –

Q    What are their names?

A    Justin, Ricky and a few people over there I know.

Q    Are you friends with Gary Horne?

A    I am now, I guess you could say.

Q    You are now?

A    Yeah, I didn't really know him on a personal level until all this got started.

Q    Did you know that Gary Horne was charged with attempted murder against John Williams?

A    Not until all this started.

Q      Not until all this started?

A      Not until I got caught with the pistol.

Q      You weren't concerned about – you didn't think, "Oh my goodness, he was shot, and Gary is charged with it. Maybe I should take this gun to the police"?

A      No.

Q      That's didn't cross your mind, did it?

A      No.

Q      None of this crossed your mind until you were arrested February the 5th?

A      Yes.

Q      That's when you started coming up with this story about John Williams and buying the gun from him? That's when this all started to come out, isn't that right, after you were already charged with having an altered weapon?

A      Say that again?

Q      You didn't go tell the police about this gun before you were arrested, did you?

A      No, sir.

Q      Your testimony is that you never told anybody that you found this gun?

A      I told them that I had found the drugs that I had, but they never really asked me where I got the pistol.

Q      Where did you find these drugs?

A      I told them that I found them at a guy's house that I have a problem with.

Q     Okay.

A     But I didn't want to tell them where I got it.

Q     So, did you steal them from that person?

A     The person wasn't there.

Q     Wasn't there?

A     No.

Q     Did this person tell you that you could take his drugs?

A     No.

Q     So, you stole his drugs, right?

A     I guess you could say that.

Q     And you now say that you didn't take the gun from that person?

A     I told them then I didn't.

Q     Okay.

A     The pistol I had was not stolen.

Q     What you told them about the drugs was just a fraud, wasn't it?

A     At the time.

Q     You were truing to deceive the law enforcement officers as to where these drugs came from?

A     Yeah.

          MR. SMITH:  That's all.

                    EXAMINATION

BY MR. NICKSON:

Q     Mr. Dassenger, did you tell the law enforcement that you had purchased

the gun?

A     No, sir, they never asked.

Q     Did you tell them that you were the owner of the gun?

A     No, they didn't ask that either.

Q     So, the officer –

A     The officer asked me if I had anything in the vehicle and I told him there was a Glock-40 beside the seat. I didn't try to hide it from him or nothing, you know. He went in and got the pistol out and then they continued to search and never found anything else but a little piece of paper folded up that had a little bit of marijuana in it and it was beside the passenger's seat where a friend of mine was sitting.

Q     Okay.

A     Then he continued to search and he had us outside the vehicle and I had some crystal meth in a jacket pocket and I had passed the jacket to my friend and he passed it back and the police officer searched it a couple of times and never found it until the end after he searched it about three times.

Q     Were you convicted of being in possession of an altered firearm?

A     Yes, sir.

Q     Of an altered firearm?

A     Well, I wasn't convicted of it. They tried to say that the serial numbers were altered. When they called it in on the radio, they called it in as a Glock-19, and the lady on the radio corrected the officer and said it wasn't a Glock-19, but that it was a Glock-40, and there was negatives 27's on the pistol.

Q    What is a negative 27?

A    I'm thinking warrants or no stolen pistol, to the best of my knowledge.

Q    Did you tell the officer that you had purchased the gun then?

A    No.

Q    When you say "late January", was it before the first day of February?

A    It had to have been because I had it a couple of weeks before I got caught with it and I got caught with it in February.

Q    And there are 31 days in January?

A    Yes.

Q    So, that would probably have put it past the 16th or 17th of January??

A    It had to have been because I only had the gun a short period of time.

Q    And the law enforcement never asked you where you got it?

A    No, they didn't.  They asked me where I got the drugs, but they never asked me where I got the pistol from.

Q    It's your testimony here today that you bought it from Mr. John Williams?

A    Yes, sir.

Q    And he wasn't willing to get rid of the firearm prior to that time?

A    Right.

Q    And then he sold it to you for a hundred dollars?

A    Yes, he asked me if I still wanted it and I told him yeah.

Q    So, he offered it to you?

A    Yes, sir.

Q    Did you have any idea about the events that transpired at the Arrowhead Apartments prior to purchasing the gun?

A    Not until probably a couple of days after I had purchased it because we had already moved out of the apartments and we were staying in the trailer in Ariton. I didn't have a phone at the time, so, I didn't really have contact with any of my friends. It took me coming to Ozark to visit people, you know, before I started hearing about it.

Q    Do you recall when I inquired about this gun?

A    You?

Q    When I did?

A    I don't remember the date, but it was when the case started happening.

Q    Your case?

A    Mr. Horne's case.

Q    So, it was after he was indicted?

A    Yes, sir.

Q    Did I talk directly to you or to your attorney?

A    To me.

Q    I talked directly to you?

A    Yes, sir.

Q    Did you have an attorney at the time?

A    No, my attorney was court appointed.

Q       Didn't you have a female attorney prior to that occasion?

A       Yeah, yeah, yeah, that's right.  I lost my attorney because I couldn't pay for her.

MR. NICKSON:  That's all.

### EXAMINATION

BY MR. SMITH:

Q       What was Mr. Williams doing when you bought this gun?

A       Sitting outside his mother's house.

Q       Just sitting in a chair?

A       Yes, sir.

Q       Outside of his mother's house?

A       Yes, sir.

Q       Was he working at that time?

A       No.

Q       Did you go over to his house?

A       I seen him outside and he told me to come here and asked me if I still wanted to get it.

MR. SMITH:  That's all.

MR. NICKSON:  We rest.

THE COURT:  Does the State have anything else?

MR. SMITH:  We call Tim Hicks.

<u>TIM HICKS</u>

Having been first duly sworn, was examined and testified as follows, to-wit:

<u>EXAMINATION</u>

BY MR. SMITH:

Q      State your name, please?

A      I am Sgt. Tim Hicks with the Ozark Police Department.

Q      And you work with the Violent Crime Drug Task Force?

A      Yes, sir.

Q      I'll try to be brief.  Were you involved in a traffic stop of John Williams Dassinger back in February of last year?

A      Yes, sir, I was called to the stop after the stop was made and the evidence was found and recovered.

Q      What evidence was found on Mr. Dassinger?

A      He had a container containing meth, a piece of notebook paper containing marijuana, $650.00, and a Glock pistol was recovered out of the vehicle.

Q      Did Mr. Dassenger make any statements as to the source or where he obtained the pistol?

A      He stated that he found it.

Q      Did he also say that about the drugs?

A      Yes, sir.

Q      He said he found all of it?

A      Yes, sir.

            MR. SMITH:  That's all.

MR. NICKSON:  No questions.

(Overnight recess was held, following which

(the following occurred the next morning

(at 9:00 a.m. out of the hearing of the Jury:

THE COURT:  Eddie Henderson and Terrance Barr are here if you want to talk to them in private or if you want to put them on the stand and ask them questions, either outside the presence of the jury or if you want to reopen your case and use them as witnesses, just whatever you want to do.

MR. NICKSON:  Your Honor, the case agent in this matter I thought was going to be here.  I did subpoena him and he was no where to be found yesterday.  Mr. Adams told me Monday that he would be here Wednesday. Quite frankly, I need the case agent and he's the individual that found the bullet in the matter.

THE COURT:  All I'm interested in now is what you're going to do with Mr. Henderson and Mr. Barr.

MR. SMITH:  That wasn't brought up before he closed his case, Your Honor.

THE COURT:  In other words, if Eddie (Henderson) and Mr. Barr hadn't showed up, we would be arguing the case to the Jury right now.  But we found them and I wanted to make sure that you knew they were found and they are here and you can use them any way you want to use them.

MR. NICKSON:  Like I said, I thought that Mr. Tipton would not be here till Wednesday.  He was not here yesterday, I was told that he would –

THE COURT:  Well, this is the first I've heard of this after both sides have rested.

MR. NICKSON:  Well, Your Honor, I have subpoenaed him every time and he testified –

THE COURT:  Where I am now, you can get all of this in the Record and what you want to do with Eddie (Hendersosn) and Mr. Barr.  Mr. Tipton – well, he's not with the City any more, is he?

MR. SMITH:  No, he's moved to Mississippi.

THE COURT:  He's moved to Mississippi?

MR. SMITH:  Yes, Your Honor.

MR. NICKSON:  Your Honor, like I said, I was told by Mr. Adams that he would be here today.

THE COURT:  Have you talked to him?

MR. SMITH:  I understand that he could be here today, but we did not – I was not under the impression that he was going to be here today.

MR. NICKSON:  Well, I had a subpoena just in case.

THE COURT:  What do you want to do with Mr. Henderson and Mr. Barr?

REPORTER:  Mr. Henderson is here and down in the law library.

MR. SMITH:  And Mr. Barr is here in the courtroom.

MR. NICKSON:  Let me talk to the individuals off the record.

THE COURT: Mr. Barr, the lawyer for the Defendant wants to talk to you. You can put him on the stand outside the presence of the Jury or reopen your case and let him testify in Court if you want to. Mr. Henderson is back there in the library and you can talk to him too.

(A brief recess was taken, following which the

(following occurred:

MR. NICKSON: I've checked with Mr. Barr and he assures me that nothing adverse happened and I am satisfied.

THE COURT: So, you're not going to put him on the stand?

MR. NICKSON: No, Your Honor.

THE COURT: Okay.

MR. HENDERSON: Am I released?

THE COURT: Right.

MR. HENDERSON: Thank you, Your Honor.

(Whereupon, Court was recessed for the night,

(following which the following occurred after

(the Jury left the courtroom:

THE COURT: Do you have any written requested charged?

MR. NICKSON: No, just basically self defense, if it please the Court.

THE COURT: Everyone be back in the morning and we'll finish the case up. Thank you.

Q    And you say that the police took the gun from you?

A    Yes, sir.

Q    Were you charged with having a firearm?

A    Yes, sir.

Q    So, the police should still have this gun?

A    They should.

Q    When you bought this handgun, was anybody with you?

A    Huh-uh.

Q    Was it the Dale County law enforcement that got the gun?

A    Yes, sir, it was Ozark.

Q    Ozark?

A    Yes, sir.

Q    Was there anything unusual about this gun?

A    No.

Q    Were you charged with having this gun?

A    I was charged with having a pistol without a permit, and then they tried to change the charges and say I had a pistol with altered serial numbers.

Q    Okay.

A    I don't know what they're trying to charge me with now.

Q    But you no longer have the gun?

A    No.

Q    And you did purchase this gun from Mr. Williams?

A    Yes, sir.

Q     And it was a .40 caliber Glock?

A     Yes, sir.

Q     Have you ever known Mr. Williams to have any other guns?

A     Yes, sir.

Q     Do you know what kind?

A     I've just seen flashes of them here and there.

Q     When you say "flashes", do you –

A     I mean like I would see one laying in the seat, you know, or laying in the floorboard or I would see it through his shirt on the side right here.

Q     He held it in his waistband?

A     Yes, sir.

Q     And you have known him for several years?

A     Yes, sir.

Q     And he would always carry a firearm?

A     As far as I know.

          MR. SMITH:  He keeps leading this witness, Your Honor, and I object.

          MR. NICKSON:  Nothing further.

                              EXAMINATION

BY MR. SMITH:

Q     Mr. Dassinger, you say you are not sure about what you are charged with?

A     I know that I was charged at first with receiving a pistol without a permit, and then they tried to change it to pistol with altered serial numbers.  The serial

numbers weren't altered because I checked them myself and they matched on the clip and on the pistol itself.

Q        Weren't you indicted for possessing a pistol with – possession of an altered pistol?

A        That's the second charge they tried to get me on.

Q        Aren't you indicted also for possession of a controlled substance?

A        Yes, sir.

Q        And possession of marijuana?

A        Yes, sir.

Q        Did you plead guilty to those charges?

A        Yes, sir.

Q        Didn't you at one point in time tell someone in law enforcement that you found this firearm?

A        No, sir, I told them that I found the drugs.

Q        You didn't say you found the firearm?

A        No.

Q        So, you told them you found the drugs?

A        Yes, sir.

Q        When did you purchase this gun?

A        Late January.

Q        Like how late in January?

A        Like towards the end of January.

Q    Was it the last day of January?

A    I'm not exactly sure of the date, but I know it was towards the end of January.

Q    Towards the end of January?

A    Yes, sir.

Q    Conveniently shortly after he was shot, correct?

A    Yeah, I guess so.

Q    Now, let me ask you this. Where did you purchase this gun?

A    At his mother's house?

Q    At his mother's house?

A    Well, I used to stay like four or five doors down from his mother and we had got kicked out of the apartments, then I stayed at a friend's house that lived in those same apartments and –

Q    What are their names?

A    Justin, Ricky and a few people over there I know.

Q    Are you friends with Gary Horne?

A    I am now, I guess you could say.

Q    You are now?

A    Yeah, I didn't really know him on a personal level until all this got started.

Q    Did you know that Gary Horne was charged with attempted murder against John Williams?

A    Not until all this started.

Q     Not until all this started?

A     Not until I got caught with the pistol.

Q     You weren't concerned about – you didn't think, "Oh my goodness, he was shot, and Gary is charged with it. Maybe I should take this gun to the police"?

A     No.

Q     That's didn't cross your mind, did it?

A     No.

Q     None of this crossed your mind until you were arrested February the 5th?

A     Yes.

Q     That's when you started coming up with this story about John Williams and buying the gun from him? That's when this all started to come out, isn't that right, after you were already charged with having an altered weapon?

A     Say that again?

Q     You didn't go tell the police about this gun before you were arrested, did you?

A     No, sir.

Q     Your testimony is that you never told anybody that you found this gun?

A     I told them that I had found the drugs that I had, but they never really asked me where I got the pistol.

Q     Where did you find these drugs?

A     I told them that I found them at a guy's house that I have a problem with.

Q      Okay.

A      But I didn't want to tell them where I got it.

Q      So, did you steal them from that person?

A      The person wasn't there.

Q      Wasn't there?

A      No.

Q      Did this person tell you that you could take his drugs?

A      No.

Q      So, you stole his drugs, right?

A      I guess you could say that.

Q      And you now say that you didn't take the gun from that person?

A      I told them then I didn't.

Q      Okay.

A      The pistol I had was not stolen.

Q      What you told them about the drugs was just a fraud, wasn't it?

A      At the time.

Q      You were truing to deceive the law enforcement officers as to where these drugs came from?

A      Yeah.

           MR. SMITH:  That's all.

                    EXAMINATION

BY MR. NICKSON:

Q      Mr. Dassenger, did you tell the law enforcement that you had purchased

the gun?

A     No, sir, they never asked.

Q     Did you tell them that you were the owner of the gun?

A     No, they didn't ask that either.

Q     So, the officer –

A     The officer asked me if I had anything in the vehicle and I told him there was a Glock-40 beside the seat. I didn't try to hide it from him or nothing, you know. He went in and got the pistol out and then they continued to search and never found anything else but a little piece of paper folded up that had a little bit of marijuana in it and it was beside the passenger's seat where a friend of mine was sitting.

Q     Okay.

A     Then he continued to search and he had us outside the vehicle and I had some crystal meth in a jacket pocket and I had passed the jacket to my friend and he passed it back and the police officer searched it a couple of times and never found it until the end after he searched it about three times.

Q     Were you convicted of being in possession of an altered firearm?

A     Yes, sir.

Q     Of an altered firearm?

A     Well, I wasn't convicted of it. They tried to say that the serial numbers were altered. When they called it in on the radio, they called it in as a Glock-19, and the lady on the radio corrected the officer and said it wasn't a Glock-19, but that it was a Glock-40, and there was negatives 27's on the pistol.

Q      What is a negative 27?

A      I'm thinking warrants or no stolen pistol, to the best of my knowledge.

Q      Did you tell the officer that you had purchased the gun then?

A      No.

Q      When you say "late January", was it before the first day of February?

A      It had to have been because I had it a couple of weeks before I got caught with it and I got caught with it in February.

Q      And there are 31 days in January?

A      Yes.

Q      So, that would probably have put it past the 16th or 17th of January??

A      It had to have been because I only had the gun a short period of time.

Q      And the law enforcement never asked you where you got it?

A      No, they didn't.  They asked me where I got the drugs, but they never asked me where I got the pistol from.

Q      It's your testimony here today that you bought it from Mr. John Williams?

A      Yes, sir.

Q      And he wasn't willing to get rid of the firearm prior to that time?

A      Right.

Q      And then he sold it to you for a hundred dollars?

A      Yes, he asked me if I still wanted it and I told him yeah.

Q      So, he offered it to you?

A      Yes, sir.

Q    Did you have any idea about the events that transpired at the Arrowhead
Apartments prior to purchasing the gun?

A    Not until probably a couple of days after I had purchased it because we
had already moved out of the apartments and we were staying in the trailer in
Ariton.  I didn't have a phone at the time, so, I didn't really have contact with any
of my friends.  It took me coming to Ozark to visit people, you know, before I
started hearing about it.

Q    Do you recall when I inquired about this gun?

A    You?

Q    When I did?

A    I don't remember the date, but it was when the case started happening.

Q    Your case?

A    Mr. Horne's case.

Q    So, it was after he was indicted?

A    Yes, sir.

Q    Did I talk directly to you or to your attorney?

A    To me.

Q    I talked directly to you?

A    Yes, sir.

Q    Did you have an attorney at the time?

A    No, my attorney was court appointed.

94

Q        Didn't you have a female attorney prior to that occasion?

A        Yeah, yeah, yeah, that's right.  I lost my attorney because I couldn't pay for her.

            MR. NICKSON:  That's all.

<u>EXAMINATION</u>

BY MR. SMITH:

Q        What was Mr. Williams doing when you bought this gun?

A        Sitting outside his mother's house.

Q        Just sitting in a chair?

A        Yes, sir.

Q        Outside of his mother's house?

A        Yes, sir.

Q        Was he working at that time?

A        No.

Q        Did you go over to his house?

A        I seen him outside and he told me to come here and asked me if I still wanted to get it.

            MR. SMITH:  That's all.

            MR. NICKSON:  We rest.

            THE COURT:  Does the State have anything else?

            MR. SMITH:  We call Tim Hicks.

<u>TIM HICKS</u>

Having been first duly sworn, was examined and testified as follows, to-wit:

<u>EXAMINATION</u>

BY MR. SMITH:

Q        State your name, please?

A        I am Sgt. Tim Hicks with the Ozark Police Department.

Q        And you work with the Violent Crime Drug Task Force?

A        Yes, sir.

Q        I'll try to be brief. Were you involved in a traffic stop of John Williams

Dassinger back in February of last year?

A        Yes, sir, I was called to the stop after the stop was made and the evidence

was found and recovered.

Q        What evidence was found on Mr. Dassinger?

A        He had a container containing meth, a piece of notebook paper containing

marijuana, $650.00, and a Glock pistol was recovered out of the vehicle.

Q        Did Mr. Dassenger make any statements as to the source or where he

obtained the pistol?

A        He stated that he found it.

Q        Did he also say that about the drugs?

A        Yes, sir.

Q        He said he found all of it?

A        Yes, sir.

                MR. SMITH:  That's all.

MR. NICKSON:  No questions.

(Overnight recess was held, following which

(the following occurred the next morning

(at 9:00 a.m. out of the hearing of the Jury:


THE COURT:  Eddie Henderson and Terrance Barr are here if you want to talk to them in private or if you want to put them on the stand and ask them questions, either outside the presence of the jury or if you want to reopen your case and use them as witnesses, just whatever you want to do.

MR. NICKSON:  Your Honor, the case agent in this matter I thought was going to be here.  I did subpoena him and he was no where to be found yesterday.  Mr. Adams told me Monday that he would be here Wednesday. Quite frankly, I need the case agent and he's the individual that found the bullet in the matter.

THE COURT:  All I'm interested in now is what you're going to do with Mr. Henderson and Mr. Barr.

MR. SMITH:  That wasn't brought up before he closed his case, Your Honor.

THE COURT:  In other words, if Eddie (Henderson) and Mr. Barr hadn't showed up, we would be arguing the case to the Jury right now.  But we found them and I wanted to make sure that you knew they were found and they are here and you can use them any way you want to use them.

ATTORNEY GENERAL'S EXHIBIT'S DEF'S                                    VOLUME 1

COURT OF CRIMINAL APPEALS NO. _Cr 04-2401_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF _DALE_ COUNTY, ALABAMA

CIRCUIT COURT NO. _CC -2004-122_

CIRCUIT JUDGE _P.B. McLAUGHLIN, JR._

Type of Conviction / Order Appealed From: _ASSAULT II_

Sentence Imposed: _22 YEARS_

Defendant Indigent: [XX] YES    [ ] NO

GARY HORNE
_____
**NAME OF APPELLANT**

HON JOSEPH GALLO      334-598-6200
(Appellant's Attorney)           (Telephone No.)
451 N. DALEVEILLE AVE STE 105
(Address)
DALEVILLE      AL      36322
(City)        (State)        (Zip Code)

**V.**

## STATE OF ALABAMA
_____
**NAME OF APPELLEE**

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____
_____

(For Court of Criminal Appeals Use Only)



EXHIBIT

_A_

INDEX:

DEF'S EXHIBIT'S

EXHIBIT # 1 STATEMENT ----------------                 1

July 13, 2005

From: Sweet Tots Home Day Care
      246 Dixie Drive
      Ozark, Al. 36360

Re: Gary Horne

I'm sending this statement because due to day care (Group Home) I wasn't

able to attend court.

I've known Gary Horne for 5 years. He had children in my day care for

up until 6 weeks ago. The reason for the change was because I did not have

space for the older child. He has a great relationship with his kids and they

adore him. He provides for them. They were very neat and clean children

with great manner. Gary had his oldest enrolled in city soccer and

basketball. Geona was in dance (Dance Dimensions) with her first recital

last year. We still keep in touch because I enjoy the whole family.

Gary has always shown me respect. When ask to be God Parents to his

children made me fill good. My daughter babysit the kids when he and

Keisha go to the movies and to dinner they are always back around

11:30 p.m. Gary has always attended to the needs of his family.

If I found out that Gary had been in trouble before, such knowledge would

not affect my high opinion of him.

Linda Roberson

*Linda Roberson*

1

ATTORNEY GENERAL'S COPY STATE'S EXHIBIT'S
VOLUME 1

COURT OF CRIMINAL APPEALS No. CR04-2461

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF  DALE  COUNTY, ALABAMA

CIRCUIT COURT NO.  CC -2004-122

CIRCUIT JUDGE  P.B. McLAUCHLIN, JR.

Type of Conviction / Order Appealed From:  ASSAULT II

Sentence Imposed:  22 YEARS

Defendant Indigent:  ☒ YES    ☐ NO

GARY HORNE

HON JOSEPH GALLO          334-598-6200
(Appellant's Attorney)                         (Telephone No.)
451 N. DALEVEILLE AVE STE 105
(Address)
DALEVILLE          AL          36322
(City)              (State)          (Zip Code)

**NAME OF APPELLANT**

### V.

## STATE OF ALABAMA

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

**NAME OF APPELLEE**

(For Court of Criminal Appeals Use Only)



EXHIBIT
A

```
INDEX:

STATE'S EXHIBIT'S
```

```
EXHIBIT # 1 SENTENCE ORDER -----------     01 - 03

EXHIBIT # 2 CASE ACTION SUMMARY ------        04
```

# IN THE CIRCUIT COURT OF PIKE COUNTY, ALABAMA

STATE OF ALABAMA,       *
                   *
       PLAINTIFF,   *   Case No.: CC 94-169
                   *
VS.                 *
                   *
GARY HORNE,         *   SX-1
                   *
       DEFENDANT.   *
                   *

## _S E N T E N C E    O R D E R_

Defendant, GARY HORNE, appeared before the Court and was represented by KEITH WATKINS, Attorney at Law. The State was represented by JOEL FOLMAR, DISTRICT ATTORNEY for the Twelfth Judicial Circuit, State of Alabama.

At Defendant's request, the Defendant was allowed to withdraw Defendant's earlier plea and to be re-arraigned.

On arraignment, Defendant entered a plea of **GUILTY** to HINDERING PROSECUTION, FIRST DEGREE in violation of Title 13A-10-43 of the Code of Alabama, 1975, as charged in the indictment.

The Court conducted a colloquy with the Defendant and did ascertain that the Defendant made a knowledgeable, intelligent and voluntary plea and that a factual basis exist sufficient to substantiate said plea.

Defendant is pronounced and declared **GUILTY** of HINDERING PROSECUTION, FIRST DEGREE in violation of Title 13A-10-43 of the Code of Alabama, 1975, against the peace and dignity of the State of Alabama.

1

Defendant was then:

(1)  Afforded an opportunity to make a statement in Defendant's own behalf before sentencing and was further asked if Defendant has anything to say as to why the sentence of the law should not be imposed;

(2)  Given an opportunity to present evidence as to any matter probative in the issue of sentence and/or facts in mitigation of any penalty that is to be imposed.

The State was then afforded an opportunity to present evidence as to any matter probative to the issue of sentence and/or facts in aggravation or mitigation of any penalty that is to be imposed.

After considering the arguments of the parties and any evidence presented:

*IT IS ORDERED* that for Defendant's conviction of HINDERING PROSECUTION, FIRST DEGREE, GARY HORNE is hereby sentenced to serve ONE (1) YEAR AND ONE (1) DAY in the PENITENTIARY, STATE OF ALABAMA.

The sentence imposed in CC 94-169 is **ORDERED** to run CONCURRENT with the sentence imposed in the case pending in Dale County, Alabama.

Defendant is given credit for any time the Defendant has already served while awaiting trial and/or disposition in this case. The Defendant is given jail credit for time served.

As an additional part of Defendant's sentence, the Defendant is hereby **ORDERED** to pay to the Circuit Clerk of the

2

Court the costs of Court, the Defendant is **ORDERED** to pay $50.00 to the Clerk of the Court, which sum is to be distributed by the Clerk to the Alabama Crime Victims Compensation Commission and is **ORDERED** to reimburse the State for any attorney fees the State is caused to pay out due to the Defendant's representation herein.

The payment of the above is to be made in the heretofore listed order and is to be made a condition of probation, parole or other early release. The payment of the above amounts shall be made within of the date of this Court order.

Should the Defendant have any income while incarcerated in an Alabama Penitentiary or Correctional Facility, the Alabama Department of Corrections is **ORDERED** to pay twenty-five percent (25%) of Defendants said funds (which funds of the Defendant the Department may come into possession of) to the Clerk of the Court, Pike County, Alabama, as is allowed by law and said Department is ordered to pay same to the Clerk of the Court until such time as all restitution, costs, and above ordered fees are paid in full.

Defendant was advised of Defendant's right to appeal, as long as the Defendant perfects Defendant's appeal within a specified time; of his rights, if declared indigent, to a free transcript for the purpose of pursuing any appeal and of his right to Court appointed legal representation, along with Defendant's other appeal rights incident thereto.

Done this the 24th of March, 1995.

I Brenda Meadows Peacock, Clerk & Register of the Circuit Court for Pike County, Alabama, do hereby certify that the foregoing is a true and correct copy of the original document in the above stated cause, which is on file and enrolled in my office. Witness my hand and seal this the 13 day of July, 2005

Brenda M. Peacock

ROBERT W. BARR, Circuit Judge
Twelfth Judicial Circuit,
State of Alabama

3

| State of Alabama Unified Judicial System Temporary Form C-6 (1)    Rev 9/90 | CIRCUIT CRIMINAL CASE ACTION SUMMARY | Case Number CC- 95-194 Judge ID CLW |
|---|---|---|

IN THE CIRCUIT COURT OF ___Dale___ COUNTY    IN THE _____ DIVISION

☒ STATE OF ALABAMA
☐ City of _____
Gary Horne
v.

**Distinguishing Features:**

| SSAN | | | | | | | |
|---|---|---|---|---|---|---|---|
| Sex | Race | DOB | Eyes | Hair | Height | Weight |

**Defendant**

**Address**

| Case Number | ☐ Jury ☐ Non Jury | Date Arrested | ☐ Incarcerated ☐ On Bond |
|---|---|---|---|

| Charges | ☐ Misdemeanor ☐ Felony ☐ Municipal ☐ Appeal Ordinance Violation |
|---|---|

Date Filed
Judge ID
Prosecutor
Attorney(s)

Date Warrant/Capias Issued — Date Committed to Jail
Date Released on Bond — Bond Amount
Date Preliminary Hearing — Bond Type & Sureties
Grand Jury Number
Date of Indictment
Date of Trial
Verdict  ☐ Guilty  ☐ Not Guilty
Sentencing Date — Court Reporter
Date Transferred to Administrative Docket   ☐ Official  ☐ Rover  ☐ Special

Defendant's
Additional

CERTIFIED TO BE A TRUE COPY
ATTEST
mary _____
REGISTER-CLERK
Circuit Court, Dale County, AL

Court Calendar

| Dispositional Data | By Trial | All Other | Date Adjudicated |
|---|---|---|---|
| | ☐ Capital Jury  ☐ Jury  ☐ Non Jury | ☐ Plea  ☐ Other | |

| DATE | ACTIONS, JUDGMENTS, CASE NOTES |
|---|---|
| 5-24-95 | Explanation of Rights & Plea of Guilt A/I and Plea Bargain Agreement filed. |
| 5-24-95 | State reduces charge of Robbery - 1st Degree to Robbery - 2nd Degree. Def. pleads guilty to reduced charge. Court finds & adjs. Def. guilty & sentences Deff. to 5 yrs. in st. pen; sentence to run concurrent with CC-94-169 in Pike Co. Def. to pay cc & $50.00 VCF - Cls. cy. DA/Newman |
| 9-14-98 | Promised to pay signed |

Original = Court    Forward Pink Copy to AOC upon Disposition

SUPPLEMENTAL 3RD

COURT OF CRIMINAL APPEALS NO. __CR-04-2461__

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF ___DALE___ COUNTY, ALABAMA

CIRCUIT COURT NO. __CC-2004-122__

CIRCUIT JUDGE __HON. P.B.MCLAUCHLIN,JR.__

Type of Conviction / Order Appealed From: __ASSAULT II__

Sentence Imposed: __22 YEARS__

Defendant Indigent: ☐ YES   ☒ NO

GARY HORNE
_____
NAME OF APPELLANT

HON. TRACY NICKSON          334-285-1776
(Appellant's Attorney)                    (Telephone No.)
2181 AA COBBS ROAD
(Address)
PRATTVILLE,          AL.          36066
(City)            (State)          (Zip Code)

V.

## STATE OF ALABAMA
_____
NAME OF APPELLEE

(State represented by Attorney General)
NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)


EXHIBIT
A

INDEX:   SUPPLEMENTAL

COPY OF ENVELOPE FRONT ------------------        01

CERTIFICATE OF COMPLETION &
     TRANSMITTAL OF RECORD
     ON APPEAL BY TRIAL CLERK ----------   02 - 03

COURT REPORTER'S COVER SHEET -----------        01

COURT REPORTER'S PROCEEDINGS -----------   02 - 05

**OFFICE OF DISTRICT ATTORNEY**
33RD JUDICIAL CIRCUIT
KIRKE ADAMS, DISTRICT ATTORNEY
POST OFFICE BOX 1688
OZARK, ALABAMA 36361



Honorable N. Tracy Nickson
2181 AA Cobbs Ford Rd.
Prattville, AL 36066

36066-7701



FILED
DALE COUNTY, AL

OCT 11 2005

MARY BLUDSWORTH
CIRCUIT CLERK

2

2

AP 14-3 Certificate of Completion and Transmittal of Record on Appeal by Trial Clerk

# CERTIFICATE OF COMPLETION AND TRANSMITTAL
## OF RECORD ON APPEAL BY TRIAL CLERK

GARY HORNE                           TO: The Clerk of the Court of Criminal
_____               Appeals of Alabama
**Appellant**

V.                                   Case No. CC-2004-122

State of Alabama Appellee            Date of Notice of Appeal 9-8-2005

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by

assembling in (a single volume of ____9____ pages) (_____ volumes of 200 pages each and one volume of

_____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal

has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of ths certificate has this date been served on counsel for each party to the appeal.

DATED this ___18th___ day of __October_____, 20_05_.

_Mary Bludsworth_____
                                     Circuit Clerk

DALE
_____
                                     County

3

Civil Action No._____

## STATE OF ALABAMA

_____DALE_____ **County**
### CIRCUIT COURT

## CERTIFICATE OF COMPLETION
## AND TRANSMITTAL OF RECORD
## ON APPEAL BY TRIAL CLERK

GARY HORNE
### APPELLANT
### V.
### STATE OF ALABAMA
### APPELLEE

**FILED**_____18th_____

_____October_____**, 20** 05 **.**

*Mary Bludsworth*
**Clerk**

4

(The following is a supplement to the Record On Appeal in the State vs.

(Gary Horne case that was heard on the 16th day of May, 2005, in response

(to Defendant's Amended Second Motion To Supplement dated October 12, 2005

(7th, 2005.



1.    At TR-112 the date for the sentencing hearing should be July 13th,

2005, and not July 14th, 2005.

2.    (Clerk's Record)  All exhibits that were marked and introduced at trial

were submitted by the Reporter to the Clerk after Notice Of Appeal

was filed.  Reporter has no further exhibits in his possession.

3.    The colloquy between the Court and the Jury, related to all Jury

questions, is transcribed and attached to this supplement.

4.    (Same as No. 3)

3

## JURY QUESTIONS

(The following took place in the courtroom with

(the Defendant and his attorney present:

### (FIRST QUESTION IN JURY ROOM)

THE COURT:  Ladies and Gentlemen of the Jury, the Bailiff gave me the following question:  "Was a bullet dropped at the scene, and if so, was the bullet in the State's possession?"  I cannot answer that question.  We can't reopen the case for more testimony.  You'll have to base your verdict on what you heard in the trial of the case.  Thank you.

### (SECOND JURY QUESTION IN COURTROOM)

THE COURT:  Ladies and Gentlemen of the Jury, the Bailiff gave me the following questions:  "Concerning the assault in the 2nd degree charge, do we have to answer whether or not he acted in self-defense?"

The State has the burden of proving beyond a reasonable doubt that the Defendant did not act in self-defense and, if you find that the State met its burden and the Defendant did not act in self-defense, then you would just find him guilty of assault in the second degree, if that's what you're looking at.

Then if the State has not met its burden in proving that the Defendant did not act in self-defense, in other words, if you found that he was acting in self-defense, then you would find him not guilty. You don't have a separate verdict if you find that the Defendant was acting in self-defense.

If you find that he was acting in self-defense, then he would be not guilty of either of the charges. If you are not reasonably satisfied that he was acting in self-defense, but that he was guilty of assault in the second degree, then you would just sign the assault in the second degree verdict.

If you are satisfied he was acting in self-defense, then you find him not guilty. If you are not so satisfied, then you would find him guilty. That's what you're looking at as far as assault in the second degree is concerned. You don't have to answer whether or not he acted in self-defense as far as writing it down on a piece of paper, but you do have to answer that in deciding whether he's guilty or not. Does that make it clear?

JURORS: (Indicating the affirmative)

THE COURT: Thank you.

5

<u>REPORTER'S CERTIFICATE</u>

STATE OF ALABAMA

COUNTY OF DALE

I, David M. Glenn, CSR, do hereby certify that the aforegoing typewritten

pages are true and correct and were transcribed by me from my machine

shorthand notes taken on said occasion.

WITNESS MY HAND this the 13th day of October, 2005.

David M. Glenn, CSR

## COURT OF CRIMINAL APPEALS NO. _CR 04-2461_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF ___DALE___ COUNTY, ALABAMA

CIRCUIT COURT NO.  CC-2004-122

CIRCUIT JUDGE  P.B. McLAUCHLIN, JR.

Type of Conviction / Order Appealed From: _ASSAULT II_

Sentence Imposed: _22 YEARS_

Defendant Indigent:  ☐ YES   ☒ NO

GARY HORNE

| | |
|---|---|
| HON. TRACY NICKSON          334-285-1776 | **NAME OF APPELLANT** |
| (Appellant's Attorney)                    (Telephone No.) | |
| 2181 AA COBBS FORD ROAD | |
| (Address) | |
| PRATTVILLE,          AL.        36066 | |
| (City)              (State)        (Zip Code) | |

### V.

## STATE OF ALABAMA

**NAME OF APPELLEE**

(State represented by Attorney General)

**NOTE:** If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



EXHIBIT

A

INDEX:  SECOND SUPPLEMENTAL

COURT REPORTER'S COVER SHEET----------     01

COURT REPORTER'S PROCEEDINGS ---------     02- 16

COURT REPORTER'S CERTIFICATE ---------     17

CERTIFICATE OF COMPLETION &
     TRANSMITTAL OF RECORD ON APPEAL
     BY TRIAL CLERK ------------------     18- 19

1

| | | |
|---|---|---|
| STATE F ALABAMA | ) | IN THE CIRCUIT COURT OF |
| PLAINTIFF | ) | DALE CO., ALABAMA |
| | ) | |
| VS. | ) | |
| | ) | |
| GARY HORNE | ) | CASE NO. CC-04-122 |
| DEFENDANT | ) | |

---o0o---

The following motion hearing was heard on the 16th day of December, 2004,

before the Honorable Judge P.B. McLauchlin, Jr. in the Dale County Courthouse,

Ozark, Alabama.

<u>APPEARANCES:</u>

<u>FOR THE STATE</u>                     <u>FOR THE DEFENDANT</u>

David Emery                              Tracy Nickson

District Attorney                        Attorney At Law

Ozark, Alabama                           Prattville, Alabama



FILED
DALE COUNTY, AL

OCT   6 2005

MARY BLUDSWORTH
CIRCUIT CLERK

PROCEEDINGS:

THE COURT:  I call the case of the State Of Alabama vs. Gary Horne.

MR. NICKSON:  This is on a motion to dismiss based on a Brady violation. Your Honor, on the second of September I filed a motion to dismiss, basically stating that Mr. Horne had been charged with attempted murder.  We made a request for discovery and I was shown the evidence in this case and I was told that there was a projectile, a bullet, and subsequently learned of the location of the firearm believed to be the weapon used in this incident.  The bullet disappeared and I have received no photographs of the scene.

THE COURT:  Mr. Emery?

MR. EMERY:  You saw a bullet?

MR. NICKSON:  No, I didn't see a bullet, I was told there was a bullet.

MR. EMERY:  We're here on a motion to dismiss?

THE COURT:  Motion to dismiss and kind of a discovery motion or something.  There can't really be a Brady violation until after you've tried the case and prove that they withheld evidence that might have aided in the defense.

MR. NICKSON:  Your Honor, in Jefferson vs. State, 645 So. 2nd, states that the existence of any small piece of evidence favoring the defense may create just the doubt that prevents the Jury from returning a verdict of guilty.

I'm not saying there's any bad faith, but I haven't gotten photographs that were of the scene at all. There was three pieces of evidence that I saw. I have learned of this projectile and I have requested it and confirmed that it was in existence, but nobody has given it to me, nobody has let me see it. I've been told it's been lost. I have asked Mr. Rex Tipton to be here and want to ask him some questions.

My contention, Your Honor, is that the projectile is instrumental because we have a weapon that was purchased from the victim and we believe that to be the firearm used in this incident.

## REX TIPTON

Having been first duly sworn, was examined and testified as follows, to-wit:

## EXAMINATION

BY MR. NICKSON:

Q      State your name?

A      Rex Tipton.

Q      How are you employed?

A      I am a pilot with Airspeed Aviation.

Q      And where were you previously employed?

A      Ozark Police Department.

Q      Are you familiar with the case of the State Of Alabama vs. Gary Horne?

A      Yes, sir, I am.

Q      And were you the case agent in this case?

A      Yes, I was.

Q     In your investigation of this matter, did you discover any evidence at the scene?

A     Yes and no. I have to back up a little bit and you need to get the whole – the night the shooting happened, I was the investigator on call.

Q     Correct.

A     Prior to me being notified, Lt. Keith Cauthen was on his way to work, driving by when it happened and he was the first one on the scene. Agent Martin Spears, who was an agent that was out that night, was the second one on the scene and he actually processed the scene that night. When I got to the scene, the victim was gone, the suspect was gone, most of the people had disbursed and I just came up as an afterthought.

Q     Okay. Did you write a report on this?

A     I done some case notes, Lt. Cauthen done the initial report.

Q     Okay. In those case notes did you state in there that there were photographs taken at the scene?

A     No, sir, because I didn't know.

Q     You did not?

A     I don't think so.

Q     Is this your report?

A     Yes, sir, that's mine.

Q     Could you read that?

A     Okay, it says the scene was photographed and evidence was collected by Spears, that would be Agent Spears.

Q       And on the next page it indicates that the evidence collected has been

retained by Agent Martin Spears?

A       Yes.

Q       Is that correct?

A       Yes.

Q       Do you know what evidence was collected by Agent Spears?

A       No, sir, I do not.

Q       Did you subsequently retrieve any evidence from the scene?

A       Yes, sir, it was a day or two after and somebody called from the apartment

complex and said they had found a projectile.  I went over there and recovered the

projectile and, from memory, I thought at the time – I have to back up a little bit.

At one point, the Drug Task Force, when they got evidence we kept it in our

office.  We were under a transition period with the new City Hall where all the

evidence was turned over to Agent Spears and I assumed that projectile was

turned over to Agent Spears.  But since I left the department, I don't know what's

happened to none of it, so, I can't testify to where that projectile is at.

Q       Did you believe that projectile to be the projectile that passed through the

victim?

A       It's hard to say.  I mean it was laying out in the open, but it was in the

vicinity where Mr. Williams was shot.

Q       Do you know if there was a projectile recovered from the victim's body?

A       No, sir, I don't have a clue.

Q     Do you know where that projectile might be at this time?

A     No, sir, I don't.

Q     Do you have any way of knowing what caliber projectile that was?

A     I'm not an expert, but from my personal opinion in dealing with firearms, it looked like a .40 caliber.

Q     So, you placed it in the hands of the Task Force and, in the transition, you haven't seen it since?

A     Between the time that I left the Task Force and us moving evidence from one place to the next, I don't know what happened to it.

Q     Is it your opinion that would have been the projectile from the weapon?

A     I couldn't tell you what weapon it came from.  The only thing I can tell you is where I found it at.

MR. NICKSON:  That's all.

## EXAMINATION

BY MR. EMERY:

Q     And where was it found at?

A     In the apartment complex over where the shooting happened.

Q     Out in the open?

A     It was out in a parking lot.

Q     Somebody called it in?

A     Yes, sir.

Q      And this was how long after the shooting?

A      It was either a day or two days after the shooting.  I know it was over in the late afternoon.

Q      And this happened in January?

A      Yes, sir.

Q      When did you stop working for the City?

A      I think my last day was July the second of this year.

Q      In the normal course of business at that time in January, the projectile would have been kept where?

A      Usually we kept our evidence at the Task Force, but during that –

Q      Over here on East Avenue?

A      Yes, sir.

Q      Okay.

A      During that time we had just moved into the new city complex and they had a new evidence room over there and we had started transferring our evidence over to Agent Spears and it went into one place, evidence, dope, everything we had all went to Agent Spears.  We did that for a couple of months and then it got so overwhelming for Agent Spears that he couldn't keep track, so, we started keeping our own evidence back at the Task Force.

Q      The Task Force is still in the same place?

A      Yes, sir.

Q        Was anything else with this projectile?

A        Like I said, I got there after the scene had already been worked by Agent Spears and –

Q        But I mean in the case file or –

A        No, I never had anything as far as evidence on this case except that one projectile that was recovered a day or two later.

Q        Was it packaged up and identified?

A        Yes, sir.

Q        So, it should be either at the police department or at the Task Force?

A        I would presume so.

Q        You haven't had occasion to look for it?

A        No, sir, I am not employed there any more.

            MR. EMERY:  That's all I have to ask.

                      EXAMINATION

BY MR. NICKSON:

Q        Several months ago, Mr. Tipton, do you recall speaking to Mr. Ford?

A        Yes.

Q        Would you tell the Court what the subject matter of that conversation was?

A        He was looking for the bullet.

Q        Did Mr. Ford indicate that he had it?

A        No, sir, he said he couldn't find it.

            MR. NICKSON:  That's all.

<u>JOHN WILLIAM DASSINGER</u>

Having been first duly sworn, was examined and testified as follows, to-wit:

<u>EXAMINATION</u>

BY MR. NICKSON:

Q       State your name?

A       John Dassinger.

Q       Where are you employed?

A       Right now I'm doing side jobs with Terminex.

Q       Do you know the Defendant Mr. Horne?

A       Kind of.

Q       Are you familiar with what he is charged with?

A       Yes, sir.

Q       Do you personally know the victim?

A       Yes, sir.

Q       Mr. Williams?

A       Yes, sir.

Q       Did you have an occasion to speak with Mr. Williams or procure anything from Mr. Williams after January the 15th of this year?

A       I bought a pistol from him in late January.

Q       What kind of pistol was it?

A       A Glock .40 caliber.

Q       Do you know where that gun is now?

A       The police got it.

Q      How did the police come to get it?

A      They pulled me over and asked me if I had anything in my car and I told

them that it was between the seats.

Q      And where did you acquire that firearm?

A      From John Williams.

Q      And it was after the 15th of January?

A      Yeah, it was late January.

Q      Did Mr. Williams tell you anything about the firearm?

A      No, I had tried to get it like numerous times before and he would never get

rid of it.  Then I had seen him right after he got out of the hospital and he asked

me, "Do you still want to get that gun?", and I was like, "Yeah, you know, but I

ain't really like got a whole lot of money", and he told me I could get it for a

hundred bucks and I had that much, so, I bought it.

Q      And you had tried to buy it numerous times before?

A      Yes.

                    MR. NICKSON:  That's all.

                         EXAMINATION

BY MR. EMERY:

Q      When did the police take the gun from you?

A      I'm not really sure, I don't remember what day it was when I got pulled

over.

Q      Do you know what month it was?

A      February or March.

Q      Were you arrested?

A      Yes, sir.

Q      What were you arrested for?

A      Carrying a firearm without a permit, possession of marijuana and possession of a controlled substance.

Q      Was anybody with you?

A      Yeah, two friends of mine.

Q      Who were they?

A      Matt Thomas and Bo Shinholster.

Q      So, the police took the gun from you?

A      Yes, sir.

Q      The Ozark Police?

A      Yes, sir.

Q      Were you charged with possession of a stolen pistol?

A      That's what they tried to say, but when the officer called in the serial numbers, he called it in as a Glock-19 and the lady on the radio came back and told him – she corrected him that it was a Glock-40 and there was negative 29's on it.

Q      Okay.

A      They tried to say I had altered the serial numbers at first, but the guns have plastic and you can't really touch the serial numbers without messing up the gun.

Q      Were the serial numbers messed up some way?

A      They were on both sides of it, and on the clip, and they all matched.

Q      It didn't come back to a probation officer in Georgia?

A      I don't know.  They said it belonged to some lady in Georgia, but they didn't say nothing about who or what she did.

MR. EMERY:  That's all I have to ask.

<u>MARTIN SPEARS</u>

Having been first duly sworn, was examined and testified as follows, to-wit:

<u>EXAMINATION</u>

BY MR. NICKSON:

Q      State your name?

A      Martin Spears.

Q      Where are you employed?

A      City Of Ozark Police Department.

Q      Are you currently employed there?

A      Yes, sir.

Q      Were you employed there on January the 16th of this year?

A      Yes, sir.

Q      And did you collect certain evidence involved in this case?

A      Yes, sir, I did.

Q      And could you tell us what specifically was collected?

A      I collected a shell casing, a spent shell casing from a .40 caliber gun, cellophane wrapper that appeared to have some residue of narcotics in it and a pager.

Q     Did you take photographs at the scene?

A     Yes, sir, I did.

Q     And do you have those photographs?

A     No, sir, I do not.

Q     Those are the only three pieces of evidence that you and I looked at?

A     Correct.

Q     And there was not a projectile in there?

A     No, sir.

Q     Do you recall receiving the projectile?

A     No, sir, but I received a mass amount of evidence at one time from Narcotics when we moved their evidence room and it is possible that projectile is in that large sum of evidence. All of it has not been processed yet into the new room.

Q     So, you didn't even get to see the projectile?

A     No, sir.

MR. NICKSON: That's all.

EXAMINATION

BY MR. EMERY:

Q     When did you take the photographs?

A     The night of the incident.

Q     And what were they pictures of?

A     They were of the crime scene and the evidence as I collected it.

Q    The only thing that you mentioned that was collected is the shell casing?

A    Shell casing and cellophane wrapper and pager.

Q    What about the cellophane wrapper?

A    It just appeared to have some narcotics residue in it.

Q    Where was it found?

A    In the parking lot adjacent to a curb, right in front of the scene.

Q    This is in an apartment complex?

A    Yes, sir.

Q    Where was the pager?

A    It was between two vehicles located in the parking lot and in front of the scene where Mr. Williams was laying.

Q    It was on the ground?

A    Yes, sir.

Q    Was it near Mr. Williams?

A    Approximately ten yards.

Q    Whose pager was it?

A    From what the witnesses stated at the scene, it belonged to Mr. Horne.

Q    Has it been checked by the numbers or anything?

A    No, sir.

Q    Were there witnesses to this crime?

A    Yes, sir.

Q     People that actually saw the shooting?

A     I can't advise you of that, sir, I didn't question any of the witnesses. All I did was collect the evidence and the photographs.

Q     Were the photographs developed?

A     Ozark Police Department policy is that a Supervisor has to turn in all photography and they are the only ones that can pick it up. I packaged the roll of film to be developed and it was turned over to a Supervisor to be carried to the film developing location and the package that it was in was marked to be carried to Narcotics after development. Where it went after turned over to the Supervisor, I can't advise you.

Q     Who was the Supervisor at that time?

A     I believe it was Butch Whittington at that time.

Q     But you haven't seen the developed pictures?

A     No, sir, I have not.

     MR. EMERY: That's all I have to ask.

### EXAMINATION

BY MR. NICKSON:

Q     Are you familiar with the victim?

A     Not on a personal basis. On a professional basis, I think I have dealt with him I think on one more case.

Q     Has he ever been known to carry a firearm?

A     I can't advise one way or the other.

MR. NICKSON:  Thank you.  Your Honor, that's the basis of our motion, evidence that would tend to prove the Defendant's self-defense. Testimony at the preliminary hearing was that Mr. Williams owned guns but he did not have a gun.  The testimony that this gun was sold by Mr. Williams subsequent to this is crucial to the defense in this case.  It's our contention that it was the victim's firearm and the Defendant was merely defending himself.

MR. EMERY:  Your Honor, it would appear to me that the Defendant's position is premature.  I mean this case is not ready to be tried.

MR. NICKSON:  This case has been set since September the 14th for trial and I believe this is the 4th time I have been here and –

MR. EMERY:  It's not set today.

THE COURT:  Let me look at this and I'll have a ruling on it shortly.

MR. NICKSON:  Thank you, Your Honor.


END OF HEARING

REPORTER'S CERTIFICATE

STATE OF ALABAMA

COUNTY OF DALE

I, David M. Glenn, CSR, do hereby certify that the aforegoing typewritten pages
are true and correct and that the same were transcribed by me from my machine
shorthand notes taken on said occasion.

_____ 10-6-05

David M. Glenn, CSR

AP 14-3 Certificate of Completion and Transmittal of Record on Appeal by Trial Clerk

# CERTIFICATE OF COMPLETION AND TRANSMITTAL
## OF RECORD ON APPEAL BY TRIAL CLERK

GARY HORNE
_____
Appellant

TO: The Clerk of the Court of Criminal
Appeals of Alabama

V.

Case No. CC-2004-122

State of Alabama Appellee

Date of Notice of Appeal  9-8-2005

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of  19  pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of ths certificate has this date been served on counsel for each party to the appeal.

DATED this  7th  day of  October  , 20 05 .

_____
Circuit Clerk

DALE
_____
County

Civil Action No. _____

# STATE OF ALABAMA

_____ DALE _____ **County**

## CIRCUIT COURT

## CERTIFICATE OF COMPLETION
## AND TRANSMITTAL OF RECORD
## ON APPEAL BY TRIAL CLERK

GARY HORNE

**APPELLANT**

**V.**

**STATE OF ALABAMA**

**APPELLEE**

**FILED** _____ 7th _____

OCTOBER _____ , 20 05 .

*Mary Hudsworth*

**Clerk**

COURT OF CRIMINAL APPEALS NO. _CR 04-2461_

# APPEAL TO ALABAMA COURT OF CRIMINAL APPEALS

### FROM

## CIRCUIT COURT OF ___DALE___ COUNTY, ALABAMA

CIRCUIT COURT NO. ___CC-2004-122___

CIRCUIT JUDGE ___P.B.McLAUCHLIN, JR.___

Type of Conviction / Order Appealed From: ___ASSAULT II___

Sentence Imposed: ___22 YEARS___

Defendant Indigent: [X] YES ☐ NO

GARY HORNE

HON. TRACY NICKSON          334-285-1776          **NAME OF APPELLANT**
(Appellant's Attorney)                                  (Telephone No.)
2181 AA COBBS FORD ROAD
(Address)
PRATTVILLE          AL.          36066
(City)          (State)          (Zip Code)

### V.

STATE OF ALABAMA

(State represented by Attorney General)          **NAME OF APPELLEE**

NOTE: If municipal appeal, indicate above, and enter
name and address of municipal attorney below.

_____

_____

(For Court of Criminal Appeals Use Only)



EXHIBIT

A

INDEX SUPPLEMENTAL:

COURT REPORTER'S COVER SHEET ------------        01

COURT REPORTER'S JURY QUESTION----------    02 - 03

COURT REPORTER'S CERTIFICATE ------------        04

CERTIFICATE OF COMPLETION &
      TRANSMITTAL OF RECORD ON
      APPEAL BY TRIAL CLERK -------------    05 - 06

STATE OF ALABAMA        )        CIRCUIT COURT OF

      PLAINTIFF              )        DALE CO., ALABAMA

                              )

VS.                    )

                              )

GARY HORNE             )        CASE NO. CC-04-122

      DEFENDANT             )


## COURT REPORTER'S SUPPLEMENT TO

## RECORD ON APPEAL


The following is a supplement to the Record On Appeal and was submitted as

ordered by the Court pursuant to the Defendant's motion to supplement.



APPEARANCES:


FOR THE STATE                           FOR THE DEFENDANT


Bill Filmore                            Tracy Nickson

Asst. District Attorney                 Attorney At Law

Ozark, Alabama                          Dothan, Alabama

<u>JURY QUESTION</u>

THE COURT:  Ladies and Gentlemen of the Jury, the Bailiff gave me the following question: "Concerning the Assault in the 2nd degree charge, do we have to answer whether or not he acted in self defense?"

The State has the burden of proving beyond a reasonable doubt that the Defendant did not act in self defense.  If you find the State met its burden and the Defendant did not act in self defense, then you would just find him guilty of Assault in the 2nd degree and sign that verdict, if that's what you're looking at.

Then if the State has not met its burden in proving that the Defendant did not act in self defense; in other words, if you found that he was acting in self defense, then you would find him not guilty.  But, you don't have a separate verdict if you find the Defendant was acting in self defense.  If you find that he was acting in self defense, then he would be not guilty of any of the charges.  If you find that the State hadn't met its burden, he would be not guilty of the charges.  But, if you are not reasonable satisfied that he was acting in self defense, and that he was guilty of Assault in the 2nd degree, then you would just sign the Assault in the 2nd degree verdict.

If you are satisfied he was acting in self defense, then you find him not guilty.

If you are not so satisfied, then you would find him guilty.  That's what you're looking at as far as Assault in the 2nd degree is concerned.  But, you do not

have to have – you don't have to answer whether or not he acted in self defense as far as writing it down on a piece of paper, but you do have to answer that in deciding whether he's guilty or not guilty.  Does that make it clear?

JUROR:  Yes, sir.

THE COURT:  Okay, you may continue your deliberations.  Thank you.

<u>END OF JURY QUESTION</u>

<u>REPORTER'S CERTIFICATE</u>

STATE OF ALABAMA

COUNTY OF DALE


I, David M. Glenn, CSR, do hereby certify that the aforegoing typewritten pages

are true and correct and that the same were transcribed by me from my machine

shorthand notes taken on said occasion.


WITNESS MY HAND this the 26th day of September, 2005.

David M. Glenn, CSR

# CERTIFICATE OF COMPLETION AND TRANSMITTAL
## OF RECORD ON APPEAL BY TRIAL CLERK

GARY HORNE

*Appellant*

V.

State of Alabama Appellee

TO: The Clerk of the Court of Criminal
Appeals of Alabama

Case No. CC-2004-122

Date of Notice of Appeal 9-8-2005

I certify that I have this date completed and transmitted herewith to the appellate court the record on appeal by assembling in (a single volume of ___6___ pages) (_____ volumes of 200 pages each and one volume of _____ pages) the clerk's record and the reporter's transcript and that one copy each of the record on appeal has been served on the defendant and the Attorney General of the State of Alabama for the preparation of briefs.

I certify that a copy of ths certificate has this date been served on counsel for each party to the appeal.

DATED this ___30th___ day of ___SEPTEMBER___, 20 05.

_Mary Bludsworth_
Circuit Clerk

DALE
County

Civil Action No._____

# STATE OF ALABAMA

DALE _____ County

## CIRCUIT COURT

## CERTIFICATE OF COMPLETION AND TRANSMITTAL OF RECORD ON APPEAL BY TRIAL CLERK

GARY  HORNE

### APPELLANT
### V.
### STATE OF ALABAMA
### APPELLEE

**FILED**_____30th_____

SEPTEMBER _____, 20 05 .

Mary Bradsworth

Clerk

# Exhibit B

DOCKET NUMBER:

---

IN THE ALABAMA COURT OF CRIMINAL APPEALS

---

GARY HORNE,
APPELLANT,

v.

STATE OF ALABAMA,
APPELLEE.

---

From the Circuit Court of Dale County, Alabama
Case No. CC-2004-1220

---

BRIEF OF THE APPELLANT

---

N. TRACY NICKSON
COUNSEL FOR APPELLANT
2181 AA COBBS FORD ROAD
PRATTVILLE, ALABAMA 36066
(334) 285-1776

ORAL ARGUMENT REQUESTED



EXHIBIT

B

## STATEMENT REGARDING ORAL ARGUMENT

Appellant requests oral argument. Appellant believes that oral argument would assist this Court in arriving at a conclusion in this action.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT.................................... i

TABLE OF CONTENTS ........................................................... ii

STATEMENT OF JURSIDICTION ............................................... iii

STATEMENT OF THE CASE ..................................................... 1

STATEMENT OF THE ISSUES ................................................. 3

STATEMENT OF THE FACTS ................................................... 4

SUMMARY OF THE ARGUMENT................................................ 7

STATEMENT OF THE STANDARD OF REVIEW............................. 8

ARGUMENT ....................................................................... 10

CONCLUSION .................................................................... 44

CERTIFICATE OF SERVICE .................................................... 46

APPENDIX I
Actions Adverse to
Appellant.......................................................................... 47

APPENDIX II
Excerpt from
Petition for Writ of
Mandamus........................................................................ 48

## STATEMENT OF JURISDICTION

This Honorable Court exercises jurisdiction over this matter pursuant to Rule 3, Alabama Rules of Appellate Procedure, and § 12-22-240, Code of Alabama 1975.

## TABLE OF AUTHORITIES

### ALABAMA CASES

Arrington v. State, 869 So. 2d 532 (Ala.Crim.

App.2003)..........................................................     18

Burgin v. State, 824 So. 2d 77

(Ala.Crim.App.,2001)......................................     27

Connolly v. State, 602 So. 2d 452 (Ala.1992)......     39

Cooper v. State, 632 So. 2d 1342 (Ala. Crim. App.

1993)...................... ...............................................     37

Ex parte Brown, 548 So.2d 993 (Ala.1989)........................     14

Ex parte Cammon, 578 So.2d 1089 Ala(1991)......     14

Ex Parte Crews, 797 So. 2d 1119 (Ala.

2000)..........................................................     38

Ex parte Gingo, 605 So.2d 1237 (Ala.1992) ............     17

Grissom v. State, 624 So. 2d 706(Ala. Crim. App

1993).................................................... . .     22

Gratton v. State, 455 So. 2d 189(Ala. Crim. App.

1984).................................................... ....     38

Holsclaw v. State, 406 So.2d 1019

(Ala.Crim.App.1981)......................................... .     39

Jefferson v. State, 645 So. 2d 313

(Ala. Crim. App. 1994)...................................................... 10

Nesbitt v. State, 531 So. 2d 37

(Ala.Cr.App.1987)........................................... 37

Petite v. State, 520 So. 2d 207

 (Ala.Crim.App.1987)................................. 27

Wilson v. State, 874 So. 2d 1145 (Ala. 2003)...... 8


**FEDERAL CASES**

Application of Kapatos, 208 F.Supp. 883, 888

(SDNY 1962) ......................................... 18

Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct.

333, 102 L.Ed.2d 281 (1988) ........................ 17

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,

10 L.Ed.2d 215 (1963)............................................ 8

Chapman v. California, 386 U.S. 18, 87 S.Ct.

824, 17 L.Ed.2d 705 (1967) ........................................ 24

Giglio v. United States, 405 U.S. 150, 154

[92 S.Ct. 763, 766, 31 L.Ed.2d 104] (1972)............... 16

Giles v. Maryland, 386 U.S. 66, 98 [87 S.Ct. 793,

809, 17 L.Ed.2d 737] (1967)................................... 18

<u>Napue v. Illinois</u>, 360 U.S. 264, 269 [79 S. Ct.

1173, 1177, 3 L.Ed.2d 1217] (1959)................................    16

<u>Strickler v. Greene</u>, 527 U.S. 263, 281-82, 119

S.Ct. 1936, 144 L.Ed.2d 286 (1999)................................    10

<u>United States v. Bagley</u>, 473 U.S. 667, 105 S.Ct.

3375, 87 L.Ed.2d 481 (1985)................................    20

## <u>STATUTORY AUTHORITY</u>

Rule 26.6(b)(3), Alabama Rules
of Criminal Procedure................................. . .    26

Rule 401, Alabama Rules of Evidence...............    33

Rule 45, Alabama Rules of Appellate Procedure    24

Title 13A-5-10.1, Code of Alabama 1975.........    28

## <u>TREATISES</u>

W. LaFave and J. Israel, 2 Criminal Procedure

§19.5(1984)................................................    22

## STATEMENT OF THE CASE

Appellant Gary Horne was arrested on 16 January 2004 for the attempted murder, with a handgun, of John Williams in Dale County, Alabama. Appellant, represented by counsel, filed a request for discovery on 29 March 2004. CR-016. Appellant filed a Motion to compel production of discovery on 14 May 2004. CR-046. On 3 September 2004, Appellant filed a Motion to Dismiss essentially based on the failure of the State to provide evidence which it collected at the scene of the crime. CR-095. A hearing on this Motion was conducted on 16 December 2004. (Second Supplemental Transcript-01). Following the hearing, but on the same day, the Trial Court denied Appellant's Motion to Dismiss without opinion. Appellant sought relief from this denial by filing a Petition for the issuance of a Writ of Mandamus with this Honorable Court, which petition was denied by this Honorable Court on 4 February 2005, Alabama Criminals Appeal Number CR-04-0545.  A document contained as Exhibit 5 within that petition is appended hereto as Appendix II; it along with many

other items, as suggested by the numerous
supplements, was not included in the instant record
on appeal despite having been stamped received by the
Dale County Circuit Clerk.

Trial was conducted on 18 May 2005, after which
the jury found the Appellant guilty of Assault in the
2d degree. CR-002. Sentencing was scheduled for 13
July 2005. CR-002. Appellant filed numerous post-
trial motions (which will be explored more fully
within the succeeding pages, including a Motion to
Vacate Sentence (CR-077) and Motions for New Trial.
CR-051, CR-077. On 13 July 2005 Appellant was
sentenced, over objection, under the Habitual Felony
Offender Act to twenty-two years in the state
penitentiary. Appellant filed a Motion to Clarify
which, like all other post-trial motions, was denied.
Appellant now appeals both his conviction and his
sentence.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

### ISSUE I

WHETHER THE CONVICTION OF THE APPELLANT MAY

STAND WHERE THE STATE FAILED TO PRODUCE POTENTIALLY

EXCULPATORY EVIDENCE GATHERED BY THE STATE?

### ISSUE II

WHETHER THE DEFENDANT WAS ILLEGALLY SENTENCED

THROUGH INVOCATION OF THE HABITUAL FELONY OFFENDER

ACT?

## STATEMENT OF THE FACTS

The Appellant Gary Horne was charged with the attempted murder of John Williams, both residents of Dale County, Alabama at the time, where said crime was alleged to have taken place at night in front of an apartment complex. TR-48. Law enforcement officers collected evidence at the scene, which evidence later was unable to be located(Second Supplemental Transcript-6, 13); numerous motions were made at both District and Circuit court levels for an order compelling production of this evidence, all of which were granted. (CR-028, 031, 038). This evidence consisted of a bullet and photographs taken by officers or evidence technicians. Appellant made very specific discovery requests, which were ordered. CR-040. Following the failure of the State to provide this evidence, Appellant moved the Trial Court to dismiss the charges citing pertinent Alabama and federal case law. (CR-095) Following the Trial Court's denial of this motion, Appellant sought from this Honorable Court a writ of mandamus to issue

4

directing the Trial Court to dismiss the action, which petition was denied by this Honorable Court on 4 February 2005, Alabama Criminals Appeal Number CR-04-0545. A document contained within this Petition is appended hereto.

Trial of the action began on 16 May 2005, and was concluded on 18 May with the jury finding Appellant guilty of Assault Second Degree. CR-002.

A sentencing hearing was conducted on 13 July 2005. At this hearing the State sought to introduce evidence of Appellant's prior convictions for the purposes of enhancing his sentence under pursuant to the Habitual Felony Offender Act (HFOA). TR-113. Appellant objected on the ground, inter alia, that he had been afforded no prior notice whatsoever of the State's intent to seek enhancement. TR-113, 114. The State argued that the notice had been filed on 11 July 2005, although the record demonstrates that this was flatly not the case. CR-081; Supplemental 3rd Transcript-2, which will be discussed fully below. Appellant implored the Trial Court, if it found notice as required by the statute to have been given,

to specify what form the notice took and what time it was provided both and at sentencing hearing (TR-142) and in his Post-Trial Motion to Clarify Post-Trial Ruling. CR-091. The Trial Court overruled these objections and sentenced the Appellant to twenty-two years, refusing to specify what particular notice of the State's intent was provided to the Appellant. Appellant filed motions for new trial (CR-051,074), to clarify what notice was given (CR-091), and to vacate sentence. CR-078. In his Motion to Vacate Sentence and at the hearing on the motion, the Appellant argued that postmarks appearing on the envelope in which the State's Notice of Habitual Offender Status was delivered clearly demonstrated the impossibility of the receipt thereof by Appellant prior to the sentencing hearing, and indeed Appellant received the notice of intent to enhance via mail at least two days after he had been sentenced. CR-078, TR-127. All of these motions were denied by order of the trial court issued on 19 August 2005. CR-084.

6

## SUMMARY OF THE ARGUMENT

The Trial Court plainly and reversibly erred in failing to dismiss the action when testimony by law enforcement officers revealed that crucial items of evidence, which were likely exculpatory in character, were gathered by officers at the scene but subsequently and irretrievably lost by the State.

The Trial Court abused its discretion by sentencing the Appellant under the Habitual Felony Offender Act despite the record overwhelmingly showing that Appellant was afforded no prior notice whatsoever of the intent of the State to seek such enhancement.

## STATEMENT OF THE STANDARD OF REVIEW

The standard of review regarding the evidentiary issue is for plain error in upholding a verdict of guilt where potentially exculpatory evidence was not provided to the Appellant, in contravention of the holdings in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and other cases cited below. "There are three components of a true Brady violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching, that evidence must have been suppressed by the state, either willfully or inadvertently, and prejudice must have ensued" Wilson v. State, 874 So. 2d 1145 (Ala. 2003). Standards which concern reasonable probability of a different result had the withheld evidence been provided are of no consequence here, in that such a determination is not feasible where the evidence had been irretrievably lost prior to trial. The standard of review is for plain error regarding the Brady claim.

The standard of review regarding the illegal sentence is for an abuse of the discretion afforded the trial court in Connolly v. State, 602 So.2d 452, 454 (Ala.1992), which held that the determination of the reasonableness of prior notice afforded a defendant of the intent of the state to proceed under the Habitual Felony Offender Act was left within the discretion of the trial court, a determination not to be disturbed absent a clear showing of an abuse of that discretion.

## ARGUMENT

**ISSUE I: WHETHER THE CONVICTION OF THE APPELLANT MAY STAND WHERE THE STATE FAILED TO PRODUCE POTENTIALLY EXCULPATORY EVIDENCE GATHERED BY THE STATE?**

Under the settled laws of Alabama and of the United States of America, a conviction may not stand where the state failed to provide potentially exculpatory evidence. In this case the potentially exculpatory evidence which was lost consisted of, by the State's own admission, a bullet and photographs.

Under Alabama and federal law the failure of the state to provide potentially exculpatory items of evidence, whether willful or inadvertent, forecloses a verdict against the defendant in any case. Jefferson v. State, 645 So. 2d 313 (Ala. Crim. App. 1994); Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), and other cases which will be presently cited. As no verdict of guilt could be legally reached in this action, the verdict against the Appellant cannot stand and his conviction is due to be reversed. This prior foreclosure of a verdict

against the Appellant in any event under situations in which material evidence is irretrievably lost grounded the petition for writ of mandamus which was filed in this before this Honorable Court on 30 December and denied without opinion on 4 February 2005, appended hereto.

Appellant was granted a hearing on his Motion to Dismiss (CR-095) on 16 December 2004. At this hearing, investigating law enforcement officers Rex Tipton and Martin Spears testified that "the scene was photographed and evidence was collected by [Agent Martin] Spears." Second Supplemental Transcript-1. The evidence which was collected consisted of a what appeared to the officer to be a .40 caliber bullet (Second Supplemental Transcript-5-6, 12), a spent .40 caliber shell casing (Second Supplemental Transcript-12), and photographs of the scene. (Second Supplemental Transcript-13). Tipton's testimony showed that the projectile was lost (Second Supplemental Transcript-6), although it had been packaged and identified. Second Supplemental Transcript-8. The testimony of Spears indicated that

11

the photographs taken by him at the scene were also lost. Second Supplemental Transcript-13.

Also testifying at this hearing was John William Dassinger, who said he purchased a "Glock-40" from the alleged victim in the case after the shooting (Second Supplemental Transcript-9, 10) and further that he had been trying to purchase it for some time when the alleged victim suddenly offered it to him for one hundred dollars (Second Supplemental Transcript-10), where Dassinger further testified that the gun was seized by Ozark police later in 2004. This history comported with Appellant's theory of self-defense advanced at trial, where it was sought to be proved that the victim in the case was actually the aggressor and was shot with his own gun after he drew it on Appellant.

Upon learning of the existence of the projectile and the gun to which the projectile could possibly be matched, Appellant on 27 April 2004 filed a "Motion to Preserve Evidence," i.e., the .40 caliber handgun, in both the courts presiding over the instant case and also in Dassinger's case. Appendix II, Exhibit 5.

12

Clearly if the projectile found at the scene matched the gun that Williams (the alleged victim) sold to Dassinger _after_ the shooting, Appellant's claim of self-defense could have been proven with virtual conclusiveness. However three articles of evidence which were crucial to the Appellant's defense were apparently lost forever: the projectile, the handgun, and the crime-scene photographs. The failure by the State to provide these potentially, and in all likelihood probably, exculpatory items of evidence, whether willful or inadvertent, forecloses a verdict against the Defendant in any case. _Jefferson v. State,_ 645 So. 2d 313 (Ala. Crim. App. 1994); _Brady v. Maryland_, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). _Strickler v. Greene_, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), Thus, "[t]here are three components of a true Brady violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching;  that evidence must have been suppressed by the State, either willfully or inadvertently;  and prejudice must have ensued,"

13

cited by Alabama Supreme Court in <u>Wilson v. State</u>, 874 So. 2d 1145 (2003). <u>Stickler</u> further holds that prejudice ensues where "there is a reasonable probability that his conviction ... would have been different had these materials been disclosed." 527 U.S. at 296, 119 S.Ct. 1936. In this case the lost evidence may well have completely exonerated the Appellant if it were shown that he was shot with the same gun he sold days after the shooting.

"To prove a Brady violation, a defendant must show (1) that the prosecution suppressed evidence, (2) that the evidence was of a character favorable to his defense, and (3) that the evidence was material." <u>Ex parte Cammon</u>, 578 So.2d 1089, 1091 (Ala.1991); <u>Ex parte Brown</u>, 548 So.2d 993, 994 (Ala.1989).

Here the prosecution lost evidence, which effectively suppressed the evidence (as will be shown, the good or bad faith of the state in withholding the evidence is immaterial); the evidence could clearly have been favorable to the accused if it proved that the victim was shot with his own gun, which would conclusively refute the victim's

testimony; and the evidence was material. The state itself collected the evidence in its prosecution of the Appellant.

As no verdict of guilt could be legally reached in this action, the verdict against the Appellant cannot stand and his conviction is due to be reversed.

On the issue of impeachment evidence (as a type of exculpatory evidence), this Court has held in Jefferson v. State, 645 So. 2d 313 (Ala. Crim. App. 1994), that the loss or non-production by the State of such evidence to be a factor in ultimately reversing the conviction of the defendant. As with the other evidence at issue, the true extent of their impeachment and exculpatory value will never be fully known, as they have been irretrievably lost. A witness for the state testified that she saw Appellant commit the crime. TR-43. The lost photographs would have tended to directly refute testimony of this State's witnesses. Jefferson, supra, goes on to hold, "Impeachment evidence ... as well as exculpatory evidence, falls within the Brady

rule.  See <u>Giglio v. United States</u>, 405 U.S. 150, 154 [92 S.Ct. 763, 766, 31 L.Ed.2d 104] (1972).  Such evidence is 'evidence favorable to an accused,' *Brady*, 373 U.S. at 87 [83 S.Ct. at 1196], so that, if disclosed and used effectively, it may make the difference between conviction and acquittal. <u>Napue v. Illinois</u>, 360 U.S. 264, 269 [79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217] (1959) ('the jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend')."

The materiality of the gun and the projectile as exculpatory, and perhaps also impeachment, evidence can never be adequately assessed; however, this should logically not work to the State's advantage or benefit as it was the State's presumed negligence that caused the evidence to be unavailable to the Appellant in the first place. While the loss of the potentially exculpatory evidence seems in this instance to be truly inadvertent, it was inarguably

negligent. Inadvertence does not excuse a violation of *Brady*; " '[T]he good faith or bad faith of the prosecution' is immaterial." <u>Jefferson v. State</u>, 645 So. 2d 313 (Ala. Crim. App. 1994) citing <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "The good or bad faith of the state is immaterial when the lost evidence is so critical to the defense as to make a criminal trial fundamentally unfair." <u>Youngblood</u>, <u>infra</u> at 339. The State concedes that it had at one time each piece of evidence but had lost them. "There may well be cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is so critical to the defense as to make a criminal trial fundamentally unfair." <u>Ex parte Gingo</u>, 605 So.2d 1237, 1241, (Ala. 1992),citing <u>Arizona v. Youngblood</u>, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The potential for abuse of a process in which "losing" exculpatory evidence warrants no sanction whatsoever clearly invites abuse of that process. Just as clearly, had the missing evidence in this case been available, the Appellant's claim of

17

self-defense could have been bolstered immeasurably, and in all likelihood bolstered to the point of acquittal. "The existence of any small piece of evidence favorable to the defense may, in a particular case, create just the doubt that prevents the jury from returning a verdict of guilty." Arrington v. State, 869 So.2d 532 (Ala. Crim. App. 2003), citing Jefferson, supra.

Also in Jefferson, supra, this Court adopted the dissent of Justice Marshall as stated in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), which held: " '[T]he purpose of a trial is as much the acquittal of an innocent person as it is the conviction of a guilty one.' Application of Kapatos, 208 F.Supp. 883, 888 (SDNY 1962); Giles v. Maryland, 386 U.S. 66, 98 [87 S.Ct. 793, 809, 17 L.Ed.2d 737] (1967) (Fortas, J., concurring in judgment) ('The State's obligation is not to convict, but to see that, so far as possible, truth emerges'). When evidence favorable to the defendant is known to exist, disclosure only enhances the quest for truth; it takes no direct toll on that inquiry. Moreover,

the existence of any small piece of evidence
favorable to the defense may, in a particular case,
create just the doubt that prevents the jury from
returning a verdict of guilty.  The private whys and
wherefores of jury deliberations pose an impenetrable
barrier to our ability to know just which piece of
information might make, or might have made, a
difference.

When the State does not disclose information in
its possession that might reasonably be considered
favorable to the defense, it precludes the trier of
fact from gaining access to such information and
thereby undermines the reliability of the verdict."
Jefferson at 316, 317.

In the instant case what is certain is that the
jury flatly rejected the State's contention that
Appellant attempted to murder anyone, by finding him
guilty instead of Assault Second Degree; this makes
the issue of irretrievably lost evidence of even
greater potential significance.

In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct.
1194, 10 L.Ed.2d 215 (1963), the United States

Supreme Court ruled that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." "Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

In *Wilson*, the Alabama Supreme Court reversed the Court of Criminal Appeals on the sole issue of prejudice, or more accurately the absence thereof, to the defendant stemming from failure by the State to provide evidence. The instant case is readily distinguishable in several aspects; in the instant case the Appellant was clearly prejudiced in presenting his defense of self-defense and in his effort to impeach State's witnesses. Further, the value of the evidence to the defendant in Wilson could be calculated; in the instant case that is

simply not possible. To the anticipated argument of
the State that ballistics testing of the gun and the
projectile may not have absolved the Appellant, he
responds that it may well have; the loss of the
evidence forever precludes any plausible assessment.
Surely fairness dictates that the Appellant shouldn't
be penalized for the state's loss of the evidence.
The State clearly considered the spent projectile and
the photographs important enough to collect and
maintain in connection with its prosecution of the
Appellant; likewise Appellant recognized the
potentially exculpatory value of the evidence and
made effort to preserve and obtain them. Appendix II,
Exhibit 5, "Motion to Preserve Evidence." Again,
Appellant avers that any uncertainty regarding the
value of lost, potentially exculpatory evidence
should be resolved in his, not the State's, favor,
pursuant to considerations of due process. Any other
result could inspire, in unscrupulous quarters,
convenient "loss" by the state of evidence with
impunity.

This Honorable Court in Grissom v. State, 624 So.2d 706 (Ala. Civ. App. 1993), cited an ineffably pertinent passage: " 'When the defendant claims that the government lost or destroyed exculpatory evidence, courts face two difficulties not presented in the typical nondisclosure case. Since the missing material cannot be produced for inspection, the court often cannot say with certainty that the material would or would not have been favorable to the accused. Second, the nondisclosure cannot be remedied by simply granting the defendant a new trial. Ordinarily, the only feasible remedies are dismissal of the prosecution or, if the missing evidence could have been used only to impeach a particular item of prosecution evidence, exclusion of that evidence.' " Grissom, supra, citing W. LaFave and J. Israel, 2 Criminal Procedure § 19.5 (1984). These are the precisely identical set of circumstances existing in the instant case, and both choices of remedies are applicable; the photographs are certainly impeachment evidence, but may have been more. The projectile and

gun are simply lost but may have conclusively established Appellant's innocence.

The trial court stated at the commencement of the hearing that, "there really can't be a Brady violation until after you've tried the case and prove that they withheld evidence that might have aided the defense." Second Supplemental Transcript-2. Aside from the more general question of the accuracy of this assessment of the strictures imposed by Brady, it is certainly not applicable to the present case here, where proof of the withholding or loss was adduced prior to trial by the admission of the same law enforcement officers who had possessed and then lost the evidence. There was no need to prove at trial what the state freely admitted prior to trial; this rationale grounded the previously filed mandamus petition.

Indeed, the question is not one of whether the lost evidence would have been persuasive, because a determination of its persuasiveness was and is not feasible. The effect on the verdict of the lost evidence simply cannot be appraised, though the

jury's finding of guilt on a substantially less serious offense than the one charged is worthy of consideration.

The error cannot be viewed as harmless; the error clearly and injuriously affects the Appellant's substantial rights pursuant to Rule 45, Alabama Rules of Appellate Procedure, and a constitutional error is never "harmless" after a determination is made that evidence is material. "Having determined that the undisclosed evidence was material, we cannot apply the harmless error analysis to the facts of this case." Bagley, supra; Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

In partial summary, the failure of the State to provide potentially exculpatory ballistic and photographic evidence which it itself gathered in its prosecution requires reversal of the Appellant's conviction and rendering of a judgment of acquittal. The state admits it lost evidence; it has been demonstrated that this evidence was potentially exculpatory and material; and prejudice to Appellant ensued. The reliability of the jury's verdict is

incalculably undermined when evidence potentially favorable to the accused is withheld, for whatever reason, and it need not be shown that the state acted in bad faith. Nor is this constitutional error harmless. A new trial would serve no useful purpose absent the finding by the state of the evidence it gathered and then lost.

ISSUE II: WHETHER THE TRIAL COURT ABUSED ITS
DISCRETION BY INVOCATION OF THE HABITUAL FELONY
OFFENDER ACT, RESULTING IN AN ILLEGAL SENTENCE?

The Appellant was sentenced illegally in that
the invocation of the Habitual Felony Offender Act
(§13A- 5-9, Code of Alabama 1975, referred
alternately herein as "HFOA") was an improper abuse
of the Trial Court's discretion. The constitutional,
statutory, and case legal authority on the subject of
proper invocation is copious, clear, and unwavering
concerning the state's duty to provide to a defendant
prior notice of any prior felony convictions it
intends to use to enhance the sentence imposed upon
the defendant. No such prior notice was provided the
Appellant in this case.

Rule 26.6(b)(3)(ii), Alabama Rules of Criminal
Procedure, states: "At a reasonable time prior to the
[sentencing] hearing, the defendant shall be given
notice of the prior conviction or convictions upon
which the state intends to proceed." Describing the
type of notice required before the HFOA can be

invoked, the Supreme Court of Alabama held in

Connolly v. State, 602 So.2d 452, 454 (Ala.1992):

"For the HFOA to apply to a particular
sentencing, the State must give reasonable notice,
prior to the sentencing hearing, of the State's
intention to proceed under the HFOA.   Rule
26.6(b)(3), Ala.R.Crim.P.   (Formerly Temp.   Rule
6(b)(3)(ii), Ala.R.Crim.P.).  The notice requirement
is eliminated when during the trial the defendant
admits the previous felony conviction.   Petite v.
State, 520 So.2d 207 (Ala.Crim.App.1987)." In the
instant case the Appellant has never confessed to any
prior felonies.

In Burgin v. State, 824 So.2d 77 (Ala.
Crim. App. 2001), this Honorable Court found that the
State failed to give proper notice prior to second
sentencing hearing of intent to seek enhancement
under Habitual Felony Offender Act (HFOA), warranting
remand for new sentencing hearing, where the record
failed to reflect that state gave defendant notice
before hearing that state intended to proceed under
HFOA and record did not indicate that state notified

defendant regarding what convictions state would attempt to prove at hearing. (See also Ala. Code 1975, § 13A-5-9). TR-113.

It should be noted that Appellant's counsel was not provided copies of these convictions either at the hearing or at any time before the hearing, or indeed at any time thereafter. The document actually listing the felonies, the "Circuit Criminal Case Action Summary" (State's Exhibits-4), was viewed for the very first time by Appellant when Appellant received the Record on Appeal in this case. The State to this day has never provided him with a copy of this document, which itself is arguably violative of the terms of The Habitual Felony Offender Act, §13A-5-10.1, Code of Alabama 1975, which holds  as proof of prior felonies:

(a) Certified copies of case action summary sheets, docket sheets or other records of the court are admissible for the purpose of proving prior convictions of a crime, if the prior conviction is otherwise admissible under the laws of this state.

(b) If the trial court determines that the defendant would be prejudiced by the admission of the documents described in subsection (a) the court may admit into evidence and inform the jury of the fact

of the conviction but not allow the jury to view the prejudicial documents.

In the instant case Appellant had no knowledge of the specific felonies subsequently found in the Record on Appeal until after the commencement of the sentencing hearing.

A sentencing hearing was conducted on 13 July 2005 (CR-002), at which Appellant objected to the introduction of certified copies of convictions by the state's representative, Mr. Smith. TR-113. The following exchange is worthy of inclusion here:

"Mr. Smith: We do have certified copies of Mr. Horne's prior convictions and we would offer them for the record.

Mr. Nickson: I would object to them Your Honor. I did not get prior notice of these whatsoever.

Mr. Smith: Those were filed on Monday or Tuesday, but in many discussions regarding a plea in the matter, it was known to the attorney in our discussions that Mr. Horne had two prior felonies. During the first day of trial we had discussions in which Mr. Nickson was advised that the Defendant had

two prior felonies and we filed a notice and mailed
them to him on Monday.

Mr. Nickson: Your Honor, I never received any
intent of prior convictions whatsoever. I still have
not received any.

The Court: They were filed in-notice of habitual
offender status and copies were sent to you on Monday

Mr. Nickson: And as of this day, I have not
received it.

The Court: Well, I find that he has had two
prior felony convictions.

Mr. Nickson: I would object on that based on
failure to notify of intent." TR-113.

Although the state argued, and the Trial Court
agreed, that the notice had been filed on Monday 11
July 2005 (TR-113), the document itself (CR-081), as
well as the envelope in which it was mailed (on 13
July 2005) show this to be patently false.
Supplemental 3rd Transcript-2.

On or about 15 July 2005, Appellant received via
United States Postal Service delivery the state's
Notification of Habitual Offender Status (C-81) which

was postmarked as having been mailed on 13 July 2005. A copy of the envelope in which this notice was mailed was both attached to Appellant's 28 July 2005 Motion to Vacate Sentence and also introduced at the sentencing hearing itself. (Supplemental 3rd Transcript-2). While the certificate of service states that the notice was mailed on the 11th of July, it was not filed until the 12th as is shown by the clerk's stamp, and, again, not mailed until the day of sentencing, i.e., the 13th. Supplemental 3rd Transcript-2. The temporal impossibility of prior written notification received by the Appellant having been shown, this Motion further demonstrated that no negotiations ever occurred at any time between Mr. Smith and the undersigned at which prior felonies could have been discussed. CR-078. The Trial Court somehow concluded that the notice had been filed on Monday 11 July 2005, despite the clerk's stamp proving otherwise, as does the case action summary (C-002) which reflects no such filing. Clearly the notice as disclosed in the record could not have

physically been received by the Appellant prior to the 13 July 2005 sentencing hearing.

The State's representative Mr. Smith also argued that because Appellant's counsel "had known" about these two prior felonies "as part of our plea negotiations," then, "If he wanted to investigate them, he's adequate time to do so." TR-114. Again, no meaningful plea negotiations ever occurred, and none of any type ever occurred with Mr. Smith. As will be shown, the awareness or not of a defendant's lawyer of his client's prior felonies does not comply with the specific notice requirement of the statute; moreover the undersigned unequivocally maintains that no discussions whatsoever ever occurred between himself and Mr. Smith. Indeed, if the state met its notice requirement at "plea negotiations," why belatedly mail a written notice at all? As was stated in his Motion to Vacate Sentence (CR-077), the only "plea negotiations" that ever took place at all consisted of very few words exchanged between the undersigned and another representative of the State, which occurred while the case was still at the

District Court level and at which no mention was made
whatsoever of any specific prior felonies or of the
State's intent to use them in enhancement. CR-78.

This and any controversy regarding what may or
may not have been said by whom and when is rendered
academic when notice as required by the statute is
provided by the state. Conformity to the rule
obviates the necessity of any "parol evidence"
regarding the substance of any plea negotiations,
even assuming that the content of plea negotiations
could be used against Appellant, which, as will be
shown, is in itself illegal.

Again, it must be reiterated that Appellant's
counsel never at any time entered into "plea
negotiations" with Mr. Smith despite his contrary
assertion in open court; aside from this, yet equally
as important, is the fact that the State's attempts
to use any imagined plea negotiations as evidence of
proper notice is unambiguously proscribed by
Rule 410, Alabama Rules of Evidence, which holds:

Except as otherwise provided in this rule,
evidence of the following is not, in any civil or
criminal proceeding, admissible against the defendant

who made the plea or was a participant in the plea
discussions:

    (1) a plea of guilty which was later withdrawn;
    (2) a plea of nolo contendere in a federal court
or criminal proceeding in another state;
    (3) any statement made in the course of any
proceedings under > Rule 11 of the Federal Rules of
Criminal Procedure or comparable state procedure
regarding either of the foregoing pleas;  or
    (4) any statement made in the course of plea
discussions with an attorney for the prosecuting
authority which do not result in a plea of guilty or
which result in a plea of guilty later withdrawn.

    At any rate, this issue of notice through plea
negotiations is ostensibly not subject to review as
the Order of the Trial Court seems to be based in no
part on the State's claims of what was said at any
plea negotiations, unless the issue is one ingredient
in some amalgamation upon which the Trial Court found
"awareness" by the Appellant of the State's intent,
as will be discussed below. As the Trial Court
declined to clarify with specificity the notice it
found, this cannot be fathomed.

    The Trial Court at the sentencing hearing
resolved the notice issue by stating simply "I think
the State met its obligations on giving notice that
he was going to be sentenced as an Habitual Offender
and what those two felonies were." TR-114. The Trial

Court declined to specify what notice was given other than the demonstrably false claims of notice by the State. It is noteworthy that the first time that the Appellant received any document whatsoever listing the felonies which the State intended to use to enhance was upon his receiving the Record on Appeal in this action; to this day he has received no document or offer to view such document from the state which lists these alleged prior felonies, only the notice of intent document which he received two days _after_ sentencing.

At the 4 August 2005 hearing on his Motion to Vacate, Appellant implored the Trial Court, if it found notice as required by the statute to have been given, to specify what form the notice took and what time it was provided. TR-142. After the ruling by the Trial Court, which will be discussed immediately below, the Appellant in his "Motion to Clarify Post-Trial Ruling" again beseeched the Court to enlighten him as to what notice was provided. CR-091. This Motion was denied. CR-086. Effectively, then, the only clue as to what notice the Court found to have

been  provided lies within this Order of the Trial
Court.

The Trial Court disposed of the issue in its
"Trial Court's Ruling on Motion for New Trial." CR-
084).

In this Order the Trial Court seems to find
proper notice by the State of its intent to enhance
based on three bases-(1) a presentence report; (2) a
"Notice of Habitual Offender Status" filed by the
District Attorney listing the State's intent to prove
unspecified prior felonies; and (3) a general
awareness by the Appellant, the court, the state, and
Appellant's counsel that Appellant had two prior
felonies. CR-084,085. As will be shown beloe, the
probabtion report is not, under Alabama law, adequate
prior notice of the state's intent to proceed under
the HFOA; the notice filed by the District Attorney
was not even mailed to Appellant's counsel until the
day of the sentencing hearing, making it impossible
for it to have been received "prior" to the hearing
as required by the rule; and the general "awareness"
by the occupants of the courtroom, even if it

existed, of two prior convictions in no way relieves the state of its duty to notify him of the existence of the felonies and also of its intent to proceed thereunder for purposes of the HFOA.

Regarding the presentence report, in Cooper v. State, 632 So. 2d 1342 (Ala. Crim. App. 1993), this Honorable Court clearly and unequivocally held that:

> "We do not believe that the presentence report contained in the record, which lists prior convictions, amounted to sufficient notice of the of the felony convictions that the state intended to prove at the sentencing hearing. While we are aware of our holding in Nesbitt v. State, 531 So.2d 37 (Ala.Cr.App.1987), that a defendant's receipt of a presentence report constitutes notice of the state's intent to proceed under the Habitual Felony Offender Act, we are not willing to extend that holding to allow the presentence report to supply sufficient notice of the specific prior convictions upon which the state intends to rely."

This conclusively refutes the Order of the Court insofar as it relies on the presentence report as being sufficient as the state's prior notice of intent; nor is instant case somehow brought within the ambit of Nesbitt. As can readily be seen (CR-055), the presentence report in no way indicates the intent of the state to invoke the convictions listed therein, for purposes of the HFOA, though it does

37

contain an uncertified "Record of Arrests." CR-056.
Alabama law does not recognize a presentence
investigation as being sufficient notice by the state
of intent to invoke the (uncertified) convictions
contained therein; it should be noted that this
document was viewed by Appellant only minutes before
the sentencing hearing, making the issue of its
provision debatable, but academic. Cooper disposes of
this issue. This leaves the documentary notice and
the Appellant's "awareness."

Regarding the documentary notice provided by the
State, as has been shown, the record discloses that
the only notice provided was provided at a time which
rendered Appellant's receipt thereof impossible prior
to the commencement of the sentencing hearing. CR-
081; Supplemental 3rd Transcript-2.

This Honorable Court has held that, "Written
notice given to the defendant two days prior to his
sentencing that the state intended to invoke the
provisions of the habitual felony offender statute
was reasonable in form and time under subdivision
(b)(3)(ii) of former Rule 6." Gratton v. State, 455

So.2d 189 (Ala.Crim.App.1984); the Alabama Supreme

Court has held that it is unreasonable to sentence a

defendant within fifteen minutes of his receiving

notice of the state's intent under the HFOA. Ex Parte

Crews, 797 So.2d 1119 (Ala.2000), on remand 797 1123.

These judicially constructed windows of

reasonableness, while highly instructive, are not

germane to the current inquiry. In this case,

Appellant initially received oral notice of the

state's intent to invoke the HFOA well after the

sentencing hearing had begun, and did not receive

written notice until two days after Appellant had

been sentenced. While a defendant need not be

notified prior to conviction of state's intent to

proceed against him as an "habitual felony offender,"

Holsclaw v. State, 406 So.2d 1019

(Ala.Crim.App.1981), writ denied 406 So.2d 1020, no

such absence of notice is prescribed prior to

sentencing.

The holdings in Holsclaw and Connolly v.

State, 602 So.2d 452 (Ala.1992) (on remand 602

So.2d 457) in no way mitigate or pardon the

39

impropriety of the complete absence of notice
provided in the instant case. Holsclaw held
that, "What is required is 'reasonable notice'
prior to the sentencing hearing as prescribed by
the Alabama supreme court in former A.R.Cr.P.,
Rule 6(b)(3)(ii), Temporary Rules," while
Connolly held that determination of the
reasonableness of the notice period is left to
the trial judge's discretion, because the trial
judge is present and is familiar with the
circumstances of the case. Both of these
holdings are predicated on facts which are
easily distinguishable from the facts of the
instant case, in that in those cases some
notice, in some form, was afforded the
defendant. In the instant case, where none was,
the sufficiency of the notice need not be
pondered, as none existed whatsoever, the Order
of the Trial Court notwithstanding. This leaves
only the "awareness" by the Appellant of his own
convictions on which the court could base its finding
of proper notice.

The Order of the Trial Court found that "the Defendant was aware that he had two prior felony convictions. This has never been disputed." CR-085. The immediate and obvious question is "At what point prior to the sentencing hearing was the Defendant ever afforded an opportunity to dispute the convictions?" The sentencing hearing itself was the first forum at which Appellant had ever been confronted with either the alleged convictions or of the State's intent to use them to enhance; clearly there was no prior notice, after which the convictions could properly have been disputed. No more than a few minutes actually transpired between the point in time at the sentencing hearing that Appellant was fist made aware of the state's intent to use the previously undisclosed felonies and the point in time in which the Trial Court found notice to have been given, leaving no time for dispute, much less for investigation into the substance of the allegations.

The Order goes on to state, "In this case, at the time of the Sentencing Hearing the State, the

Defendant, and the Defendant's attorney, and the Court were aware that the Defendant had two prior felony convictions and this has never been disputed. Therefore, the Defendant was properly sentenced as an Habitual Offender." CR-085. With these two sentences, the prior notice requirements of the statute and rule are apparently replaced with a novel standard of "awareness" by the parties and the court, which renders the prior notice duty of the HFOA quaintly obsolete. It is unclear, despite Appellant's pleas for clarification, what constitutes this awareness, but nothing in Alabama case law supports this supplanting of the requirements of the rule and the HFOA with a nebulous, subjective, and disputable standard of knowledge or awareness. A finding of proper notice of the state's intent to enhance under the HFOA by saying, "He knew about them" or "everybody knows about them" is a facile circumvention of the requirements of the rule and the HFOA. While a defendant <u>may</u> be expected to remember his own prior convictions, the law does not mandate his telepathic divination of the state's intent to

42

use them against him, just as it does not require him
to maintain vigil outside the office of the district
attorney in hopes of receiving written notice of that
intent. The law does provide the defendant with
notice so that he may investigate the allegations.
The law requires precisely what it says in the rule,
the HFOA, and judicial construction thereof. Under no
viewing of the facts were those requirements met in
the instant case. Indeed, the finding of this prong
of "awareness" seems to indicate that the Trial Court
did to some extent credit the state's assertion that
notice was provided in plea negotiations, which would
be improper. The Order is silent on the subject and
unclarified despite Appellant's pleas. Again,
Appellant had no opportunity to dispute the existence
of any prior felonies prior to the sentencing hearing
itself.

It is this finding by the Trial Court of proper
notice, where no valid notice whatsoever exists or is
disclosed in the record, that is an abuse of the
discretion imparted to the trial court in Connolly.
This abuse further demands reversal and resentencing

43

under the legal statutory range of one to ten years
incarceration.

## CONCLUSION

In conclusion of the evidentiary issue, the
Trial Court plainly erred in failing to dismiss the
action when testimony by law enforcement officers
revealed that crucial items of evidence, which were
likely exculpatory in character, were gathered by
officers at the scene but subsequently and
irretrievably lost by the State. Appellant prays that
this Honorable Court will reverse the conviction and
render a judgment of acquittal; the lost evidence
which grounds this appeal remains lost, making a new
trial superfluous in that, under applicable and cited
law, no conviction can be maintained against
Appellant under these circumstances. It is this error
without remedy for which Appellant respectfully prays
reversal and rendering.

In conclusion of the sentencing issue, the Trial
Court abused its discretion by sentencing the
Appellant under the Habitual Felony Offender Act

despite the record overwhelmingly showing that
Appellant was afforded no prior notice whatsoever of
the intent of the State to seek such enhancement.
This abuse of discretion requires reversal and
resentencing under the legal statutory range of
one to ten years incarceration, and it is this
reversal and remand for proper sentencing for
which Appellant now respectfully prays.


      Respectfully submitted this the ____ day of
_____, 200___.



                                    _____
                                    N. TRACY NICKSON (NIC026)
                                    COUNSEL FOR APPELLANT
                                    2181 AA COBBS FORD ROAD
                                    PRATTVILLE, ALABAMA 36606
                                    334) 285-1776

DOCKET NUMBER:

IN THE ALABAMA COURT OF CRIMINAL APPEALS

GARY HORNE,
        APPELLANT,

v.

STATE OF ALABAMA,
        APPELLEE.

_____

From the Circuit Court of Dale County, Alabama
Case No. CC-2004-1220

_____

CERTIFICATE OF SERVICE

_____

I hereby certify that a copy of the foregoing
document has been served upon the following parties
to the action by placing a copy in the U.S. Mail,
first class, postage pre-paid on this ____ day of
_____, 2005.

_____
N. Tracy Nickson

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Room 410
Montgomery, AL 36310

46

## Appendix I

Following are actions taken by the trial court which are adverse to the Appellant and which ground the instant appeal:

1. The 16 December 2004 Order of the Trial Court (CR-002) which denied the Motion to Dismiss filed by Appellant on 3 September 2004. CR-095.

2. The 13 July 2005 Order of the Trial Court (CR-084) which denied the Motion to Vacate Sentence filed by Appellant on 28 July 2005. CR-077.

3. The 13 July 2005 Order of the Trial Court (CR-084) which denied the Motion for New Trial filed by Appellant on 21 June 2005. CR-074.

## APPENDIX II


The following "Motion to Preserve Evidence" was both filed with the Dale County Circuit Clerk on the date stamped, i.e., 27 April 2004, and also was attached as Exhibit 5 to Appellant's Petition for Writ of Mandamus, which itself was filed with this Honorable Court on 30 December 2004, Alabama Criminal Appeals Number CR-04-0545.

DEC 3 0 2004

CLERK
ALA COURT CRIMINAL APPEALS

PETITION FOR WRIT OF MANDAMUS

IN THE COURT OF CRIMINAL APPEALS OF ALABAMA

Ex Parte: GARY HORNE,                 Case No.: _____

      PETITIONER

_____

RE:      STATE OF ALABAMA
           Plaintiff,

      v.

      GARY HORNE,
           Respondent.

Dale County Circuit Court Case No. CC-2004-122

_____

ORIGINATING IN THE DALE COUNTY CIRCUIT COURT

_____

N. TRACY NICKSON
COUNSEL FOR PETITIONER
2181 AA COBBS FORD ROAD
PRATTVILLE, ALABAMA 36066
(334) 285-1776

ORAL ARGUMENT REQUESTED

# EXHIBIT 5

# IN THE DISTRICT COURT OF DALE COUNTY, ALABAMA

## CRIMINAL DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA,<br>     Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | CASE NO.:   DC–2004–213 |
| | ) | |
| WILLIAM DASSINGER,<br>     Defendant. | ) | |
| | ) | |

## <u>MOTION TO PRESERVE EVIDENCE</u>

**COMES NOW,** Gary Horne, by and through his attorney N. Tracy Nickson, who is the

Defendant in Case No. CC-2004-1220, in the Circuit Court of Dale County, and respectfully

requests that this Honorable Court will preserve certain evidence in the above styled action for

inspection and/or testing by defense counsel in Mr. Horne's case; as grounds he states as follows:

1.  William Dassinger currently faces charges of, *inter alia*, possession of an altered handgun

    in this Honorable Court.

2.  Gary Horne, represented by the undersigned, currently faces a charge of Attempted

    Murder in Dale County Circuit Court.

3.  The investigation currently being conducted by the undersigned indicates a strong

    possibility that the firearm at issue in Mr. Dassinger's case, a semiautomatic .40 caliber

    handgun, was purchased by Mr. Dassinger from the alleged victim in Mr. Horne's case

    shortly after the act for which Mr. Horne faces charge.

4.  If indeed the handgun for which Mr. Dassinger is charged is the same used in the crime

    for which Mr. Horne is charged, the effect would be so exculpatory as to Mr. Horne as to

completely absolve him of the charge, and moreover would in all likelihood result in a

criminal investigation of the alleged victim in Mr. Horne's case.

5.    This request is made pursuant to the authorities expounded in ***Brady v. Maryland***, 373

U.S. 83, ***Giglio v. United States***, 405 U.S. 150,; Naque v. Illinois, 360 U.S. 264; ***United***

***States v. Tashman***, 478 FR.2d 129 (5 Cir. 1973.).

**WHEREFORE, THESE PREMISES CONSIDERED,** the undersigned respectfully requests

that this Honorable Court will preserve the above described evidence for inspection and/or testing

by counsel for the Defendant.

    **RESPECTFULLY** submitted on this the 26th day of April, 2004.

            N. TRACY NICKSON (NIC026)
            **ATTORNEY FOR DEFENDANT**
            **2181 AA COBBS FORD ROAD**
            **PRATTVILLE, ALABAMA 36066**
            **(334) 285-1776**


                **CERTIFICATE OF SERVICE**

    I do hereby certify that a copy of the foregoing document has been served upon the

offices of the Dale County District Attorney and upon the Hon. Circuit Judge K.W. Quattlebaum

by placing same in his/her box and or by first class U.S. Mail, postage pre-paid on this the

of _April_  2004.

            FILED
            DALE COUNTY AL

            APR 2 7 2004

                        OF COUNSEL

# Exhibit C

No. CR-04-2461

===============================================

*In the COURT of CRIMINAL APPEALS*
*of ALABAMA*

———————————◆———————————

GARY HORNE,

Appellant,

v.

STATE OF ALABAMA,

Appellee.

———————————◆———————————

*On Appeal From the Circuit Court of*
*Dale County (CC-04-1220)*

===============================================

**BRIEF OF APPELLEE**

Troy King
*Attorney General*

Robin Blevins Scales
Assistant Attorney General

John Porter
*Assistant Attorney General*
Counsel of Record *

State of Alabama
Office of the Attorney General
11 South Union Street
December 5 2005                    (334) 242-7300*


EXHIBIT
C

## STATEMENT REGARDING ORAL ARGUMENT

The State of Alabama does not request oral argument.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT........................ i

TABLE OF CONTENTS....................................... ii

TABLE OF CASES AND AUTHORITIES......................... iii

STATEMENT OF THE CASE................................... 1

STATEMENT OF THE ISSUES................................. 2

STATEMENT OF THE FACTS.................................. 3

STANDARDS OF REVIEW..................................... 6

SUMMARY OF THE ARGUMENT................................. 7

ARGUMENTS............................................... 9

I.   Horne's Argument That His Due Process Rights Were
     Violated Because The State Lost Potentially
     Exculpatory Evidence Is Without Merit Because He Has
     Failed To Show That The State Acted In Bad Faith Or
     That Such Evidence Was So Critical To His Defense
     That His Trial Was Fundamentally Unfair.............. 9

II   The Trial Court Did Not Abuse Its Discretion When It
     Determined That Horne Received Adequate Notice Under
     The Habitual Felony Offender Act.................... 17

CONCLUSION............................................. 22

CERTIFICATE OF SERVICE................................. 23

# TABLE OF CASES AND AUTHORITIES

## Cases

Arizona v. Youngblood, 488 U.S. 51, 55-58 (1988)......... 10

Berry v. State, 630 So. 2d 131, 132 (Ala. Crim.
  App. 1993) ......................................... 21

Brady v. Maryland, 373 U.S. 83 (1963).................... 9

California v. Trombetta, 467 U.S. 479, 486 (1984)....... 10

Connolly v. State, 602 So. 2d 452, 454-55 (Ala. 1992).... 17

Cooper v. State, 632 So. 2d 1342, 1344 (Ala. Crim.
  App. 1993) ......................................... 18

Ex parte Gingo, 605 So. 2d 1237, 1241 (Ala. 1992)........ 11

Ex parte Rieber, 663 So. 2d 999, 1014-15 (Ala. 1995)..... 13

Gurley v. State, 639 So. 2d 557 (Ala. Crim. App. 1993)... 12

Hobson v. State, 625 So. 2d 1168, 1170 (Ala. Crim.
  App. 1993) ......................................... 20

Jones v. State, 625 So. 2d 1167, 1168 (Ala. Crim.
  App. 1993) ......................................... 20

May v. State, 710 So. 2d 1362, 1369 (Ala. Crim.
  App. 1997) ......................................... 12

R.J.S. v. State, 905 So. 2d 26, 31 (Ala. Crim.
  App. 2004) ......................................... 20

Weaver v. State, 500 So. 2d 1278, 1279 (Ala. Crim.
  App. 1986) ......................................... 15

Williams v. State, 616 So. 2d 374, 376 (Ala. Crim.
  App. 1993) ......................................... 20

## STATEMENT OF THE CASE

This is the direct appeal from a conviction for assault in the second degree.  The Honorable P.B. McLauchlin, Jr. presided.

On March 3, 2004, the appellant, Gary Horne, was indicted by the Dale County Grand Jury for attempted murder by shooting John Williams with a handgun.  (C. 34-35)  On September 3, 2004, Horne moved to dismiss the charges against him, arguing that the State had lost evidence that was "crucial to the defense."  (C. 95-97; RS2. 2)[1] Specifically, Horne argued that the State had lost a bullet which was "strongly believed" to have been shot from a gun allegedly sold by the victim, John Williams, shortly after the actions serving as the basis for the prosecution against Horne were committed.  (C. 95; RS2. 2-12, 16) Horne also argued that photographs taken of the scene were unavailable.  (C. 96; RS2. 13-15)  Judge McLauchlin denied Horne's motion to dismiss on December 16, 2004.  (C. 2)

Horne was tried before a jury, beginning on May 16, 2005.  (R. 1-111)  On May 18, 2005, the jury found Horne

---

[1] References to the hearing on Horne's motion to dismiss, contained in the "Second Supplemental" record on appeal, are designated by "RS2".

guilty of the lesser included offense of assault in the
second degree.  (C. 2)

On July 14, 2005, Judge McLauchlin sentenced Horne
according to the Habitual Felony Offender Act ("HFOA")
based upon two prior felonies to twenty-two years'
imprisonment.  (C. 2; R. 123-124)  At the sentencing
hearing, Horne, through his attorney, objected to the
State's alleged failure to give sufficient notice of the
two prior felonies used to enhance his sentence.  (R. 112-
114)  Judge McLauchlin ruled that the State had given
sufficient notice of the two felonies.  (R. 114)  Horne
filed a motion for new trial on July 28, 2005, which Judge
McLauchlin denied after a hearing on August 19, 2005.  (C.
8-9; R. 125-142)  Horne timely filed a notice of appeal on
August 29, 2005.  (C. 87-88)


## STATEMENT OF THE ISSUES

1.   Is Horne's argument that his due process rights
were violated because the State lost potentially
exculpatory evidence without merit because he has failed to
show that the State acted in bad faith or that such

2

evidence was so critical to his defense that his trial was fundamentally unfair?

2.    Did the trial court abuse its discretion when it determined that Horne received adequate notice under the Habitual Felony Offender Act?

## STATEMENT OF THE FACTS

John Williams testified that, on January 15, 2004, he was visiting the house of the appellant, Gary Horne, where he played X-Box video games.  (R. 9-10)  Present at the house that day along with Horne and Williams were Immogene Kesha Paul, Horne's girlfriend; Shanice Horne, Horne's sister and the mother of Williams's son; Williams's son; and, Terrance Bar.  (R. 10, 52-53)

While Williams was playing video games with Horne, Williams's wife at the time, Christina Patterson Williams, arrived.  (R. 10-11,41)  After Paul accidentally pressed the "send" button when borrowing Williams's cell phone and hung up without saying anything, Christina thought her husband had called and went to Horne's house to check on him.  (R. 41-42, 69)  When she arrived, she angrily told Williams that "[i]t's time to go."  (R. 11-12)

3

While Williams looked for his keys and pager, Shanice, who felt that Williams had left her for Christina, hit him in the face.  (R. 11-12)  Williams and Shanice began "tussling" in the kitchen; Williams, in the process, grabbing Shanice to prevent her from hitting him again. (R. 12)  After they fell over the kitchen table and into a corner, Horne began pushing Williams.  (R. 13)  As Williams "rushed" Horne back into the refrigerator, Horne asked him "what the hell [he thought he was] doing."  (R. 13) Williams decided to leave and, as he was trying to get to his car, Shanice "kept trying to fight on [him]."  (R. 13) When he got into his car, Shanice tried to open the door. (R. 13)

After he finally was able to leave Horne's house, Williams saw Christina following him and Shanice following her.  (R. 14)  Thinking it would be a safe haven from the "foolishness" that had been taking place, Williams drove to Arrowhead Apartments where his mother lived.  (R. 14)  On the way he called Horne.  (R. 14)  While he thought things had calmed down between them, he told Horne that he thought it was "messed up the way [he] handled the situation."  (R. 14)  Horne then stated, "I'll fuck you up, nigger, you

4

don't know me," repeating what he was planning on doing to
Williams.  (R. 14)  When Williams responded, "You know I'll
beat your ass," Horne asked him where he was.  (R. 14)  Not
thinking Horne would actually come, Williams replied, "Come
to Arrowhead."  (R. 14)

After parking in the Arrowhead Apartments parking lot,
Williams noticed that Christina had parked in the adjacent
spot and Shanice parked in the closest available spot.  (R.
15)  Shanice, however, started her car again and pulled in
right behind Williams, blocking Williams from being able to
leave.  (R. 15)  Williams continued to sit in his car,
realizing that his mother did not want people there "acting
up."  (R. 16)  Williams then saw Horne's car "shoot up into
the apartment complex" and park in the spot Shanice had
initially parked in.  (R. 16)  As Williams got out of his
car and stood on the curb in front of Christina's car, he
noticed that Horne was carrying a gun.  (R. 16)  When
Williams stated, "You got a gun, you're tough now," Horne
began "talking smack," asking Williams, "What the fuck did
you have your wife come to my house for in front of my
sister?"  (R. 17)  When Horne pushed him, Williams fell
back and tried to swing back.  (R. 19)  As his hand grazed

5

Horne's chin, Horne shot Williams in his right side. (R. 19-20) Horne then stood over Williams, stating, "I should kill this fuck nigger." (R. 20) After Terrance Bar, who had arrived with Horne, said, "Come on, my nigger, let's go," they both ran from the scene. (R. 23)

Williams was taken to the Dale Medical Center where he received treatment for a week, including two surgeries. (R. 21) After having been shot he has suffered severe back pain as well as pain while urinating. (R. 22) Williams denied having any gun on the night he was shot and denied ever owning a 40-caliber Glock. (R. 27, 29)

## STANDARDS OF REVIEW

1.  Whether a trial court's denial of a motion to dismiss was error is reviewed under an abuse-of-discretion standard. Raper v. State, 584 So. 2d 544, 548 (Ala. Crim. App. 1991).

2.  Whether notice under the Habitual Felony Offender Act is reasonable should be left to the discretion of the trial judge, who is familiar with the surrounding circumstances. Connolly v. State, 602 So. 2d 452, 454 (Ala. 1992).

6

## SUMMARY OF THE ARGUMENT

1.   The State did not violate Horne's due process rights when it lost evidence which, according to Horne, was potentially exculpatory.  Unlike in the Brady[2] situation where the State fails to disclose exculpatory evidence, when the State loses evidence before its exculpatory value can be determined, a defendant must show either that the State acted in bad faith or that the lost evidence was so critical to his defense that his trial was fundamentally unfair.  Horne admits that no bad faith occurred in this case and fails to show that the lost evidence was so critical to his case that his trial was fundamentally unfair.

Horne claims that the preservation of a gun, bullet, and photographs might have proved his self-defense claim. Horne, however, failed to present any substantial evidence at trial that he acted in self-defense.  Indeed, the

---

[2] Brady v. Maryland, 373 U.S. 83 (1963).

7

undisputed evidence at trial showed that he was the initial aggressor in the confrontation leading to the shooting of the victim.  Horne has failed to even allege how the gun, bullet, and photographs could have established that he was not the initial aggressor.  Furthermore, the State presented overwhelming evidence unrelated to the lost evidence showing that Horne was not acting in self-defense when he shot Williams.  Accordingly, Horne has failed to show that his due process rights were violated when the evidence was lost.

2.   Horne received sufficient notice under the Habitual Felony Offender Act.  Not only was a presentence report listing the felonies relied upon to enhance his sentence available, but the trial court concluded from the circumstances surrounding the discussions between the parties that Horne and his attorney were aware of such prior felonies and that Horne did receive sufficient notice.

8

## ARGUMENTS

I.    **Horne's Argument That His Due Process Rights Were Violated Because The State Lost Potentially Exculpatory Evidence Is Without Merit Because He Has Failed To Show That The State Acted In Bad Faith Or That Such Evidence Was So Critical To His Defense That His Trial Was Fundamentally Unfair.**

Horne argues that the trial court erred in denying his motion to dismiss because the State violated his due process rights when it lost potentially exculpatory evidence.  Brief of the Appellant, pp. 10-25. Specifically, Horne argues that the State lost a bullet, gun, and photographs which, according to him, were crucial to his self-defense claim.  Id.  Because Horne failed to show that the State acted in bad faith or that the lost evidence was so critical to his defense that his trial was fundamentally unfair, however, he has failed to show that any due process violation occurred.

In arguing that his conviction is due to be reversed because the State lost potentially exculpatory evidence, Horne erroneously relies upon <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), in which the United States Supreme Court set the requirement that the State must disclose exculpatory evidence to a defendant.  Brief of the Appellant, pp. 13-

9

20.  In Arizona v. Youngblood, 488 U.S. 51, 55-58 (1988),

that Court distinguished the Brady situation from cases in

which evidence had been lost or destroyed before the

exculpatory value of such evidence could be determined.

While the Court acknowledged that the good or bad faith of

the State was irrelevant when the State failed to disclose

evidence that had been determined to have been material and

exculpatory, it emphasized that a different standard should

apply when the State failed "to preserve evidentiary

material of which no more can be said than that it could

have been subjected to tests, the results of which might

have exonerated the defendant."  Id. at 57.  As the Court,

quoting California v. Trombetta, 467 U.S. 479, 486 (1984),

explained, "[w]henever potentially exculpatory evidence is

permanently lost, courts face the treacherous task of

divining the import of materials whose contents are unknown

and, very often, disputed."  For this reason, the Court

held that the State was not required to preserve all

material that had any "conceivable evidentiary

significance" and that a defendant alleging that his due

process rights had been violated because of lost evidence

10

that was potentially exculpatory had to show that the police acted in bad faith.  488 U.S. at 58.

Although Alabama courts must follow the rule expressed in Youngblood when interpreting the federal due process clause and when setting a minimum standard for state constitutional rights, states are permitted to give defendants more constitutional protection and, indeed, the Alabama Supreme Court appears to have done so in Ex parte Gingo, 605 So. 2d 1237, 1241 (Ala. 1992).  Relying on Justice Stevens's concurring opinion in Youngblood, the Ex parte Gingo Court held that a defendant could show a due process violation even under certain circumstances where the State lost potentially exculpatory evidence without any bad faith.  Id. at 1241.  Quoting Justice Stevens's opinion, the Court stated that Gingo's case fell within the class of "cases in which the defendant is unable to prove that the State acted in bad faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair." Id., quoting Youngblood, 488 U.S. at 61 (Stevens, J., concurring in the result).  While this Court interpreted the Ex parte Gingo framework in Gurley v. State, 639 So. 2d

11

557 (Ala. Crim. App. 1993), the State respectfully disagrees with this Court's conclusion that the Alabama Supreme Court replaced the Youngblood one-step analysis with a three-part balancing test.  According to this Court in Gurley, "[t]his three-part analysis – which weighs culpability, materiality, and prejudice – is what the Alabama Supreme Court seems to have employed in Ex parte Gingo."  639 So. 2d at 567.   Rather than rejecting Youngblood and creating a balancing test, however, it appears that the Alabama Supreme Court added to Youngblood an alternative method under which a defendant could show a due process violation through lost potentially exculpatory evidence.  Not only could a defendant establish a due process violation by showing the State's bad faith, but also by showing that the lost evidence was "so critical to the defense as to make a criminal trial fundamentally unfair."  This analysis comports with this Court's conclusion in May v. State, 710 So. 2d 1362, 1369 (Ala. Crim. App. 1997), that the Ex parte Gingo Court "adopted" Youngblood and "additionally recognized that a defendant's right to due process can be violated when the loss or destruction is of evidence so critical to the defense that

12

its loss or destruction makes the trial fundamentally unfair." See also Ex parte Rieber, 663 So. 2d 999, 1014-15 (Ala. 1995)("We further note that even in those cases where evidence is actually lost or destroyed by the police and, thus, is unavailable for inspection and testing by the defendant, there is no due process violation unless the police acted in bad faith in handling the evidence or the evidence destroyed was so critical to the defense that its destruction renders the trial fundamentally unfair."). Accordingly, Horne can show that his due process rights were violated either by showing that the police acted in bad faith or by showing that the lost bullet, gun, and photographs were so critical to his defense that their being lost rendered his trial fundamentally unfair.

Because Horne has conceded that the State did not act in bad faith, he must show that the loss of the bullet, gun, and photographs rendered his trial fundamentally unfair. See Brief of the Appellant, pp. 16-17 ("While the loss of the potentially exculpatory evidence seems in this instance to be truly inadvertent, it was inarguably negligent."). Horne, however, has failed to show any non-speculative connection between the lost evidence and his

13

self-defense claim.  Indeed, proving such a connection is made problematical by the fact that Horne presented virtually no evidence at trial that he shot Williams in self-defense.  According to Horne, the 40-caliber bullet collected at the scene might match a gun allegedly sold by Williams shortly after he was shot.  Brief of the Appellant, pp. 10-12.  Horne's argument follows that the bullet, gun, and photographs, had they been preserved, would have supported his self-defense argument by showing that Williams was the one who brought a weapon to the scene and, in fact, was shot with his own gun.  Brief of the Appellant, pp. 12-13.

The evidence indicating that Williams sold a gun shortly after being shot, however, is questionable. Although John William Dassinger testified that Williams sold him a Glock-40 pistol in late January of 2004, he also testified that the pistol had been confiscated when he was arrested for possession of marijuana.  (R. 83-84, 87) Dassinger, who at the time of trial considered himself Horne's friend, was charged with possession of a controlled substance and an altered pistol.  (R. 87-88)  Most importantly, even if the jury were to believe that Williams

14

sold Dassinger the pistol, it would still have to speculate
if and how the pistol was used in the confrontation between
Horne and Williams.  Although Horne asks this Court to
infer that Williams brought the pistol to the scene and
that he was somehow shot with his own gun, there was no
evidence at trial from which the jury could even infer such
a conclusion.  The undisputed evidence at trial showed that
Williams was trying to avoid confrontation by driving to
his mother's apartment.  (R. 14)  The evidence,
furthermore, showed that Horne, provoked merely by a couple
of ill-advised comments made by Williams, followed Williams
to where his car had been blocked.  (R. 14)  Even if the
gun and bullet had been preserved and forensics had been
able to show that the gun was somehow used during the
confrontation, any inference that Williams confronted Horne
with the gun and that Horne somehow grabbed the gun from
Williams and shot him with it to avoid suffering serious
bodily injury is not only based upon pure speculation, but
contradicts the undisputed evidence presented at trial that
Horne was the initial aggressor.  As this Court stated in
Weaver v. State, 500 So. 2d 1278, 1279 (Ala. Crim. App.
1986):

15

> "To justify conduct through a claim of self
> defense the accused must neither provoke nor
> encourage the difficulty . . . ."  Finchum v.
> State, 461 So. 2d 37, 39 (Ala. Cr. App.
> 1984)(citations omitted).  "[O]ne who claims
> justification in the use of force must not have
> brought on the necessity of using it; he must have
> been entirely free from fault."  Commentary to
> Alabama Code 1975, § 13A-3-23."

Horne has failed to even allege how the preservation of the

evidence in question could have proved that he was not the

initial aggressor and that he merely shot Williams in self-

defense.

The present case is distinguishable from the situation

involved in Ex parte Gingo.  In that case, the State, in

its case-in-chief, relied upon test results of what was

believed to have been hazardous waste samples to prove

hazardous waste violations.  605 So. 2d at 1240.  Although

the samples were destroyed through no bad faith, because

they had been destroyed, Gingo had no way of refuting the

test results.  Id.  Accordingly, the Court held that,

because the samples were so critical that their loss

rendered Gingo's trial fundamentally unfair, Gingo's due

process rights had been violated.  Id. at 1241.  On the

other hand, the State in this case did not even attempt to

use the gun at issue in its prosecution of Horne and, even

16

without the gun, bullet, and photographs, the State

presented overwhelming evidence of Horne's guilt and lack

of self-defense.  Because Horne has failed to show that the

loss of this evidence rendered his trial fundamentally

unfair, he has failed to show that his due process rights

were violated.

## II.  The Trial Court Did Not Abuse Its Discretion When It Determined That Horne Received Adequate Notice Under The Habitual Felony Offender Act.

Horne argues that his sentence was illegal because he

did not receive proper notice under the Habitual Felony

Offender Act ("HFOA").  Brief of the Appellant, pp. 26-45.

Before the trial court may sentence a defendant under the

HFOA, the State is required to give the defendant prior

notice of its intention to proceed under the HFOA as well

as notice of the specific prior felonies it intends to

prove.  Connolly v. State, 602 So. 2d 452, 454-55 (Ala.

1992).  As Horne argues, the record appears to reflect that

the document entitled "Notification of Habitual Offender

Status" was mailed to Horne's attorney on the day of

sentencing and, accordingly, could not have provided timely

17

notice.  (C. 77-81; C3. 2)[3]  Because the trial court had sufficient basis upon which to determine that both of the notice requirements were satisfied, however, Horne's sentence should be affirmed.

The requirement that the State give a defendant notice of its intent to proceed under the HFOA may be satisfied by the service of a presentence report on a defendant listing that defendant's prior convictions.  Cooper v. State, 632 So. 2d 1342, 1344 (Ala. Crim. App. 1993).  Such a presentence report, the availability of which Horne does not dispute, is included in the record and lists the two felonies used to enhance his sentence.  (C. 55-60)  The State, furthermore, respectfully requests this Court to reconsider its holding in Cooper, 632 So. 2d at 1344, that such a presentence report cannot serve as the notice of the specific felonies to be used, especially when the report lists the felonies to be used and use of such felonies is mandatory when the State is aware of them.  See Connolly, 602 So. 2d at 455 (State under duty to attempt to prove prior felonies of which it becomes aware).

---

[3] References to the portion of the clerk's record contained in the "Supplemental 3rd" record are designated by "C3".

18

Even if the presentence report does not provide
adequate notice, however, the trial court had a sufficient
basis to conclude that Horne did, in fact, receive timely
notice.  At the sentencing hearing, the State's attorney
stated that:

> [I]n many discussions regarding a plea in this
> matter, it was known to the attorney in our
> discussions that Mr. Horne had two prior felonies.
> During the first day of trial we had discussions
> in which Mr. Nickson [Horne's attorney] was
> advised that the Defendant had two prior felonies.

(R. 113)  Although Horne disputes that any substantial plea
discussions ever took place, he has not disputed that the
prior felonies were mentioned during any discussions.
Indeed, he appears to concede that he, his attorney, the
State's attorney, and the trial court were all aware of the
two felonies to be used to enhance his sentence.  Brief of
the Appellant, pp. 38-43.

Rather than dispute his awareness of his prior
felonies, Horne argues that such awareness cannot serve as
evidence that he received proper notice under the HFOA.
Brief of the Appellant, pp. 38-43.  This Court, however,
has inferred numerous times from a defendant's or his
attorney's awareness of prior felonies that proper notice

19

had been given.  See Williams v. State, 616 So. 2d 374, 376

(Ala. Crim. App. 1993)("Here, at the sentencing hearing,

the appellant's trial counsel appeared to be familiar with

the appellant's prior convictions, and made specific

objections relating to the use of several of appellant's

prior convictions."); R.J.S. v. State, 905 So. 2d 26, 31

(Ala. Crim. App. 2004)("[O]ur review of the record reveals

that R.J.S. knew before the sentencing hearing that the

State intended to use this prior Indiana conviction because

his attorney introduced a copy of the pertinent statute

from Indiana and argued that R.J.S.'s Indiana conviction

did not constitute a felony under Alabama law."); Jones v.

State, 625 So. 2d 1167, 1168 (Ala. Crim. App. 1993)("The

appellant's trial counsel testified that both he and the

appellant were aware of the prior qualifying felony before

trial and that they had discussed at that time its possible

use by the State for impeachment purposes."); and Hobson v.

State, 625 So. 2d 1168, 1170 (Ala. Crim. App. 1993)("It

appears that the appellant was fully aware that the State

intended to proceed under the Habitual Felony Offender Act

and of what prior felony would be used to enhance his

sentence.").  Although the State's attempt at providing

written notice appears to have been untimely, oral notice is sufficient. Connolly, 602 So. 2d at 452. Indeed, such notice may be "informal". Berry v. State, 630 So. 2d 131, 132 (Ala. Crim. App. 1993). Furthermore, whether the notice is reasonable should be determined by the trial judge, who is familiar with the surrounding circumstances. The trial court in this case found that all parties, including Horne, were aware of his two prior felonies and that Horne had received proper notice under the HFOA. Accordingly, Horne's sentence should be affirmed.

## CONCLUSION

Based on the foregoing, Horne's conviction and sentence should be affirmed.

Respectfully submitted,

Troy King
*Attorney General*

John M. Porter
*Assistant Attorney General*

22

## CERTIFICATE OF SERVICE

I hereby certify on this 5th day of December, 2005, I served a copy of the foregoing on the attorney for Horne, by placing the same in the United States Mail, first class, postage prepaid and addressed as follows:

N. Tracy Nickson
2181 AA Cobbs Ford Road
Prattville, Alabama  36066


John M. Porter
*Assistant Attorney General*

ADDRESS OF COUNSEL:
Office of the Attorney General
Criminal Appeals Division
11 South Union Street
Montgomery, Alabama 36130-0152
(334) 242-7300

230151/85302-001

# Exhibit D

*Porter*
*85302*

DOCKET NUMBER: CR-04-2461

---

IN THE ALABAMA COURT OF CRIMINAL APPEALS

---

GARY HORNE,
     APPELLANT,

v.

STATE OF ALABAMA,
     APPELLEE.

---

From the Circuit Court of Dale County, Alabama
Case No. CC-2004-1220

---

REPLY BRIEF OF THE APPELLANT

---

N. TRACY NICKSON
COUNSEL FOR APPELLANT
2181 AA COBBS FORD ROAD
PRATTVILLE, ALABAMA 36066
(334) 285-1776



EXHIBIT
D

# TABLE OF CONTENTS

TABLE OF CONTENTS                                   2

TABLE OF AUTHORITIES                                3

SUMMARY OF THE ARGUMENT                             5

ARGUMENT                                            9

CONCLUSION                                         26

CERTIFICATE OF SERVICE                             28

## TABLE OF AUTHORITIES

**ALABAMA CASES**

Connolly v. State, 602 So. 2d 452 (Ala.1992)          26

Cooper v. State, 632 So. 2d 1342
(Ala. Crim. App. 1993)                                 6

Grissom v. State, 624 So. 2d 706
(Ala. Crim. App 1993)                                 11

Gurley v. State, 639 So.2d 557
(Ala. Crim. App. 1993)                                11

Hobson v. State, 625 So. 2d 1168
(Ala. Crim. App.)                                     21

Jefferson v. State, 645 So. 2d 313
(Ala. Crim. App. 1994)                                10

Jones v. State, 625 So. 2d 1167
(Ala. Crim. App. 1993)                                20

Nesbitt v. State, 531 So. 2d 37
(Ala.Cr.App.1987)                                     19

R.J.S. v. State, 905 So. 2d 26
(Ala. Crim. App. 2004),                               20

Williams v. State, 616 So. 2d 374
(Ala. Crim. App. 1993),                               19

FEDERAL CASES

Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333,
102 L.Ed.2d 281 (1988)                                    11

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194,
10 L.Ed.2d 215 (1963)                                     6

Giglio v. United States, 405 U.S. 150, 154
[92 S.Ct. 763, 766, 31 L.Ed.2d 104] (1972)               11

United States v. Bagley, 473 U.S. 667,
105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)                    10


STATUTORY AUTHORITY


Rule 26.6(b)(3), Alabama Rules
of Criminal Procedure                                    17


Rule 401, Alabama Rules
of Evidence                                              7

4

## SUMMARY OF THE ARGUMENT

By asking this Honorable Court to reverse its holdings in <u>Gingo</u> and <u>Cooper</u>, <u>infra,</u> the State implicitly admits that the conviction and the sentence from which Appellant appeals cannot be maintained under the terms of those holdings. Appellant will now reply to the brief of Appellee.

1.   Because the State lost potentially exculpatory evidence that it itself gathered, a fair trial under Alabama law was not possible, nor can a verdict against the Appellant be maintained.

The Appellant, tried on the charge of Attempted Murder, was convicted of Assault Second Degree, with the jury rejecting the State's contention that Appellant intended to murder anyone. This fact alone greatly magnifies the potential value of the evidence which the State concedes it lost if it could be shown to be exculpatory, which, given the ballistic nature of the exculpatory evidence and its permanent unavailability, is impossible. As will be shown, there is no requirement that Appellant prove bad faith on the part of the State in order to invoke the

due process protections afforded the Appellant under
Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10
L.Ed.2d 215 (1963. As will be reiterated, when the
exculpatory value of lost evidence cannot be
assessed, and in a verdict this disparate from the
crime charged, this should logically not work to the
State's benefit, as it was the State's negligence
which caused the exculpatory items to be lost despite
numerous pleas by the Appellant for the preservation
of the evidence.

2.   The State's adoption of the Trial Court's novel
and nebulous standard of "awareness" as sufficing for
the specifically defined prior notice required by the
statute regarding the invocation of the Habitual
Felony Offender Act (HFOA), and its further citation
of authority which it simultaneously asks this
Honorable Court to invalidate (Cooper v. State, 632
So. 2d 1342(Ala. Crim. App. 1993), is absolutely
devoid of merit. The record discloses the provision
of no notice whatsoever by the State of its intent to
invoke the HFOA until after the commencement of the

6

sentencing hearing. While the State argues that Appellant has "conceded" that it was aware of the two prior felonies, no such concession has ever been made, as the record clearly reveals. Again, no plea discussions ever took place at which the State's representative at sentencing was even present, and certainly none at _any_ time at which any specific prior felonies were discussed. The credibility of State's memory regarding any aspect of the notice requirement is automatically suspect, considering it erroneously stated in open court that it sent notice to Appellant on a Monday, (TR-113), when actually it was not filed until Tuesday (CR-081), and mailed the following Wednesday. Supplemental 3rd Transcript-2.

Moreover, pursuant to Rule 410, Alabama Rules of Evidence, the substance of plea negotiations cannot by used against the Appellant. This was discussed at length in Appellant's initial brief.

However, Appellant maintains that specific felonies were never discussed at any plea negotiations, which plea negotiations never took place with any seriousness, and maintains that the

first notice it received of either the prior felonies

or the State's intent to invoke them occurred well

into the sentencing hearing. As the record clearly

and uncontrovertedly shows, no notice whatsoever of

the State's intent to enhance under the HFOA was ever

provided, in any form, at any time, prior to the

sentencing hearing.

## ARGUMENT

1.   It is undisputed that the State lost evidence which it itself collected in its prosecution of the Appellant. It is further undisputed that Appellant specifically implored the State to preserve this evidence, recognizing that the evidence could exonerate him completely.

The State in its brief dwells at inordinate length upon the facts of the case as adduced at trial. The only material denouement of this recitation relevant to the current inquiry is that the jury flatly rejected the State's charge of attempted murder, which both renders the State's tautological reference throughout its brief to the "overwhelming evidence" adduced, dubiously unsupported; and, perhaps more importantly, also renders the lost evidence of ineffably greater significance in creating the possibility of a different verdict. "Evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

9

proceeding would have been different.'" <u>United States</u>

<u>v. Bagley</u>, 473 U.S. 667, 682, 105 S.Ct. 3375, 87

L.Ed.2d 481 (1985).

    The State apparently and curiously characterizes

crime scene photographs, taken by the State on the

night of the act in its prosecution of the case, as

non-crucial evidence. The inaccuracy of this

appraisal seems self evident; and the potential value

to the defense of the photographs, the bullet and the

gun have been shown throughout the record in this

case. Reference is hereby made to Appellant's

"Motion to Dismiss," CR-95, "Motion to Vacate" CR-77,

and generally to the initial brief filed by Appellant

in this case.

    At trial the only eyewitnesses testifying that

Appellant was the initial aggressor were John

Williams (TR-19), who was shot, and his wife

Christina Patterson. TR-43. Williams's testimony was

predictable, leaving his wife's more subject to

legitimate impeachment. Photographs showing the

darkness of the scene would have almost certainly

aided in this impeachment. . <u>Jefferson v. State</u>, 645

So. 2d 313 (Ala. Crim. App. 1994), holds "Impeachment evidence ... as well as exculpatory evidence, falls within the *Brady* rule."

However, the inquiry does not end there regarding the photographs, which may have disclosed other exculpatory evidence. As with all the items, their exculpatory effect can never be adequately assessed, leaving the question of the cruciality of the evidence perennially unanswerable. It is not fair to answer that it could <u>not</u> be crucial, thus rewarding the State's negligence, and depriving the Appellant of a defense which, had the State preserved and disclosed, could have in all likelihood exonerated hem completely.

Fortunately, under the holdings in <u>Gurley v. State,</u> 639 So.2d 557 (Ala. Crim. App. 1993), <u>Jefferson v. State,</u> 645 So. 2d 313 (Ala. Crim. App. 1994), <u>Grissom v. State</u>, 624 So.2d 706 (1993), <u>Ex parte Gingo,</u> 605 So.2d 1237 (Ala. 1992), <u>Arizona v. Youngblood</u>, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), <u>Brady v. Maryland</u>, <u>supra</u>, and <u>Giglio v. United States,</u> 405 U.S. 150, 154 [92 S.Ct. 763, 766,

31 L.Ed.2d 104] (1972), among others, the loss of the evidence does <u>not</u> work to the State's advantage, and indeed precludes a verdict against the Appellant. The holdings in these cases are more meticulously parsed and concatenated to the facts of the instant case within Appellant's initial brief.

The Appellant respectfully submits that every case cited by the Appellee in its brief unambiguously supports the foreclosure of a verdict against the Appellant, and demands reversal of the current conviction.

The State argues that no evidence at trial was presented from which a jury could even infer the conclusion that Williams was shot with his own gun .Brief of the Appellee, pages 15-17. The jury clearly found Appellant liable for a much less serious charge for <u>some</u> reason(s), and in fact the record is full of evidence tending to show that Williams was the initial aggressor. Although unnecessary to a resolution of the <u>Brady</u> issue before this Honorable Court, Appellant will, in brief response to the tendentiously truncated recitation of

trial testimony by the Appellee in its brief, clarify what the record also shows. The record reveals that Williams had tussled with Appellant's sister inside Appellant's own home, and that Williams grabbed Shanice Horne by the throat. (Testimony of Shanice Horne, TR-62; testimony of Imogene Paul, TR-73.). The record further shows that Williams told Appellant, "I'm shooting you, and if you don't hurry up and get over here by the time my Mom gets home, I'm going to shoot this bitch in the head." TR-76. There was ample evidence presented from which the jury could infer that Williams was of a violent predisposition, and apparently it did so infer to some extent.

Furthermore, John William Dassinger testified he purchased a "Glock-40" from Williams after the shooting (Second Supplemental Transcript-9, 10) and further that he had been trying to purchase it for some time when the alleged victim suddenly offered it to him for one hundred dollars (Second Supplemental Transcript-10). Investigating law enforcement officers Rex Tipton and Martin Spears testified that "the scene was photographed and evidence was

collected by [Agent Martin] Spears." Second
Supplemental Transcript-1. The evidence which was
collected consisted of a what appeared to the officer
to be a .40 caliber bullet (Second Supplemental
Transcript-5-6, 12), a spent .40 caliber shell casing
(Second Supplemental Transcript-12), and photographs
of the scene. (Second Supplemental Transcript-13). It
is not an abstruse or farfetched theory that Williams
was shot with his own gun, the same .40 caliber
handgun he practically gave to Dassinger just after
the incident, who had been begging him to buy it for
a long time.  Clearly this testimony strongly
supports the Appellant's self-defense claim. Again,
if it could have been shown that the bullet recovered
from the scene matched the gun sold to Dassinger by
Williams after the shooting, the Appellant would
almost certainly been acquitted, a prediction further
evidenced by the jury's conviction of Appellant of an
offense closer in class to a misdemeanor than to the
Class A offense for which he was tried.

     That the theory of self defense or defense of
another was seriously considered by the jury is

revealed by the letter from juror Andrew McCray, CR-63; this reference is being made for the sole purpose of solidly refuting the State's claim that there was no evidence of self-defense presented at trial.

But more importantly and obviously, the fact that the other evidence wasn't presented is because the State lost it; the state lost evidence which it gathered, processed, and had in its possession, and moreover lost it despite Appellant's pleas for its preservation. While Appellant fully concedes that the loss in this case appears to have been truly inadvertent, reality demands the recognition that, were this conviction to be affirmed, convenient "loss" of potentially exculpatory evidence, gathered by the State itself, could become a disturbingly frequent occurrence in other unscrupulous quarters. The holdings in the controlling cases cited by the parties act as a brake on this eminently conceivable scenario.

At any rate the Appellant is not required, under the authorities cited, to prove that the lost evidence would have with absolute certainty

15

exonerated him completely. In this case that can never possible, as the evidence is lost and therefore not available for ballistics or forensic examination. But it may well have, and is thus brought within the proper cruciality standard. The State thought the evidence was important enough to collect and process, and again, Appellant beseeched that it be preserved.

The fact that the State didn't use the items it lost in its case-in-chief, as Appellee argues at pages 16 and 17 of its brief, is totally without merit. How could it use them after it lost them? This fact, though, has nothing to do with due process considerations, predicated on the holdings in the cases cited by both Appellant and Appellee, that foreclose an adverse verdict in this case and demand a reversal of the Appellant's conviction where potentially exculpatory evidence is not made available to the defendant.

Aside from this reply, Appellant relies squarely upon the arguments advanced in his original brief.

2. Rule 26.6(b)(3)(ii), Alabama Rules of Criminal
   Procedure, states: "At a reasonable time prior to
   the [sentencing] hearing, the defendant shall be
   given notice of the prior conviction or
   convictions upon which the state intends to
   proceed."

No notice whatsoever was provided to the
Appellant in this case, as is clearly revealed in the
record and thoroughly explored by the Appellant in
his original brief. Again, the cases cited by the
Appellee in its brief only support remand of this
case to the trial court for proper sentencing.

The State argues at page 18 of its brief that
the trial court had sufficient basis from which to
determine that notice requirements were satisfied.
Appellant has twice implored the Trial Court to state
what that basis is, and all requests have been
denied. TR-142, CR-91.

The state argues that the holding in Cooper v.
State, 632 So. 2d 1342 (Ala. Crim. App. 1993) permits
service of a presentence report upon a defendant to
substitute for notice as required under this statute.

17

This is flatly wrong, and at any rate no service of such a report was made in the instant case. Cooper actually holds,

"We do not believe that the presentence report contained in the record, which lists prior convictions, amounted to sufficient notice of the of the felony convictions that the state intended to prove at the sentencing hearing.  While we are aware of our holding in Nesbitt v. State, 531 So.2d 37 (Ala.Cr.App.1987), that a defendant's receipt of a presentence report constitutes notice of the state's intent to proceed under the Habitual Felony Offender Act, we are not willing to extend that holding to allow the presentence report to supply sufficient notice of the specific prior convictions upon which the state intends to rely." Id at 1346.

Creation of a presentence report by one state department, which the department is under no duty to "provide" to a defendant, cannot through the most tortuous reasoning be construed as notice by the state of its intent to enhance on specific prior felonies. This is the common-sense result of the holding in Cooper.

The State also adopts the trial court's reasoning that, because Appellant has never denied

18

the felonies, this silence somehow suffices for prior notice as required by the statute. The fallacy of this reasoning is consummate. It was not proper for the notice of intent to enhance to be sprung upon the Appellant at sentencing hearing in the first place (TR-113), and doubly improper to seek to somehow use his counsel's objection, which is all the record shows, as some kind of implied, tacit admission. Had the Appellant been afforded prior notice of the State's intent to use specific felonies to enhance, as the law prescribes, then he would have been able to respond.

The cases cited by Appellee are either inapposite to the facts of the instant case, overruled by subsequent decisions, or support the Appellant.

In Williams v. State, 616 So. 2d 374 (Ala. Crim. App. 1993),cited by Appellee at page 20 if its brief, it appears this Court found some oral notice to have been provided. No oral notice was provided here, and the only "evidence" that there was such oral notice was provided by a representative of the State with

whom Appellant's counsel never discussed any prior felonies or entered into any cursory plea negotiations. (TR-113).

In R.J.S. v. State, 905 So. 2d 26 (Ala. Crim. App. 2004), cited by Appellee at page 20 if its brief, the defense attorney introduced documents which revealed his knowledge of the state's intent to use a specific foreign felony conviction. In this case, Appellant had no prior notice whatsoever of the specific felonies with which he was ambushed, as is clearly revealed in the record in this case. All the Appellant did was object at their surprise introduction. TR-112,113.

The citation by the State of Jones v. State, 625 So. 2d 1167 (Ala. Crim. App. 1993), cited by Appellee at page 20 if its brief, is unfathomable. In that case appellant's counsel testified regarding confidential attorney-client discussions at which prior felonies were discussed, which this Court found to imply notice. No such testimony was provided by the instant Appellant's trial counsel.

The facts and holding in the case of Hobson v. State, 625 So. 2d 1168 (Ala. Crim. App.), cited by Appellee at page 20 if its brief, are even more remote from those of the instant case. In that case this Honorable Court recited the facts as follows: "The record reflects that the State served the required notice on the appellant on June 17, 1992. The appellant argues that he did not receive the notice until June 19, 1992. The appellant was sentenced on June 22, 1992." Id at 1168.

In the instant case, as has been iterated and reiterated, notice was mailed on the day of sentencing, and was not received by Appellant until two days after sentencing, not two before.

Appellant does not dispute that cases may be interpreted to hold that oral notice, even informal notice, may suffice. In the instant case there was no notice whatsoever provided to the Appellant prior to sentencing. Testimony that there was oral notice came from a state's representative whom, it is undisputed, was never present when any "notice" was given, and with whom no prior felonies were ever discussed. The

21

State has never contended that Mr. Smith was ever at any of these "plea negotiations" of which he testified, nor has it disputed Appellant's assertion that he was most certainly not present. To the extent that the trial court relied on this misleading representation cited by Appellee at page 19 of its brief, in its decision, the decision is clearly due to be reversed. All of this is reflected and uncontradicted in the record.

Indeed, if the state met its notice requirement at "plea negotiations," why belatedly mail a written notice at all?

Appellee argues that "[Appellant] appears to concede that he, his attorney, the State's attorney, and the trial court were all aware of the felonies used to enhance his sentence. Brief of the Appellant, pp.38-43." Appellee's brief, page 19. Frankly Appellant is nonplussed by this bizarre remark, as nothing in his brief concedes anything of the kind.

Appellant repeatedly and earnestly implored the Trial Court to specify, as to time and form, the prior notice it found to have been provided. TR-142,

22

CR-91. These requests were denied. The Order (CR-50) was exhaustively discussed in Appellant's initial brief. Cooper unequivocally rejects as proper prior notice of intent a presentence report, which the Order mentions, and the general "awareness" found by the Trial Court and adopted by the State finds no support in any case law cited by either of the parties to this action. As stated earlier, to the extent this "awareness" was based on representations made by a representative of the State who was never present at any place where informal oral notice could have conceivably transpired, the Order is due to be reversed.

The Order of the Trial Court found that "the Defendant was aware that he had two prior felony convictions. This has never been disputed." CR-085. Again, Appellant was surprised by the introduction at the sentencing hearing. All he could do was object; when exactly was he supposed to dispute the allegations? Again, the first time Appellant or his counsel saw any document listing the certified felonies was upon receipt of the record on appeal in

23

this case.  Requiring an on-the-spot admission or
denial of the allegations is proscribed by the terms
of the statute itself, which affords a defendant time
to investigate and defend.

The Order goes on to state, "In this case, at
the time of the Sentencing Hearing the State, the
Defendant, and the Defendant's attorney, and the
Court were aware that the Defendant had two prior
felony convictions and this has never been disputed.
Therefore, the Defendant was properly sentenced as an
Habitual Offender." CR-085. Again, from where the
trial court found this awareness to have originated
was not disclosed, despite Appellant's pleas.
Although awareness may settled into the consciousness
of the Trial Court during the sentencing hearing
after the state handed him a document listing claimed
prior felonies (which document has never been
provided to Appellant), there was certainly no such
awareness upon the part of the Appellant, whose
awareness is the singular concern under the statute.
Nor does the record reflect any such "awareness."

As the record clearly and uncontrovertedly shows, no notice whatsoever of the State's intent to enhance under the HFOA was ever provided, in any form, at any time, prior to the sentencing hearing. The finding of notice by the Trial Court where none existed is a palpable abuse of the Trial Court's discretion.

## CONCLUSION

By asking this Honorable Court to reverse its holdings in Gingo and Cooper, supra, the state implicitly admits that the conviction and the sentence from which Appellant appeals cannot be maintained under the terms of those holdings.

There are two ineluctable conclusions to be drawn from the record in this case that the state lost potentially exculpatory evidence which it itself gathered and processed; and no prior notice whatsoever was provided to the Appellant of the State's intent to use prior convictions to enhance his sentence. The resolutions of the issues raised by these conclusions are governed by clear, unambiguous Alabama and federal law. The Trial Court's failure to dismiss was plain error, and finding proper HFOA notice where none whatsoever is disclosed in the record was an palpable abuse of the discretion afforded the court in Connolly v. State, 602 So. 2d 452 (Ala. 1992).

The Appellant, who is incarcerated, prays that this Honorable Court will merely apply the law as

dictated in the cases cited by Appellant and Appellee in their respective briefs, and, consequently, will reverse the conviction and render a judgment of acquittal (as the lost evidence is lost forever, making a new trial superfluous); while this would of course render resolution of the remaining notice issue academic, Appellant nevertheless and further prays that this Honorable Court will remand the case to the Trial Court for proper sentencing in the range prescribed by law for a single Class C felony conviction.

Respectfully submitted this the ____ day of _____, 2005.

N. TRACY NICKSON (NIC026)
COUNSEL FOR APPELLANT
2181 AA COBBS FORD ROAD
PRATTVILLE, ALABAMA 36606
334) 285-1776

DOCKET NUMBER: CR-04-2461

IN THE ALABAMA COURT OF CRIMINAL APPEALS

GARY HORNE,
    APPELLANT,
v.

STATE OF ALABAMA,
    APPELLEE.

---

From the Circuit Court of Dale County, Alabama
Case No. CC-2004-1220

RELPY BRIEF OF THE APPELLANT

---

CERTIFICATE OF SERVICE

---

    I hereby certify that a copy of the foregoing document has been served upon the following parties to the action by placing a copy in the U.S. Mail, first class, postage pre-paid on this _____ day of _____, 2005.

Office of the Attorney General
Criminal Appeals Division
Alabama State House
11 South Union Street
Room 410
Montgomery, AL 36310

N. Tracy Nickson

28

# EXHIBIT

# E

*Porter 85302*

Notice: This unpublished memorandum should not be cited as precedent. See Rule 54, Ala.R.App.P. Rule 54(d), states, in part, that this memorandum "shall have no precedential value and shall not be cited in arguments or briefs and shall not be used by any court within this state, except for the purpose of establishing the application of the doctrine of law of the case, res judicata, collateral estoppel, double jeopardy, or procedural bar."

# Court of Criminal Appeals

State of Alabama

Judicial Building, 300 Dexter Avenue

P. O. Box 301555

**Montgomery, AL 36130-1555**



**H.W."BUCKY" McMILLAN**
Presiding Judge
SUE BELL COBB
PAMELA W. BASCHAB
GREG SHAW
A. KELLI WISE
Judges

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk
(334) 242-4590
Fax (334) 242-4689

## MEMORANDUM

CR-04-2461                          Dale Circuit Court CC-04-1220

<u>Gary Horne v. State of Alabama</u>

COBB, Judge.

Gary Horne was indicted by a Dale County grand jury for attempted murder, a violation of §§ 13A-6-2, -4-2, Ala. Code 1975. Horne was charged with shooting John Williams with a handgun. Horne was tried before a jury and the jury found Horne guilty of the lesser-included offense of assault, second degree. The trial court sentenced Horne as a habitual offender with two prior felonies to a 22-year term of imprisonment. The trial court further ordered Horne to pay restitution to the victim and to pay a $100 assessment to the victims compensation fund. This appeal follows.

Horne does not challenge the sufficiency of the evidence,

1



EXHIBIT

*E*

so a summary of the evidence presented at trial will suffice. The evidence tended to show that, on January 15, 2004, John Williams went to Gary Horne's apartment to play video games, which they often did together. Horne's sister, Shanice, also came to the residence, along with Horne's girlfriend, Kesha Paul. Shanice and Williams had a child together, and Shanice brought their son so Williams could visit with him. The record suggests that, sometime before this incident, even though Williams and Shanice had ended their relationship and Williams had married Christina and had children with her, Williams and Shanice continued to have an intimate relationship. At some time during the evening, Shanice and Kesha borrowed Williams's cell phone and placed a call to Williams's wife, who came to the apartment and told Williams he needed to leave. When Williams began to leave Horne's apartment, Shanice hit him and the two began "tussling into the kitchen." (R. 12.) Horne intervened and began pushing Williams. Williams left the apartment.

Williams drove away in his vehicle and his wife, Christina, followed him in her vehicle; the Williams's baby was riding with her. He noticed that Shanice was following them in her own vehicle. Williams decided to go to his mother's residence because, he said, his mother "don't allow no foolishness at her house." (R. 14.) Williams said that, while he was driving, he telephoned Horne to tell him that he thought that Horne had not handled the situation well. Williams said that Horne threatened to hurt him, to which Williams replied that he could beat Horne in a fight. Horne asked where Williams was, and Williams told him he was at his mother's. Williams had parked his car in the parking lot of his mother's apartment complex and he noticed that Shanice had pulled her vehicle behind his and blocked his vehicle. Horne arrived a few minutes later.

After Horne arrived, Williams got out of his car and stood in front of Christina's car. Horne had a gun tucked in his pants, Williams said. Horne was "talking smack" and "mouthing off" to Williams for a minute or two, and Williams told Horne that he was acting tough now that Horne had a gun. Williams asked Horne what he wanted to do, and Horne pushed him. Williams acknowledged that he attempted to strike Horne in return, and Horne shot him in the side. Williams denied having a gun.

2

Shanice Horne and Christina Williams provided testimony about the shooting that substantially corroborated the testimony Williams gave. Shanice testified that she had been angry that Christina came to Horne's house, and then she was angry that Williams left without finishing the argument, so she followed him. Shanice said that she did not see Horne shoot Williams because she had left her car to walk across the street to call her mother.

Kesha Paul, Horne's girlfriend, testified for the defense. She stated that, after Williams left Horne's house, Williams called Horne, threatened to shoot Shanice, and told Horne he needed to come get his sister. She also said that Horne did not own a gun, but that Williams had a gun in his possession that night. Finally, John Dassinger, a friend of Horne's, testified that, in late January 2004, he bought a Glock .40 caliber pistol from Williams. That pistol was in the possession of the police department because officers seized it after Dassinger was arrested for possession of marijuana and a controlled substance as well possession of a pistol without a permit and possession of a pistol with altered serial numbers.

I.

Horne first argues that his conviction must be reversed because the State lost potentially exculpatory evidence. Specifically, he argues, the State lost a .40 caliber bullet and shell casing and crime scene photographs that he might have been able to use to support his self-defense claim.

Prior to trial, Horne filed a motion for discovery and a motion to compel production of exculpatory evidence. He later filed a motion to dismiss based on a violation of Brady v. Maryland, 373 U.S. 83 (1963), due to the loss of the bullet, shell casing, and photographs. Testimony at that hearing established that the shell casing was collected on the night of the shooting and photographs were taken at that time. Residents of the apartment complex contacted the police a day or two after the shooting and reported that they had found a bullet in the parking lot near where the shooting occurred. An officer retrieved the bullet, which he said appeared to be a .40 caliber. Testimony further established that, at the time of the shooting, the police had just moved into new offices and they transferred evidence to the new evidence room

3

under the supervision of an agent.  The sole agent in charge of the evidence became too overwhelmed and could not keep track of the evidence, so the police department again began to maintain the evidence they had obtained.  None of the officers who handled the evidence knew where it was located.  Although the record does not contain a written order denying the motion to dismiss, the trial court obviously denied the motion as the case proceeded to trial.   The State did not refer to any of the missing evidence in its case-in-chief.  The parties agree that the police did not act in bad faith with regard to the lost evidence, and that the evidence was lost through negligence or inadvertence only.

Horne argues that the lost evidence was potentially exculpatory.  He claims that the .40 caliber bullet might have matched the .40 caliber weapon that John Dassinger testified he purchased from the victim after the shooting, and that the testing might show that the victim was shot with his own gun and not a gun that Horne brought to the fight.  He argues that the lack of bad faith in the loss of the evidence is immaterial because the evidence was crucial to his defense. Horne bases much of his argument on cases such as Brady v. Maryland, involving evidence that was suppressed -- whether intentionally or inadvertently -- by the police, but the State correctly notes that this case is governed by Arizona v. Youngblood, 488 U.S. 51 (1988), and its progeny, because the evidence here was lost before its exculpatory value could be determined and because the State did not rely on the lost evidence in its case-in-chief.  We have previously recognized these important distinctions when reviewing cases in which evidence has been lost or destroyed.  Holley v. State, 651 So. 2d 50 (Ala. Crim. App. 1994), presents the exact issue now before us.  Writing for the majority, Judge Bowen stated:

> "The appellant claims that he is entitled to a new trial because the State lost a hair sample that had been removed from his automobile during a search of that vehicle after he was arrested and after the vehicle was impounded.  Citing Gurley v. State, 639 So. 2d 557 (Ala.Cr.App. 1993), he argues that the loss of the hair sample, which he says could have proved his innocence, rendered his trial fundamentally unfair.

4

"This case is different from <u>Gurley</u> and from <u>Ex parte Gingo</u>, 605 So. 2d 1237 (Ala. 1992), cert. denied, 506 U.S. 1049, 113 S.Ct. 967, 122 L.Ed.2d 123 (1993), upon which <u>Gurley</u> relied, because in this case the State did not use or allude to the hair sample in its case-in-chief. In <u>Gurley</u>, the State presented oral testimony about a charred object alleged to have been the victim's wallet, which had been lost by the time of trial, to establish the theft component of a capital indictment. In <u>Gingo</u>, the prosecution used the results from tests conducted on allegedly hazardous waste materials, which had been destroyed by the time of trial, to establish a crucial element of the State's case. Both <u>Gurley</u> and <u>Gingo</u> involved the State's use, at trial, of evidence that was unavailable for examination or testing by the defense.

"In this case, the hair sample was apparently lost before it could be subjected to forensic testing. It was not available to the defense, but it was also not available to or used by the State. The lost evidence in the appellant's trial is analogous to the missing evidence in <u>Arizona v. Youngblood</u>, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

"In <u>Youngblood</u>, the police failed to preserve a sodomy victim's semen-stained clothing, but the State did not introduce any evidence pertaining to the clothing in its case-in-chief. The Supreme Court held that 'unless a criminal defendant can show bad faith on the part of the police, the failure to preserve potentially useful evidence does not constitute a denial of due process of law.' 488 U.S. at 58, 109 S.Ct. at 337. The appellant's case falls squarely within the rule of <u>Youngblood</u>.

"The appellant did not claim at trial and he does not claim on appeal that the State's loss of the hair sample was the result of bad faith. Therefore, the trial court did not err by failing to order an investigation into the disappearance of the

5

evidence. See <u>Youngblood</u>, supra. Furthermore, even
if it had been determined that the hair sample did
not match [the victim's] hair, that fact would not
have precluded the appellant's guilt as [the
victim's] kidnapper. The appellant was not entitled
to a new trial on this ground."

651 So. 2d at 51-52.

This case is governed by the holdings in <u>Youngblood v.
Arizona</u> and in <u>Holley</u>. Horne is not entitled to any relief
due to the inadvertent loss of evidence which the prosecution
did not use or allude to at trial.

## II.

Horne next argues that the trial court abused its
discretion when it sentenced him pursuant to the Habitual
Felony Offender Act ("HFOA"), §13A-5-9, Ala. Code 1975,
because the State failed to provide him with the requisite
prior notice of its intent to proceed under that statute.
Horne raised this claim below and the trial court rejected it,
finding that Horne had been aware of the State's intent to
seek sentencing under the HFOA and that the notice requirement
had been satisfied.

The sentence hearing in this case was set for July 13,
2005, approximately two months after the jury found Horne
guilty of second-degree assault. The State mailed defense
counsel written notice of its intent to rely on the HFOA, but
the record reflects that the notice was postmarked on July 13,
2005, so Horne obviously did not receive the written notice
prior to sentencing. (3d Supp. R. 2, 6.) When the State
offered certified copies of Horne's prior convictions at
sentencing, Horne objected on grounds that he had not received
any prior notice. The prosecutor stated that the written
notice had been filed a day or two before sentencing[1], and
also stated, "in the many discussions regarding a plea in this
matter, it was known to the attorney in our discussions that
Mr. Horne had two prior felonies. During the first day of
trial we had discussions in which [defense counsel] was

_____

[1]The notification was filed on July 12, 2005. (C. 81.)

6

advised that the Defendant had two prior felonies ...." (R. 113.) Horne said he had not received any prior notice and, he said, "I still have not received any," (R. 113), apparently indicating that he was awaiting written notice. The trial court found that Horne had two prior felony convictions, one for hindering prosecution, first degree, and the other for robbery, second degree, and that he had been represented by counsel in both cases. Horne again objected based on the State's failure to notify him of its intent to rely on the HFOA provisions. The prosecutor stated that defense counsel:

> "has known that he had these two prior felonies before the trial even started. As part of our plea discussions, he's well aware of the fact his client had prior convictions and that we intended to use them. If he wanted to investigate them, he's had adequate time to do so."

(R. 114.) The trial court determined that the State had met its obligation to give notice of its intent to rely on the HFOA and of the two convictions it would rely on.

After the trial court sentenced Horne pursuant to the provisions of the HFOA, Horne filed a motion to vacate the sentence. (C. 77-80.) He argued that he had not received written notice of the State's intent to proceed under the HFOA until after sentencing. In that motion, he argued for the first time that during plea negotiations, the State did not mention which prior convictions it would use to enhance his sentence. The trial court held a hearing on this motion and on a motion for new trial. Horne argued at that hearing that he did not receive written notice of the State's intent to proceed under the HFOA until after sentencing. He argued, "The law and the rule requires (sic) that prior written notice be given of the State's intention to enhance under the H.F.O.A., which this attorney did not get, nor did the Defendant get either." (R. 127.)(Emphasis added.)

The trial court denied the motion to vacate Horne's sentence. The court noted, first, that the probation report filed on July 8, 2005, listed Horne's two prior felonies for robbery and hindering prosecution. The court noted that, on July 12, 2005, the State filed notice of its intent to proceed under the HFOA. Finally, the court stated that it had

7

determined that Horne was aware that he had two prior felonies convictions and that that had "never been disputed." (C. 85.)

On appeal, Horne continues to argue that the State failed to notify him in writing prior to sentencing of its intent to rely on the HFOA or of the prior convictions it intended to prove. He also argues that he received no oral notice prior to the sentencing hearing.

The Alabama Supreme Court has stated:

"The HFOA requires enhanced punishment for repeat felony offenders. Ala. Code 1975, § 13A-5-9. See, e.g., McLester v. Smith, 802 F.2d 1330 (11th Cir.1986). For the HFOA to apply to a particular sentencing, the State must give reasonable notice, prior to the sentencing hearing, of the State's intention to proceed under the HFOA. Rule 26.6(b)(3), Ala.R.Crim.P. (formerly Temp. Rule 6(b)(3)(ii), Ala.R.Crim.P.). Written notice is not required; oral notice will suffice. Garrett v. State, 480 So. 2d 58 (Ala.Crim.App. 1985). Determination of the 'reasonableness' of the notice period is left to the trial judge's discretion, because the trial judge is present and is familiar with the circumstances of the case. Humber v. State, 481 So. 2d 452 (Ala.Crim.App. 1985)."

Connolly v. State, 602 So. 2d 452, 454 (Ala. 1992).

The State concedes that its written notice was mailed to defense counsel on the day of sentencing and could not have provided timely notice. (State's brief at p. 17.) To the extent Horne contends that the HFOA requires written notice, however, the law is clearly otherwise. E.g., Connolly, supra; Perry v. State, 861 So. 2d 1, 4 (Ala. Crim. App. 2002). The State argued at sentencing, and defense counsel did not dispute at that time, that during plea negotiations, the State informed Horne that it intended to invoke the HFOA and to prove the two prior felonies for robbery and hindering prosecution. Thus, the record supports the trial court's determination that Horne had received oral notice before trial of the State's intent to invoke the HFOA and of the two prior felonies it would attempt to prove. Therefore, as the trial court correctly determined at the sentencing hearing, the

8

State's oral notice was adequate.  Horne is not entitled to
any relief on this claim.

    For the foregoing reasons, the judgment of the Circuit
Court of Dale County is affirmed.

    AFFIRMED.

    McMillan, P.J., and Baschab, Shaw, and Wise, JJ., concur.

9

# EXHIBIT

# F

# IN THE ALABAMA COURT OF CRIMINAL APPEALS

Gary Horne
  Appellant,
    vs.
State of Alabama
  Appellee.

\*
\*
\*
\*

Case No. CR-04-2461

## VERIFICATION OF MAILING

I hereby verify that on the 24th day of August, 2006, I have placed a copy of the above BRIEF and APP-LICATION for REHEARING in the Institutional Mailbox, via U.S. Mail, postage pre-paid and properly addressed to Troy King, Attorney General, 11 South Union St., Montgomery, AL 36130 and Lane Mann, Clerk, 300 Dexter Ave., Montgomery, AL 36104.

I verify that pursuant to Houston v. Lack, 487 U.S. 266, 101 L.Ed.2d 245, 108 S.Ct. 2379 (1988), Ex parte Powell, 674 So.2d 1258 (Ala.1995) and Ex parte Wright, 860 So.2d 1253 (Ala. 2002), these three (3) witnesses saw me do so.

Gary Horne

WITNESSES:

Kenneth C. Powell
KENNETH C. POWELL #187215

Henry Marshall
Henry Marshall, #137996

Elmore Nichols Jr.
Elmore Nichols, Jr.

EXHIBIT
F

CR-04-2461

IN THE ALABAMA COURT OF CRIMINAL APPEALS

Gary Horne
Appellant,

vs.

State of Alabama
Appellee.

_____

ON APPEAL FROM THE CIRCUIT COURT OF

DALE COUNTY, ALABAMA; CASE NO. CC04-1220

_____

Rule 39 (d)(5) Motion
AND
BRIEF IN SUPPORT
OF
APPLICATION FOR REHEARING

Gary Horne #180206
7A-62
Easterling Correctional Fac
200 Wallace Drive
Clio, Alabama 36017

Pro-se:

# IN THE ALABAMA COURT OF CRIMINAL APPEALS

Gary Horne
 Appellant,
  VS.
State of Alabama
 Appellee.

   \*

   \*   Case No. CR-04-2461

   \*

## APPLICATION FOR REHEARING

Comes now the Appellant, Gary Horne, pro-se, and makes this Application to this Alabama Court of Criminal Appeals for a Rehearing of the issues, provided by Rule 40, Ala. R. App. P., and would support said Application with the brief affixed hereto.

## RULE 39 (d)(5) MOTION

Pursuant to Rule 39 (d)(5), Ala. R. App. P., Appellant moves this Honorable Court to accept this statement of facts, in lieu of, the statement of facts encompassed in the opinion of the court; released on August 11, 2006, to wit:

The statement of the facts are the Appellant was convicted of the offense of assault in the second-degree, and acquitted of the offense of attempted murder. John Williams (hereinafter Williams) was shot on the evening in question.

Williams and the Appellant were good friends, and Williams had a son by the Appellant's sister. An eye witness saw Williams with a Glock .40 caliber pistol in his possession on the night of this incident. A confrontation ensued between Williams and the Appellant. The Appellant, in fear for his life believed that Williams would cause serious physical harm, or worse kill him, had he not fought back in self-defense.

During this brief struggle, Williams's pistol discharged, the .40 caliber bullet piercing through his body.

On or about January 2004, John Dassinger testified that he bought a Glock .40 caliber pistol from Williams.

During pre-trial, the appellant made several motions, one of them a motion to preserve evidence (i.e. exculpatory evidence). The Appellant avers that the prosecution lost the exculpatory evidence (i.e., a .40 caliber bullet, shell casing, and crime scene photographs) in which the appellant had vehemently tried to preserve in order that he may protect his substantial rights.

On or about July 13, 2005, the Appellant was sentenced to 22 years in the penitentiary. The Appellant was sentenced pursuant to H.F.O.A. § 13A-5-9, Code of Alabama 1975. The Appellant avers that the State of Alabama failed to notify him of its intent prior to his hearing. The State of Alabama conceded that its written notice was mailed to defense counsel on the day of sentencing and could not have provided timely notice. [See: State's Brief at p.17.]

Date: August 24, 2006

Respectfully Submitted,

Gary Horne #180206
7A-62
Easterling Correctional Facility
200 Wallace Drive
Clio, Alabama 36017

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of August, 2006, I have served a copy of the above and foregoing Application for Rehearing and Rule 39 (d)(5) Motion upon Troy King, Attorney 11 South Union St., Montgomery, Alabama 34130, via U.S. Mail, postage prepaid and properly addressed.

Gary Horne

-1.2-

## STATEMENT REGARDING ORAL ARGUMENT

The Appellant, Gary Hume, submits that he requests oral argument to assist court in evidentiary issues and appointment of counsel to conduct his oral argument due to the fact he is Pro-se, and incarcerated within the Alabama Department of Corrections.

# TABLE OF CONTENTS

PAGES

APPLICATION FOR REHEARING . . . . . . . . . . . . . . . . . . . . . . 1.1

RULE 39(d)(5) MOTION . . . . . . . . . . . . . . . . . . . . . . . . . 1.2


STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE STANDARD OF REVIEW . . . . . . . . . 3

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 5,6,7

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 8

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . 8

# TABLE OF AUTHORITIES

CASES:                                                          PAGES:

Brady v. Maryland, 373 U.S. 83, 10 L.Ed. 2d 215, 83 S.Ct. 1144 (1963) .... 4,5

Giglio v. U.S., 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.
        2d 104 (1972)........................................ 6

U.S. v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.
        2d 481 (1985)........................ 5

OTHERS:

## ALABAMA RULES OF COURT:
Rule 26.6(b)(3)(ii), Ala. R. App. P.............................7
Rule 40(b), Ala. R. App. P.......................... 3
Rule 410(4), Ala. R. Evid.......................... 7

## UNITED STATES CONSTITUTION:
14th Amendment........................ 5

## ALABAMA CONSTITUTION 1901:
Article I, § 6........................ 5

## STATEMENT OF THE CASE

1. On or about May 18, 2005, the Appellant was convicted by a trial by jury of Assault in the second-degree.

2. On or about June 20, 2005, the Appellant filed a Motion for New Trial, or In the Alternative for Judgment notwithstanding the Verdict.

3. On or about July 13, 2005, Appellant was sentenced to 22 years in the penitentiary.

4. On or about November 4, 2005, Appellant filed Brief for Direct Appeal.

5. On or about December 5, 2005, the Appellee filed the Appellee's Brief.

6. On or about December 9, 2005, Appellant filed Reply Brief.

7. On or about August 11, 2006, the Alabama ~~Supreme~~ Court of Criminal Appeals affirmed the decision of the trial court; released by "Memorandum."

8. On or about August 24, 2006, the Appellant filed a Brief and an Application for Rehearing.

# STATEMENT OF THE ISSUES

## ISSUE I.

WHETHER THE CONVICTION OF THE APPELLANT MAY STAND WHERE THE STATE FAILED TO PRODUCE POTENTIALLY EXCULPATORY EVIDENCE GATHERED BY THE STATE?

## ISSUE II.

WHETHER THE APPELLANT WAS ILLEGALLY SENTENCED THROUGH INVOCATION OF THE HABITUAL FELONY OFFENDER ALT?

## STATEMENT OF THE STANDARD OF REVIEW

The standard of review on Application for Re-hearing is whether the Alabama Court of Criminal Appeals overlooked or misapprehended the facts in its review and determination on appeal. [See: Rule 40(b), Ala. R. App. P.]

# SUMMARY OF THE ARGUMENT

The Appellant is convinced that this court overlooked or misapprehended the unambiguous fact that the trial court allowed the State of Alabama to concede to losing material exculpatory evidence in direct violation of the due process clause of the 14th Amendment of the U.S. Constitution and landmark U.S. Supreme Court decision <u>Brady v. Maryland</u>, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

The Appellant would further assert that this court overlooked or misapprehended the fact that the State failed to give notice of intent to use prior convictions against him, in contradiction with clear precedence set by the Alabama Supreme Court.

<u>ARGUMENT</u>

<u>Issue I.</u>

The Appellant's right to due process of the 14th Amendment of the U.S. Constitution and Article I, §6 of the Alabama Constitution 1901 were violated when the prosecution, irrespective of good faith or bad faith, lost material evidence favorable to the Appellant which was relevant and material to either guilt or to punishment. [ See: <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. 2d 215 (1963).]

The record clearly reflects that the prosecution conceded to losing, which effectively suppressed, a .40 caliber bullet, shell casing and photographs, even though Appellant had filed a Motion to Preserve Evidence. Lack of this evidence prejudiced Appellant because had this evidence been available at trial, the outcome of Appellant's trial would have been different. [ See: <u>U.S. v. Bagley</u>, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed. 2d 481 (1985).]

The Appellant was originally charged with attempted murder. Obviously, the jury didn't buy the State's contentions. The jury acquitted the Appellant of the attempted murder charge. The exculpatory evidence lost would have been favorable enough to sustain a plausible claim of self-defense, thus making the

difference between a conviction and an acquittal. [ See: Giglio v. U.S., 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).]

There are three components to a Brady violation. Moreover, there's no need to be repetitive with rote and rhetorical speech because this Honorable Court already knows the applicable law.

This is clear reversible error. It would be a fundamental miscarriage of justice to allow this ruling/judgment to stand without addressing the issues in dispute.

"It is a requirement that cannot be deemed to be satisfied by mere notice and hearing if a State has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony (or lack of) Such a contrivance by a State to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation." [See: Brady, supra.]

It's been well established that the suppression (i.e., losing) by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, regardless of good or bad faith of prosecution. Upon the virtues of these facts, the Appellant would ask that this Court grant this Application for Rehearing.

-6-

ISSUE II.

The Appellant avers that he was not given prior notice of the State of Alabama's intent to enhance his sentence via H.F.D.A. The Appellant's sentencing hearing was July 13, 2005. The record reflects that the notice of intent was postmarked July 13, 2005, so its obvious the Appellant did not receive the prior notice to sentencing. [See: 3d Supp. R. 2, 6.]

The Appellant avers that Rule 26.6(b)(3)(ii), Ala. R. Crim. P. mandates that the defendant <u>shall</u> be given notice of the prior convictions, at a reasonable time <u>prior</u> to the hearing.

Furthermore, the prosecutor stated that defense counsel:
"has known that he had these two prior felonies before the trial even started. As part of our plea discussions, he's well aware of the fact his client had prior convictions and that we intended to use them. If he wanted to investigate them, he's had adequate time to do so."

From this, the trial court determined that the state had met its obligation to give notice of its intent to rely on the H.F.D.A. and of the two convictions it would rely on.

Rule 410(4), Ala. R. Evid., explicitly states:
"any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn."

The Appellant went to trial by jury. The State of Alabama is in violation of the Rules prescribed and promulgated by the Alabama Supreme Court.

Both claims are meritorious. This Application for Rehearing should be granted. In the alternative, this cause should be remanded with instructions for new sentencing.

—7—

## CONCLUSION

The Appellant has brought forth cognizable claims supported with facts and evidence, which substantiates this Honorable Court overlooked or misapprehended the facts with an erroneous conclusion. This cause is due to be reversed and remanded with instructions than an evidentiary hearing be held with appointment of counsel.

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of August, 2006, I have served a copy of the above and foregoing Brief, Rule 39 (d)(5) Motion and Application for Rehearing upon Troy King, Attorney General, 11 South Union St., Montgomery, Alabama 36130, via U.S. Mail, postage prepaid and properly addressed.

Gary Horne

# COURT OF CRIMINAL APPEALS
## STATE OF ALABAMA

Lane W. Mann
Clerk
Gerri Robinson
Assistant Clerk



P. O. Box 301555
Montgomery, AL 36130-1555
(334) 242-4590
Fax (334) 242-4689

September 1, 2006

**CR-04-2461**

Gary Horne v. State of Alabama  (Appeal from Dale  Circuit Court: CC04-122)

## NOTICE

You are hereby notified that on September 1, 2006 the following action was taken in the above referenced cause by the Court of Criminal Appeals:

Application for Rehearing Overruled.

**Lane W. Mann, Clerk**
**Court of Criminal Appeals**

cc: Hon. Mary Bludsworth, Circuit Clerk
    N. Tracy Nickson, Attorney
    Gary Horne, Pro Se
    John M. Porter, Asst. Atty. Gen.

EXHIBIT
G

IN THE ALABAMA SUPREME COURT

85302
Porter

Gary Horne
Petitioner,
    vs.
State of Alabama
Respondent.

*
*
*
*

Case No. CR-04-2461

## PETITION FOR WRIT OF CERTIORARI

Comes now the Petitioner, Gary Horne, pro-se, in the above styled cause of Action; on appeal from the Circuit Court of Dale County to the Alabama Supreme Court; shows the following in support:

On or about August 11, 2006, petitioner's direct appeal was denied by the Circuit Court of Dale County, Alabama. On or about August 24, 2006, petitioner filed an Application for Rehearing and Rule 39 (d)(5) motion to the Alabama Court of Criminal Appeals. On or about September 1, 2006, petitioners Application for Rehearing was overruled.

The Court of Criminal Appeals in its published memo-randum misapprehended the facts of petitioner's case. The Petitioner's Issues are: (I)"whether the conviction of the Appellant may stand where the State failed to produce potentially exculpatory evidence gathered by the State?" And (II)"whether the Appellant was illegally sentenced through invocation of the H.F.O.A.?" [See: Record on File for Exhibits.]

WHEREFORE, for the above reasons, the petitioner prays that this Court will issue this writ.
Date: September 11, 2006

EXHIBIT
tabbies'
H

Respectfully Submitted,
Gary J
Gary Horne #180206
74-C-
62
Easterling Corr. Faci.
200 Wallace Dr.
Clio, AL 36017

## CERTIFICATE OF SERVICE

I hereby certify that Troy King, A.G. has been properly served, postage prepaid and properly addressed by U.S. Mail, at 11 South Union St. Montgomery, Alabama

# IN THE SUPREME COURT OF ALABAMA

*85302*
*Porter*



October 13, 2006

**1051770**

Ex parte Gary Horne.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF
CRIMINAL APPEALS  (In re: Gary Horne v. State of Alabama)   (Dale Circuit Court:
CC04-122; Criminal Appeals : CR-04-2461).

## <u>CERTIFICATE OF JUDGMENT</u>

### <u>Writ Denied</u>

  The above cause having been duly submitted, IT IS CONSIDERED AND
ORDERED that the petition for writ of certiorari is denied.

  WOODALL, J. -  Nabers, C.J., and Lyons, Smith, and Parker, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appear(s) of record in said
Court.
Witness my hand this 13th day of  October,   2006



Clerk, Supreme Court of Alabama

<div style="border:2px solid black; display:inline-block; padding:4px;">

**EXHIBIT**

I
</div>

/bb